IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **SHARON BOOKER, as Executrix of the Estate of Corey Donegan and as Next Friend of J.D., C.D. and C.T, minor children and surviving heirs of Corey Donegan,**<br><br>         **Plaintiff,**<br><br>**v.**<br><br>**Tiffiny D. Anderson, Timothy J. Lattimore, Charles J. Lister, Junior L. Stephens, Samuel G. Woolwine and Edward Parks, individually,**<br><br>         **Defendants.** | **CIVIL ACTION FILE NO.**<br><br>_____ |

## <u>COMPLAINT</u>

**COMES NOW**, Plaintiff **Sharon Booker**, as Executrix of the Estate of Corey

Donegan and as Next Friend of J.D., C.D. and C.T., minor children and surviving

hairs of Corey Donegan ("Plaintiff") and files this civil rights action against **Tiffiny**

**D. Anderson**, **Timothy J. Lattimore**, **Charles J. Lister**, **Junior L. Stephens**, **Samuel**

**G. Woolwine** and **Edward Parks**, as follows:

## PRELIMINARY STATEMENT

This case is related to Case No. 1:17-cv-02046-LLM, a closed case that was dismissed without prejudice on January 18, 2018.  In that case, Plaintiff's former attorney sued several government officials, in their official and individual capacities, and alleged that they were responsible for the death of Corey Donegan.[1] Prior to entry of the voluntary dismissal without prejudice, the Court entered an Order dismissing, with prejudice, any claims Plaintiff might have had under Federal and State law against DeKalb County, Georgia and the City of Lithonia. The Court did not dismiss any other claims or parties, with prejudice, during the pendency of the original suit.[2] In this case, Plaintiff names three Defendants who were not parties to the prior lawsuit: Tiffiny D. Anderson, Timothy J. Lattimore and Samuel G. Woolwine.  Plaintiff also names three defendants who were also defendants in the first case: Charles J. Lister (previously named as Officer J. Lister),

---

[1] Plaintiff sued Michael Thurmond, DeKalb Chief Executive Officer, Jeffery L. Mann, DeKalb County Sheriff, William O'Brien, DeKalb Police Chief, Officer Justtus, Officer D. Brown, Officer J. Lister, Officer J. Stephens, Sergeant Ferna, Detective Harris and Lithonia Police Officer Parks.

[2] The Court dismissed Plaintiff's state law wrongful death claim without prejudice. The Court entered an Order dismissing, without prejudice, Plaintiff's Complaint as to Defendant Stephens, for failure to serve and want of prosecution. The Court granted Defendants Motion for More Definite Statement but the action was voluntarily dismissed before the Court ruled on the Defendant's renewed Motion to Dismiss.

Edward Parks (previously named as Lithonia Police Officer Parks and Junior L. Stephens (previously named as Officer J. Stephens).

Plaintiff's pre-suit investigation was constrained by the DeKalb County District Attorneys office's open investigation into the death of Corey Donegan. As permitted by the Open Records Act, the DeKalb County Police Department has withheld documents from disclosure until the investigation is completed. As the statute of limitations for Plaintiff's claims runs on September 13, 2018, the undersigned files this lawsuit based on the facts presently known to the Plaintiff and will separately request that the Court authorize the immediate issuance of a subpoena to secure any documents withheld from production pending the outcome of the District Attorneys' investigation.

## INTRODUCTION

1. This is a civil rights case arising from the death of Corey Donegan on October 8, 2016. Donegan died as a result of injuries he suffered during an encounter with the Defendants, all sworn law enforcement officers, on September 13, 2016. At the time of the encounter, Donegan, who was unarmed and displaying signs of mental illness and drug intoxication, fled from Defendant Tiffiny Anderson when she tried to question him about his strange behavior. When

she later found him banging on a door of a nearby home, he fled again, and Anderson fired her Taser gun to stop him. The Taser prongs struck Donegan in the back as he ran away, causing him to fall face-first on a hard surface. The other Defendants arrived to find Donegan lying face down on the ground holding his injured right wrist with his left hand. As Donegan lay face down and defenseless, Anderson repeatedly discharged her Taser. As six officers worked to handcuff Donegan, Defendant Lattimore also deployed his stun gun multiple times. Donegan left the scene in an ambulance with a severe brain injury and severe metabolic acidosis that ultimately led to his demise.

