IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| Sharon Booker as Executrix of the Estate of Corey Donegan and as Next Friend of J.D., C.D., and C.T, minor children and surviving heirs of Corey Donegan, | CIVIL ACTION FILE NO. 1:18-CV-04297-LMM |
| Plaintiff, | |
| v. | |
| Tiffiny D. Anderson; Timothy J. Lattimore; Charles J. Lister; Junior L. Stephens; Samuel G. Woolwine; and Edward Parks, individually, | |
| Defendants. | |

## DEFENDANTS ANDERSON, LATTIMORE, LISTER, AND WOOLWINE'S STATEMENT OF MATERIAL FACTS

COME NOW Defendants Tiffany D. Anderson, Timothy Lattimore, Charles J. Lister, Jr., and Samuel G. Woolwine and, pursuant to LR 56.1(B)(1), submit these material facts to which these Defendants contend there is no genuine issue to be tried and show this Honorable Court as follows:

1.

At the time of his death, Corey Donegan was married to Victoria Donegan. (Exhibit 8, Plaintiff's Responses to Defendants' First Interrogatories and Request to Produce to Plaintiff, Response to Interrogatory No. 8; Exhibit 9, certified copy of Order Admitting Will to Probate).

2.

Officer Tiffiny Anderson is a DeKalb County Police Officer. (Declaration of Tiffiny Anderson, ¶ 2).

3.

Officer Timothy Lattimore is a DeKalb County Police Officer. (Declaration of Timothy Lattimore, ¶ 2).

4.

Officer Charles Lister is a DeKalb County Police Officer. (Declaration of Charles Lister, ¶ 2).

5.

Officer Samuel Woolwine is a DeKalb County Police Officer. (Declaration of Samuel Woolwine, ¶ 2).

6.

In 2016, the DeKalb County Police Department issued TASER X26P Conducted Energy Weapons (CEW) to its police officers, who are certified to carry

these weapons. (Anderson Dec., ¶ 2; Lattimore Dec., ¶ 2; Lister Dec., ¶ 2; Woolwine Dec., ¶ 2; Exhibit 5, Declaration of S. Berman, ¶ 12).

## THE SUBJECT INCIDENT

### 7.

On September 12, 2016, at approximately 10:30 p.m., Officer Anderson was dispatched to the intersection of Phillips Road and Phillips Lake Way in reference to a "shots fired" call. (Anderson Dec., ¶ 4).

### 8.

Dispatch advised that the caller saw a black male in a white tank top and blue jeans take off his shoes and start walking in circles in the intersection. (Anderson Dec., ¶ 4)

### 9.

Officers Lattimore, Lister, and Woolwine heard the dispatch and headed to the area to serve as back-up for Officer Anderson. (Lattimore Dec., ¶ 4; Lister Dec., ¶ 4; Woolwine Dec., ¶ 4).

### 10.

Upon Officer Anderson's arrival at the intersection, she made contact with a male wearing a blood-smeared tank top and blue jeans who seemed to be slightly disoriented, and he began to walk into the roadway toward oncoming traffic. (Anderson Dec., ¶ 5).

11.

Officer Anderson commanded the man to stop, and when he put his hands in the air and raised his arms slightly, keeping his elbows close to his body, she observed that he had a firearm under his armpit. (Anderson Dec., ¶ 5).

12.

Officer Anderson drew her firearm and commanded the several times to drop the weapon, but he did not comply. (Anderson Dec., ¶ 5).

13.

The man then turned away from Officer Anderson slightly and slowly placed his weapon on the ground. (Anderson Dec., ¶ 5).

14.

At this point, she holstered her firearm and drew her Taser. (Anderson Dec., ¶ 5).

15.

The subject then ran off, fleeing on foot, with Officer Anderson in pursuit. (Anderson Dec., ¶ 6).

16.

The subject kept running into traffic, Anderson flagged down cars with her flashlight to keep them from running him over. (Anderson Dec., ¶ 6).

17.

