# EXHIBIT 7

# DEKALB COUNTY POLICE DEPARTMENT
# CRIMINAL INVESTIGATION DIVISION
# SUPPLEMENTAL REPORT

| | |
|---|---|
| **INCIDENT:** | In Custody Death |
| **DATE (S):** | Arrested 9-13-16<br>Died 10-8-16 |
| **LOCATION (S):** | Fairfield Inn<br>7850 Stonecrest Sq<br>Lithonia, GA<br><br>Phillips Rd & Phillips Lake Way<br>Lithonia, GA<br><br>DeKalb Medical Hillandale<br>2801 DeKalb Medical Parkway<br>Lithonia, GA<br><br>6316 Laurel Post Dr<br>Lithonia, GA |
| **VICTIM (S):** | Corey Donegan **(Deceased)**<br><br>**Charisma Johnson**<br><br>Victim of Aggravated Assault<br><br>**Sharonda Stewart**<br><br>Victim of Aggravated Assault<br><br>**DeKalb County Police Officers (East Precinct Uniform)**<br>Ofc. T. D. Anderson, #3293<br>Ofc. J. Stephens, # 2877<br>Ofc. C. J. Lister, # 3328<br>Ofc. T. Lattimore, # 3266<br>Victims of Felony Obstruction<br><br>**Lithonia Police Department**<br>Ofc. E. Parks, #96 |

**Sgt. B. L. Danner, #1917**          Approved by: _____
****************** Closed Pending Further Court Action ******************

### Victim of Felony Obstruction

Sylverine Burrows

### Victim of Burglary, 1ˢᵗ Degree

Cierra Burrows



### Victim of Burglary, 1ˢᵗ Degree

**LOST:**　　　　$0
**RECOVERED:**　$0

**DEFENDANT (S):**　None

**WITNESS (ES):**

Epiphany Porter
7850 Stonecrest Sq
Lithona, GA
(W) 770-484-9993
Employee of Fairfield Inn
Can testify to calling 911 in reference to shots fired inside the hotel.

Ofc. B. F. Butler, #3208
Can testify to writing incident report 16-089186 and finding shell casings in the second floor hallway.

Ofc. Justtus, #3285
Can testify to responding to backup Ofc. Butler

Sgt. Farna
Can testify to responding to backup Ofc. Butler

Caridad Rojas
7850 Stonecrest Sq
Lithona, GA
(W) 770-484-9993 extension 500
Manager of Fairfield Inn
Can testify to showing the video to responding officers

Nurse Tamiko
DeKalb Hillandale Hospital

**Sgt. B. L. Danner, #1917**　　　　**Approved by:** _____
****************** Closed Pending Further Court Action ******************

(W) 404-501-8660
Can testify to placing a 911 call reporting Charisma Johnson had been shot.

Ofc. D. J. Brown, #3296
Can testify to writing report 16-089202

Ofc. Grant Compton
Can testify that Sharonda Stewart transported Charisma Johnson to DeKalb Medical Hillandale and identify the car used for the transport.

Ofc. Richard Howell
Can testify that Sharonda Stewart transported Charisma Johnson to DeKalb Medical Hillandale and identify the car used for the transport.

Sgt. Corey Blackmon
Can testify that Sharonda Stewart transported Charisma Johnson to DeKalb Medical Hillandale and identify the car used for the transport.

Det. R. S. Harris
1960 W. Exchange Pl.
Tucker, GA 30084
(W) 770-724-7879
Can testify to responding to Grady and documenting Corey Donegan's and Charisma Johnson's injuries.

Det. K. C. Payton
1960 W. Exchange Pl.
Tucker, GA 30084
(W) 770-724-7854
Can testify to interviewing Charisma Johnson and documenting Corey Donegan's injuries.

Sgt. S. H. Dorsey
1960 W. Exchange Pl
Tucker, GA 30084
(W) 770-724-7845
Can testify to using a fingerprint scanner to identify Corey Donnegan.

Det. K. M. McQuilkin
1960 W. Exchange Pl

Tucker, GA 30084
(W) 770-724-7862
Can testify to obtaining search warrant for Fairfield Inn, the car Sharonda Stewart was driving and all cell phones as well as interviewing various witnesses.

Det. B. P. Kershaw
1960 W. Exchange Pl
Tucker, GA 30084
(W) 770-724-7634
Can testify to interviewing Marquitta Hanna Rolle and Sharonda Stewart

Marquitta Hanna Rolle

Can testify to picking up Sharonda Stewart from DeKalb Medical Hillandale and taking her back to Fairfield Inn

Miquel Hightower

Can testify to hearing a gun shot and seeing a suspect outside and then calling 911.

