FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 23 2019

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATE DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Sharon Booker as Executrix of the estate
Donegan as next friend of J.D., C.D., and C.T.
minor children and surviving heirs of Corey
Donegan,
      Plaintiff,                     1:18-cv-04927-LLM
vs.
Tiffiny D. Anderson, Timothy J. Lattimore,
Charles J. Lister, Junior L. Stephens, Samuel G. Woolwine,
unknown officers and Edward parks, individually,
Defendants.

## PLAINTIFF BRIEF IN SUPPORT OF OPPOSING DEFENDANTS MOTION FOR SUMMARY JUDGEMENT

TO THE HONORABLE JUDGE OF SAID COURT,
The Plaintiff respectfully request to oppose summary judgment pursuant to federal rule of civil procedure 56(d) in support of this motion.

## INTRODUCTION

This section 1983 case alleges claims of excessive force, failure to intervene, assault and battery, and wrongful death against 9 DeKalb County Police officers and 1 co-defendant from Lithonia Police department.

Between 21:50 hours and 23:10 hours on 9-12-16, (According to DeKalb County Police department Criminal Investigation Division supplemental reports PG. 6 plaintiff exhibit 4) plaintiff Corey Donegan, was involved in multiple incident at multiple locations in unincorporated DeKalb County. It was not known at the time of the initial arrest by all Defendants, he was involved in multiple incidents until the investigations was completed. Donegan was eventually arrested for a obstruction charge and possession of a firearm on a shots fired call, during a terry stop by DeKalb Police, after allegedly fighting five police officers after fleeing, He was tased multiple of

5 times, 4 times while handcuffed according to DeKalb CAD detail report(Ex.1 pg.1-4,6) as well as the DeKalb Police Taser records(Ex.2 pg.1 of 2) Plaintiff was assaulted and unconscious on scene, according to American Medical (Ex.5 pg.1-9) Response records. He was then transported from the scene of the arrest to Grady Hospital to be treated for multiple sever lacerations of the upper and lower right arm requiring sutures for 7 and 10 inches long lacerations, as well as an alleged self-inflicted gunshot wound to the hand. (See M.E. Autopsy photos plaintiff exhibit 3) Plaintiff Corey Donegan during contact with 10 police officers and according to Dekalb Police/Fire communication reports (Ex.1), and Grady hospital reports, was partially paralyzed (Ex.F pg.21) and received a traumatic head injury to the Top of his Head upon arrival from the unnecessary, egregious use of force, from police alleged control holds and tactical take downs before He was unconscious and unresponsive on scene and upon arrival to Grady Hospital on late evening of 9-13 of 2016. He later died on 10-8-2016.  According to Detective Harris Criminal Investigation Division report, plaintiff Corey Donegan was also a victim as well, of a shooting and was robbed. (See Sgt. Danner report(Ex. I pg.8)

The medical Examiner of Dekalb County concluded that the cause of death was the result of delayed complications of cocaine associated with excited delirium and that the deceased additionally suffered from a gunshot wound to the hand.  But, Grady Hospital Concluded that the specific cause of death at that time was Renal Kidney Failure from Taser exposure and Subarachnoid Hemorrhage of The Brain Due to trauma, Grady Hospital stated on( para. 2 Ex. Q pg.66) hospital records  plaintiff was found to have Rhabdomyolysis with a CPK of 50,000 from Taser exposure causing AKI (acute kidney infection) these facts were made known to the DeKalb Medical Examiner who by law, has the final determination on the cause and manner of the plaintiff death who ultimately decided without given any weight to Grady Hospital Clinical Findings.

Let it be known that the alleged shooting victim Charisma Johnson never once in many statements said Plaintiff Corey Donegan shot her, there was no bullets recovered from her or inside of the vehicle she was allegedly shot in, or from hospital reports or GBI reports, linking plaintiff Corey Donegan. Let it be known that all charges was dropped on plaintiff Corey Donegan by

DeKalb County D.A.

Plaintiff's pre-suit investigation was constrained by the DeKalb County District Attorney office's open investigation into the death of Corey Donegan. As permitted by the Open Records Act, the DeKalb County Police Department has withheld documents from disclosure until the investigation was completed. As the statute of limitations for Plaintiff's claims ran on September 13, 2018, the undersigned filed this lawsuit based on the facts that was presently known to the Plaintiff at that time. Plaintiff separately requested the Court to authorize the immediate issuance of a subpoena to secure documents withheld from production pending the outcome of the District Attorney investigation.

## STATEMENTS OF RELEVANT MATERIAL FACTS:

Let it be known that as stated above there are contradictory issue as of the cause and manner of death of the plaintiff Corey Donegan, and, According to the sequence of the dispatch communications log pg.6( 1-2), that, At the time of the initial incident, it was created by the DeKalb County Police department, not allowing the plaintiffs father to receive but only 4 public incident reports , which led the plaintiff family to believed that the plaintiff encountered 6 DeKalb Police officers, but, since proceeding Pro se and the turning over and reviewing of discovery documents, Use of Force reports, autopsy photos, on scene photos, Grady Hospital medical records, AMR medical emergency records  DeKalb Police Communications time-line reports,  Taser logs and investigation statements made by the involved officers, there is credible information to prove that the officers version of events not only is contradicted by the record, but prove, Corey Donegan, was unarmed and posed no risk of imminent danger according to officer Tiffany Anderson, first officer on scene Use Of Force Report (pg. 1 of 3 exhibit 7), in the suspect action section, stated, there was no physical attack by the plaintiff towards no one ,but let it be known the plaintiff Corey Donegan was assaulted twice, the 2nd assault happened while handcuffed inside ambulance subdued to a stretcher, while all time displaying mental illness, pain from an unknown gunshot wound, head trauma from the officers assault and battery, and multiple tasing, under the setting of drug intoxication.

A.        Events that occurred during the incident

According to the CAD incident detail report pg.6, Officer Naomie Verelien was the 2nd officer on scene driving #422M, Officer Naomie Verelien was the transporting officer riding in the ambulance with the plaintiff, Corey Donegan that night, officer B. Anderson, was the 3rd officer on the scene according to pg.6, officer L.D. Goodwin was the 4th officer on the scene according to CAD report pg. 6,  and officer B. P. Ehasz ,all 4 officers  was already on the scene, before Officer Lister, officer Stephens and officer Parks arrival according to the CAD detail report pg. 6. According to CAD Report and witness call log report, all 4 officers identity was concealed from the criminal investigations by the DeKalb Police department, all 4 officers failed to file or complete a Use of Force report, according to policy ( 4-6.6).  Ex.8) Use of Force report states, it will be the responsibility of the supervisor and any employee involved or witness an incident to complete the use of force report no later than 24 hours.