2.     Plaintiff alleges that the Defendants violated Donegan's Fourth Amendment rights and Georgia law on September 13, 2016. Anderson used excessive force by using a Taser to stop Donegan, a non-violent, unarmed person, who was not a threat to anyone. Anderson and Lattimore used excessive force by repeatedly tasing Donegan while other officers handcuffed him. The remaining Defendants failed to intervene to protect Donegan from Anderson and Lattimore's use of excessive force.  Plaintiff also alleges a State law claims of Assault and Battery against Anderson and Lattimore and a Wrongful Death claim on behalf of Donegan's hairs against all Defendants.  Plaintiff alleges that

the Defendants are jointly and severally liable for Donegan's injuries and death, and seek recovery of economic, compensatory, "value of the life" and punitive damages.

## JURISDICTION AND VENUE

3.  This Court has original jurisdiction over Plaintiffs' federal civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §§ 1367.

4.  Pursuant to 28 U.S.C. § 1391 venue is proper in this District and Division as at least one of the Defendants resides therein and the cause of action arose therein.

## PARTIES

5.  Sharon Booker is a citizen of the State of Georgia and subject to the jurisdiction of this Court.

6.  As the duly appointed Executrix of the Estate of Corey Donegan, Ms. Booker seeks recovery of medical expenses, funeral and burial expenses and Mr. Donegan's pain and suffering prior to his death. See O.C.G.A. § 51-4-5(b).

7.  At the time of his death, Mr. Donegan had three children, J.D. (11 years old), C.D. (10 years old) and C.T. (5 years old), who are his surviving heirs entitled

to recover damages, including without limitation, for the full value of his life. See O.C.G.A. § 51-4-2. Ms. Booker sues on behalf of J.D., C.D. and C.T. as their Next Friend. See Fed. R. Civ. Pro. 17(c)(2),

8.  Upon information and belief, Defendant Tiffiny D. Anderson is a resident of DeKalb County, Georgia.  She is subject to venue and jurisdiction in this Court.  Ms. Anderson may be served with summons and a copy of this Complaint at the DeKalb County Police Department, 1960 West Exchange Place, Tucker, Georgia 30084.

9.  Upon information and belief, Timothy J. Lattimore is a resident of DeKalb County, Georgia.  He is subject to venue and jurisdiction in this Court.  Mr. Lattimore may be served with summons and a copy of this Complaint at the DeKalb County Police Department, 1960 West Exchange Place, Tucker, Georgia 30084.

10. Upon information and belief, Charles J. Lister is a resident of DeKalb County, Georgia.  He is subject to venue and jurisdiction in this Court.  Mr. Lister may be served with summons and a copy of this Complaint at the DeKalb County Police Department, 1960 West Exchange Place, Tucker, Georgia 30084.

11. Upon  information  and  belief,  Junior  L.  Stephens  is  a  resident  of  DeKalb

County, Georgia.  He is subject to venue and jurisdiction in this Court.
Stephens may be served with summons and a copy of this Complaint at the
DeKalb County Police Department, 1960 West Exchange Place, Tucker,
Georgia 30084.

12.    Upon information and belief, Samuel G. Woolwine is a resident of DeKalb
County, Georgia.  He is subject to venue and jurisdiction in this Court.
Woolwine may be served with summons and a copy of this Complaint at the
DeKalb County Police Department, 1960 West Exchange Place, Tucker,
Georgia 30084.

13.    Upon information and belief, Edward Parks, is a resident of DeKalb County,
Georgia.  He/she is subject to venue and jurisdiction in this Court.  Edward
Parks has waived formal service and will be served through his counsel of
record in the prior litigation.

## FACTUAL ALLEGATIONS

14.    At approximately 10:20 on September 12, 2016, a man called 9-1-1 in
DeKalb county to report that a man was running around in the street near
the intersection of Philips Road and Philips Lake Way.

15.    Ten minutes later, another man called 9-1-1 to report a "dude walking

around, like straggling around and he looks kind of funny." The person

had kicked off his shoes and was walking in circles at the intersection.

16.   Both callers also reported hearing a gunshot but neither reported that the

man in the street had fired the gunshot.