The subject then turned into a neighborhood and headed down Laurel Post Drive. (Anderson Dec., ¶ 6).

18.

The subject stopped at 6316 Laurel Post Drive and attempted to break into the residence by banging against the door with his right shoulder with his right hand on the doorknob, trying to open the door and push into the house. (Anderson Dec., ¶ 6).

19.

The owner of 6316 Laurel Post Drive and her daughter called 911 to report the attempted break-in, advising that they did not know the suspect nor were they expecting anyone. (Anderson Dec., ¶ 14).

20.

When Officer Anderson approached the subject at the residence at 6316 Laurel Post Drive, she commanded him, "Get down!" (Anderson Dec., ¶ 7).

21.

As the subject left the front porch and started to run across the yard, Officer Anderson saw a woman a couple of houses down walk toward her car, and she was concerned about the woman's safety. (Anderson Dec., ¶ 7).

22.

As the subject attempted to run away again, Officer Anderson told him to stop running or he would be Tased. (Anderson Dec., ¶ 7).

23.

He did not stop, so Officer Anderson yelled, "Taser! Taser!" (Anderson Dec., ¶ 7).

24.

As Officer Anderson did not want the subject to hurt himself or anyone else, she then deployed her Taser, making contact with each of the suspect's triceps. (Anderson Dec., ¶ 7).

25.

The subject fell on his side to the ground on the grassy lawn. (Anderson Dec., ¶ 7).

26.

Officer Anderson directed the subject to stay down and put his hands behind his back, but he still did not comply with Officer Anderson's instructions and resisted arrest.  (Anderson Dec., ¶ 8).

27.

The subject attempted to get back up, so Officer Anderson gave him a second charge with her Taser. (Anderson Dec., ¶ 8).

28.

At this point, Officer Anderson was the only officer on the scene. (Anderson Dec., ¶ 8).

29.

DeKalb County officer J.L. Stephens and a City of Lithonia police officer then arrived on the scene. (Anderson Dec., ¶ 9; Affidavit of Edward Parks, ¶¶ 3, 4).

30.

Officer Stephens and Officer Anderson tried to hand-cuff the subject, but they were unable to do so. (Anderson Dec., ¶ 9).

31.

When Officer Lister arrived on the scene, Officer Anderson already had deployed her Taser; he did not see her do it. (Lister Dec., ¶ 5).

32.

Upon his arrival, Officer Lister observed the subject and Officers Anderson and Stephens on the ground in the front yard. (Lister Dec., ¶ 5).

33.

The officers were attempting to put the subject into custody and Officer Anderson had the suspect at Taser point. (Lister Dec., ¶ 5).

34.

When Officer Lattimore arrived at 6316 Post Laurel Drive at approximately 10:45 p.m., he observed the subject and Officers Anderson, Lister and Stephens in the front yard attempting to put the subject into custody. (Lattimore Dec., ¶ 5).

35.

When Officer Lattimore arrived on the scene, Officer Anderson already had deployed her Taser; he did not see her do it. (Lattimore Dec., ¶ 13).

36.

Once DeKalb County officers T. Lattimore and J. Lister arrived, Stephens, Lattimore, Lister and Anderson attempted to get Mr. Donegan into custody, but the subject continued to resist and be combative. (Anderson Dec., ¶ 9; Lister Dec., ¶ 6).

37.

The subject continued to resist, and he refused to move his hands from under his body, so Officer Lattimore drive stunned him with his Taser; however, the subject continued to resist. (Anderson Dec., ¶ 10; Lattimore Dec., ¶ 5; Lister Dec., ¶ 6).

38.

During the struggle, the subject bit Officer Lister as he was trying to place the subject's arm behind his back, causing a laceration on Lister's right hand. (Anderson Dec., ¶ 11; Lister Dec., ¶ 7; Lattimore Dec., ¶ 6).

39.

At this point, Officer Anderson holstered her Taser and helped hold the subject in place so he could not bite anyone else. (Anderson Dec., ¶ 11).

40.