Det. J. D. Paden
1960 W. Exchange Pl
Tucker, GA 30084
(W) 770-724-7856
Can testify to executing search warrant at the Fairfield Inn

CSI Richardson
1960 W. Exchange Pl
Tucker, GA 30084
(W) 404-294-2221
Can testify to photographing room 218 of the Fairfield Inn and collecting evidence.

CSI Harrison
1960 W. Exchange Pl
Tucker, GA 30084
(W) 404-294-2221

Can testify to photographing the Nissan Maxima driven by Stewart and collecting evidence.

Ofc. S. G. Woolwine, #3360
Can testify to locating Corey Donegan's gun.

Sgt. A. Brown, Sr. #1852
Can testify to completing the Use of Force Report.

Lt. M. F. Lavigne
1960 W. Exchange Pl.
Tucker, GA 30084
(W) 770-724-7851
Can testify to creating time line of incidents and analysis of Taser usage.

Sgt. B.L. Danner, #1917
1960 W. Exchange Pl.
Tucker, GA 30084
(W) 770-724-7868
E-mail: bldanner@dekalbcountyga.gov
Can testify to writing this report.

**EXHIBITS:**

(A) 16-089186 – Fairfield Inn Incident

(B) 16-089200 – Phillips Road Incident

(C) 16-089202 – DMC Hillandale Incident

(D) Case Notes

(E) Corey Donegan

(F) Charisma Johnson

(G) Shronda Stewart

(H) Marquita Hanna-Rolle

(I) 2002 Nissan Maxima associated with Shronda Stewart

(J) Use of Force documentation

(K) Timeline

(L) List of personnel guarding Donegan at Grady Hospital

(M) Officer's Written Statements

(N) Crime Scene Reports

(O) Search Warrants

(P) Property Sheets

(Q) Taser Report

(R) Medical Examiner Report

(S) Fairfield Inn Video

(T) Cell Phone Extraction Report

(U) Photo Lineup

(V) 911 Audio CD

(W) Ofc. Stephens Dash-cam video CD

(X) **GBI Report (Pending)**

## SUMMARY:

Between 21:50 hours and 23:10 hours on 9-12-16, Corey Donegan, was involved in multiple incidents at multiple locations in Unincorporated DeKalb County. It was not known that he was involved in all the incidents until the investigation was completed.

Donnegan was eventually arrested by DeKalb Police after fighting five police officers. He was then transported from the scene of the arrest to Grady Hospital to be treated for a self-inflicted gunshot wound he received prior to contact with the police. He was admitted to Grady Hospital on or about the late evening of 9-12 or early morning hours of 9-13 of 2016. He later died on 10-8-2016.

The Medical Examiner concluded that the cause of death was the result of delayed complications of cocaine associated with excited delirium and that the deceased additionally suffered from a gunshot wound to the hand.

**The manner of death has been ruled accidental.**

Sgt. B. L. Danner, #1917        Approved by: _____
****************** Closed Pending Further Court Action ******************

Corey Donegan had gone to the Fairfield Inn at 7850 Stonecrest Square in Lithonia with Sharonda Stewart and Charisma Johnson where they got a room and all three drank beer. Additionally, Donegan consumed cocaine. Donegan became increasingly paranoid and the three left the hotel. As they were walking down the hotel hallway, Donegan fired a handgun twice into the ceiling. The three of them then left the location.

After leaving, they got into a car. Stewart was driving, Donegan was sitting behind Stewart, and Johnson was in the front passenger seat. Per Stewart and Johnson, Donegan kept attempting to jump out of the car and was pointing his gun at Johnson. He eventually shot Johnson and left the vehicle. Stewart drove Johnson to DeKalb Medical Hillandale then left that location and went back to the hotel.

Meanwhile, citizens were calling about a black male (Donegan) running through a neighborhood, randomly firing a gun. Ofc. Anderson was dispatched and encountered Donegan. Donegan seemed dazed and confused and was bloody from a gunshot wound to his wrist. He had a gun tucked up under his arm. Ofc. Anderson challenged him and eventually Donegan dropped the gun and ran away. Anderson gave chase and eventually caught up with Donegan as he tried to break into a home. Ofc. Anderson used her Taser on him and kept him in place until other officers arrived. Donegan fought five officers biting one before he was finally taken into custody. He was then transported to Grady as a John Doe.