According to DeKalb County Police-Fire Communication CAD detail time-line report pg.6(Ex.1) and taser logs pg. 1of 2, (Ex.2 )
that there was 10 officers on the scene at the time when the plaintiff Corey Donegan was subjected to unnecessary and deadly use of force from inappropriate tactical conduct and tasing , for the 2nd,3rd, 4th and 5th time, while handcuffed, that caused the plaintiff Corey Donegan,s life.  There are on-scene photos, see exhibits showing the plaintiff, Corey Donegan, handcuffed behind his back, face down on the grass during the first initial arrest with a top of head injury noted in the photo, exhibit 9-14) which all involved officers never mentioned a head injury in any reports or statements,  there are also other photos of the plaintiff handcuffed behind his back with Taser darts, still embedded showing no prior injury of lacerations to his right arm , there are photos of the plaintiff, inside the ambulance handcuffed to the stretcher, unconscious, while DeKalb EMS paramedics work on him, showing no resistance, There are no lacerations or abrasions seen on the plaintiff rights arms ( exhibit 10 and 10A) or knees( exhibit( 9) during the first initial arrest ground photos exhibit( 11) or fire/rescue ambulance photos exhibit(10 b.)( 10 c. ), which fully shows the plaintiffs arms and knees had no previous injuries, which disproves the officers statements of noticing injuries to plaintiff from a prior encounter. There was certainly documents of extensive injuries that was noted, by Detective K. C. Payton DPK373  (Ex. U pg.1of 1) report, that displayed head trauma received during the 2nd assault by the involved officers on scene,  Detective K. C. Payton, in his DeKalb County Police Criminal Investigation Supplemental report (exhibit U), DPK373 Pg.1of 1, noted extensive injuries including a small lump to

the top of head causing brain swelling, as seen in the police on scene ground photos,(Exhibit 9) as well as the Grady hospital photos Exhibit( ).

According to the 5th officer on the scene, Officer Charles Lister police supplemental statement exhibit J, and police time-line CAD details pg.6, and taser reports, he stated that upon his arrival at 22:43, he notice plaintiff already on the ground from the 22:34 tasing by officer Tiffiny Anderson, and that after a short struggle with the plaintiff not removing his hands from underneath him, it took him 30. Seconds to place handcuffs and the plaintiff in custody according to DeKalb CAD report(Ex.1) at 22:44 as recorded. At 22:51 and 22:52 according to the taser logs(Ex.2) pg. 1-2, and autopsy photos exhibit(3), and reports, Officer Lattimore tased plaintiff Corey Donegan twice, in succession in his upper back chest area, instead of officer Lattimore,s statement report of tasing to the lower back area, according to the taser logs narrative( Ex.2) pg. 1-2, in-succession meaning one after another, which shows officer Lattimore did not give the plaintiff time to comply, while already in-custody, subdued and handcuffed on the ground by the other officers, displaying only insolence  and stationary resistance ,while at all times controlled by officer Anderson already embedded taser darts from her first taser deployment at 22:34.(Ex.2)

4.

According to officer Tiffany Anderson sworn statements during the DeKalb Criminal Investigations, she never once admitted that she re- deployed her taser at 23:02 and 23:03 while plaintiff was already in handcuffed.

But, According to(AMR)AMERICAN MEDICAL RESPONSE PATIENT CARE REPORTS pg. 1-2, who was on scene at the plaintiff side at 22:55, given treatment from the first initial arrest and assault ,witness officer Tiffany Anderson and involved officers, according to DeKalb County Criminal Investigation time-line reports pg. 1-3 and the taser  report(Ex.2) pg.1-2 report and AMR report(Ex5) pg. 2, that at 23:02 and 23:03, tased  and assaulted plaintiff Corey Donegan for the 4th and 5th time while handcuffed  and according to officer Tiffiny Anderson Investigations  (Ex.Z)statement of the plaintiff trying to get out of the ambulance, yet again she mentions the plaintiffs action, but never mention her counter action of tasing the plaintiff, further proves a 2nd assault took place in back of the ambulance while restrained. In the cause of injury section of the AMR( Ex5)report pg.2, it was recorded that assaulted, and assault, was the cause of injuries to the Plaintiff who also had an on-scene Glasgow scale of 4. Indicative of brain trauma and unconsciousness, According to the American Medical Response service report(Ex.5) pg. 2.  Grady Hospital reports and medical records, pages 1-15, shows that not only did the plaintiff Corey Donegan arrived with head trauma, he had a Glasgow coma scale of 3, indicating brain damage ,also there was upper and lower compartment trauma so sever, that he was partially paralyze and had complete

respiratory failure, page 10 of the Grady hospital report dr. notes describes the condition that the plaintiff arrived in. she stated that the patient presented with multisystem trauma plus metabolic abnormalities and potential for imminent hemodynamic deterioration, the record went on to say on( pg. 15), that unfortunately the injury to the plaintiff Corey Donegan head was too severe and neurosurgical intervention was deemed futile. Detective K. C. Payton according to his dekalb county police dept. criminal investigation supplemental report DPK 373 pg.1, noted and took pictures of injury to the top of the head in the form of a small lump that causing brain swelling in the morning after the attack. These photos have not been turned over to the pro se yet.   America Medical Response (AMR) Report(Ex.5) pg. 1of 9, shows that the plaintiff condition after 4th and 5th tasing and assault, for being verbally combative and alleged attempt to bite officer Lister on his hand, while all times hand- cuffed to a Stretcher , was so excessive that the police own EMS unit had to call out for Aadvance life support unit , because the basic life support unit was not sufficient enough for the injuries that was caused by the officers. AMR report goes on to say that the plaintiff had a alert/oriented (Ex.5)(A/O)scale x1, which shows the plaintiff was unconscious on scene after being assaulted, when involved officers in there statements clearly stated he was alert and responding to medics, and jumping up and down on stretcher, before transportation, which is false reporting. EMS medics who is part of the dekalb police medical emergency team was on-scene and treated the plaintiff for the first assault by the officers before AMR arrival, according to CAD detail reports and dekalb criminal investigations records, EMS did not report any injurie to the plaintiff ,or to them self , but instead it was alleged and narrated by the investigating detectives records, and not by any EMS personnel , that the plaintiff tried to attack EMS personnel, no involved officers never mentioned or stated, that the plaintiff tried to attack EMS personnel or them in any reports, which further shows cover up by  police department  detectives.

## DEPARTMENTAL POLICY VIOLATIONS:

4-6.6 USE of  FORCE REPORT It will be the responsibility of the supervisor of any employee involved in any listed incidents to complete the Use of Force Report as soon after the incident as possible. A copy of the preliminary Use of Force Report will be immediately (no later than 24 hours) forwarded to the Internal Affairs Unit to be logged as pending. The completed report, along with supporting documentation, will be submitted through the chain-of-command to the Division Assistant Chief.

Sargent A. Brown of the dekalb county police department was the on scene

supervisor on the night of sept. 12, 2016, according to the involved Officers police use of force reports pg. 3 of 3.(Ex.M ) Sargent A. Brown failed to enforce 4-6.6 guide lines by allowing unknown officers to not filed a use of force report as well, he allowed and never reported the excessive use force, when he knew the involved officers had violated departmental and federal policy and law.

Officer Naomie Verelien, Officer B. Anderson , Officer L.D. Goodwin, Officer B.P. Ehaz all was part of the first set of officers, that knowingly went unidentified through the whole criminal investigation until the plaintiff received discovery documents of the dekalb police detail and communication reports and time-line logs, they failed to file a incident report as well as a required use of force report.