17.   The callers did not report that the man had committed a crime.

18.   The man the callers saw was Corey Donegan.

19.   Donegan had a gun shot wound in his right hand near his wrist.

20.   Donegan suffered from a kidney disease and may have been under the

influence of cocaine, conditions that made him susceptible to developing

acute metabolic acidosis.

21.   Donegan also suffered from diagnosed mental illness.

22.   Defendant Anderson was dispatched to the scene.

23.   Anderson arrived on scene at approximately 10:36 p.m. and found

Donegan walking on the road into oncoming traffic. He appeared

disoriented.

24.   Anderson ordered Donegan to stop and put his hands in the air.

25.   Donegan raised his arms but kept his elbows close to his body.

26.   Anderson observed what appeared to be a firearm under his armpit.

27.    Anderson drew her firearm and ordered Donegan to drop the weapon.

28.    Donegan complied with Anderson's commands and slowly placed the weapon on the ground.

29.    Donegan did not physically or verbally threaten Anderson.

30.    Donegan did not walk or run towards Anderson.

31.    Donegan was not loud or belligerent towards Anderson.

32.    Donegan did not commit a serious crime in Anderson's presence.

33.    Donegan fled on foot into oncoming traffic.

34.    Upon information and belief, Anderson pursued Donegan on foot.

35.    At approximately 10:41 p.m., Sylverine Peacock called 9-1-1 to report that a man was banging on her front door. Ms. Peacock was calling from her home at 6316 Laurel Post Drive in Lithonia.

36.    Ms. Peacock told the 9-1-1 operator she did not know the man who was banging on her door.

37.    Donegan was banging on Ms. Peacock's door.

38.    Donegan did not damage the door or any other part of Ms. Peacock's property.

39.    Donegan was standing on a raised portico at the front entrance to Ms.

Peacock's home.

40.     Ms. Peacock's residence has a concrete walkway leading up to her front door and a concrete driveway.

41.     Laurel Post Drive is a paved asphalt road.

42.     Upon information and belief, Anderson arrived at Ms. Peacock's residence and saw Mr. Donegan banging on the front door.

43.     Anderson observed that Mr. Donegan had not damaged the door.

44.     When Donegan saw Anderson approaching, he turned to flee.

45.     Anderson knew Donegan was unarmed because he had obeyed her command to drop his weapon during their first encounter.

46.     Anderson had no probable cause to believe that Donegan had committed a felony or crime of violence.

47.     When Anderson encountered him at Ms. Peacock's house, Donegan was not hostile or belligerent towards Anderson.

48.     He never attempted to approach Anderson.

49.     Anderson had no objectively reasonable basis to believe that Donegan presented an immediate threat to her safety or that of anyone else.

50.     Donegan turned away from Anderson and attempted to flee.

51.    Anderson knew that Donegan was on a raised portico made of concrete and the walkway below was also concrete, significantly increasing the danger that he would suffer a serious injury when he lost control of his muscle function because of the electric shock from the Taser.

52.    Anderson knew that the manufacturer of her Taser specifically warned of secondary injuries, including impact injuries to the head, due to a fall or other uncontrolled movements.

53.    Anderson knew that due to the risk of secondary injuries, the manufacturer recommended that users avoid deploying a Taser on a person who is running, in motion or moving under momentum.

54.    Anderson knew that her Taser gun was designed to fire two probes connected to the Taser gun by high-voltage insulated wire.

55.    Anderson knew that when the probes hit Donegan, the Taser gun would transmit electrical pulses along the wires and into his body, causing significant, uncontrollable muscle contractions capable of incapacitating him.

56.    Anderson knew that the pulses are five seconds in duration but that they would last longer if she held the trigger down.

57.    Anderson fired her Taser at Donegan.

58.    The prongs struck Donegan in the back.

59.    Donegan lost control of his muscle function and fell face first onto the pavement. He could not break his fall and the right side of his head struck the pavement.

60.    A reasonable officer in Anderson's position would have known that deploying her Taser to stop an unarmed fleeing subject, who had not committed a serious crime and did not present an imminent threat of harm, was objectively unreasonable and disproportionate to the need for force necessary to stop Donegan from running away, particularly given the risk that he would suffer a serious injury.