Soon after that, the other officers were able to hand-cuff him, but he continued to act in a belligerent manner. (Anderson Dec., ¶ 11; Lister Dec., ¶ 8; Lattimore Dec., ¶ 7).

41.

Once the subject was cuffed, Officer Anderson called EMS to the scene. (Anderson Dec., ¶ 12; Lister Dec., ¶ 9; Lattimore Dec., ¶ 8).

42.

After he was cuffed, the subject told the officers that he had a gunshot wound to his wrist. (Lister Dec., ¶ 9).

43.

On his way to the scene, Officer Samuel Woolwine stopped at approximately 10:46 p.m. at the intersection of Phillips Road and Phillips Lake

Way to secure Officer Anderson's police unit that remained at the intersection after she pursued the subject on foot. (Woolwine Dec., ¶ 5).

44.

While securing her vehicle, Officer Woolwine noticed a silver and black handgun in the grass near Phillips Road that he secured. (Woolwine Dec., ¶ 5). Officer Woolwine also retrieved a pair of brown boots lying in the middle of the road. (Id.) He turned the boots and gun over to Officer Anderson. (Id.)

45.

When Officer Woolwine arrived at 6316 Post Laurel Drive, the subject now known to be Corey Donegan was in hand-cuffs. (Woolwine Dec., ¶ 6).

46.

Officer Woolwine did not see any officer use a Taser on Mr. Donegan. (Woolwine Dec., ¶ 11).

47.

American Medical Response (AMR) of Georgia responded to the scene. (Anderson Dec., ¶ 13; Lattimore Dec., ¶ 9; Lister Dec., ¶ 10; Exhibit 11, AMR Patient Care Report, p. 1).

48.

While the officers were attempting to get Mr. Donegan on a stretcher, he attempted to bite Officer Lattimore but did not make contact. (Anderson Dec., ¶13; Lattimore Dec., ¶ 9; Exh. 11, p. 11).

49.

The subject continued to struggle, and he kept jumping up off the stretcher. (Anderson Dec., ¶ 13; Lattimore Dec., ¶ 9; Lister Dec., ¶ 10; Woolwine Dec., ¶ 7; Exh. 8; Declaration of Edward Parks, ¶ 7).

50.

Once the subject was strapped to the stretcher and inside the ambulance, he continued being very combative. (Anderson Dec., ¶ 14; Lattimore Dec., ¶ 10; Woolwine Dec., ¶ 8, Exh. 8; Parks Dec., ¶7).

51.

The EMS personnel left the scene with the subject in the ambulance and took him to Grady Memorial Hospital. (Anderson Dec., ¶ 15; Exh. 11, p. 1; Lattimore Dec., ¶ 12; Lister Dec., ¶ 12; Woolwine Dec., ¶ 10).

52.

On September 12, 2016, Officer Anderson deployed her Taser against the subject two times, eighteen seconds apart. (Anderson Dec., ¶ 16).

53.

When Officer Anderson deployed her Taser, the subject was a threat to public safety, he had not been restrained, and she was the only officer on the scene. (Anderson Dec., ¶ 16).

54.

Other than deploying her Taser twice and using her hands to try to hold him still, Officer Anderson did not use any other force on the subject, now known to be Corey Donegan. (Anderson Dec., ¶ 17).

55.

Other than deploying his Taser twice in the drive stun mode to gain compliance and using his hands to try to pull the subject's arms from under his body, Officer Lattimore did not use any other force on the subject, now known to be Corey Donegan. (Lattimore Dec., ¶ 13).

56.

No officer on the scene kicked, struck, punch, or otherwise assaulted or battered Mr. Donegan. (Anderson Dec., ¶ 17; Lattimore Dec., ¶ 13; Lister Dec., ¶ 13; Woolwine Dec., ¶ 12; Parks Dec., ¶ 8).

57.

The officers on the scene used only that amount of force that was reasonably necessary under the circumstances to restrain Mr. Donegan so that he no longer

posed a threat to himself or others and so the EMS personnel could transport him safely to the hospital. (Anderson Dec., ¶ 17; Lattimore Dec., ¶ 13; Lister Dec., ¶ 13; Woolwine Dec., ¶ 12; Parks Dec., ¶ 8).