By this time, Stewart was back at the Fairfield Inn and was detained by officers in reference to the earlier shooting at the hotel. It was then realized that all the incidents were connected.

Donegan was admitted to Grady and was charged with Felony Obstruction and Disorderly Conduct by the uniform officers. While at Grady, Donegan never recovered and eventually died, making his death an in custody death.

Donegan was never charged with the aggravated assault on Johnson because she was not able to pick him out of a photo lineup. <u>Given later statements by Johnson and Stewart, it appears Johnson deliberately refused to pick Donegan out of the lineup.</u>


NARRATIVE:

Part 1 – The Fairfield Inn Incident

On 9-12-16 at 21:50 hours, Epiphany Porter, an employee of Fairfield Inn, called 911 (See Tab A) to report that shots had been fired inside the hotel. Ofc. Butler was the first to respond and was joined later by Ofc. Justtus and Sgt. Farna. After speaking to Ms. Porter, they learned that the occupant of room 220 had reported hearing gun shots in the hallway. Checking the location, the officers found two .45 caliber shell casings in the hallway (Tab P). The officers knocked on all the doors in the hallway but found no witnesses to the incident.



With the assistance of the hotel management, the officers entered all the rooms where there was no response to knocks to check to make sure there were no gunshot victims. They located no victims but did note that in room 218 there appeared to be drugs and alcohol in plain sight. Ofc. Butler learned the room had been rented by Charisma Johnson.

Hotel Manager Caridad Rojas responded to the scene and pulled up the hallway video (Tab S) for the incident. In his police report, Ofc. Butler describes what appears to be a struggle *but he doesn't describe it any further*. He goes on to say there was dust falling from the ceiling. When I first viewed the video on the hotel monitor, I concluded I was at seeing at least two people duck while being shot at. It appeared one of the subjects was male.

After reviewing the video again, I've concluded that there are two camera angles, one from each end of the hallway. Both angles show the same people from different vantage points. The time stamp showed the incident occurred at the 21:41 hours. It shows two females and a male (Corey Donegan, Charisma Johnson and Shronda Stewart) leaving room 218. As they walk towards the elevator, Donegan makes a sudden movement and then you can see dust from the ceiling fall in front of the camera. This is consistent with Donegan discharging his weapon and striking the ceiling. The three then leave camera view to exit via the elevator.

### Part 2 – The Shooting of Charisma Johnson

The next incident, chronologically, is where Charisma Johnson was shot. However there was a delay in reporting the incident due to Stewart driving the victim to the hospital instead of calling for an ambulance.

On 9-12-16, at 23:10 hours, Nurse Tamiko at DeKalb Medical Hillandale placed a 911 (Tab C) call advising they had a patient (later identified as Johnson) that had been shot. Ofc. D. J. Brown, #3296 responded to the hospital but learned the victim had been transported to Grady Hospital prior to his arrival (See Det. Harris case note at Tab D). He then responded to Grady Hospital but was unable to speak to the victim as she was taken directly to surgery. Ofc. Brown learned from the ambulance crew that the victim told them she had been shot at a gas station near Covington Hwy and Phillips Rd. and that she was then transported to DeKalb Medical Hillandale by a friend.

While still at Grady, Ofc. Brown later learned of the incident involving Corey Donegan. He spoke to the ambulance crew (Med-54) that transported Donegan and learned from them that Donegan told them that he and a female friend had been robbed.

Homicide Det. R. S. Harris responded to Grady Hospital (Tab D) but was unable to speak to Johnson due to her still being in surgery. He retrieved her belongings from the trauma room and lodged them in the Property Room. While still at Grady, Det. Harris also responded to a John Doe (Donegan) victim with a possible gunshot wound (Tab D). The

victim was in custody for Felony Obstruction of Officers. Det. Harris was unable to speak to him due to him being intubated and unresponsive. The medical staff advised that the victim was possibly suffering from a drug overdose and had a possible gunshot wound to the right wrist. Det. Harris filled out an anatomy chart and noted the injury to the right wrist. (Tab E)

Det. K. C. Payton also responded to Grady Hospital but about 8 or 9 hours after Det. Harris. Det. Payton wrote a case note (Tab C) that noted abrasions to Donegan's right knee, a gunshot wound to his *left* hand, and an injury to the top of the *"leg"* causing brain swelling. He also took a photo of the head injury (Tab E). Det. Payton was not on duty at the time Donegan was originally taken to Grady and was viewed by Det. Harris. He had responded to Grady sometime after Det. Harris. Det. Payton's case note lacked the time he observed the victim so I directed Det. Payton to correct and rewrite his case note to include the time he responded. As best he could remember it was about 10:00 hours on the 13th. He then corrected his original case note to include the approximate time he responded to Grady (10:00) and to correct the non-existent injury to the *"leg"* to reflect the existent injury to the *"head"* and the injury from the *left* hand to the correct injury to the *right* hand. The corrected case note is also in Tab E.