H) The deployment of the ECD to subdue an individual For any Use of Force incident not involving a response by the Internal Affairs Unit and the Criminal Investigations Division, it will be the responsibility of every officer witnessing an incident on which a Use of Force Report should be filed to complete a supplemental report. Within or after 24hrs. All 4 officers were on scene and witness the plaintiff receive multiple tasing as well as assaulted. Officer L. D. Goodwin even stated in his declaration on holding plaintiff down and helping securing him on the stretcher and finding his shoes and gun, so he definitely witness the plaintiff plight which shows he ultimately was involved. Officer Verelien was noted as being the transport officer riding in the ambulance and also was on scene early enough according to the undisputed CAD logs, to have witness and participated in the assault on the Plaintiff Corey Donegan.

(Ex.G)    4-6.4    ELECTRONIC CONTROL DEVICES – TASERS

PURPOSE and SCOPE  The purpose of this policy is to establish guidelines for the DeKalb County Police Department's use of Electronic Control Devices (ECD).

POLICY An ECD may be used to control resistant or aggressive individual and other enforcement situations. It is the policy of this agency that officers use an ECD when warranted, but only in accordance with the guidelines set forth here, in

training, and in the use-of-force policy.  An ECD is a control device.

C.  DEPLOYMENT  3.  When multiple officers are present and an ECD is to be used on a subject, only one officer should deploy the ECD on the subject.  In the event the ECD malfunctions or both probes are not in contact with the subject, an additional officer may deploy an ECD if compliance has not been gained.

According to dekalb police dept.-criminal investigation division case note supplement form dated 10/13/2016, pg.1of 2 and dekalb police time-line report pg.6(Ex.6) and taser report pg.1(Ex.2), proves that multiple officers was on scene and officer Tiffiny Anderson had complete control and used only one taser cartridge and that both prongs was embedded in the plaintiff continuously, over 30 minutes from 22:34 til 23:03, when officer timothy Lattimore according to taser logs(Ex.2) pg.1 simultaneously in-succession tased the plaintiff  at 22:51 and 22:52,while according to officers Lattimore,  initial police statement , stated that upon arrival when he got out his car he seen officer Anderson had plaintiff at taser point with other officers assisting to put handcuff on the plaintiff, and he decided to remove his taser and dri stun the plaintiff in the lower back twice, clear violation of  deployment 3 policy procedures.

                                                5.
When possible, avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges.  When activating the ECD the officer should use it for one cycle and stop to evaluate the situation and the subject.

At all times according to the dekalb county police taser logs pg.1, there was prolong exposure, uninterrupted discharges from officer Lattimore taser device as well as extensive multiple discharges and prolong discharges from officer tiffiny Anderson taser device.

Officer Tiffiny Anderson from 22:34 til 23:03= over 30 minutes without changing cartridge, is indicative of extensive and prolong discharges  which violated ECD policy # 5.
Officer Timothy Lattimore use of extended and uninterrupted discharges according to the police taser report violated ECD policy # 5.

Use of the Taser should be combined with physical restraint techniques to minimize the total duration of the struggle and Taser use. Every attempt should be made to take the subject into custody as quickly as possible after the initial

deployment of the ECD in order to reduce the need for subsequent cycles of the ECD. Officers should transition to a different force option if multiple Taser deployments fail to gain compliance.

B. Officer timothy Lattimore violated this procedure when he, according to his own  police supplement statements, stated that upon his arrival he noticed officer Anderson had deployed her taser and had the plaintiff on the ground with other officers trying to place him in custody, instead of following procedures of making a physical attempt to quickly help the other officers to take plaintiff into custody, he decided to pull out his taser and tased the plaintiff twice in succession in the upper back chest area, not allowing the plaintiff time to comply.

8. The ECD should not be used against handcuffed subjects, pregnant women, juveniles, or the elderly unless exigent circumstances exist.

There was 10 officers present, according to the police CAD detail report,(Ex.6) after the plaintiff was handcuffed placed on a stretcher and loaded inside the ambulance and according to the EMS personnel she noted that the plaintiff was handcuffed by all extremities , clearly shows no exigent circumstances existed after the plaintiffs first initial tasing and arrest by officer  Tiffiny Anderson, he was subdue,  handcuffed to the stretcher inside of the ambulance according to all involved officers statements when officer Anderson tased the plaintiff for the 4th and 5th time without mentioning it, in any of her statements or reports.

10. An officer's decision to deploy the ECD on fleeing person(s) who are subject to arrest, should be predicated upon the totality of the circumstance and the considerations outlined above, along with distance and the difficulty in accurately deploying on a moving subject.  A subject's flight should not be the sole justification for deploying the ECD.

See Oliver, 586 F.3d at 898; Smith, 127 F.3d at 1416 both together concluded and clearly established multiple taser shocks can amount to excessive force.

According to officer tiffiny Anderson statement from the initial criminal investigation report,  she stated plaintiff tried to get out of ambulance , which she has has now in her declaration changed to jumping up and down on stretcher, to cover her actions,  but she never mention that she tased the plaintiff for the 4th and 5th time, while at all time handcuffed to the stretcher, and not that the plaintiff jumped out the ambulance and tried to run.

(Ex. H)4-5.9   SEARCH AND SEIZURE GUIDELINES To establish guidelines for the DeKalb County Police Department in controlling search and seizure of property and persons through an overview of existing laws.  It shall be the policy of the Department to conduct searches of persons, places and things pursuant to established State and Federal laws governing search warrants and/or warrantless searches.  Law enforcement officers shall have due regard for the protections guaranteed under the provisions of the Fourth Amendment to the U. S. Constitution.

## FAILURE TO INTERVENE:

Plaintiff contends that dekalb county unknown police officers as well as officer parks of the Lithonia police dept. violated civil stature 4.6.2 by failing to intervene and stop the unnecessary excessive force used by officer Tiffiny Anderson and officer timothy Lattimore, officer Charles Lister, and officer J.L. Stephens, and unknown officers, Let it be known that at all times no officers stated that the plaintiff kicked, punched, or raised a fist towards any officer, except a alleged bite to officer Lister knuckle, which did not break skin,( see officer photos) but, Officer parks clearly stated that he witness plaintiff fighting with the officers when he decided to leave to look for officer Anderson car , which was already secured by Officer S. Woolwine according to his declaration, stated the car was less than a 100 yards away, with lights on at night time, officer parks stated he returned because he could not find it, he stated he return to find officers still fighting with the plaintiff, which proves he had enough time and awareness to stop the physical assault by the officers and that the officers was doing the fighting and not the plaintiff. Multiple officers were on scene within a few feet of each other, and had ample opportunity to save Mr. Donegans life, but failed to do so.  No dignity was shown to the plaintiff as seen in the dekalb police on scene ground photos ( See Exhibits(9,10,10a,10b,10c,11) , the plaintiff is seen beaten with his pants around his ankles, with his private parts exposed.