61.    After hitting his head on the ground, Donegan was lying face-first, holding his right wrist with his left hand.

62.    He did not attempt to get up and run away.

63.    He did not attempt to get up and confront Anderson in a threatening manner.

64.    He did not disobey any commands.

65.    Anderson knew that back up had been called and was on the way to the

scene so she did not attempt to handcuff Donegan.

66.     Anderson deployed her Taser again for the sole purpose of inflicting pain on Donegan, who was no longer fleeing presented no threat to Anderson or anyone else.

67.     Tasing Donegan while he was lying prone on the ground was objectively unreasonable and disproportionate to the need for force necessary to take Donegan into custody.

68.     Defendant Junior L. Stephens arrived on the scene.

69.     Defendant Edward Parks arrived on the scene.

70.     When Stephens arrived on scene, he observed Anderson with her Taser out and Donegan on the ground.

71.     Stephens did not observe Donegan acting belligerently or combatively with Anderson.

72.     Stephens attempted to handcuff Donegan but was unable to do so because Donegan put his hands over his wrists.

73.     Defendant Timothy J. Lattimore arrived on the scene.

74.     Defendant Charles J. Lister arrived on the scene.

75.     Defendant Samuel G. Woolwine arrived on the scene.

76.    Six officers were on the scene to arrest Donegan, who had been tased at least two times, had a gunshot wound in his right hand and was lying face first on the ground.

77.    Stephens was able to get one of Donegan's arms free. Stephens placed a handcuff on Donegan's arm.

78.    Stephens and Parks freed Donegan's other arm and handcuffed him.

79.    Donegan did not violently resist the officers' efforts to handcuff him.

80.    Donegan was holding his hands together because of the gunshot wound to his right hand.

81.    With six officers on the scene working to free Donegan's hands, no objectively reasonable basis existed for using a Taser to inflict more pain on Donegan.

82.    As Stephens and Parks handcuffed Donegan, Lattimore deployed his Taser in "dry stun" mode at least two times for the sole purpose of inflicting pain on Donegan.

83.    Deploying his Taser in "dry stun mode" was objectively unreasonable and disproportionate to the need for force necessary to handcuff Donegan.

84.    Stephens, Lister, Woolwine and Parks knew that the circumstances did not

warrant the use of a Taser by either Anderson or Lattimore.

85.    Stephens, Lister, Woolwine and Parks failed to intervene to prevent Anderson from using objectively unreasonable and disproportionate force by tasing Donegan when he was on the ground.

86.    Stephens, Lister, Woolwine and Parks failed to intervene to stop Lattimore from using objectively unreasonable and disproportionate force by tasing Donegan as the other officers handcuffed him.

87.    Donegan was transported by ambulance to Grady Memorial Hospital.

88.    On the way to Grady, Donegan decompensated and was intubated with a Glasgow Coma Scale score of 3.

89.    The Glasgow Coma Scale is used to measure the severity of a brain injury. A score of 8 or less indicates a severe brain injury.

90.    Upon admission at Grady, Donegan presented with a hematoma along the right parietal scalp. A CT scan that revealed a right cerebral convexity subarachnoid hemorrhage with extension into the interpeduncular cistern.

91.    Donegan was also suffering from severe metabolic acidosis.

92.    Donegan remained in intensive care at Grady until October 7, 2016 when doctors determined that his injury was too severe and neurosurgical

intervention was deemed futile.

93.    Donegan died on October 8, 2016.

94.    Repeated or prolonged exposure to the electric shock produced by a Taser gun may trigger acute metabolic acidosis, especially in individuals who are under the influence of drugs or suffer from a preexisting kidney condition.

95.    Upon information and a good faith reliance on the medical evidence, Anderson triggered her Taser multiple times while Donegan was on the ground and/or held the trigger down for more than 5 seconds when she tased Donegan.[3]

96.    Upon information and a good faith reliance on the medical evidence, Lattimore triggered his Taser in "dry stun" mode multiple times while Donegan was on the ground and/or held the trigger down for more than 5 seconds when he tased Donegan.[4]

97.    As a direct and proximate cause of Anderson's use of her Taser to stop Donegan from fleeing the scene and/or Anderson and Lattimore's

---

[3] The electronic log for Anderson's Taser is presently unavailable to the undersigned due to the DeKalb County District Attorneys Office's open investigation.
[4] The electronic log for Lattimore's Taser is presently unavailable to the undersigned due to the DeKalb County District Attorney's Office's open investigation.

repeated use of a Taser after Donegan was on the ground, Donegan developed a catastrophic traumatic subarachnoid hemorrhage and severe metabolic acidosis that ultimately caused his demise.