58.

The only injuries that Officer Anderson observed on Mr. Donegan were scrape marks on one of his arms and an injury to his hand, and, as Plaintiff acknowledges, he had these injuries before she made any contact with him. (Anderson Dec., ¶ 18; Compl., ¶ 19).

59.

The only injury that Officer Lister, Officer Lattimore, and Officer Woolwine observed was the injury to the subject's hand. (Lattimore Dec., ¶ 11; Lister Dec., ¶ 11; Woolwine Dec., ¶ 9).

60.

While he was at the scene, Mr. Donegan was awake. (Anderson Dec., ¶ 18; Lattimore Dec., ¶ 11; Lister Dec., ¶ 11; Woolwine Dec., ¶ 9).

61.

However, he seemed unable to comprehend what was going on. (Anderson Dec., ¶ 18).

62.

When Donegan arrived at Grady Memorial Hospital, the emergency room physician reported "no trauma noted to head." (Exhibit 13, Grady records, pp. 2, 20).

63.

Donegan had some visible injuries upon his arrival at Grady, namely, a gunshot wound to his right hand near the wrist and abrasions to his right knee. (Exh. 11, p. 3).

## FACTS REGARDING TASERS

64.

A Taser is a non-lethal weapon that uses propelled wires to conduct energy that affects the sensory and motor functions of the central nervous system. (Berman Dec., ¶ 4).

65.

The Taser Conducted Electrical Weapon (CEW) uses electrical impulses delivered to the body to attempt to gain control through Neuro-Muscular Incapacitation. (Berman Dec., ¶ 4).

66.

These pulses "over-ride" signals sent to the brain which control the motor nervous system (as well as the sensory nervous system or pain receptors) of the muscle groups affected.  (Berman Dec., ¶ 4).

67.

When a circuit is completed, control can be gained over those muscle groups. (Berman Dec., ¶ 4).

68.

Though Taser devices are designed to temporarily incapacitate a target from a safe distance without causing death or permanent injury, non-lethal weapons are not risk-free. (Berman Dec., ¶ 4).

69.

These weapons are intended to significantly reduce the probability of fatalities or injuries as compared with traditional weapons that achieve their effects through physical destruction. (Berman Dec., ¶ 4).

70.

The electrical output of the Taser CEW is 50,000 volts.  (Berman Dec., ¶ 5).

71.

Voltage is the amount of pressure pushing the electric charge through a circuit. (Berman Dec., ¶ 5).

72.

Volts are not dangerous; rather, it is the amps that determine safety.  (Berman Dec., ¶ 5).

73.

Amperes measure the flow of electrons.  (Berman Dec., ¶ 5).

74.

The Taser is low amperage, putting out a fraction of the dangerous level. (Berman Dec., ¶ 5). While a Christmas tree bulb delivers 1 amp, Taser output is 0.0036 amps. (Id.)

75.

The high voltage makes the Taser less injurious, by allowing the Taser discharge to jump through up to 2 inches of clothing so that the probes do not have to penetrate the body. (Berman Dec., ¶ 5).

76.

The probe deployment of the Taser is when a cartridge is loaded on the front of the Taser and by pulling the trigger, it sends a current into the cartridge firing it (by means of compressed nitrogen) up to a maximum distance of 35 feet (depending on the cartridge used 15, 21, 25, or 35 foot options). (Berman Dec., ¶ 7).

77.

As the cartridge is fired, two darts, or probes (both have barbs on them), are propelled down range in hopes to stick into the intended target. (Berman Dec., ¶ 7).

78.

Once the darts stick into the target, a current is delivered causing control of the motor nervous system and the sensory nervous system affected.  (Berman Dec., ¶ 7).

79.

The greater the spread of the darts onto the body/target, the better the affect the TASER has overall locking up muscles.  (Berman Dec., ¶ 7).