In the same case note, Det. Payton also spoke to Charisma Johnson and asked her who shot her. She said she didn't know and directed Det. Payton to Sharonda Stewart. This interview was recorded and placed in RMS.

On 9-14-16, Sgt. Dorsey responded to Grady Hospital with a fingerprint scanner and was able to positively identify the John Doe as Corey Donnegan. (Tab D)

On 9-14-16, Det. McQuilkin created a photographic lineup including the now identified Donegan (Tab U) and went to Grady Hospital to interview Charisma Johnson. In her interview, Johnson said she only knew the shooter by "Boss" and had met him a few times before. She said she and her friend Sharonda got a hotel room for the three of them and that Boss was using powder cocaine in the room. They left the room to go to another location and while in the car, Boss wanted to stop for cigarettes. Johnson said Boss started acting crazy, possibly from the drugs, and several times he opened the car door and jumped out several times. She then persuaded him to get back in. Boss was seated behind Sharonda who was driving. At some point, Johnson heard a gunshot and was struck in her side. Johnson said she fell out of the car and Boss fled from the vehicle.

When asked if she could recognize Boss, Johnson said yes. When shown the photographic lineup, she was not able to identify anyone.

On 10-17-16, Det. McQuilkin contacted Johnson via telephone and she clarified that Sharonda had stopped the vehicle prior to Boss shooting her. (Tab D)

On 10-18-16, I also contacted Johnson via telephone (Tab D) and she said she'd known Boss for about 3 to 4 months prior to the shooting and had been introduced by a mutual friend. When I asked her why she couldn't pick him out of the photo lineup she said she

was still in pain and on drugs the doctors had given her for her gunshot wound. I also asked her if the car was still moving when she was shot and she said no. She also told me that Boss had left the hotel and then came back with some powder cocaine and began acting strangely once he was back. She said she saw Boss using cocaine at the hotel.

On 9-13-16, after dropping Johnson off at DeKalb Medical Hillandale, Sharonda Stewart returned to the Fairfield Inn and attempted to gain entry to room 218. The hotel personnel had deactivated the card key, thus she was forced to contact the front desk to get into her room. They in turned called the police and when uniform officers responded, they detained her in reference to the earlier incident involving the shooting in the hallway. Marquita Rolle was with Stewart and when she was interviewed, that's when it was realized that Stewart was responsible for transporting Johnson to DeKalb Medical Hillandale and that the events at the hotel and Ms. Johnson's shooting were related.

Det. McQuilkin responded to DeKalb Medical Hillandale and Det. Kershaw responded to Fairfield Inn. Upon arrival at DeKalb Hillandale, Det. McQuilkin made contact with Ofc. Compton, Ofc. Howell and Sgt. Blackmon. They advised that the female gunshot victim Charisma Johnson arrived at about 22:10 hours in a blue Nissan Maxima driven by Sharonda Stewart. The vehicle was still in the parking lot when Det. McQuilkin arrived and it had rear end damage and blood stains on the front passenger seat. The vehicle was impounded to Statewide Towing and a hold placed on it for a later search warrant. (See Det. McQuilkin's case note at Tab D).

Per the officers at DeKalb Medical, Stewart had brought the victim to the hospital and then left when the victim was taken to Grady. As Stewart walked back to her vehicle, a black male in a Ford Expedition confronted Stewart, then grabbed her and struggled with her. When Ofc. Howell and Sgt Blackmon challenged the male; he returned to his vehicle then drove it forward striking the rear of Stewart's vehicle. He then fled the scene. None of the officers was able to get a tag number for the male's vehicle. Stewart refused to provide any information on the incident beyond that the male was her "baby daddy" and that he was in the country illegally. Stewart then left the hospital again and the officers saw her get into the same black Expedition the male had driven away in earlier. The vehicle left the area with Stewart inside.

While Det. McQuilkin was at DeKalb Medical Hillandale, Det. Kershaw was at the Fairfield Inn and interviewed Marquitta Hanna-Rolle. (See Det. Kershaw's case note, Tab D. Interview in RMS). In her statements, Rolle said she got a call from Sharonda saying she was at DeKalb Medical Hillandale because Charisma had been shot. Rolle and her husband then went to the hospital. When they found Stewart, she was not willing to come home with them so Rolle rammed her Expedition into the Nissan. Rolle explained she owns the Nissan. Eventually Stewart agreed to go with them and they drove to the Fairfield Inn to retrieve her and Charisma's belongings. When they couldn't get in the room, they checked in with the front desk who then called the police.