## AUGEMENTS AND CITATIONS OF LAWS
### COUNT I
### EXCESSIVE FOURCE
(Defendant Tiffiny Anderson)
(4th Amendment & 42 U.S.C. 1983)

Plaintiff re-alleges the allegations of count 1 (excessive force)   against defendant Tiffiny Anderson under the( 4th & 42 U.S.C. 1983) At all times relevant to this action , Defendant Tiffiny Anderson was acting under cover of state law and in her discretionary capacity as a dekalb county police officer. Defendant Tiffiny Anderson violated the fourth Amendment of the United States Constitution by using objectively unnecessary and unreasonable and disproportionate force on the plaintiff Corey Donegan , who was unarmed and did not present imminent threat to anyone,  Defendant Tiffiny Anderson violated the 4th against the plaintiff Corey Donegan, and according to Grady hospital doctor audio evidence,  caused the plaintiff Life from acute kidney infection when she repeatedly tased the plaintiff while handcuffed on a stretcher while receiving treatment from the Emergency Medical Unit, displaying only stationary and insolence resistance, at all times relevant to this action, a reasonable officer would have known that her actions violated clearly established law under the 4th to the united states constitution. Tiffiny Anderson and plaintiff had a special relationship that develope  after the arrest, and that relationship was Breached  by officer Andersons actions and conduct.

To recover, a section 1983 plaintiff must prove two elements: (1) that the conduct complained of was committed by a person acting under state law; and (2) that this conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States.

COMMUNICATIONS DIVISION  (Emergency Operations Center)

The Communications Division represents the central contact point for any person requesting or requiring, police, fire or emergency medical services within DeKalb County.  The Division is responsible for receiving and processing requests for emergency services and coordinating these requests through the selective assignment of primary and secondary field response units.  With all emergency service communications within one central area with support of 911 emergency telephone service, the citizens of Dekalb County are afforded one of the most comprehensive and immediate emergency response systems in the country

## AUGEMENTS AND CITATIONS OF LAWS:

COUNT 1
### EXCESSIVE FOURCE
(Defendant Tiffiny Anderson)
(4th and 42 U.S.C. 1983)

Plaintiff re-alleges the allegations of count 1 (excessive force) against defendant Tiffiny Anderson under the( 4th & 42 U.S.C. 1983) At all times relevant to this action , Defendant Tiffiny Anderson was acting under cover of state law and in her discretionary capacity as a dekalb county police officer. Defendant Tiffiny Anderson violated the fourth and fourteenth amendment of the United States Constitution by using objectively unnecessary and unreasonable disproportionate force on the plaintiff Corey Donegan , and deprive him of due process of the law plaintiff Corey Donegan was unarmed and did not present imminent threat to anyone.  According to Grady hospital doctor audio evidence, dr. stated excessive tasing caused the plaintiff demise from acute kidney infection. Officer Anderson repeatedly tased the plaintiff while handcuffed on a stretcher while receiving treatment from the Emergency Medical Unit, displaying only stationary and insolence resistance, at all times relevant to this action, a reasonable officer would have known that her actions violated clearly established law under the 4th amendment to the united states constitution.

## COUNT II EXCESSIVE FOURCE
### Defendant Timothy J. Lattimore)
(4th & 42 U.S.C. 1983)

Plaintiff re-alleges the allegations of count1 1against defendant Timothy Lattimore under the 4th and 14th amendment to the constitution, at all time revelant defendant was acting under color of law and in his discretionary capacity as a dekalb police officer when he violated the fourth and fourteenth amendment of the United States Constitution by using objectively unnecessary and unreasonable disproportionate force on the plaintiff Corey Donegan, who was unarmed, on ground and handcuffed at all times.


According to documented Grady hospital medical reports as well as AMR patient care medical reports, and detective K.C. Payton report,(Ex.U) the unnecessary excessive force used from the excessive tasing and inappropriate control tactics by officer Timothy Lattimore, clearly was the direct cause of the plaintiffs injuries which deprived the plaintiff of his life without equal protection and due process of the law. The officer and plaintiff had a special relationship after the arrest that was breached  by officer Lattimore actions and conduct , officer Lattimore was acting under color of law.

## COUNT III
## EXCESSIVE FORCE – FAILURE TO INTERVENE
(Defendants Charles J. Lister, Junior L. Stephens,
( Samuel G. Woolwine, Edward Parks and now known officers)
(4th Amendment & 42 U.S.C. § 1983)

Plaintiff re-alleges the allegations contained in complaint as if fully restated herein. Acting under color and authority of state law, Defendant Charles J. Lister, Junior L. Stephens, Samuel G. Woolwine and Edward Parks violated the Fourth Amendment of the United States Constitution when they failed to intervene to protect Donegan from Defendant Anderson and Defendant Lattimore's objectively unreasonable and disproportionate use of force. At all times relevant to this action, a reasonable officer in Lister, Stephens, Woolwine and Parks' position would have known that their actions violated clearly established law under the Fourth Amendment to the United States Constitution. Lister, Stephens, Woolwine and Parks acted intentionally, willfully, maliciously and oppressively,

## COUNT IV – WRONGFUL DEATH
(All Defendants)
(O.C.G.A. § 51-4-2 & 51-4-5(b))

Plaintiffs re-allege the allegations contained in complaint 1-120 as if fully restated herein. The Defendants acted intentionally, willfully, maliciously and oppressively and it was there action that cause the plaintiff death

14

## ASSAULT & BATTERY
ANDERSON AND LATTIMORE
(O.C.G.A. § 51-1-13 & 51-1-14)

Plaintiffs re-allege the allegations contained in complaint 1-125 as if fully restated herein. At All time relevant to this action, the individual Defendants were acting under color of state law and within the scope of their employment with the DeKalb County Police Department. Anderson and Lattimore were engaged in the performance Discretionary duties during the incident with Plaintiff Corey Donegan. The acts of Anderson and Lattimore as set forth more specifically herein constitute an Assault and Battery against Donegan and were committed with actual malice and/or intent to injure Donegan. As a direct and proximate cause of Anderson and Lattimore's acts, Donegan suffered catastrophic injuries resulting in his death.

As in all Fourth Amendment cases, The court must determine the reasonableness of The Officers actions by reference to what they knew at the time.

To begin the excessive force analysis, the district court rejected Sebastian's

Argument that any use of force was unlawful because the arrest itself was lawful

And law enforcement officers are entitled to use some degree of force in effecting a lawful arrest.  Indeed, this Court has recognized that a "typical arrest involves

Some force and injury." See, e.g., Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th

Cir. 2002).  Whether the use of force in making an arrest is excessive turns on

Multiple factors including the severity of the crime and whether the suspect posed a

Threat, was resisting, or fleeing.

A. Let it be known that at the time of incident, what was known to all defendants, was a Terry stop for a shots fired called. Which is a misdemeanor by nature.

Applying this standard, the trial court held that the severe injuries Sebastian suffered from handcuffing provided a sufficient basis to

Deny qualified immunity and permit the claim to move forward to discovery.

B. Plaintiff Corey Donegan received several sever injuries by officers that ultimately led to his death, on scene injuries was so severe that on scene supervisor sgt. A. Brown was unable to identify plaintiff due to unconsciousness, received a 7 inch as well a 10 inch lacerations, to the same right arm that rendered him paralyzed, as well as blunt force trauma to the head, according to grady hospital reports. (See exhibit M investigating supervisor section.)

It concluded, however, that confining Sebastian inside the hot, unventilated car was not excessive force, especially since he suffered no lasting injuries from this

Conduct.  The district court also determined that Sebastian had sufficiently alleged a supervisory liability claim against Lieutenant Ortiz for failure to stop unlawful acts by his officers.