98.  As a direct and proximate cause of the Stephens, Lister, Woolwine and Parks' failure to intervene to prevent Anderson and Lattimore from repeatedly tasing Donegan, Donegan developed a catastrophic traumatic subarachnoid hemorrhage and severe metabolic acidosis that ultimately caused his demise.

99.  As a direct and proximate cause of Anderson and Lattimore's repeated tasing of Donegan, he experienced conscious pain and suffering each time they pulled the trigger and from the injuries that ultimately caused his demise.

## COUNT I
## EXCESSIVE FORCE
(Defendant Tiffiny Anderson)
(4th Amendment & 42 U.S.C. § 1983)

100.  Plaintiff re-alleges the allegations contained in paragraphs 1-99 above as if fully restated herein.

101.  At all times relevant to this action, Defendant Tiffiny Anderson was acting

under color of state law and in her discretionary capacity as a DeKalb County police officer.

102.    Defendant Tiffiny Anderson violated the Fourth Amendment of the United States Constitution by using objectively unreasonable and disproportionate force to prevent Donegan, who was unarmed and did not present a threat to anyone, from fleeing the scene.

103.    Defendant Tiffiny Anderson violated the Fourth Amendment of the United States Constitution by using objectively unreasonable and disproportionate force against Donegan when she repeatedly tased him after he was on the ground and did not present a threat to anyone.

104.    At all times relevant to this action, a reasonable officer in Anderson's position would have known that her actions violated clearly established law under the Fourth Amendment to the United States Constitution.

105.    The Estate of Corey Donegan is entitled to recover economic and compensatory damages for the constitutional deprivations Donegan suffered, including his medical expenses, funeral and burial expenses and conscious pain and suffering in amounts to be determined by the enlightened conscience of the jury.

106.    Donegan's heirs are entitled to recover damages for the full value of the life of Corey Donegan in an amount to be determined by the enlightened conscience of the jury.

107.    Anderson acted intentionally, willfully, maliciously and oppressively, thereby entitling Plaintiff to an award of aggravated, exemplary and punitive damages in an amount to be determined by the enlightened conscience of the jury.

## COUNT II
## EXCESSIVE FORCE
(Defendant Timothy J. Lattimore)
(4th Amendment & 42 U.S.C. § 1983)

108.    Plaintiff re-alleges the allegations contained in paragraphs 1-107 above as if fully restated herein.

109.    At all times relevant to this action, Defendant Timothy J. Lattimore was acting under color of state law and in his discretionary capacity as a DeKalb County police officer.

110.    Defendant Timothy J. Lattimore violated the Fourth Amendment of the United States Constitution by using objectively unreasonable and disproportionate force on Donegan by repeatedly tasing him in "drive

stun" mode when he was lying on the ground holding his arms.

111. At all times relevant to this action, a reasonable officer in Lattimore's position would have known that his actions violated clearly established law under the Fourth Amendment to the United States Constitution.

112. The Estate of Corey Donegan is entitled to recover economic and compensatory damages for the constitutional deprivations Donegan suffered, including his medical expenses, funeral an burial expenses and conscious pain and suffering in amounts to be determined by the enlightened conscience of the jury.

113. Donegan's heirs are entitled to recover damages for the full value of the life of Corey Donegan in an amount to be determined by the enlightened conscience of the jury.

114. Lattimore acted intentionally, willfully, maliciously and oppressively, thereby entitling Plaintiff to an award of aggravated, exemplary and punitive damages in an amount to be determined by the enlightened conscience of the jury.

<u>**COUNT III**</u>
<u>**EXCESSIVE FORCE – FAILURE TO INTERVENE**</u>
(Defendants Charles J. Lister, Junior L. Stephens,
Samuel G. Woolwine and Edward Parks)
(4th Amendment & 42 U.S.C. § 1983)

115.   Plaintiff re-alleges the allegations contained in paragraphs 1-114 above as if fully restated herein.

116.   Acting under color and authority of state law, Defendant Charles J. Lister, Junior L. Stephens, Samuel G. Woolwine and Edward Parks violated the Fourth Amendment of the United States Constitution when they failed to intervene to protect Donegan from Defendant Anderson and Defendant Lattimore's objectively unreasonable and disproportionate use of force.