80.

The spread is determined by the proximity to the target.  (Berman Dec., ¶ 7).

81.

The ideal range for the TASER to be deployed is 7-15 feet.  This distance usually ensures you will be close enough to hit your target and that the spread will be enough to affect a large group of muscles.  For every seven feet of travel, you roughly get one foot of spread of the darts (for the 15, 21, and 25-foot cartridges). (Berman Dec., ¶ 7).

82.

To obtain the full effects of electro-muscular disruption, the probes should be separated by a minimum of 4 inches, deployed from approximately two feet from the suspect.  (Berman Dec., ¶ 8).

83.

When deploying Taser devices with probes, the electro-muscular disruption stuns the suspect and overrides the central nervous system, causing uncontrollable contractions of muscle tissue. (Berman Dec., ¶ 9).

84.

A suspect is incapacitated only during the 5-second Taser cycle; the suspect can recover immediately. (Berman Dec., ¶ 9).  Therefore, a Taser operator should be prepared to apply additional cycles if necessary. (Id.)

85.

Officers should use as many cycles as necessary either to gain compliance from the subject or to allow back-up officers to safely restrain the subject while he is incapacitated. (Berman Dec., ¶ 9).

86.

The Taser can be used as an alternative to a hands-on fight or wrestling match that can result in injuries to officers and suspects.  (Berman Dec., ¶ 6).

87.

Officers do not always have the option to use probes, however. (Berman Dec., ¶ 11). When this is the case, they should attempt to target the drive stun to appropriate pressure points in an attempt to get the suspect restrained as soon as possible. (Id.)

88.

A TASER operator incapacitates the suspect's muscles only by use of the probes. (Berman Dec., ¶ 10). Using the TASER CEW in the drive stun mode does not cause incapacitation. (Id.)

89.

The drive stun mode affects the sensory nervous system only, making it a pain compliance weapon and not causing electro-muscular disruption. (Berman Dec., ¶ 10).

90.

Drive stun may not be effective; if it is not, the officer should evaluate the location of the drive stun and target pressure points or consider alternative force options. (Berman Dec., ¶ 10).

91.

In 2016, the DeKalb County Police Department issued TASER X26P

Conducted Energy Weapons (CEW) to its police officers, who are certified to carry

these weapons. (Berman Dec., ¶ 12).

92.

At the beginning of each shift, DeKalb County police officers must conduct

a "spark test" to confirm that the officer's weapon is working properly. (Berman

Dec., ¶ 13). This test consists of one five-second deployment of the CEW. (Id.)

93.

The TASER X26P CEW records information regarding each deployment of

the CEW and the duration of the deployment into an Event Log. (Berman Dec., ¶

14; Affidavit of Bryan Chiles, ¶ 10). The internal computer will record the spark

test and every other time the weapon is deployed. (Id.)

94.

The Event Log is a recording of the date, time, and details of each event that

occurs with the X26P, including every time the weapon is armed, the trigger is

pulled, the time is changed, the safety switch is placed in the safe position, the

USB mode is entered, and more. (Berman Dec., ¶ 14; Chiles Aff., ¶ 10).

95.

The X26P is downloaded by connecting the CEW to a USB. Once

connected, the X26P enters USB mode and an officer can download the data from

the CEW to a local personal computer. (Berman Dec., ¶ 15; Chiles Aff., ¶ 13). The

USB mode also allows the synchronization of the X26P clock, firmware updates,

and configuration setting. (Id.)

96.

Over time, there is a change in the time registered by the CEW, which

becomes out of synch. (Berman Dec., ¶ 16; Chiles Aff., ¶ 15).

97.

To fix this, the DeKalb County Police Department requires its supervisors to

do quarterly inspections. (Berman Dec., ¶ 16).

98.

The supervisor attaches the CEW to a USB, checks for updates, and saves an

Event Log. (Berman Dec., ¶ 16).

99.

When the supervisor does this, the download fixes the time if the clock is

off. (Berman Dec., ¶ 16; Chiles Aff., ¶ 13). The CEW syncs to computer time.