Det. Kershaw attempted to interview Stewart at the hotel but she was being evasive so she was eventually taken to police headquarters. In her interview and statement, (Tab G)

she said Boss was a high ranking member of the Gangster Disciples (GD) and that she was afraid of him. She claimed she had heard people call him "king" on the phone. She said that Charisma Johnson had rented room 218 for the night and that Johnson invited Boss. She said that they were all drinking beer and that Boss was using cocaine. She also said Boss had a gun in the room. She said that Boss was becoming increasingly paranoid due to the drugs and that they were going to leave the room.

She stated as they were leaving the room, she heard a gunshot and thought that someone was shooting at them. The three of them then left the hotel and got into the Nissan Maxima. She said Johnson was in the front passenger seat, she was driving, and Boss was seated behind her. While driving, Boss opened his door repeatedly and attempted to jump out a few times. At one point, he had his door wide open and he was hanging his upper body out of the vehicle telling Stewart to "just drive" while pointing his gun at Johnson. Stewart told Boss she would not until he got back in the vehicle.

Boss shot Johnson in the side then jumped out of the car and started to run. Johnson got out of the car too and tried to run but realized she was hurt. Stewart then drove Johnson to DeKalb Medical Hillandale. Johnson told Stewart not to tell the police who shot her. She indicated to Stewart she was going to tell the police she couldn't remember who shot her. Det. Kershaw showed a photo of the John Doe at Grady and Stewart confirmed that the John Doe was Boss.

While Det. Kershaw was interviewing Stewart, Det. McQuilkin prepared a search warrant that Det. Paden, CSI Richardson and I executed (Tab O) on room 218 of the Fairfield Inn. Photos were taken and several items were seized (See Tab B) to include suspected cocaine and suspected marijuana.

On 9-21-16, Det. McQuilkin executed a search warrant (Tab O) on the 2002 blue Nissan Maxima recovered in this case. Crime Scene Investigator Harrison photographed the vehicle and processed the rear driver's side door area for latent evidence. He searched the vehicle and noted a defect to the rear of the arm rest between the two front seats. One defect was noted on the left side of the front passenger seat. Another defect was found on the passenger seat in the area of the blood stain. He used a metal rod as a dowel and marked the trajectory through the seat. The round which caused the damage was fired from the area of the rear driver's side of the vehicle near the door and at low and horizontal trajectory. No shell casing was found in the vehicle. He located a cell phone on the floorboard behind the driver's seat and took custody of that. CSI Investigator Harrison took custody of a partially smoked cigar and a lighter found in the door handle of the rear side driver's door where "Boss" was reported to have been sitting.

On 10-18-16, Det. McQuilkin executed a search warrant (Tab O) on the cell phone taken from the Nissan. Tab T is the cell phone extraction report.

**Part Three – Donegan's Encounter with the Police**

On 9-12-16 at 22:19 hours, the first 911 call was received (Tab V for 911 audio) advising that a gunshot was heard in the area of Phillips Rd and Phillips Lake Way and that a male was in the roadway taking off his shoes. An additional caller advised seeing a male in the same roadway walking in circles. Ofc. T. D. Anderson, # 3293, was the first officer to respond. In her report (Tab B) Ofc. Anderson describes the subject as being disoriented and walking into oncoming traffic. She commanded him to stop and put his hands up in the air. When he did so, she noticed he kept his elbows close to his body. She realized that he had a gun under his armpit. She drew her weapon and ordered him to drop the weapon. He initially refused but eventually did slowly place the gun on the ground. He then kept walking into traffic and eventually ran away. Ofc. Anderson pursued him and finally caught up with him at 6316 Laurel Path Rd, where he was trying to break into the home. Sylverin Burrows and her daughter Cierra Burrows were at home at the time and they called 911 saying someone was breaking into their home.

Ofc. Anderson deployed her Taser at the suspect and held him at Taser point until Ofc. Stephens, Ofc. Lattimore, Ofc. Lister, and Ofc. Parks of Lithonia PD arrived. They all struggled with the suspect in an effort to take him into custody and handcuff him. During the struggle, Ofc. Lister was bitten on the hand by the suspect.