C. Sgt. A. Brown was on scene at 23:02:00 and witness the Tasing by Officer

Anderson at 23:02 and 23:03 while plaintiff was handcuffed yet, he did nothing to stop or discipline defendants. See A. Brown Ex.#

Sebastian was unsure whether Lieutenant Ortiz or Officer Doe

Actually applied the handcuffs, and his supervisory claim alleges that Ortiz failed to

Stop Doe's use of excessive force.  Because the court found that Sebastian

Sufficiently alleged the underlying excessive force claim, he had sufficiently

Alleged this supervisory claim as well.

<u>ARGUMENT AND CITATION OF AUTHORITY</u>

To deny qualified immunity at the motion to dismiss stage, we must

Conclude both that the allegations in the complaint, accepted as true, establish a

Constitutional violation and that the constitutional violation was "clearly

Established."  Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010).

D. There is no dispute that all defendants was acting within the scope of their discretionary authority when wrongful acts occurred.

For these purposes, clearly established law consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state.  See Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997).  A "public

Official 'must first prove that he was acting within the scope of his discretionary

Authority when the allegedly wrongful acts occurred'" to receive the benefit of

Qualified immunity.  Lee, 284 F.3d at 1194 (quoting Courson v. McMillian, 939

F.2d 1479, 1487 (11th Cir. 1991)).  Here, no one disputes that Ortiz was acting

Within the scope of his discretionary authority when he arrived at the scene and

Ultimately arrested Sebastian.  After the defendant makes this showing, "the burden

Shifts to the plaintiff to show that qualified immunity is not appropriate."
Sebastian argues that Lieutenant Ortiz is not entitled to qualified immunity
Because he violated the clearly established law prohibiting the use of excessive
Force in making an arrest. 2  More specifically, Sebastian points to our body of
Cases holding "that gratuitous use of force when a criminal suspect is not resisting
Arrest constitutes excessive force."  Hadley v. Gutierrez, 526 F.3d 1324, 1330
(11th

Cir. 2008).
E. Blunt force trauma to the head, multiple deep lacerations, left plaintiff paralyze
and unconscious was uncalled for while plaintiff was all time handcuffed. See on
scene and autopsy photos.( EX.A,B,C,D)

Sebastian also renews his argument that the use of force was categorically
unlawful because the traffic stop was unlawfully extended and Lieutenant Ortiz
was not entitled to make an arrest.  See Jackson v. Sauls, 206 F.3d 1156, 1171
(11th Cir. 2000) ("[I]f a stop or arrest is illegal, then there is no basis for any threat
or any use of force . . . .").  We decline to address this argument because under this
Court's precedent, "a claim that any force in an illegal stop or arrest is excessive is
subsumed in the illegal stop or arrest claim and is not a discrete excessive force
claim."  Id.; Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995).  Only
Sebastian's excessive force and supervisory failure to intervene claims are before
this Court on appeal.

 To determine whether the force used is excessive, the Supreme Court has
Directed us to consider many factors "including the severity of the crime at issue,
Whether the suspect poses an immediate threat to the safety of the officers or
Others, and whether he is actively resisting arrest or attempting to evade arrest by
Flight."  Graham v. Connor, 490 U.S. 386, 396 (1989).

These cases have added "the relationship between the need and amount of force
used" and "the extent of the injury inflicted" as important considerations.  Vinyard
v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002).  "Because this standard

establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the officer's] position to conclude the force was unlawful."

Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993), modified, 14 F.3d 583 (11th Cir. 1994).  Applying this test, "[w]e have repeatedly ruled that a Police officer violates the Fourth Amendment, and is denied qualified immunity, if He or she uses gratuitous and excessive force against a suspect who is under Control, not resisting, and obeying commands."  Stephens v. DeGiovanni, 852 F.3d 1298, 1328 (11th Cir. 2017) (quoting Saunders v. Duke, 766 F.3d 1262, 1265 (11th Cir. 2014)).

F. There are on-scene photos shows plaintiff Corey Donegan under control, face down, handcuffed at all time behind his back as well sitting up on the lawn handcuffed behind his back, and in the ambulance handcuffed to the stretcher unconscious. He could not follow commands according to AMR reports stating his Glasgow coma scale was a he was nevertheless subjected to force that left him with permanent injuries.( See autopsy photos exhibit M )

Although an officer is entitled to make a custodial arrest for this Kind of violation under Atwater and unsafe driving of course poses some risk to Public safety, speeding is far from the most serious offense an officer can expect to Encounter on patrol.  What's more, there is not the slightest indication in this Record that Sebastian posed a threat to officer safety or to anyone else, or was a Flight risk at any time during the interaction.  All he did was refuse the officers' Requests for permission to search his vehicle, and he was nevertheless subjected to Force that left him with permanent injuries.  This is enough to establish that

Sebastian's Fourth Amendment right to be free from the excessive use of force was
Violated under the exceptional circumstances of this case.

G. according to AMR report, medic was helping defendants load plaintiff in
ambulance, when he became combative of spitting and allegedly bites officer while
all times handcuffed, which led to being Tased and beating until unconscious, no
officers ever mentions plaintiff trying to escape but officer Anderson to cover her
action of Tasing handcuffed  plaintiff twice. See AMR(Ex.5) report pg.1-2.

Now to the "clearly established" question.  A plaintiff can show the violation
Of a clearly established right in a few ways.  See Vinyard, 311 F.3d at 1350–52.

First, and most commonly, a plaintiff can point to a case with "materially similar"
Facts decided by the Supreme Court, the Court of Appeals, or the highest court of
The relevant state.  Or, a plaintiff can "show that a broader, clearly
Rstablished principle should control the novel facts in this situation."  Mercado v.
City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005).  The final, and often most
 Difficult option is to demonstrate that "the official's conduct 'was so far beyond
the hazy border between excessive and acceptable force that [the official] had to
know he was violating the Constitution even without case law on point.'"  Priester
v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (quoting Smith v.
Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).

H. According to all documents of records the plaintiff was tased and put on the
ground by1 female officer, who held her grounds for 3 minutes until back up
arrived, and according to her use of force report there was no physical attack by the
plaintiff, he laid on top of his shot right wrist, on his stomach when back up
arrived, backup officers also stated in reports of noticing plaintiff on the ground
upon arrival with Taser probes embedded from officer Anderson Taser, instead of
exercising due care for a shot suspect experiencing mental illness and drug
intoxication , back up officers subjected plaintiff to physically force in placing
handcuffed on plaintiff at 10:45 the first time,  there are on scene ground photos
showing plaintiff on his face handcuffed ,without autopsy injuries, plaintiff is seen
in EMS ambulance photos handcuffed without  autopsy injuries, plaintiff is seen on
ground photos with probes embedded sitting upright without autopsy injuries, but

what pictures you want see is AMR ambulance photos of the 2nd assault that took place at 23:02 and 23:03 according to( Ex. 2) Taser report pg.1-2( Ex.5)AMR report pg. 1-2 and Sgt. Brown use of force report (Ex. M) pg.1 and Grady hospital report, the plaintiff was beating, dragged, and Tased while handcuffed for the 3rd 4th and 5th time according to Taser records that he was unconscious paralyze unresponsive (Ex.U) when placed in the AMR ambulance which had to be called out because of severe injuries ,which cause the plaintiff Lost of his life, according to doctors recording, there was no pictures taken after second assault.(Ex.5)

Plaintiff case law establishes that "gratuitous use of force when a criminal Suspect is not resisting arrest" may constitute excessive force. Hadley, 526 F.3d at 1330. Thus, for example, in Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), an Officer approached Smith while investigating a tip that described someone with Smith's characteristics as being in the possession of cocaine. Smith Raised a baseball bat in a threatening posture toward the officer and then fled. Id. At 1418. After a short chase, Smith "docilely submitted to arrest" when an officer Ordered him to "get down." Id. The officer then put his knee into Smith's back While he was on the ground, pulled his arm behind his back to apply handcuffs, "And then with a grunt and a blow -- but no sign of anger -- [the officer] broke Smith's arm." Id. The Court held that the officer was not entitled to qualified Immunity because the "broken arm was obviously unnecessary to restrain" Smith When he "was offering no resistance at all." Id. at 1420. This pushed the case into "The slender category of cases in which the unlawfulness of the conduct is readily Apparent even without clarifying case law.