117.   At all times relevant to this action, a reasonable officer in Lister, Stephens, Woolwine and Parks' position would have known that their actions violated clearly established law under the Fourth Amendment to the United States Constitution.

118.   The Estate of Corey Donegan is entitled to recover economic and compensatory damages for the constitutional deprivations Donegan suffered, including his medical expenses, funeral and burial expenses and conscious pain and suffering in amounts to be determined by the

enlightened conscience of the jury.

119.  Donegan's heirs are entitled to recover damages for the full value of the life of Corey Donegan in an amount to be determined by the enlightened conscience of the jury.

120.  Lister, Stephens, Woolwine and Parks acted intentionally, willfully, maliciously and oppressively, thereby entitling Plaintiff to an award of aggravated, exemplary and punitive damages in an amount to be determined by the enlightened conscience of the jury.

## COUNT IV – WRONGFUL DEATH
### (All Defendants)
### (O.C.G.A. § 51-4-2 & 51-4-5(b))

121.  Plaintiffs re-allege the allegations contained in paragraphs 1-120 as if fully restated herein.

122.  As a direct and proximate cause of the wrongful acts of the Defendants, Donegan suffered catastrophic injuries that led to his death on October 8, 2016.

123.  The Estate of Corey Donegan is entitled to recover economic and compensatory damages for the constitutional deprivations Donegan suffered, including his medical expenses, funeral and burial expenses and

conscious pain and suffering in amounts to be determined by the enlightened conscience of the jury.

124. Donegan's heirs are entitled to recover damages for the full value of the life of Corey Donegan in an amount to be determined by the enlightened conscience of the jury.

125. The Defendants acted intentionally, willfully, maliciously and oppressively, thereby entitling Plaintiff to an award of aggravated, exemplary and punitive damages in an amount to be determined by the enlightened conscience of the jury.

## **ASSAULT & BATTERY**
ANDERSON AND LATTIMORE
(O.C.G.A. § 51-1-13 & 51-1-14)

126. Plaintiffs re-allege the allegations contained in paragraphs 1-125 as if fully restated herein.

127. At all time relevant to this action, the individual Defendants were acting under color of state law and within the scope of their employment with the DeKalb County Police Department.

128. Anderson and Lattimore were engaged in the performance of

discretionary duties during the incident with Donegan.

129. The acts of Anderson and Lattimore as set forth more specifically herein constitute an Assault and Battery against Donegan and were committed with actual malice and/or intent to injure Donegan.

130. As a direct and proximate cause of Anderson and Lattimore's acts, Donegan suffered catastrophic injuries resulting in his death.

131. The Estate of Corey Donegan is entitled to recover economic and compensatory damages, including his medical expenses, funeral and burial expenses and conscious pain and suffering in amounts to be determined by the enlightened conscience of the jury.

132. Donegan's heirs are entitled to recover damages for the full value of the life of Corey Donegan in an amount to be determined by the enlightened conscience of the jury.

133. Anderson and Lattimore acted with actual malice and the intent to injure Donegan, thereby entitling the Plaintiff to an award of aggravated, exemplary and punitive damages in an amount to be determined by the enlightened conscience of the jury.

**WHEREFORE**, the Plaintiffs respectfully request the following relief:

A)      That a trial by jury be had on all issues wherein a jury trial is

permitted under law;

B)      That attorney's fees and expenses of litigation be awarded as

authorized under 42 U.S.C. §1988;

C)      That prejudgment interest be awarded; and

D)      That the Court award such other equitable or monetary relief as the

Court deems just and proper.

Respectfully submitted this 11th day of September, 2018.

_/s/William Atkins_
WILLIAM J. ATKINS
Georgia Bar No. 027060
KEITH L. LINDSAY
Georgia Bar No. 452995
***Attorneys for Plaintiffs***

**EDMOND, LINDSAY & ATKINS, LLC**
344 Woodward Ave SE
Atlanta, Georgia 30312
T: 404 525-1080
F: 404 525-1073
klindsay@edmondfirm.com
batkins@edmondfirm.com