(Berman Dec., ¶ 16; Chiles Aff., ¶ 13).

100.

Safety team members assigned to each shift can download the officers'
CEWs, but because each precinct has more than one cord to connect the CEWs, the
CEWs may be downloaded to and synced with different computers. (Berman Dec.,
¶ 16).

101.

The Event Log for the Taser assigned to Officer Tiffiny Anderson shows
that Officer Anderson deployed her CEW on September 12, 2016, one time as a
spark test during roll call. (Anderson Dec., ¶ 3; Berman Dec., ¶ 18 and Exh. A).

102.

The Event Log for Officer Anderson's CEW shows that, on September 12,
2016, she deployed her weapon two additional times for five seconds each.
(Berman Dec., ¶ 18 and Exh. A; Chiles Aff., ¶ 18 and Exh. A).

103.

The Event Log also shows that when Investigator Berman of the DeKalb
County Training Division connected Anderson's CEW to a USB on September 14,
2016, it performed a Time Sync. (Berman Dec., ¶ 16 and Exh. A; Chiles Aff., ¶ 13
and Exh. A).

104.

The clock in Anderson's CEW was updated from 15:11:08 to 14:49:19, showing that before the download the CEW had been running 21 minutes and 49 seconds fast. (Berman Dec., ¶ 16 and Exh. A; Chiles Aff., ¶ 19 and Exh. A).

105.

The Event Log for the Taser assigned to Officer Timothy Lattimore shows that Officer Lattimore deployed his CEW on September 12, 2016, one time as a spark test during roll call. (Lattimore Dec., ¶ 3; Berman Dec., ¶ 19 and Exh. B).

106.

The Event Log for Officer Lattimore's CEW shows that, on September 12, 2016, he deployed his weapon two additional times for five seconds each. (Berman Dec., ¶ 19 and Exh. B; Chiles Aff., ¶ 24 and Exh. B).

107.

The Event Log also shows that when Investigator Berman of the DeKalb County Training Division connected Lattimore's CEW to a USB on September 19, 2016, it performed a Time Sync. (Berman Dec., ¶ 19 and Exh. B; Chiles Aff., ¶ 25 and Exh. B).

108.

The clock in Lattimore's CEW was updated from 14:02:33 to 13:57:37, showing that before the download the CEW was running 4 minutes and 56 seconds fast. (Berman Dec., ¶ 19 and Exh. B; Chiles Aff., ¶ 25 and Exh. B).

109.

The CEW assigned to Officer Anderson was trigger activated two times between 22:41 and 22:42 EDT on September 12, 2012. (Berman Dec., Exh. A; Chiles Aff., ¶¶ 21, 22 and Exh. A).

110.

The CEW assigned to Officer Lattimore was trigger activated two times between 22:46 and 22:47 EDT on September 12, 2016. (Berman Dec., Exh. B; Chiles Aff., ¶¶ 27, 28 and Exh. B).

111.

Officer Stephens deployed his CEW on September 12, 2016, one time at a time that normally would be associated with morning watch roll call. He did not deploy his weapon again on that day. (Berman Dec., ¶ 20 and Exh. C).

112.

Officer Woolwine did not deploy his CEW on September 12, 2016. (Berman Dec., ¶ 21 and Exh. D).

113.

Officer Lister deployed his CEW on September 12, 2016, one time as a spark test during roll call. (Lister Dec., ¶ 3; Berman Dec., ¶ 22 and Exh. E).

114.

Although Officer Lister armed his CEW two more times on September 12, 2016, he did not pull the trigger again on that date. (Lister Dec., ¶ 6; Berman Dec., ¶ 22 and Exh. E).

## DECEDENT COREY DONEGAN'S INJURIES

115.

Corey Donegan died at Grady Memorial Hospital on October 8, 2016. (Compl., ¶ 93; Declaration of Geoffrey Smith, ¶ 4).

116.

Dr. Geoffrey Smith performed an autopsy of the body of Corey Donegan on October 10, 2016. (Smith. Dec., ¶ 4).