Ofc. S. G. Woolwine, #3360, went to the location of Ofc. Anderson's car to secure her car and to look for the suspect's gun. He located both the gun (Tab B) and the suspect's boots.

Once he was in custody, an ambulance was called for his injuries and he was transported to Grady as a John Doe. Each of the officers above completed a supplemental police report except for Ofc. Parks of the Lithonia Police Department. He wrote a statement (Tab J)

Per a case note from Det. McQuilkin (Tab C), Ofc. Anderson contacted him about the incident and Det. McQuilkin noted that when the suspect was tased, he fell and bumped his head. On 11-16-16, I interviewed Ofc. Anderson. The details of that interview are listed below. *On 1-24-16, I asked Ofc. Anderson Det. McQuilkin's case note and she said she didn't remember speaking to a detective and repeated what she told me in her interview; that Donnegan did not hit his head when the Taser was used, that he landed in the grass on his side.* On 1-26-17, I asked Det. McQuilkin to review the case note and see if he could further clarify the issue. He could not. *Given that there are no documented head injuries from the Use of Force report, the photos that accompany that report nor from Medical Examiner's report, I am not able to rectify the discrepancy.*

Sgt. A. Brown, Sr, #1852 responded to the location and completed a Use of Force package as is standard procedure for a Taser deployment. (The actual Use of Force report is *not included due to potential Garrity Issues*). As a part of that package, photos were taken of the suspect (Tab J) and of the officers, their injuries and the Taser cartridges, the Tasers, the overall scene and the door the suspect was trying to break into. Also include in the report are the Taser download reports and a written statement by

**Sgt. B. L. Danner, #1917**          Approved by: 

Miquel Hightower who reported hearing a gunshot, seeing the suspect and then calling the police.

A letter (Tab E) dated 9-16-16 from Christopher J. Palazzola, an attorney, advised the Homicide unit that his firm was representing Corey Donegan. On 9-30-2016, Kenneth Booker filed a complaint (Tab J) with DeKalb County Police Internal Affairs alleging excessive use of force against his son Corey Donegan. On 10-8-16, Corey Donegan died. On 10-11-16, Sgt. Dean wrote a statement (Tab D) about a phone conversation he had with Mrs. Donegan who wanted to retrieve his personal belongings. During the conversation, Sgt. Dean said he thought Donegan may have been injured when he jumped out of a car. Sgt. Dean went on to write that he was not very familiar with the case.

Tab L is the list of the DeKalb police officers that guarded Corey Donegan until the Sheriff's office took over. Also at Tab L is a written statement from Ofc. O'Neil, #2290 detailing when and how he was relieved of guard duty by a deputy from the Sheriff's office. Tab L also contains the list of Sheriff's Office personnel that guarded Donegan.

At Tab C is an analysis prepared by Lt. Lavigne of the Use of Force in regards to the Taser usage of Ofc. Anderson and Ofc. Lattimore. It's extracted from the Taser download (Tab J). Tab K is a time line created by Lt Lavigne by merging the times on the CAD calls as well as the Taser download reports.

On 10-17-16, Lt Bryant assigned me this case as an in-custody death investigation. I contacted Inv. Anglin of the Medical Examiner's office and asked if Grady Hospital had provided the medical records. Per Inv. Anglin they had not yet done so. Inv. Anglin also asked for a copy of the video footage from the hotel and a copy of written statements. Only Sharonda Stewart provided written statements, Charisma Johnson's statements were audio taped due to her injuries. I had Det. McQuilkin make two copies of the video, one for myself and one for the ME's office. I also scanned Sharonda Stewart's statements and e-mailed them to Inv. Anglin.

Inv. Anglin also asked about a discrepancy in the case notes of Det. R.S. Harris and Det. K.C. Payton as Det. Payton's listed a head injury. I knew that Det. Harris responded to the hospital the night of the incident, sometime after midnight, and Det. Payton was not working at the time of the incident and didn't start working until day shift on Monday and didn't come in to work until about 0630 hours.

I directed Det. McQuilkin to take the shell casings recovered from the Fairfield Inn to the GBI and request they be compared with the gun recovered from Corey Donegan during his arrest. The results are pending.