These case law establishes that "gratuitous use of force when a criminal Suspect is not resisting arrest" may constitute excessive force. Hadley, 526 F.3d at 1330. Thus, for example, in Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), an Officer approached Smith while investigating a tip that described someone with

Smith's characteristics as being in the possession of cocaine. Id. at 1417.  Smith

Raised a baseball bat in a threatening posture toward the officer and then fled.
After a short chase, Smith "docilely submitted to arrest" when an officer

Ordered him to "get down."   The officer then put his knee into Smith's back

While he was on the ground, pulled his arm behind his back to apply handcuffs,

"And then with a grunt and a blow -- but no sign of anger -- [the officer] broke

Smith's arm."  The Court held that the officer was not entitled to qualified

Immunity because the "broken arm was obviously unnecessary to restrain" Smith

When he "was offering no resistance at all."   This pushed the case into

"The slender category of cases in which the unlawfulness of the conduct is readily

Apparent even without clarifying case law." Again, in Stephens v. DeGiovanni,
852 F.3d 1298 (11th Cir. 2017), this Court denied qualified immunity when an
officer "slugged" the plaintiff in the chest and threw him into a car-door jamb in
the course of a misdemeanor arrest while the plaintiff was obeying the officer's
commands and responding to his questions.  Considered alongside the minor
nature of the offense, the Court found that the nature and extent of the plaintiff's
injuries -- a cervical sprain, a torn rotator cuff, and a sprained wrist, among others -
- were "the most telling factor[s]" in evaluating whether the force used was
excessive.   The Court held that "no particularized preexisting case law was
necessary for it to be Clearly established" that the officer used excessive force on
these facts.

Still again, in Lee v. Ferraro, 284 F.3d 1188 (11th Cir. 2002), we denied

Qualified immunity to an officer who violently slammed an arrestee's head into the

Trunk of her vehicle after she was handcuffed.   The Court relied on

"The clear and obvious principle that once an arrest has been fully secured and any

Potential danger or risk of flight vitiated, a police officer cannot employ the severe

And unnecessary force allegedly used."   No reasonable officer could have

Believed that use of force was legal under the circumstances, so this officer was
not

Entitled to qualified immunity.  And in Hadley v. Gutierrez, 526 F.3d 1324 (11th

Cir. 2008), we likewise denied qualified immunity to a police officer who punched

 An arrestee in the stomach after he was handcuffed and while he was not resisting,

Even though the suspect appeared to be "high on cocaine and paranoid."   The

Court relied on our "cases hold[ing] that gratuitous use of force when a

Criminal suspect is not resisting arrest constitutes excessive force," such as Lee.

So, this case law is clear that serious and substantial injuries caused during a

Suspect's arrest when a suspect is neither resisting an officer's commands nor

Posing a risk of flight may substantiate an excessive force claim.  Although we

Have never addressed a claim factually identical to Sebastian's, Smith established

That if An arrestee demonstrates compliance, but the officer nonetheless inflicts

Gratuitous and substantial injury using ordinary arrest tactics, then the officer may

Have used excessive force.  This was true even though the plaintiff in Smith,
unlike

Sebastian, was initially recalcitrant and even acted aggressively toward the officer.

Lifting an arrestee's arm behind his back in order to handcuff him is a routine

Arrest technique, but a panel of this Court found that the officer clearly violated
the

Fourth Amendment because he deployed it with undue severity to an obedient

Arrestee.  Here, the facts as alleged in the complaint lead inescapably to the

Conclusion that the substantial injuries were inflicted on Sebastian in a similarly

Gratuitous manner, not as an incidental effect of legitimate law enforcement

Actions.


 The issue of qualified immunity as to the supervisory liability claim can be

Dealt with quickly.  "[I]f a police officer, whether supervisory or not, fails or

Refuses to intervene when a constitutional violation such as an unprovoked beating

Takes place in his presence, the officer is directly liable under Section 1983."
Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998) (quoting Byrd v. Clark, 783
F.2d 1002, 1007 (11th Cir. 1986)).  To be held liable, the officer must both be "in a
Position to intervene" and "fail[] to do so."  Priester, 208 F.3d at 924.  Of course,
There also must be an underlying constitutional violation.  Crenshaw v. Lister, 556
F.3d 1283, 1294 (11th Cir. 2009).  Plainly, an officer cannot be liable for failing to
Stop or intervene when there was no constitutional violation being committed.

This claim is premised on the idea that Sebastian is unsure which officer --
Lieutenant Ortiz or Officer Doe -- actually applied the handcuffs.  Sebastian
Alleges that if it was Doe, Ortiz is liable for failing to intervene in Doe's use of
Excessive force.  As the district court correctly noted, the failure to intervene claim
Is therefore wholly dependent on the underlying excessive force claim.  The parties
Do not dispute, at the motion to dismiss stage, whether Lieutenant Ortiz was in a
Position to intervene or whether he failed to do so, assuming that the unidentified
Officer actually applied the handcuffs.  The only dispute is whether a constitutional
Violation occurred, so this issue necessarily turns on the analysis we have already
Set forth.  Because Sebastian has adequately pleaded a clearly established
Constitutional violation of his right to be free from excessive force, Lieutenant
Ortiz is not entitled to qualified immunity on the failure to intervene claim.

The district court did not err in denying Lieutenant Ortiz qualified immunity


## STANDARD OF REVIEW

Our review of a district court's entry of summary judgment is *de novo,* and we view the facts
in the light most favorable to the nonmoving party. *Gray ex rel. Alexander v. Bostic,* 458
F.3d 1295, 1303 (11th Cir. 2006).

We must draw all reasonable inferences in favor of the party opposing summary judgment.
*Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1313 (11th Cir. 1999). "Even where the parties

agree on the facts, if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Manners v. Cannella, 891 F.3d 959, 967 (11th Cir. 2018)*

In contrast, summary judgment should be granted when the record evidence shows that there is no genuine dispute concerning any material fact and the movant is entitled to judgment as a matter of law. *Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013)* (citing Fed. R. Civ. P. 56(a)).

Conclusory allegations and speculation are insufficient to create a genuine issue of material fact. *See Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)* ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").