117.

In addition to examining the body and taking x-rays, Dr. Smith reviewed the following: records prepared by American Medical Response of Georgia regarding case #2816188 on September 12, 2106; Mr. Donegan's medical history, including records regarding his most recent treatment at Grady Memorial Hospital; and DeKalb County Police Department records. (Smith Dec., ¶ 4).

118.

Based on the autopsy of Corey Donegan and all the information Dr. Smith reviewed, he concluded that the manner of death was an accident and the cause of death was delayed complications of cocaine associated excited delirium. (Smith Dec., ¶ 5 and Exh. A).

119.

In reaching this conclusion, Dr. Smith relied on all the information available to him, considering the fact that EMS reported that Mr. Donegan had been extremely agitated and combative at the scene; Mr. Donegan bit one of the officers; Mr. Donegan had been on a foot chase; Mr. Donegan had been trying to take his clothes off; Mr. Donegan was combative with the EMS personnel. (Smith Dec., ¶ 6).

120.

EMS reported that Mr. Donegan's temperature was 103.8 when they arrived, and that his vital signs at the scene included blood pressure of 161/110 and a heart rate of 155 beats/minute. (A normal blood pressure reading is less than 120 over 80. A normal resting heart rate ranges from 60 to 100 beats per minute. Normal body temperature ranges from 97 to 99 degrees.) (Smith Dec., ¶ 6; Exh. 11, p. 3).

121.

At the hospital, a drug screen of Mr. Donegan's urine was positive for cocaine. (Smith Dec., ¶ 6; Exh. 13, p. 31 (see, also, pp. 12, 14, 15, 21, 36)).

122.

Upon admission Mr. Donegan, medical records show that he had no signs of trauma to the head. (Smith Dec., ¶ 7; Exh. 11, p. 2; Exh. 13, pp. 6, 10).

123.

Upon admission to the hospital, Mr. Donegan had abrasions on his right forearm and right knee, but no bruising. (Smith Dec., ¶ 7; Exh. 11, p. 1; Exh. 13, pp. 6, 7, 22).

124.

Upon admission to the hospital, Mr. Donegan had no scalp lacerations or obvious signs of hemorrhage. (Smith Dec., ¶ 8; Exh. 13, pp. 11, 12).

125.

Donegan also had a gunshot wound to his right palm with edema and swelling to the distal part of his wrist. (Smith Dec., ¶ 7; Exh. 11, p. 1).

126.

Corey Donegan had been diagnosed with kidney disease and was under the influence of Cocaine, both conditions that made him susceptible to developing acute metabolic acidosis. (Compl., ¶ 20).

127.

A CT scan showed a small subarachnoid hemorrhage without herniation that the doctor noted did not readily explain the patient's Glasgow Coma Scale (GCS) score of 3. (Compl., ¶ 90; Smith Dec., ¶ 8; Exh. 13, pp. 12, 21, 26).

128.

Approximately three and a half hours after arrival, doctors placed an external ventricular drain (EVD) to relieve elevated intracranial pressure. (Smith Dec., ¶ 8; Exh. 13, pp. 6, 21, 26-30).

129.

At the hospital, Donegan suffered from acute tubular necrosis (ATN), a structural change that can lead to kidney failure, due to rhabdomyolysis and cocaine abuse. (Smith Dec., ¶ 8; Exh. 13, p. 15).

130.

The Grady records show that, upon arrival, Mr. Donegan had severe metabolic abnormalities. (Compl., ¶ 91; Smith Dec., ¶ 8; Exh. 13, pp. 14).

131.

The kidney dysfunction caused hypernatremia, a high concentration of sodium in the blood. (Smith Dec., ¶ 8; Exh. 13, pp. 19, 34, 35, 39).

132.

Other problems included acute respiratory failure with hypoxia (a condition where the body is deprived of adequate oxygen) and metabolic acidosis (a disorder where the kidneys are unable to remove enough acid produced from normal metabolism). (Smith Dec., ¶ 8; Exh. 13, pp. 12, 14, 19, 34, 35, 36, 39).