I also directed Det. McQuilkin to obtain a search warrant (Tab O) on the phone recovered from the search of the vehicle. Det. McQuilkin did so and found the phone contained the phone numbers of Shronda Stewart, Charisma Johnson, and Sharon Booker, who is believed to be related to Donegan. (Tab D)

**Sgt. B. L. Danner, #1917                    Approved by: _____**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **Closed Pending Further Court Action** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I then reviewed the video footage from the Fairfield Inn. There are two camera angles, one from each end of the hallway. The relevant portion begins at the 21:41 hours of the time stamp. The video shows a male and two females leaving a room. The subjects appear to be Corey Donegan, the deceased, Charisma Johnson, the victim, and Sharonda Stewart, the witness. The Donegan subject appears to be staggering as he walks down the hallway toward the elevator. From one camera angle, you can see the male subject make a sudden movement then dust coming from the ceiling tile falling in front of the camera. This is consistent with the male discharging his weapon and striking the ceiling. Uniform officers that responded to the initial call located shell casings by the elevator and these were collected and put into evidence.

On 10-18-16, Chief Pat Bailey of the MEs office picked up a copy of the Fairfield Inn video. He also told me that they still had not received the medical records from Grady.

On 10-18-16 about 1600 hours I attempted to call Sharonda Stewart at the number we had for her. I did not get an answer and attempted to leave a voice mail. I then called Charisma Johnson.

I asked her how long she had known Boss and she said about 3 to 4 months and that she had been introduced to him by a mutual friend. I then asked her why she couldn't pick him out of a photo lineup and she said she was still in the hospital and was still receiving pain killers and wasn't able to do so because of the drugs she was being given. I then asked her if the car was moving when she was shot and she said no. I then asked her if the car was moving when Boss got out of it and she again said no. She went on to tell me that Boss started acting strangely when he left the hotel and came back. She said he only left once and when he came back he had some powder. When I asked what kind of powder, she said cocaine. She went on to say she saw Boss using cocaine at the hotel.

I then asked her if she could come to the police headquarters and provide a written statement. She agreed and said she would be up after 5pm and that Sharonda Stewart would be the person that gave her a ride. I then asked her to call Sharonda and ask her to also come up and provide another written statement. She agreed. I then gave her both the office number to the Homicide/Assault unit and my direct number. I told her to call either number once she was on the way so I could be sure to be in the office when they arrived.

Neither Johnson nor Stewart called or came to the police headquarters.

On 10-31-16 Inv. Anglin of the MEs office told me that the files from Grady hospital had been received at their office but were still under review.

On 11-10-16 around 16:00 hours, Ofc. Parks of the Lithonia Police Department came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of his Miranda Rights, Ofc. Parks agreed to give a statement. He said that when he first got to the scene, Ofc. Anderson had already deployed her Taser and the suspect was on the ground. He then heard Ofc. Anderson say her patrol car wasn't secured so he left to try and find it to secure it. When he couldn't find her patrol car, he came back and saw the suspect was still fighting the other officers. He then grabbed one of the suspect's arms to help him be handcuffed.

I asked if his patrol car had a video system and he said it did not and that he did not have a body camera. I asked him if he saw any injuries to the suspect and he said he saw blood on his shirt but did not see any injuries. **I asked him specifically if he saw any injuries to the suspect's head and he said no.** I also asked him if he or any officer used any impact weapons or any hand, knee or elbow strikes. He said he did not and he is not aware of any other officer using any strikes.

Ofc. Parks said he provided a written statement on the night of the incident but I could not locate that in the file. I later retrieved if from DeKalb Internal Affairs (Tab J). I asked him to provide a new written statement and he did. The statement is included in the file. (Tab M)

Also on 11-10-16 about 17:00 hours Ofc. Lister responded to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. The interview has been loaded into RMS.

After being advised of his Miranda Rights, Ofc. Lister agreed to provide me with a statement. He said that when he got to the scene, the suspect had already been Tasered and that he joined the other officers already present in trying to handcuff the suspect. He said that as he was struggling with the suspect the suspect bit him but that he was wearing a glove and the bite didn't go through the glove. He said that they were eventually able to handcuff the suspect.

When asked if he or any other officers used hand, knee or foot strikes, he said no. When I asked if any impact weapons were used, he again said no. **When I asked if he saw any injuries to the suspect he said no.** He did say the suspect complained of being shot in the wrist but that he did not see the injury.

Ofc. Lister also said his car does not have cameras and he was not wearing a body camera.

I did not ask for a written statement as he wrote a supplemental report at the time of the original incident.

On 11-14-16 around 16:00 hours, Ofc. Lattimore came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of his Miranda Rights, Ofc. Latimore agreed to give a statement. He said that when he arrived on scene the suspect was already face down and other officers were already trying to put him into custody. He said that he did drive stun the suspect twice in the back with his Taser but that it had no effect. He then switched to trying to grapple with the suspect and bend his arms behind his back.