J. Dekalb police department has created a lot of conclusory allegations and speculations of hearsay about plaintiff Corey Donegan like a unproven kidney condition and shooting of his friend and his self. Plaintiff was jumping up and down on stretcher, plaintiff tried getting out of ambulance plaintiff bites officer while officer was pulling hand out of plaintiff mouth causing laceration then changes story, because picture show no skin broken, detective stated to plaintiff wife he jumped out of car, detective stated plaintiff fell and bumped head after tasing, plaintiff tried to break in house, plaintiff was combative with EMS which EMS never mention plaintiff was combative with them, all of these allegations was never proven and cause a negative narrative of the plaintiff as well as false issues which is the defendants demolishing goal. Plaintiff never attacked anyone, only displayed insolent and stationary resistance of yelling and cursing all time handcuffed  (Ex.28)(Ex.29)

A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority." *Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007)*. After the official makes this showing — and here it is undisputed — the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)*.

K.  Let it be known that dekalb search and seizure policy 4-5.9 clearly establishes at the time of incident defendants a constitutional violation of reapeated tasing and beating a handcuffed subdue suspect violated 4th amendment rights of being free from unnecessary excessive use of force.   See exhibit #H

Viewing the evidence in the light most favorable to Mr. Glasscox and drawing all reasonable inferences in his favor, we conclude that Officer Moses violated his constitutional right to be free from the excessive use of force by repeatedly tasing him even though Mr. Glasscox had ceased any resistance and was attempting to comply with Officer Moses's commands. We thus affirm the district court's denial of the City's motion for summary judgment.[8] We also conclude that the law was clearly established at the time of Mr. Glasscox's encounter with Officer Moses that the repeated deployment of a taser on an arrestee who has stopped

resisting and is attempting to comply constituted excessive force. We affirm the denial of qualified immunity to Officer Moses.

"The critical time period for purposes of determining whether" the repeated use of a taser on an arrestee "constituted unconstitutional excessive force spans ... just before the first activation... through ... the time of the [final] [t]aser deployment." *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016). Even if the arrestee's resistance justified deployment of a taser initially, if he has "stopped resisting ... during this time period," further taser deployments are excessive. *Id.*; *see id.* at 1021 ("Construing the evidence in favor of Plaintiff, the unambiguous facts are that [he] was no longer resisting at least after the first two tasings, and that [the officer's] further use of the [t]aser was wholly unnecessary and grossly disproportionate to the circumstances."). Construed in Mr. Glasscox's favor, the evidence shows that he offered no resistance at least after 1215*1215 the second tasing, making Officer Moses's further use of the taser excessive under the circumstances.

In the time spanning the second to fourth tasings, Mr. Glasscox did nothing that reasonably could be viewed as resistance. During the second taser shock, Mr. Glasscox's movements were entirely involuntary: his hands and arms curled up toward his chest while he shook and writhed. Then, mere seconds after the second shock ended, without giving Mr. Glasscox time to get out of the truck Officer Moses tased him a third time. During this third shock and immediately following, Mr. Glasscox insisted that he would get out of the car, but Officer Moses gave him no more than two seconds to do so before tasing him a fourth time All of the relevant circumstances, including the very brief time — mere seconds — between Taser deployments; the nature of Mr. Glasscox's movements, which were involuntary responses to the taser shock; and Mr. Glasscox's expression of his intent to comply by repeatedly saying "I will" in response to Officer Moses's commands to get out of the truck indicate that rather than resisting Mr. Glasscox was attempting to comply but was continuously thwarted by Officer Moses's repeated tasings, delivered in rapid succession. Because a reasonable jury could conclude that Officer Moses's own actions appear to have been preventing Mr. Glasscox from complying.

L. facts are seen on scene photos, and ambulance photos of plaintiff not resisting after 3 tasing, all voluntary movement was due to being tased multiple times, twice in sucession, keeping plaintiff from complying, while being beating and manhandle , by 10 officers, plaintiff at all time told officers of his gunshot wound, yet due care was not performed.( Ex.2 & Ex.A,B,C,D)

The final factor, the nature and extent of Mr. Glasscox's injuries, also favors Mr. Glasscox. Officer Moses argues that Mr. Glasscox's injuries were "minimal," so this *Graham* factor weighs in his favor. But Officer Moses reported that immediately after the multiple taser shocks, Mr. Glasscox was "bleeding all over the place," and Mr. Glasscox's treating physician testified that he suffered psychological injury, commands; thus, Officer Moses's repeated firing of his taser, which caused Mr. Glasscox injury, "was wholly unnecessary, and grossly

disproportionate to the circumstances." _Wate, 839 F.3d at 1021_. As our precedent makes clear, "[t]he use of a taser beyond the arrestee's complete physical capitulation repeatedly in a short period where an arrestee was mostly cooperative and made no attempt to flee would be excessive." _Manners, 891 F.3d at 974_

M. the plaintiff injuries was not minimal at all, treating physicians stated that due to his injuries attempt to save his life was deem futile. See Dr. reports ( Exhibit#F)

## Clear Established Law Demonstrates that ALL Defendants knew there Conduct Was Unconstitutional.

To determine whether a right was clearly established, we look to binding decisions of the Supreme Court of the United States, this Court, and the highest court of the relevant state _McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007)_. We ask whether it would be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful," _District of Columbia v. Wesby,      U.S.     , 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018)_  "`in light of the specific context of the case, not as a broad general proposition,'" _Lee, 284 F.3d at 1194_ (quoting _Saucier, 533 U.S. at 201, 121 S.Ct. 2151_).

To be clearly established, a legal principle must be "settled law," meaning that it is not merely suggested, but rather "is dictated by controlling authority or a robust consensus of cases of persuasive authority." _Wesby, 138 S.Ct. at 589-90_ (internal quotation marks omitted). What's more, a rule must be specific enough that the officer's unlawfulness "follow[s] immediately from the conclusion that the rule was firmly established." _Id._ at 590 (alteration adopted) (internal quotation marks omitted). The Supreme Court has "stressed that the specificity of the rule is especially important in the Fourth Amendment context." _Id._ This means that officers are not required to be "creative or imaginative in drawing analogies from previously decided cases." _Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002)_ The crucial question here is whether the state of the law gave police officers "fair warning" that their conduct was unconstitutional. _Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)_.

## N.    4-5.9   SEARCH AND SEIZURE GUIDELINES

To establish guidelines for the DeKalb County Police Department in controlling search and seizure of property and persons through an overview of existing laws. It shall be the policy of the Department to conduct searches of persons, places and things pursuant to established State and Federal laws governing search warrants and/or warrantless searches.  Law enforcement officers shall have due regard for the protections guaranteed under the provisions of the Fourth Amendment to the U. S.  Constitution.

1. Proof that All defendants was aware of departmental policy regarding 4th amendment violation when they blatantly disregarded the plaintiff rights, by subjecting him to 5 tasing, 4 while handcuffed, beating so severe that he was paralyzed and unresponsive on scene and upon arrival to hospital only to succumb to his injuries days later.  (See exhibit #F,G, G(a)

"[T]he rule requiring particularized case law to establish clearly the law in excessive force cases" has "[a] narrow exception," _Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000),_ known as the "obvious clarity" rule, _Oliver, 586 F.3d at 907._ Under this rule, "an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law" on point. _Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)._ "To come within the narrow exception, a plaintiff must show that the official's conduct `was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without case law on point.'" _Priester, 208 F.3d at 926_ (alteration adopted) (quoting _Smith, 127 F.3d at 1419_). "This test entails determining whether application of the excessive force standard would inevitably lead every reasonable officer in the Defendants' position to conclude the force was unlawful." With these principles in mind, we conclude that it was clearly established on the date of Mr. Glasscox's arrest that the repeated tasing of a suspect who had ceased any resistance was unlawful. _See Oliver, 586 F.3d at 898;` Smith, 127 F.3d at 1416. Oliver_ and _Smith_ together dictate this result. We address these authorities in turn.