133.

Drug poisoning can cause metabolic acidosis. (Smith Dec., ¶ 8).

134.

In severe cases, metabolic acidosis can put the patient in a coma. (Smith Dec., ¶ 8).

135.

Excited delirium syndrome is characterized by extreme agitation and aggression in a person with an altered mental status, often caused by substance abuse. (Smith Dec., ¶ 9).

136.

Cocaine and other drugs, as well as mental illness, can trigger excited delirium syndrome. (Smith Dec., ¶ 9).

137.

Persons suffering from excited delirium syndrome often shed clothing, as the

condition produces hyperthermia (an abnormal rise in core body temperature).

(Smith Dec., ¶ 10).

138.

The syndrome also causes tachycardia, a condition that causes the heart to

beat more than 100 times per minute. (Smith Dec., ¶ 10).

139.

The person typically engages in uncontrollable violent behavior, and he may

display superhuman strength and is difficult to restrain. (Smith Dec., ¶ 10).

140.

Cocaine and other psychostimulants increase the synaptic levels of

dopamine. (Smith Dec., ¶ 11).

141.

A chronic cocaine abuser, therefore, adapts to offset the dopamine overflow

which can lead to functional hyperdopaminergia, which triggers the acute onset of

delirium and other altered behaviors. (Smith Dec., ¶ 11).

142.

Excited delirium can cause metabolic acidosis, which then increases the

body's respiratory rate, and rhabdomyolysis, the breakdown of muscles. (Smith

Dec., ¶ 12).

143.

Additionally, acute kidney injury can occur from direct damage to nephrons

caused by the release of myoglobin into the bloodstream. (Smith Dec., ¶ 12).

144.

Cases of excited delirium are often associated with mortality due to

preexisting medical conditions or drug-induced physiological changes. (Smith

Dec., ¶ 13).

145.

If a person does not die at the scene from cardiac arrest or respiratory failure,

there are some causes of death that a person suffering from excited delirium may

experience after being transported to the hospital, including clotting of the small

blood vessels; breakdown of skeletal muscle tissue; and kidney failure. (Smith

Dec., ¶ 13).

146.

Mr. Donegan suffered all three of these conditions. (Smith Dec., ¶ 13).

*[signatures on next page]*

Respectfully submitted this 2nd day of October, 2019.

**Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP**

*/s/ Karen E. Woodward*
**Karen E. Woodward**
Georgia Bar No. 775260
Email: kwoodward@cmlawfirm.com
Direct Dial:  404-881-2623
**Marisa M. Beller**
Georgia Bar No. 845893
Email: mbeller@cmlawfirm.com
Direct Dial:  678-684-2147

*Attorneys for Defendants Anderson, Lattimore, Lister and Woolwine.*

Meridian II, Suite 2000
275 Scientific Drive
Norcross, GA 30092
Facsimile:  404-881-263

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 7.1</u>

The undersigned attests that this document was prepared in Times New Roman, 14-point font that complies with this Court's Rules.

This 2nd day of October, 2019.

<div style="margin-left:50%;">

**Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP**


*/s/ Karen E. Woodward*
**Karen E. Woodward**
Georgia Bar No. 775260
Email:  kwoodward@cmlawfirm.com
Direct Dial:  404-881-2623

</div>

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the within and foregoing ***DEFENDANTS ANDERSON, LATTIMORE, LISTER, AND WOOLWINE'S STATEMENT OF MATERIAL FACTS*** with the Clerk of Court using the CM/ECF system.

I FURTHER CERTIFY that I have served a copy of the above-referenced pleading, via U.S. Mail, upon all counsel of record, addressed as follows:

> Sharon Booker, Pro Se
> 5054 Stoney Pointe Ln
> Stone Mountain, GA 30088

This 2nd day of October, 2019.

**Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP**

*/s/ Karen E. Woodward*
**Karen E. Woodward**
Georgia Bar No. 775260