**Once the subject was in custody he did notice a wound to his hand but did not recall seeing any other injuries.** He also said that the suspect never lost consciousness and that he was still awake and alert when the ambulance left with the suspect.
Ofc. Lattimore said his car does not have a camera system and he was not wearing a body camera. Ofc. Lattimore also provided a written statement. (Tab M)

On 11-16-16 around 14:30 hours, Ofc. Anderson came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of her Miranda Rights, Ofc. Anderson agreed to give a statement. She said when she first encountered the suspect, he was in the roadway, had blood on him and had a handgun tucked under one arm pit. When she challenged him, he kept walking into oncoming traffic. He eventually stopped and then eventually put the gun on the ground. As she continued to give him commands to get on the ground he started to go to the ground then got up instead and started running away. She gave chase and eventually caught up with him as he was trying to break down a door to a home with his shoulder. He then tried to flee again and she used her Taser. One probe went into each arm. He then fell to the ground in the grass on his side. Once other officers arrived, they began trying to pry his arms from under him. While doing so one officer got bit by the suspect. Ofc. Anderson said she thinks another officer did drive stuns on the suspect but she wasn't sure which one. **The only injuries she saw were scrape marks on one of his arms and the injury to his wrist.** She said the suspect was awake but seemed unable to comprehend what was going on or what was being said to him. She noted he had dilated pupils and that EMS administered something to him prior to him being transported via the ambulance. When Ofc. Anderson last saw him he was conscious and the ambulance crew was talking to him.

Ofc. Anderson said her car does not have a camera system and he was not wearing a body camera.

Ofc. Anderson also provided a written statement. (Tab M)

On 11-16-16 around 1430 hours, Ofc. Stephens came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of his Miranda Rights, Ofc. Stephens agreed to give a statement. He said that he and Ofc. Parks both arrived on scene at the same time. He saw Ofc. Anderson with her Taser out and the suspect down on the ground, in the grass, with Taser

probes in his arms. Ofc. Anderson said her car still needed to be secured and the suspect left a gun back near her car. Ofc. Parks then left to secure Ofc. Anderson's car.

Ofc. Stephens came up and tried to handcuff the suspect but he was holding his arms under his body and he couldn't pry them from under him. **He saw that the suspect was bleeding from his arms and palm.** At this point he *backed off* and requested EMS. As other officers arrived, he and Ofc. Lister and Ofc. Lattimore then went *back in* to arrest the suspect and they were eventually able to bring his hands from under his body and handcuff him.
Ofc. Stephens said the suspect didn't respond to questions but he was awake. Ofc. Stephens took the photos of the suspect at the scene. The only injuries he noticed were scrapes on his forearms and the injury to his wrist. **He saw no injuries to his head or face.**

Ofc. Stephens said his car had a personally purchased video camera on the dashboard but he didn't think it recorded the incident as it was facing the wrong way. He also said that it has a limited memory and may have recorded over as he keeps it on all the time. I asked him to bring in the camera and he agreed.

Ofc. Stephens also provided a written statement. (Tab M)

On 11-22-16, Ofc. Stephens brought in his dash cam and I downloaded all the video from it. None of the files show the incident or any incident from that day. The files were copied to a CD and are with the case file. (Tab W)

On 12-8-16 I spoke to Inv. Bowen of the Medical Examiner's Office. Per Bowen, the cause of death had not been determined and was still pending.

On 1-10-17, I spoke to Inv. Minter of the MEs office and he said the death was caused by delayed complications of cocaine associated with excited delirium and that other conditions included a gunshot wound of the hand. He went on to say the death has been ruled accidental. I requested a copy of the final report and received it 1-13-17 (Tab R). On page 6 of 7, the Medical Examiner noted that at the time of admission to the hospital, <u>no head trauma was noted</u>.

The GBI forensic report (Tab X) comparing the shell casings to the gun recovered by Ofc. Woolwine is still pending. At Tab N are the DeKalb County Crime Scene Unit reports.

A CD containing all of the 911 audio calls is included at Tab V

Also included with this file are CDs of the officer interviews I conducted and the crime scene photographs. A separate CD also includes photos from the Use of Force package. These are the same photos that are printed and posted with Tab J.

## RECOMMENDATION:

Sgt. B. L. Danner, #1917      Approved by: _____
****************** Closed Pending Further Court Action ******************

**This investigation revealed no criminal acts by the officers.**

Closed pending further action by the DeKalb County District Attorney.

I recommend that the Internal Affairs unit conduct an investigation of the Use of Force by the officers to ensure compliance with all relevant policies.