_Oliver_ clearly established that administering multiple taser shocks can amount to excessive force. A patrolling police officer encountered Mr. Oliver in the median of a roadway, waving his arms in an attempt to flag the officer down. _586 F.3d at 901._ The officer stopped and exited her car and began speaking with Mr. Oliver, who was standing several feet away. _Id._ at 901-02. Mr. Oliver told the officer that someone had been trying to shoot him, and she called for backup. _Id._ at 902. A backup officer arrived and attempted to move Mr. Oliver from the median, but Mr. Oliver "struggled and pulled away from him" and "attempted to walk away." _Id._ Without warning, the first officer tased Mr. Oliver. _Id._ The taser shock brought Mr. Oliver to the ground. _Id._ at 903. "[O]nce [Mr.] Oliver was on the pavement after the first tase, he never got back up, and he never hit, kicked, punched, or threatened the officers." _Id._ Nevertheless, three to four seconds after the first shock ended, the officer tased Mr. Oliver again. _Id._ Ten seconds after the end of this second shock, she tased him for the third time. _Id._ After this third shock, Mr. Oliver screamed that the pavement was "too hot." _Id._ He attempted to sit up and get off the ground. _Id._ The officer continued to shock Mr. Oliver, and after no fewer than eight shocks, he was lying flat and did not get up. _Id._ Mr. Oliver died 19 days later as a result of his injuries. _Id._ at 901, 904.

We affirmed the denial of the officer's motion for summary judgment based on qualified immunity. _Id._ at 1417. We held that it was obviously clear to any reasonable officer — and therefore clearly established — that a police officer's use of force on a "previously threatening" arrestee after the arrestee ceased any resistance was excessive.

In light of this clearly established law, no objectively reasonable officer in Officer Moses's position could have thought it was lawful to use a taser repeatedly on an arrestee who was not resisting, even if that arrestee had previously offered resistance and was not yet restrained. *Oliver* settled any question whether repeated taser deployment could constitute excessive force even if an earlier deployment was justified. And *Smith* removed any doubt that an officer's use of substantial force on an arrestee who, although not yet restrained, had ceased any resistance or threatening behavior, is excessive. Together, *Smith* and *Oliver* clearly establish that the repeated tasing of a subdued arrestee who has ceased any resistance or threatening conduct is excessive force in violation of the Fourth Amendment.

Alternatively, under the unusual circumstances of this case, it would be obviously clear to any reasonable officer that the display of force was excessive. It is clear from precedent that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). "We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) (citing cases decided before Mr. Glasscox's arrest, including one, *Priester*, in which the suspect was subdued but not restrained). Accepting the evidence in the light most favorable to Mr. Glasscox, we conclude that, because Officer Moses used gratuitous and excessive force on an arrestee who was not resisting arrest, "no particularized preexisting case law was necessary for it to be clearly established that what [Officer Moses] did violated [Mr. Glasscox's] constitutional right to be free from the excessive use of force." *Priester*, 208 F.3d at 927; *see also Oliver*, 586 F.3d at 908 (holding that the facts of the plaintiff's case fell within the obvious clarity rule); *Smith*, 127 F.3d at 1420

O. On scene and ambulance photos clearly shows plaintiff  Corey Donegan handcuffed and under control, when according to AMR report of plaintiff becoming passive/aggressive on the stretcher during transport, he was tased for the 4th and 5th time at 23:02 and 23:03 and received a beating that left him with a severe head injury, noted by Detective K.C. Payton, multiple deep lacerations and unconscious and paralyzed according to Grady hospital records before arrival. See Exhibit# (A,B,C,D)

Any resistance offered after the use of force is irrelevant to the reasonableness of the force employed. *See Saucier v. Katz*, 533 U.S. 194, 206-07, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (explaining that excessive force claims must be evaluated for objective reasonableness based on the information officers have at the moment the force is applied), *receded from on other grounds in Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Let it be known that after the plaintiff was placed in custody at 10:44, he was subjected to excessive unnecessary use of force that caused his life without due regard to the law. See plaintiff Ex.2  pg. 1of2

ARTICLE 8.  CONDUCT IN ARRESTING AND DEALING WITH LAW VIOLATORS The law enforcement officer shall use his powers of arrest strictly in accordance with the law and with due regard to the rights of the citizen concerned. His office gives him no right to prosecute the violator nor to mete out punishment for the offense.  He shall, at all times, have a clear appreciation of his responsibilities and limitations regarding detention of the violator.  He shall conduct himself in such a manner as will minimize the possibility of having to use force.  To this end he shall cultivate a dedication to the service of the people and the equitable upholding of their laws whether in the handling of law violators or in dealing

Officers should not take undue risks that could result in death or serious bodily injury. Whenever possible, officers should attempt to defuse and stabilize the situation by using communication skills and/or waiting for additional responding officers. Officers are never required to take unreasonable risks and may opt to disengage or withdraw if such action can be safely accomplished without further endangering themselves, other officers or the public. Officers should always be prepared to constantly reevaluate any situation and de-escalate or escalate as needed or required.

Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force. Deadly force will be used with great restraint, as a last resort, and only when the level of resistance warrants the use of deadly force. The DeKalb County Police Department places a greater value on human life than on the protection of property; therefore, the use of deadly force is not allowed to protect property interests.

P. The level of passive/aggressive behavior of the Plaintiff while handcuffed did not warrant the use of deadly force and there was other possible remedies like pepper spray, spit mask, including straight jacket that could have been used, let it be known that at all time the plaintiff was outnumbered by 10 dekalb police officers.

## MEMORANDUM OF LAW

There are numerous cases which confirms that repeated Tasing of handcuffed suspect is a violation of excessive force under the 4th amendment. Malice has been shown through reports and the medical records provided

Let it be known that the Officers version of events is contradicted by the record and the plaintiff has cleared the two hurdles in order to defeat summary judgment, we have demonstrated that the facts alleged on the defendants, violated statutory and constitutional rights, and it has been shown that the right was clearly established through their departmental policy. see riley v. newton, 94 F.3d 632,636-37(11th cir. 1996),cert.denied, 117 s.ct.955(1997)

There are numerous cases which confirms that repeated Tasing of handcuffed suspect is a violation of excessive force under the 4th amendment. Malice has been shown through reports and the medical records provided

Let it be known that the Officers version of events is contradicted by the record and the plaintiff has cleared the two hurdles in order to defeat summary judgment, we have demonstrated that the facts alleged on the defendants, violated statutory and constitutional rights, and it has been shown that the right was clearly established through their departmental policy. see riley v. newton, 94 F.3d 632,636-37(11th cir. 1996),cert.denied, 117 s.ct.955(1997)

## CONCLUSION

Wherefore, The foregoing reasons the plaintiff request that the court find that the defendants not only be denied summary judgment, but be denied qualified immunity as well.

This 23rd day of October, 2019.

Sharon Booker

Pro se Plaintiff