TABLE OF CONTENTS FOR REVISED SUBMITTED REPLY BREIF

A. GRADY DOCTOR'S RECORDING……………………………………..

B. OFFICER'S ANDERSON NOTED LACERATIONS ON PLAINTIFF ON SCENE……………………………………………………………….

C. INTUBATED WITH HEAD TRAUMA…………………………………...

C (a) BLOWN AND FIXED PUPIL INDICATING HEAD TRAUMA…………..

D. OFFICER LISTER SUPPLEMENTAL STATEMENT…………………….

D (a) OFFICER'S STATEMENTS OF NOTICING INJURIES TO PLAINTIFF pg 16-17

E. GRADY HOSPITAL REPORT (UPPER RIGHT EXTREMITIES SWOLLEN AND TENSED………………………………………………………….

F. USE OF FORCE POLICY 4-6.1………………………………………….

F. (a) RESPIRATORY FAILURE WITH RHABDOMYOLYSIS ………………….

G. ELECTRONIC CONTROL POLICY 4-6.4…………………………………....

G (a). FAILURE TO INTERVENE CIVIL STATUE 4-6.2……………………...

H. SEARCH AND SEIZURE GUIDELINES 4-5.9………………………………

I.  DEFENDANTS INDEX TABS A-X

J. INTUBATED AFTER K.C. PAYTON NOTED POSITIVE HEAD TRAUMA…

K. DETECTIVE K.C. PAYTON NOTED HEAD INJURY ONSCENE…………...

L.  TASER INTERNATIONAL WARNINGS…………………………………....

M. OFFICER ANDERSON STATEMENT OF NOT NOTICING INJURY TO PLAINTIFF……………………………………………………………..

N.  GRADY RECORDS OF CRITICAL CONDITIONS, PARALYZED W/HEAD TRAUMA…… pg. 21………………………………………………...

O. GRADY REPORT OF HEAD INJURY DEEMED FUTILE…………………..

P. DEKALB DEALING WITH MENTAL ILLNESS POLICY………………....

Q. GRADY HOSPITAL REPORT OF RHABDOMYOLYSIS…………………..

R. CHARISSMA JOHNSON PAID FOR THE ROOM……………………….

# EXHIBIT B

## DEKALB COUNTY POLICE DEPARTMENT
## GA0440200
### NARRATIVE

| Case # |
| --- |
| 16-089200 |

| Officer ID/Name | | Date | Approving Officer ID/Name | | Date |
| --- | --- | --- | --- | --- | --- |
| 3293 | Anderson t d | 9/13/2016 12 38 10 AM | | | |

INITIAL REPORT

On September 12, 2016, I was dispatched to the intersection of Phillips Road and Phillips Lake Way in reference to a shots fired call. Comments on the call advised after hearing the shots fired, the complainant saw a black male in a white tank top and blue jeans take off his shoes and start walking in circles at the intersection

Upon my arrival, I made contact with the black male in a white, bloody tank top and blue jeans. He seemed to be slightly disoriented and began to walk into the roadway into on coming traffic. I commanded him to stop and put his hands in the air and he slightly raised his arms and kept his elbows close to his body. I then observed he had a firearm under his armpit. I drew my weapon and commanded him several times to drop the weapon but he did not comply. He was slightly turned away from me at this point and slowly placed the weapon on the ground

The subject then continued to walk into oncoming traffic and began fleeing on foot southbound on Phillips Road into oncoming traffic as I pursued. He then headed east on Laurel Post Dr and attempted to break into the residence of 6316 Laurel Post Dr The homeowner, Ms. Sylverine Burrows and her daughter, Ms Cierra Burrows were inside the location and advised that did not know the suspect nor were they expecting anyone. The door was not damaged

When I approached the suspect at the residence of 6316 Laurel Post Drive, he attempted to run again. I commanded him to stop running or he would be tased. At this point it was unknown what his intentions were and he seemed to be a danger to the public. I yelled Taser, Taser and deployed my taser, making contact in each tricep of the suspect. He fell to the ground but still did not comply. The suspect was given another charge as he continued to resist before backup arrived

Officers, JLStephens #2877, TLattimore #3266 and JLister# 3328 all arrived on scene and we attempted to get the suspect into custody. During this process, he bit Officer JLister #3328 through his glove causing a laceration on his right hand. AMR56 responded to the scene to treat the suspect for lacerations unrelated to the arrest and complaints of wrist injury.

While we were attempting to get the suspect onto the stretcher he attempted to bite Officer TLattimore #3266 but did not make contact. The suspect was then transported to Grady Memorial Hospital for treatment. He was immediately taken into surgery and was unable to give any further information or be identified.

During this incident a person shot call came out at DeKalb Medical Hospital before the victim was transported to Grady Memorial Hospital and is believed to be related (see case number 16-089186)

The homeowner at 6316 Laurel Post Dr was given a case number for this incident. Assault Detective Mcquilkin #922 was notified and responded to Grady Memorial Hospital

# EXHIBIT C

 Grady

GRADY HOSPITAL
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN, COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/8/2016

Consults by Winters, Amalia, MD at 9/13/2016 7:32 PM (continued)                              Version 1 of 2

PPI
Holding lovenox

**Dispo - ICU**

**Amalia Winters, MD**
**Surgery**
**PIC# 60240**
**(Please contact SICU on call resident with questions)**

Signed by Winters, Amalia, MD on 9/13/2016 10:46 PM

Consults by Payne, Diane S., MD at 9/13/2016 11:02 PM                                          Version 2 of 2

Author: Payne, Diane S., MD            Service: Orthopedics          Author Type: Physician
Filed: 9/16/2016 11:57 AM              Note Time: 9/13/2016 11:02 PM  Status: Addendum
Editor: Payne, Diane S., MD (Physician)
Related Notes:    Original Note by Kurkis, Gregory, MD (Resident) filed at 9/13/2016 11:20 PM

Orthopaedic Consult Note

Ref Physician: MTC

Pt was seen at 800 on 9/13/16

Chief Complaint: Wound to right hand

HPI: Emergency is a 109 y.o. unknown s/p unknown trauma. Apparent puncture wound to right hand
- per report was gunshot to right hand. Agitated and then tazed by police. Unknown mechanism.
Patient agitated on arrival and intubated positive head trauma, unknownLOC.

Non ortho injuries:
Subarachnoid hemorrhage
Metabolic acidosis

ROS: A 15 point ROS was done and is negative except per HPI

PMHx: No past medical history on file.

PSHx: No past surgical history on file.

Meds:
No current facility-administered medications on file prior to encounter.

No current outpatient prescriptions on file prior to encounter.

# EXHIBIT C(a)

 **Grady**

GRADY HOSPITAL
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN,COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/8/2016

Consult Notes (continued)

Consults by Sayed, Huda, MD at 10/6/2016 3:39 PM (continued)

Advanced Directives: none
Healthcare Directive: No, patient does not have an advance directive for healthcare treatment

Version 1 of 1

PAST MEDICAL HISTORY: unknown as pt is unresponsive
Other than HPI, other disease:
SOCIAL HISTORY:
**Social History**
Substance Use Topics
- Smoking status:                Not on file
- Smokeless tobacco:          Not on file
- Alcohol Use:                    Not on file

FAMILY HISTORY: Non contributary

**PHYSICAL EXAM:**

BP 166/89 mmHg | Pulse 111 | Temp(Src) 37.1 °C (98.8 °F) (Bladder) | Resp 27 | Ht 1.88 m (6' 2") |
Wt 81.647 kg (180 lb) | BMI 23.10 kg/m2 | SpO2 92% |

General: critically ill in ICU, on CRRT, being re-warmed, unresponsive
Eyes: No icterus,
ENMT: dry mucosa
CV: tachycardic
Pulm: CTA, respiratory support from vent via trach
GI: decreased BS, PEG tube in place, soft
GU: foley in place
Musculoskeletal: no deformity
Neurological: sedated, pupil blown and fixed, not reactive to light, no corneal reflex
Skin: abrasions on R knee, wound vac in place in RUE with serosanguinous fluid.
Hematologic/Lymphatic/Immunologic: No bruising, petechiae
Psychiatric: unable to assess

Lab and test reviewed: yes

**HEMOGLOBIN-BLOOD**

| Date | Value | Ref Range | Status |
|---|---|---|---|
| 10/05/2016 | 7.9* | 13.5-17.5 g/dL | Final |

**HEMATOCRIT-BLOOD**

| Date | Value | Ref Range | Status |
|---|---|---|---|
| 10/05/2016 | 25.6* | 40.0-50.0 % | Final |

**UREA NITROGEN-SERUM**

| Date | Value | Ref Range | Status |
|---|---|---|---|
| 10/05/2016 | 42* | 8-22 mg/dL | Final |

**AST (SGOT)**

# EXHIBIT D

| Officer ID/Name: 3328 | Lister c } | Date: 9/12/2016 11:43.00 PM | Approving Officer ID/Name: | Box: |
| --- | --- | --- | --- | --- |

| Title: | SUPPLEMENTAL NARRATIVE |
| --- | --- |

Report Date:
Reporting Officer: -
Approving Officer: -

On September 12, 2016, at approximately 2238 hours, I responded to Laurel Post Drive to back Officer T Anderson (Badge 3293) detain a subject who hit the ground.

Upon my arrival, Officer J. Stephens, T. Lattimore, and T. Anderson had the suspect on the ground while Officer T Anderson had the suspect at taser point. I attempted to to restrain the suspect and place him into custody. During the struggle the suspect bit me on the right hand. Approximately 30 seconds to a minute later the suspect was placed in custody. AM56 transported the suspect to Grady due to a possible gun shot wound to the right wrist.

DKPD000453

# EXHIBIT D(a)

After being advised of his Miranda Rights, Ofc. Latimore agreed to give a statement. He said that when he arrived on scene the suspect was already face down and other officers were already trying to put him into custody. He said that he did drive stun the suspect twice in the back with his Taser but that it had no effect. He then switched to trying to grapple with the suspect and bend his arms behind his back.

**Once the subject was in custody he did notice a wound to his hand but did not recall seeing any other injuries.** He also said that the suspect never lost consciousness and that he was still awake and alert when the ambulance left with the suspect. Ofc. Lattimore said his car does not have a camera system and he was not wearing a body camera. Ofc. Lattimore also provided a written statement. (Tab M)

On 11-16-16 around 14:30 hours, Ofc. Anderson came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of her Miranda Rights, Ofc. Anderson agreed to give a statement. She said when she first encountered the suspect, he was in the roadway, had blood on him and had a handgun tucked under one arm pit. When she challenged him, he kept walking into oncoming traffic. He eventually stopped and then eventually put the gun on the ground. As she continued to give him commands to get on the ground he started to go to the ground then got up instead and started running away. She gave chase and eventually caught up with him as he was trying to break down a door to a home with his shoulder. He then tried to flee again and she used her Taser. One probe went into each arm. He then fell to the ground in the grass on his side. Once other officers arrived, they began trying to pry his arms from under him. While doing so one officer got bit by the suspect. Ofc. Anderson said she thinks another officer did drive stuns on the suspect but she wasn't sure which one. **The only injuries she saw were scrape marks on one of his arms and the injury to his wrist.** She said the suspect was awake but seemed unable to comprehend what was going on or what was being said to him. She noted he had dilated pupils and that EMS administered something to him prior to him being transported via the ambulance. When Ofc. Anderson last saw him he was conscious and the ambulance crew was talking to him.

Ofc. Anderson said her car does not have a camera system and he was not wearing a body camera.

Ofc. Anderson also provided a written statement. (Tab M)

On 11-16-16 around 1430 hours, Ofc. Stephens came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of his Miranda Rights, Ofc. Stephens agreed to give a statement. He said that he and Ofc. Parks both arrived on scene at the same time. He saw Ofc. Anderson with her Taser out and the suspect down on the ground, in the grass, with Taser

Sgt. B. L. Danner, #1917               Approved by: _____
****************** **Closed Pending Further Court Action** ******************
- 16 -

probes in his arms. Ofc. Anderson said her car still needed to be secured and the suspect left a gun back near her car. Ofc. Parks then left to secure Ofc. Anderson's car.

Ofc. Stephens came up and tried to handcuff the suspect but he was holding his arms under his body and he couldn't pry them from under him. He saw that the suspect was bleeding from his arms and palm. At this point he *backed off* and requested EMS. As other officers arrived, he and Ofc. Lister and Ofc. Lattimore then went *back in* to arrest the suspect and they were eventually able to bring his hands from under his body and handcuff him.

Ofc. Stephens said the suspect didn't respond to questions but he was awake. Ofc. Stephens took the photos of the suspect at the scene. The only injuries he noticed were scrapes on his forearms and the injury to his wrist. He saw no injuries to his head or face.

Ofc. Stephens said his car had a personally purchased video camera on the dashboard but he didn't think it recorded the incident as it was facing the wrong way. He also said that it has a limited memory and may have recorded over as he keeps it on all the time. I asked him to bring in the camera and he agreed.

Ofc. Stephens also provided a written statement. (Tab M)

On 11-22-16, Ofc. Stephens brought in his dash cam and I downloaded all the video from it. None of the files show the incident or any incident from that day. The files were copied to a CD and are with the case file. (Tab W)

On 12-8-16 I spoke to Inv. Bowen of the Medical Examiner's Office. Per Bowen, the cause of death had not been determined and was still pending.

On 1-10-17, I spoke to Inv. Minter of the MEs office and he said the death was caused by delayed complications of cocaine associated with excited delirium and that other conditions included a gunshot wound of the hand. He went on to say the death has been ruled accidental. I requested a copy of the final report and received it 1-13-17 (Tab R). On page 6 of 7, the Medical Examiner noted that at the time of admission to the hospital, no head trauma was noted.

The GBI forensic report (Tab X) comparing the shell casings to the gun recovered by Ofc. Woolwine is still pending. At Tab N are the DeKalb County Crime Scene Unit reports.

A CD containing all of the 911 audio calls is included at Tab V

Also included with this file are CDs of the officer interviews I conducted and the crime scene photographs. A separate CD also includes photos from the Use of Force package. These are the same photos that are printed and posted with Tab J.

## RECOMMENDATION:

Sgt. B. L. Danner, #1917            Approved by: _____
****************** Closed Pending Further Court Action ******************

# EXHIBIT E



**GRADY HOSPITAL**
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN,COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/8/2016

Consult Notes (continued)

Consults by Saad, Marc, MD at 9/15/2016 12:15 PM (continued)                        Version 2 of 2

## Physical Exam (need 9 areas)
Gen: mild distress
HEENT: no JVD
Dialysis access: non at this time
Chest: Clear, no crakles
CV: RRR, no murmur
Abd: soft, non distended
Ext: no pitting edema in lower depedent area. Right upper extremity swollen and tense
GU: foley in place with dark concertrated urine
Joint: no swelling
Skin: no rash
Neuro: alert, cooperative

## Reviewed Data
I/O last 3 completed shifts:
In: 10970.2 [I.V.:9470.2; Blood:1500]
Out: 2661 [Urine:2150; Emesis/NG output:5; Drains:506]
I/O this shift:
In: 700 [I.V.:700]
Out: 93 [Urine:50; Drains:43]

## Recent Labs

|     | 09/14/16 0600 | 09/14/16 1813 | 09/15/16 0442 |
|-----|-----|-----|-----|
| WBC | 15.2* | 12.7* | 10.6 |
| HGB | 13.1 | 12.3 | 11.5 |
| PLT | 90* | 101* | 82* |

No results found for: CD4TABS
@LASTTIBC@
@LASTINR@
## Lab Results
| Component | Value | Date |
|-----------|-------|------|
| APTT | 62.2* | 09/13/2016 |

@LASTDIMER@

## Recent Labs

|     | 09/14/16 0600 | 09/14/16 1813 | 09/15/16 0442 |
|-----|-----|-----|-----|
| NA | 143 | 147* | 146* |
| K | 4.0 | 4.8 | 4.1 |
| CL | 109 | 110 | 108 |

# EXHIBIT F

# USE OF FORCE

## 4-6    PURPOSE and SCOPE

It is the mission of the DeKalb County Police Department to promote order, protect the public, and deliver the optimum police services through an effective, efficient and professional response in partnership with the entire community.

In fulfilling the Department's mission, its officers have been delegated the ultimate responsibility to protect life and property and apprehend criminal offenders. The apprehension of criminal offenders and protection must at all times be subservient to the protection of life. The officer's responsibility for protecting life must include the officer's own life.

It is the responsibility of every member of the department to keep our standards at an adequate level to provide protection and service to the community while at the same time keeping ourselves as safe as possible.

The value of human life is immeasurable. One of the department's core value statements is the preservation of life. Officers must exhaust every means available of non-lethal force, prior to utilizing deadly force. When non-lethal force is utilized, officers should only use that force which is minimal and reasonable to effect control of a non-compliant subject.

Litigation resulting from a shooting by a police officer will usually require the Department to prove the individual officer was properly trained in all aspects of the use of force, up to and including the use of firearms. This type of requirement demands that the Department take a pro-active approach to defending itself long before litigation is filed.

The purpose of this policy is to structure the use of force, including deadly force, by members of the DeKalb County Police Department and to provide a framework whereby the law enforcement duties can be properly and lawfully discharged by police officers. Since police officers have 24-hour/7 day-a-week law enforcement powers, this policy will be adhered to concerning off-duty conduct as well as on-duty conduct. This policy also applies to all other employees who may encounter situations with the public where a degree of force is required in order to carry out and complete their job responsibilities.

This policy is for departmental use only and does not apply in any criminal or civil proceeding. The departmental policy shall not be construed as a creation of a higher-level standard of safety or care in an evidentiary sense with respect to third party claims. Violations of this policy will form the basis for departmental administrative sanctions only. Violations of law will form the basis for civil and criminal sanctions in a recognized judicial setting.

## 4-6.1   USE of FORCE

Georgia Statutory Law, under Criminal Code Section 16-3-21 (Use of Force), justifies the threat or use of force. Ga. O.C.G.A. 16-3-21 reads:

*"A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat of force is necessary to defend himself or a third person against such others' imminent use of unlawful force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or a third person, or the commission of a forcible felony".*

Officers are often confronted with situations where control must be exercised to affect arrests and to protect the public safety. Control may be achieved through advice, warnings, and persuasion or by the use of necessary force.

Necessary Force is the use of a reasonable amount of force to achieve a legitimate police objective. Reasonable refers to belief that is supported by facts or circumstances. Force may be used by a police officer in the performance of police duties:

A. When necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self inflicted injury

B. When preventing or interrupting a crime or attempted crime against property

C. When making lawful arrests and searches, overcoming resistance to such arrests and searches, and preventing escapes from custody

D. When in self-defense, or defense of another against unlawful violence to that person.

The amount and degree of force which may be employed are based upon, but not limited to, the following factors:

A. The nature of the offense

B. The behavior of the subject against whom the force is to be used

C. Action by third parties who may be present

D. Physical conditions and tactical considerations

E. The possibility of creating an unreasonable risk of injury or death to innocent persons

F. The feasibility or availability of alternative actions

At times necessary force will include the use of certain tactics or equipment by the officer or specialty team, such as:

A. Verbal Skills and Empty Hands

B. Physical Strength and Compliance Techniques

C. Soft or Hard Hand Techniques

D. Handcuffs

E. Oleoresin Capsicum (OC)

F. ASP Baton

G. Electronic Control Devices (ECDs)

H. Patrol-rifles

I. Chemical Munitions
J. Specialty Impact Munitions

K. Distraction Devices

L. Approved Weapon and Ammunition

The use of any unauthorized weapon is prohibited unless very unusual, severe, and justifiable circumstances prevail.

In every community, the proper utilization of force is crucial to the definition, design, and delivery of effective police services. We must recognize that the fate of our function directly impacts the lives of those we have sworn to serve and protect. Officers with the DeKalb County Police Department will be trained in the use of the Federal Integrated Force Management model. This Use of Force Continuum model is a concept used in incident handling that simultaneously recognizes the level of subject resistance encountered and the level of control and force required for the situation. This concept does not direct an officer on how much control and/or force to use in a particular incident, but gives the officer direction in dealing with changing situations that might dictate the escalation or de-escalation of the amount and degree of force to be used.

The Integrated Force Management program shifts force focus and function from a pattern of confusion, towards a process of consolidation and coordination, consistent with contemporary management procedures and principles.

It is important to note that this Use of Force Continuum is to be used as a general guide and officers must always factor in objective reasonableness in determining the appropriate level of control and force to be utilized.

Any use of force by an officer must be examined from two perspectives: Resistance (Subject) and Control or Force (Officer). Both control and resistance can be in the form of verbal directives or physical action.

**Resistance** is a subject's non-compliance to the officer. The amount and type of resistance varies based on a number of factors.

**Control** is the force an officer uses to influence or neutralize a non-compliant subject. Officers are justified in using physical control methods in the following situations:

To protect the officer or another from injury or death.
To effect the lawful detention or arrest of a non-compliant subject.
To stop potentially dangerous and unlawful behavior.
To protect a subject from self-injury.

The DeKalb County Police Department uses broad standards to measure the justification of an officer's use of force.
The control methods used were initiated by a subject's resistance, and
The level of control used was necessary and reasonable considering the subject's resistance.

A *Show of Control* (displaying tactical advantage to persuade the subject to comply with verbal commands) can be implemented to influence a subject to make positive decisions.
A *Show of Control*:
Reduces reaction time;
Serves as a visual warning of potential use and imparts to a subject that resistance is futile;
Adds intermediate steps to the Use of Force Continuum; and
Can be recalled or de-escalated to lower forms of control.
A *Use of Control* is an action that can result in tissue damage to a subject and when employed cannot be recalled.

Officers must always be alert and attentive to changing situation which may dictate the escalation or de-escalation of control and/or force to be utilized. Officers should never abandon verbal communications when seeking compliance.

**Use of Deadly Force:**
If a situation does occur which dictates the use of deadly force, the decision to take another person's life is the most serious decision a police officer can ever be called upon to make. Officers should take great strides in attempting to de-escalate an incident and avoid using deadly force whenever possible.

The protection and preservation of human life is a primary goal of this department; therefore, officers have a responsibility to use only the amount and degree of force necessary and reasonable to protect and preserve life.

**Deadly force is defined as that force which is intended to cause death or great bodily harm or which creates some specified degree of risk that a reasonable and prudent person would consider likely to cause death or great bodily harm.**

According to Georgia State Law, O.C.G.A. 16-3-21, deadly force may be used if:
   A.    There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure the officer

   B.    There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure another person

   C.    There is clear and sufficient reason to believe that the force must be used to prevent the commission of a forcible felony

Great bodily harm has been generally defined to mean harm that is likely to maim or permanently disable.

O.C.G.A. 17-4-20 (b) addresses the use of deadly force for arrest by peace officers by stating *"...peace officers...may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm..."*

To reasonably believe is the determination of whether or not the officer's decisions and actions are in fact reasonable and is most commonly decided on the basis of the "reasonable officer doctrine," which is a basic standard of our legal system. In common terms it means that if an officer of common judgment and ordinary prudence, experiencing the same facts and circumstances experienced by the officer, would come to the same general conclusion that the officer reached, and then it is a reasonable belief.

Forcible Felony, as defined in Ga. O.C.G.A. 16-1-3, means, *"any felony which involves the use or threat of physical force or violence against any person".* From this definition, it is obvious that many crimes that could be technically classified as "forcible felonies" would not be life threatening enough to justify the use of deadly force to prevent them. It should be noted that Section 16-3-21 does not give the police officer any more authority in using deadly force than any other citizen in the State of Georgia. The law says, *"a person is...justified in threatening or using force,"* which means that any person may use deadly force under the given circumstances. Although the courts commonly recognize that officers are frequently involved in the justifiable use of deadly force, technically the law provides no additional authority or latitude to the circumstances under which deadly force may be used by a police officer.

It will be the policy of this Department **NOT to use deadly force in order to prevent the escape of a fleeing felon, unless that suspect continues to pose an immediate danger or serious threat to innocent persons.**

If someone is fleeing or attempting to flee (felon or not; convicted or not), the officer will be allowed to use reasonable force to prevent the escape. The fact that someone is escaping or attempting to escape is not justification in itself to use deadly force. It is important to note again that reasonable grounds must exist to justify the use of deadly force, and again the reasonable officer doctrine is the standard of justification.

Once the officer has determined that the use of deadly force is reasonable, the Department's policy is shoot to stop. An officer shall not discharge a weapon to kill, but rather to stop and incapacitate an assailant from completing a potentially deadly act as described in this policy. For maximum stopping effectiveness and minimal danger to innocent bystanders, the officer should shoot at "center mass," unless extreme circumstances cause for an elevated shot to immediately stop the suspect. Appropriate first aid is to be rendered whenever possible after any use of force (either rendered by the officer, or summoning EMS, etc.).

*Self-defense and imminent threat shall be the only policy guideline for employing deadly force.* The discharge of a firearm is an irreversible action and officers should ensure that their actions do not unreasonably precipitate the use of deadly force by placing themselves or others unnecessarily in jeopardy by engaging in actions that are inconsistent with the officer's training and/or Departmental policies and guidelines.

In all situations, justification for the use of deadly force must be limited to the facts reasonably apparent to the officer at the time the officer decides to use the force.

These considerations are provided to aid officers who decide to utilize deadly force:
1. other methods available to effect an arrest or apprehension
2. whether the suspect is in plain view
3. the need for extreme caution at night as darkness may inhibit vision
4. danger posed to bystanders by the discharge of the firearm, regardless of whether they are in plain view or concealed, such as in a building
5. the direction of fire
6. moving to cover, repositioning and/or waiting for additional responding units to gain and maintain a superior tactical advantage
7. the possibility of collateral injury or death.

Officers should not take undue risks that could result in death or serious bodily injury. Whenever possible, officers should attempt to defuse and stabilize the situation by using communication skills and/or waiting for additional responding officers. Officers are never required to take unreasonable risks and may opt to disengage or withdraw if such action can be safely accomplished without further endangering themselves, other officers or the public. Officers should always be prepared to constantly re-evaluate any situation and de-escalate or escalate as needed or required.

Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force.

Deadly force will be used with great restraint, as a last resort, and only when the level of resistance warrants the use of deadly force. The DeKalb County Police Department places a greater value on human life than on the protection of property; therefore, the use of deadly force is not allowed to protect property interests.

No distinction shall be made relative to the age of the intended subject of deadly force.

Officers must make every attempt to identify and isolate a specific subject and then "shoot to stop."

Officers **will not** discharge a firearm as a warning shot.

Officers who are authorized can deploy with patrol rifles when they have reason to believe the suspect(s) is (are):
1. Wearing body armor
2. Armed with firepower that is superior to their sidearm
3. Armed and situated at a distance or fortified position with a tactically superior position requiring accuracy at a greater range
4. When an armed confrontation is imminent or when the officer is engaged in activities that have a high probability that the suspect(s) may be armed and dangerous, such as armed robberies in progress or active shooter situations, or
5. With prior authorization from a supervisor in situations where the tactical environment is such that a rifle would be the most effective way to prevent the death or serious physical injury to officers or the public.

Officers are prohibited from discharging firearms when it appears likely that an innocent person may be injured. Officers **will not** discharge a firearm at or from a moving vehicle except as the ultimate measure of self-defense or defense of another when the suspect is using deadly force. Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force. This policy is intended to be concordant with OCGA Title 17, Chapter 4, Article 2, Section 17-4-20 (b) and (d).

Every time a firearm is discharged (accidentally or not) it is that officer's duty to report the incident to a superior officer(s), who will then report it to Internal Affairs. In addition, officers must also report to the firing range for re-qualification and weapons inspection by a member of the range staff. Officers will not have to re-qualify for shooting an injured animal unless otherwise directed to do so by Internal Affairs. Only Range staff or Internal Affairs are authorized to provide replacement ammunition following a weapon discharge event. Exceptions to this policy are when the weapon is fired during qualification or other training exercises.

Excessive force and brutality on individuals by any member of this Department will not be permitted. When an officer is affecting an arrest, reasonable force may be used as previously mentioned. The use of any piece of equipment, whether county issue or not, (i.e., flashlight, handcuffs, ASP baton, etc) will be used for their intended purposes only and not as a method for inflicting injury except in cases where the officer must defend himself against deadly force or great bodily harm. The use of any type of neck restraint or choke hold is prohibited.

When a person is arrested or placed into custody and resistance by that person has ceased, the officer shall immediately reduce their level of force to control techniques. It shall be the responsibility of the officer to take appropriate behavior or physical contact with the individual. It shall be the responsibility of the officer to take appropriate action without any unnecessary use of force.

Pursuant to Section 519 of Public Law 101-104, the 1990 HUD Appropriations Act, officers are, in addition to the prohibitions previously mentioned, specifically prohibited from using excessive force against any individual engaged in a nonviolent civil rights demonstration.

Officers who are working off-duty jobs and are involved in situations, which require a degree of force, shall report the incident immediately to the area supervisor who shall complete a Use of Force report as if the incident occurred while the officer was on duty.

The killing of an animal is justified: (1) for self-defense; (2) to prevent substantial harm to the officer or another; or (3) when the animal is so badly injured that humanity requires its relief from further suffering. A seriously wounded or injured animal may be destroyed only after all attempts have been made to request assistance from an agency (humane society, animal control, game warden, etc.) responsible for the disposal of animals. The destruction of vicious animals shall be guided by the same rules set forth for self-defense and the defense and safety of others.

### Domesticated Animals injured in a use of force incident

If a domesticated animal is injured during a use of force incident, the animal will be provided medical treatment to the best ability of the officer. This treatment may include;

A) Allowing the owner, or designee, to transport the animal to a veterinarian unless the animal must remain at the scene related to a crime or investigation.
B) If the owner cannot be located in a timely manner, DeKalb County Animal Enforcement will be called to transport the animal to a veterinarian.

This policy applies to domesticated animals injured by Department personnel. Officers must always use caution and their best judgment when handling an injured animal.

Except for general maintenance, storage or authorized training, officers shall not draw or exhibit a firearm unless circumstances create strong reasonable cause to believe that it may be necessary to lawfully use the weapon in conformance with other sections of this policy.


**4-6.2 OLEORESIN CAPSICUM**

**PURPOSE**
The purpose of this policy is to establish guidelines for the use of oleoresin capsicum (OC) aerosol restraint spray.

**POLICY**
The department has issued OC aerosol restraint spray to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance of resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that personnel use OC when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

**PROCEDURES**

A. **AUTHORIZATION**
  1. All sworn personnel will be required to complete the prescribed course of instruction in the use of OC spray. Only sworn and non-sworn personnel who have completed the prescribed course of instruction on the use of OC are authorized to carry the device. Only Departmental issued 10% oleoresin capsicum cone spray will be carried.

  2. All on-duty uniformed officers shall be equipped with the Department issued OC spray.

  3. Sworn and non-sworn personnel whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry departmentally authorized OC while on duty.

4. Uniformed officers shall carry only departmentally authorized OC canisters in the prescribed manner on the duty belt. Non–uniformed personnel may carry OC in alternative devices as authorized by the agency.

**B. USAGE CRITERIA**

1. OC spray is considered a use of force and shall be employed in a manner consistent with this agency's use-of-force policy. OC is a force option following verbal compliance tactics and the use of physical strengths and skills (the "soft or hard hands" approach) when appropriate on the use-of force continuum.

2. OC may be used when a verbal dialogue has failed to bring about the subject's compliance and the subject has signaled his intention to actively resist the officer's efforts to make the arrest.

3. Whenever practical and reasonable, personnel should issue a verbal warning prior to using OC against a suspect.

4. An officer may use deadly force to protect himself from the use or threatened use of OC when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.

5. Once a suspect is incapacitated or restrained, use of OC is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.

**C. USAGE PROCEDURES**

1. Whenever possible, officers should be upwind from the suspect before using OC and should avoid entering the spray area.

2. Personnel should maintain a safe distance from the suspect of between two and 10 feet.

3. A single spray burst of between one half and one second should be directed at the suspect's eyes, nose and mouth. Additional burst(s) may be used if the initial or subsequent burst proves ineffective.

4. Use of OC should be avoided, if possible, under conditions where it may affect innocent bystanders. Caution should be taken during the use of OC in enclosed areas, business, homes, etc.

**D. EFFECTS of OC, OFFICER RESPONSE and MEDICAL AID**

1. Within several seconds of being sprayed by OC, a suspect will normally display symptoms of temporary blindness, have difficulty breathing, burning sensation in the throat, nausea, lung pain and/or impaired thought processes.

2. The effects of OC vary among individuals. Therefore, all suspects will be handcuffed as soon as possible after being sprayed. Personnel should also be prepared to employ other means to control the suspect - to include, if necessary, other force options consistent with the agency policy - if the suspect does not respond sufficiently to the spray and cannot otherwise be subdued.

3. Immediately after spraying a suspect, personnel will be alert to any indications that the individual needs medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.

4. Air will normally begin reducing the effects of OC spray within 15 minutes of exposure. How-

ever, once the suspect has been restrained, officers may flush the exposed area with water if the suspect request.

5. Suspects that have been sprayed will be monitored for indications of medical problems and will not be left alone while in police custody. Personnel should provide assurance to suspects who have been sprayed that the effects are temporary and encourage them to relax.

6. Assistance will be offered to any individuals accidentally exposed to OC spray who feel the effects of the agent. All such incidents will be reported as soon as possible to the officer's immediate supervisor and shall be detailed in an incident report. Non-sworn personnel will report any such incident to the nearest police supervisor.

E. **REPORTING PROCEDURES**
1. An incident report will be submitted. Accidental discharges as well as intentional uses of OC spray against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible. All uses of OC spray by non-sworn personnel will immediately be reported to the nearest police supervisor.

2. A use-of-force report will be completed following all discharges of OC spray except during testing, training, malfunction or accidental discharge.

F. **REPLACEMENT**
1. All OC spray devices will be maintained in an operational and charged state by assigned personnel. Replacements for damaged, inoperable or empty devices are the responsibility of officers to whom they are issued.

2. Unexplained depletion of OC canisters will require an investigation and written report by the officer's supervisor to the Division Commander.

G. **TRAINING**
1. The Department's OC spray training program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) effects and first aid procedures, and (4) a practical exercise including exposure.

2. All personnel will receive annual In-Service training on the use of OC. This training will include instruction of the Departmental policy on use of force.

H. **OFF-DUTY/PART TIME EMPLOYMENT**
1. All authorized part-time employment will be approved as per existing Departmental policy.

2. Officers working part-time in uniform must wear the Department issued OC Spray canisters in the prescribed manner on the duty belt.

3. Officers working part-time employment in plain clothes must carry the Department issued OC spray the alternative device as authorized by the agency.

## 4-6.3   ASP BATON

**PURPOSE**
The purpose of this policy is to establish guidelines for the use of the ASP Tactical Baton expandable defensive impact weapon.

**POLICY**

The department has issued the ASP Baton to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance and control of resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that personnel use the ASP Baton when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

**PROCEDURES**

A.  **AUTHORIZATION**
1.  All on-duty uniform officers shall be equipped with the Department issued ASP Baton or authorized self-purchased ASP Baton unless specifically exempted by the Chief of Police. All sworn personnel will be required to complete the prescribed course of instruction in the use of the ASP Baton.

2.  Only sworn and non-sworn personnel who have completed the prescribed course of instruction are authorized to carry the device. The 21" and 26" ASP Batons will be the standard authorized impact weapon issued to employees of the DeKalb County Police Department. In addition, the Airweight 21" or 26" ASP Baton may be carried (*after completing the prescribed training course*) at the employee's expense. The Airweight Baton is lighter in weight and more practical for carry by non-uniform personnel and those officers who desire to carry less weight on their duty belt.

    Personnel who are authorized to wear plain clothes and Command/Administrative Staff not wearing the duty belt may carry the ASP P12 12" baton or the ASP P16 16" baton. These batons are designed for carry without the Sidebreak Scabbard and are purchased at the expense of the employee. Any employee in full uniform must carry the 21" or 26" baton.

3.  Any officer whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry a departmentally authorized ASP Baton while on duty.

4.  Uniformed personnel shall carry only departmentally authorized ASP Batons in the issued Sidebreak Scabbard in the prescribed manner on the duty belt. Non-uniformed personnel may carry the ASP Baton in an alternative manner as authorized by the agency.

5.  "Hindi" (mushroom) or other non-ASP end caps shall not be installed on any ASP Baton, as it voids the manufacturer's warranty.

B.  **USAGE CRITERIA**
1.  The ASP Baton is considered a use of force and shall be employed in a manner consistent with this agency's Use-of-Force policy. The ASP Baton is an intermediate level of force on the same level with the OC spray and the use of a firearm to control an assailant.

2.  The ASP Baton may be used to establish lawful objectives when:
    a)  verbal dialogue has failed to bring about the subject's compliance

    b)  the use of OC spray has failed to bring about the subject's compliance or the use of OC spray is impractical in the given situation

    c)  the subject has signaled his intention to actively resist the officer's efforts to make the arrest or

    d)  in self-defense, or defense of another against unlawful violence to that person

3. Whenever practical and reasonable, employees should issue a verbal warning prior to using the ASP Baton against a suspect.

4. An officer may use deadly force to protect himself from the use or threatened use of an ASP Baton when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.

5. Once a suspect is incapacitated, controlled, or restrained, use of the ASP Baton is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.

**C. USAGE PROCEDURES**

1. All action, relational factors between parties and conditions surrounding the enforcement situation comprise the totality of the situation. These include officer/subject factors and special circumstances. Each relevant condition relates to the confrontation in determining the officer's course of action.

> Officer/Subject Factors may include:
> a. age
> b. gender
> c. size
> d. fitness
> e. skill level
> f. multiple officers
> g. multiple subjects

It is reasonable that a discrepancy in the age, gender, physical size, fitness, or skill level of individuals involved in the confrontation may mandate that an officer use more or less force to control the situation. In a similar manner, it would be reasonable for a single officer to use more force controlling a situation when confronted by multiple subjects.

Special Circumstances may include:
a. close proximity to a firearm/weapon
b. special knowledge
c. injury or exhaustion
d. ground position
e. disability
f. imminent danger

A subject in close proximity to a firearm or other weapon creates an increased danger to the officer, which must be dealt with immediately. An officer may have special knowledge of a subject's skills that would require the use of increased force. An officer who is injured, exhausted, on the ground, disabled, or is in imminent danger would be justified in escalating through the use-of-force options.

2. The ASP Tactical Baton is drawn with the weapon hand or drawn with the reaction hand (off-hand) and transferred to the weapon hand.

3. All basic strikes are delivered with the baton in the weapon hand, unless the weapon hand is incapacitated.

4. There are two modes of the ASP Baton, Open Mode and Closed Mode. The Baton Mode is determined by the distance to the threat encountered by the employee.

5. When striking a subject, the employee should target those areas of the subject, which are likely to inflict injury to the subject (i.e., center mass of arm, center mass of leg, center mass of body). These targets are the vehicles, which transport force against the employee.

6. Open Mode strikes are ideally delivered to target areas with the last three inches of the shaft or tip of the ASP Baton. Closed Mode strikes are delivered to target areas with the end cap or fist.

7. Do not target strikes to the head, neck, spine, sternum, or groin. Strikes to these areas may produce injuries that could be fatal, while not effectively terminating assailant resistance.

**D.    EFFECTS of the ASP BATON, OFFICER RESPONSE, APPROPRIATE MEDICAL AID**
1. Strikes to the center mass of the extremities effectively disable an assailant's "delivery system." Strikes to the center mass of the body generate fluid shock waves. Strikes to the primary "center mass" target areas have a high potential for control and a low potential for fatal injury.

2. If the assailant moves or a strike misses its target, surrounding targets also have a high potential for control and a lesser potential for damage.

3. All suspects will be handcuffed as soon as possible after being controlled. However, personnel should also be prepared to employ other means to control the suspect – to include, if necessary, other force options consistent with agency policy – if the subject does not respond sufficiently to the strikes and cannot otherwise be subdued.

4. Immediately after employing the ASP Baton, employees should be alert to any indications that the individual needs medical care and if needed, will ensure appropriate medical aid. This includes, but is not limited to, loss of consciousness, breathing difficulties, and excessive swelling to extremities. Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.

5. Suspects on which the ASP Baton has been used will be monitored for indication of medical problems and will not be left alone while in police custody.

6. In order to minimize the stress involved in the use of force, any officer or non-sworn personnel involved in a use of force incident, which results in death or serious injury, will be placed on "administrative leave" directly upon completion of their preliminary report of the incident. This leave will be without loss of pay or benefits, pending the results of the investigation. The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly.

While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time. The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family.

Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

**E.    REPORTING PROCEDURES**
1. Use of the ASP Baton against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible.  If non-sworn personnel employ the baton, the incident will immediately be reported to the nearest police supervisor.

2. A use-of-force report and an incident report will be completed following all tactical uses of the ASP Baton.

3. To properly complete the Use of Force Report, it will be necessary to document and photograph the strike area on the suspect's body.

4. The Department will conduct an annual analysis of reported usage of the ASP Baton, via documented reports conducted by the Internal Affairs Department.

**F.    REPLACEMENT**
1. Assigned personnel will maintain ASP Batons in an operational state.  Repair or replacements for damaged or inoperable batons are the responsibility of employees to whom they are issued.

2. Qualified personnel in the Training Division will make all repairs of ASP Batons.  No employee should attempt to repair his or her own baton.  If repair of the baton is not possible, Training Division personnel will recommend the Supply Unit replace the ASP Baton.

**G.    TRAINING**
1. The Department's ASP Baton 8-hour certification program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) ASP baton skills, and (4) a practical exercise for proficiency.

2. Once an officer or non-sworn personnel completes the certification class, he/she must annually be re-certified to retain carry authorization.

3. Those employees failing to re-certify by December 31st of each year, will no longer be authorized to carry the ASP Baton until completion of the 2-hour certification class for ASP re-familiarization.

4. Should the officer fail to meet certification standards, the authority to carry the weapon shall be IMMEDIATELY REVOKED by the certifying authority and written notification of such revocation shall be forwarded to the officer's Commander, the Training Division, and the Chief of Police.  Officers, whose authority to carry the ASP Baton has been revoked, shall be reassigned to non-uniformed administrative duty for a period of 5 days.  Within the 5 day period, the officer must report to the Training Division for remedial ASP Baton training and certification.  Officers who fail to achieve certification after attending remedial ASP Baton training will be recommended for termination for failing to maintain certification standards.  A non-sworn employee who, after receiving remedial training fails to meet certification standards, will have the authority to carry the ASP Baton immediately revoked by the certifying authority and written notification of such revocation will be forwarded to the employee's Commander, the Training Division, and the Chief of Police.

5. Any employee who is absent from duty for any extended period of time and fails because of that absence to re-certify as scheduled will have 10 days to re-certify upon their return to full duty status. Responsibility for notifying the Training Division will rest with the individual employee.

6. All sworn personnel will receive annual In-Service training on the use of the ASP baton.  This training will include re-certification and instruction of Departmental policy on use of force.

# EXHIBIT F(a)

 **Grady**

GRADY HOSPITAL
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN,COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/8/2016

## Operative Notes (continued)

Op Note by Fox, Elizabeth D., MD at 9/20/2016 4:13 AM (continued)                                                                                    Version 1 of 1

muscles, particularly the proximal aspect of pronator teres and flexor digitorum profundus, were frankly ischemic and did not react to electrocautery. These were excised with cautery. Hemostasis was achieved with electrocautery. A small skin flap at the wrist was closed with 3-0 Nylon so as to protect the median nerve. The remainder of the wounds were packed with saline-dampened Kerlix and wrapped with a dry Kerlex followed by an Ace wrap.

Next, the skin of the left neck was prepped with ChloraPrep and draped in the standard sterile fashion. The left internal jugular vein was identified on ultrasound. Using ultrasound guidance, the vein was accessed and a wire was passed into the vessel in the Seldinger technique. Longitudinal views confirmed the presence of the wire in the internal jugular vein. After creating a small skin nick, the tract was serially dilated. A Vascath was passed over the wire and advanced into the internal jugular vein. Once in place, each port was aspirated and flushed without difficulty. The catheter was then secured in place and a Biopatch and dry sterile dressing were applied.

At the conclusion of the case, the patient remained intubated and was taken back to the Intensive Care Unit. All sponge, needle, and instrument counts were correct for the case. Please note that Dr. Patel was present and scrubbed for the entirety of the procedure.

Signed by Fox, Elizabeth D., MD on 9/20/2016 5:07 AM

Brief Op Note by Fox, Elizabeth D., MD at 9/20/2016 1:43 PM

| | | | |
|---|---|---|---|
| Author: Fox, Elizabeth D., MD | Service: Trauma | Author Type: Physician | Version 1 of 1 |
| Filed: 9/20/2016 1:44 PM | Note Time: 9/20/2016 1:43 PM | Status: Signed | |
| Editor: Fox, Elizabeth D., MD (Physician) | | | |

## DEBRIDEMENT; SKIN, SUBCUTANEOUS TISSUE, AND MUSCLE OR BONE, TRACHEOSTOMY, GASTROSTOMY TUBE PLACEMENT, PERCUTANEOUS, ENDOSCOPIC Procedure Note

### Emergency U Alpharetta4
### 9/13/2016 - 9/20/2016

PRE-OP DIAGNOSIS: rhabdomyolysis, respiratory failure

POST-OP DIAGNOSIS: Same

WOUND CLASSIFICATION : Class IV : Dirty, Infected(Old wound with devitalized tissue ie gangrene or necrosis; existing infection ie purulence or peritonitis; perforated viscera)

PROCEDURE(S): Procedure(s):
DEBRIDEMENT; SKIN, SUBCUTANEOUS TISSUE, AND MUSCLE OR BONE
TRACHEOSTOMY
GASTROSTOMY TUBE PLACEMENT, PERCUTANEOUS, ENDOSCOPIC

ANESTHESIA: General

# EXHIBIT G

**H.     OFF-DUTY/PART TIME EMPLOYMENT**

1. All authorized part-time employment will be approved as per existing Departmental policy.

2. Officers working part-time employment in uniform must wear the Department issued ASP Baton in the issued Sidebreak Scabbard.

3. Officers working part-time employment in plain clothes must carry the Department issued ASP Baton in the alternative manner as authorized by the agency.

## 4-6.4    ELECTRONIC CONTROL DEVICES - TASERS

### PURPOSE and SCOPE
The purpose of this policy is to establish guidelines for the DeKalb County Police Department's use of Electronic Control Devices (ECD).

### POLICY
An ECD may be used to control resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that officers use an ECD when warranted, but only in accordance with the guidelines set forth here, in training, and in the use-of-force policy. An ECD is on the same level of force as Oleoresin Capsicum in the non-deadly force category. **An ECD is a control device.**

The Taser X26 will be the standard authorized electronic control device issued to members of the DeKalb County Police Department.

It shall be the policy of the DeKalb County Police Department to resolve incidents requiring law enforcement intervention in as humane and safe a manner as reasonably possible.

### PROCEDURES
**A.     AUTHORIZATION**

1. Only officers who have completed the prescribed course of instruction on the use of the ECD will be authorized to carry the device.
2. Basic certification for the use of an ECD shall consist of no less than the manufacturer's minimum recommendation.
3. Re-certification shall be conducted once a year.
4. Training topics for both the basic certification and annual re-certification should consist of, but are not limited to, the following topics:
   a. Manufacturer's Recommendations / Maintenance
   b. Deployment / Use / Documentation
   c. Response to Resistance Matrix Levels and other Tactical Options
   d. ECD Retention and Transition Drills
   e. Scenario Based Training
   f. Recognition of Symptoms: Excited Delirium, Medical Concerns, etc.

5. Only current Manufacturer Certified Instructors are eligible to instruct officers in the use of an ECD.
6. Officers whose normal duties/assignments may require them to make arrests or supervise arrestees shall carry the authorized departmental ECD.
7. Uniformed Supervisors/Officers shall carry only a departmental authorized ECD in the issued cross-draw holster. Non-uniformed officers may carry the ECD in alternative devices as authorized by the agency.

**B.  PRIOR TO DEPLOYMENT**

1. An officer's response level to subject resistance should always be based upon reasonable objectiveness, and depending upon subject/officer factors such as age, size, weight, and the subject's apparent ability to physically challenge the officer or do harm to himself or others, balanced against the seriousness of the incident.

2. An officer's decision to deploy the ECD shall involve an arrest or custodial situation wherein the subject is escalating resistance from passive physical resistance towards active physical resistance. Passive resistance includes subjects who question an officer's commands in a non-threatening manner and persons who are participating in a non-violent public protest. The ECD shall not be used as a tool of coercion to intimidate an individual into compliance with simple requests or directives by an officer.

3. The primary purpose in the decision to deploy the ECD is to prevent a continuing escalation of the subject's resistance or violence and to minimize injury to both the officer(s) and subject(s).

4. Prior to deployment of the ECD, officers must take into consideration environmental factors which may contribute to serious injury. These factors include but are not limited to; subjects standing on or near the edge of a roof, stairwells, next to a window or body of water.

5. No policy or guideline can anticipate every situation that officers might face, but in general terms, the following deployment procedures are established. An ECD can be utilized under the following circumstances:

    a. When the subject is exhibiting threatening body language associated with verbal threats or refusing to comply with the officer's instructions, and the subject has the apparent ability to physically challenge the officer. Threatening body language includes, but is not limited to:
        1. blading the body
        2. assuming a "boxer stance"
        3. circling or surrounding the officer
        4. moving the hands from open to closed, forming a fist, etc.

    b. When a subject makes physically evasive movements to defeat an officer's attempt to control. This may be in the form of:
        1. bracing or tensing of the body
        2. attempts to kick, push, or pull away
        3. not allowing the officer to get close to him

    c. When a subject makes overt, hostile, attacking movements, which may cause injury, but are not likely to cause death or great bodily harm to the officer or others.

    d. When subject makes overt, hostile, attacking movements with or without a weapon with the intent and apparent ability to cause death or great bodily harm to the officer or others.

    e. When lesser force options may be ineffective.

6. The ECD is a sensitive electronic device (similar to a cell phone) and should be treated with appropriate care. It should not be dropped or thrown around. When not in use it should remain in an approved holster and should be protected from rain.

7. The ECD will be turned over to any supervisor or the Internal Affairs Unit upon request to investigate the use of the ECD.

8. Only department issued batteries and cartridges will be used with the Taser. No changes, alterations, modifications or substitutions shall be made to the Taser. All repairs to a Taser shall be completed by an authorized vendor or armorer.

9. At the beginning of each shift the ECD shall be tested to ensure it is functioning properly. It is the responsibility of each officer to test the ECD prior to the shift or part time job, and to immediately report any improperly functioning ECD to their supervisor.

**IMPORTANT:** Make sure to remove the air cartridge prior to testing and replace it afterwards. Defective ECD's and cartridges should be returned to the Training Division as soon as possible and should not be used until repaired or replaced.

10. Personnel issued a Taser shall be issued a minimum of one spare cartridge as a backup in case of cartridge failure or the need for reapplication. The spare cartridges shall be stored and carried in a manner consistent with training and the cartridges replaced by the officer's division. Each division/unit/precinct will maintain an adequate supply and keep a log of the cartridge serial number, date of issue, and the name of the officer to whom cartridge was issued. Always replace the Air Cartridges by the expiration date and use expired cartridges for training purposes only.

11. The Taser shall be pointed at the ground in a safe direction with the safety on during administrative handling procedures.

## C. DEPLOYMENT

1. The ECD should be deployed at the same level of force as OC spray.

2. Prior to the deployment of the Taser the officers deploying the device have the responsibility to reasonably visually and physically confirm that the use of force tool selected is in fact the Taser and not a firearm.

3. When multiple officers are present and an ECD is to be used on a subject, **only one officer should deploy the ECD on the subject.** In the event the ECD malfunctions or both probes are not in contact with the subject, an additional officer may deploy an ECD if compliance has not been gained. Officers will communicate with each other on which officer will deploy the ECD and which officers will act to take the subject into physical custody.

4. Care should be taken that the ECD not be aimed at the neck or above, and the point of aim for front deployment of the Taser should be lower-center of mass, when possible. The Taser should be aimed at the suspect's back to reduce risk of injury; however, this may not always be possible.

5. When possible, avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges. When activating the ECD the officer should use it for one cycle and stop to evaluate the situation and the subject. Use of the Taser should be combined with physical restraint techniques to minimize the total duration of the struggle and Taser use. **Every attempt should be made to take the subject into custody as quickly as possible after the initial deployment of the ECD in order to reduce the need for subsequent cycles of the ECD. Officers should transition to a different force option if multiple Taser deployments fail to gain compliance.**

6. When reasonable, the ECD should not be used near flammable liquids and fumes. Do not deploy the ECD near suspected meth labs, or after alcohol-based OC spray has been deployed.

7. The ECD will cause most everyone to fall and therefore should not be used when the risk of falling would likely result in death (e.g. on a roof or next to a swimming pool).

# EXHIBIT H

SEARCH WARRANTS WITHIN THE INCORPORATED AREA OF DEKALB COUNTY AND OUTSIDE OF DEKALB COUNTY

Whenever a law enforcement officer attempts to serve a search warrant at any location within the incorporated area of DeKalb County or at any location outside of DeKalb County, the officer will have uniform officers from the agency responsible for law enforcement within that location present during the warrant execution. A departmental supervisor will also be present during the warrant execution.

SERVING CRIMINAL ARREST AND SEARCH WARRANTS WITHOUT UNIFORM LAW ENFORCEMENT OFFICERS

In certain situations, such as using the element of surprise in order to affect an arrest or a search, the execution of criminal arrest and search warrants may be done, periodically or on a routine basis, without the presence of uniform law enforcement officers. This practice will be an exception to the rule and will only be done after approval of a division or section commander.

## 4-5.8 GOOD FAITH

Whenever a departmental law enforcement officer executes any phase of the legal process function, that officer will do so in good faith and pursuant to all federal, state, and local laws, and in accordance with departmental procedures and policies. In situations where procedures are not clearly set out by law or policy, the officer will consult with their supervisors, prosecutors or the County Attorney.

Officers and detectives will stay abreast of current laws, ordinances and court decisions which may affect their duties on an annual basis. This information will be obtained through independent study, in-service training, legal bulletins, specialized training and roll-call training.

## 4-5.9 SEARCH AND SEIZURE

GUIDELINES

To establish guidelines for the DeKalb County Police Department in controlling search and seizure of property and persons through an overview of existing laws. It shall be the policy of the Department to conduct searches of persons, places and things pursuant to established State and Federal laws governing search warrants and/or warrantless searches. Law enforcement officers shall have due regard for the protections guaranteed under the provisions of the Fourth Amendment to the U. S. Constitution. The following procedures shall address search and seizure policy and shall cite major case law and/or state statutes where applicable.

GENERAL

Searches with a Search Warrant

The following is required of all search warrants and search warrant affidavits:

a. Issuance
The warrant must be issued by a judicial officer authorized to hold a court of inquiry. (O..C.G.A. 17-5-21) For search warrants within DeKalb County, officers shall use the DeKalb County Magistrates Court. For areas outside DeKalb County, officers shall use the appropriate judicial officer.

**b. Probable Cause**

The magistrate must find probable cause that the place to be searched contains items connected with criminal activity. (Berger v. New York, 388 U. S. 41) The officer must swear or affirm under oath that the facts presented for establishing probable cause are true.

Probable cause is defined as "what facts and circumstances within an officer's knowledge would lead a reasonable man to believe that an offense has been committed or is being committed and/or that a particular individual has committed or is committing the offense."

**c. Description**

The warrant must describe with sufficient particularity the person or the place to be searched and the items to be seized (O.C.G.A. 17-5-23). If a place can be easily identified by a street number or address, then no further information shall be necessary; however, an officer or investigative component may elect to further describe the place to be searched.

NOTE: A warrant may be issued based on an affidavit containing only hearsay where the reliability of the informant is established and the underlying factual circumstances are described.

### Searches Without a Warrant/Searches Incident to Arrest

#### Scope

A search incident to a lawful arrest must be limited in scope to the arrestee's person and the area "within his immediate control". (Chimel v. California, 395 U. S. 752; 1969).

#### When Authorized

A search incident to an arrest shall be authorized for the following reasons: For the safety of the officer.

To secure items that might aid in an arrested individual's escape.

To prevent the destruction of instruments or fruits of a crime.

At or near the scene of a crime where exigent circumstances warrant. (see 3b)

#### Nature

A search incident to a lawful arrest must be concurrent in time and place with the arrest.

#### Booking or Administrative Searches

A jailhouse search of an arrested individual is justified as an administrative search.

### Exigent Circumstances

#### Justification

A warrantless search is permitted when there is both probable cause and exigent circumstances. The ultimate test is whether there is such a compelling necessity for immediate action that proceeding without a warrant is justified.

## Exigent Circumstances Defined

Hot pursuit, a fleeing suspect, destruction of evidence, or other situations in which speed is essential to the accomplishment of lawful police action are examples of exigent circumstances.

# STOP AND FRISK

## Grounds for Stop

To lawfully stop an individual, the law enforcement officer must have a reasonable suspicion that the person stopped is involved in criminal activity. In appropriate situations, a criminal activity report should be filled out on all such stops of suspicious persons and forwarded to the appropriate investigative component. A detailed description of the activity and of the person should be included.

## Grounds for Frisk

To lawfully frisk an individual, the law enforcement officer must have a reasonable belief that the person stopped is armed and dangerous. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonable inferred that the individual was armed and dangerous. The frisk must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. (Terry v. Ohio, 392 U. S. 1) Officers are reminded that a frisk is not a "search".

## Nature of Frisk

The frisk for weapons must be only a limited intrusion of a person (pat down). Pockets cannot be entered during a pat down unless the officer feels an object which is consistent with a weapon in its size, shape or feel.

## Search After Frisk

Feeling an object which might be a weapon will justify a more extensive intrusion to obtain the suspected weapon. An officer may enter pockets to dispel the alarm that a weapon is present.

# VEHICLE STOPS

## Significance of Stop

A "seizure" occurs whenever a vehicle is stopped, even though the purpose is generally limited and the detention quite brief; therefore, the Fourth Amendment applies.

# EXHIBIT I

## INDEX

**(A)** 16-089186    Fairfield Inn Incident

**(B)** 16-089200    Phillips Road Incidnet

**(C)** 16-089202    DMC Hillandale Incident

**(D)** Case Notes

**(E)** Corey Donegan

**(F)** Charisma Johnson

**(G)** Shronda Stewart

**(H)** Marquita Hanna-Rolle

**(I)** 2002 Nissan Maxima associated with Shronda Stewart

**(J)** Use of Force documentation

**(K)** Timeline

**(L)** List of personnel guarding Donegan at Grady Hospital

**(M)** Officer's Written Statements

**(N)** Crime Scene Reports

**(O)** Search Warrants

**(P)** Property Sheets

**(Q)** Taser Report

**(R)** Medical Examiner Report

**(S)** Fairfield Inn Video

**(T)** Cell Phone Extraction Report

**(U)** Photo Lineup

**(V)** 911 Audio CD

(W) Ofc. Stephens Dash-cam video CD

**(X)  GBI Report (Pending)**

DKPD000324

# EXHIBIT J

 **Grady**

GRADY HOSPITAL
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN,COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/8/2016

**ED Notes (continued)**

ED Provider Notes by Dodson, Ian, MD at 9/13/2016 12:39 AM (continued)

Spinal Tenderness: unable to assess                                    Version 1 of 1

Procedures
*Information below is documented by providers, but will be empty if no procedures were performed*
Procedures

EM Work-up
MDM

**MEDICAL DECISION MAKING**

30ish male with unknown PMH presents s/p GSW to the right hand. Per EMS, he was extremely agitated, running around, trying to take his clothes off, when 911 was called.

HR of 160 without physical evidence of large hemmorhage, along with tachypnea to 45, large pupils, and fever to 103 are concerning for neuroleptic malignant syndrome vs other sympathomimetic overdose.

Will intubate patient for tachypnea to 45, to alleviate some metabolic demand, to faciliate care, and given GCS 3 in the setting of trauma. Patient will require CT abd/pelvis/head/neck due to inability to obtain reliable exam given GCS.

Will provide benzos for potential sympathomimetic overdose while labs pend. Will consider LP for possible encephalitis given fever and AMS. Patient getting 2 L NS wide open currently.

Update: Labs very abnormal with pH 6.7, gap of 41, UDS cocaine +, CT head with small SAH which does not readily explain patient's GCS of 3. Neurosurgery was consulted immediately after CT head performed, they are at bedside currently. Their plan is EVD, MRA and MRI and ICU admission.

**DISPOSITION**
Most Recent Vitals
*Right-click to refresh data below for latest vital signs*
Temp: 39.5 °C (103.1 °F)
Heart Rate: 150
Resp: (!) **45**
BP: 142/61 mmHg
SpO2: 98 %

Diagnosis(es):
1.  SAH
2.  AMS
3.  Metabolic acidosis

Condition:
stable

Disposition:
Admit: To SICU

Printed on 11/21/2016  3:03 PM

EXHIBIT K



On 09/13/2016 at approximately 10:00 hours I responded to Grady Memorial Hospital in reference to an Aggravated Assault investigation. Upon my arrival I went to Trauma Room #6 and observed an unconscious person. The subject had not been to surgery yet. Dr. Oname Ulcukpo was present. Dr. Ulcukpo and I observed the persons extensive injuries all over his body to include:

- Abrasions to his right knee
- Gunshot wound to his right hand
- Injury to the top of his head in the form of a small lump that caused brain swelling

The suspect has and large Six Point Star Tattoo (Gang Symbol) on the chest. The symbol represents the Gangster Disciples Gang.

I then went to the Operating Room located on the 6th Floor of Grady Memorial Hospital. Upon my arrival I observed the victim Charisma Johnson who was fresh out of surgery. I spoke to Nurse Johnson who advised me that the victim was heavily sedated. I was able to wake the victim for as short period of time and she provided me with a recorded statement (See RMS). I asked the victim who shot her? The victim advised she was with her Friend Shoronda Stewart and doesn't know who shot her. The victim further advised that she would be able to identify the suspect if she observed a picture. The victim then went back to sleep. The victim was in pain from the Gun Shot Wound to her stomach.

Detective Signature -- Badge # -- Date

EXHIBIT L



Background: TASER International issues warnings regarding the use of our Electronic Control Devices to ensure that end users are aware of risks associated with the use of these devices. As more research is completed and/or more knowledge is obtained, the warnings are updated to ensure that TASER device operators are provided with the most current information. Please go to www.TASER.com to find the new TASER International, Inc. (TASER) law enforcement ADVANCED TASER® M26™ and TASER® X26™ Electronic Control Device (ECD or device) warnings. These device warnings are effective on Monday April 28, 2008, and supersede prior law enforcement warnings and relevant training materials and bulletins, specifically including TASER Training Bulletin 12.0 – 04 (June 28, 2005[1]).

These warnings are being updated to reflect new data from recent human scientific and medical studies which found, in part, the following:

- (Breathing[2]) The available human data directly contradicts prior animal studies and does not reveal any evidence of breathing impairment or respiratory acidosis.

- (Metabolic Acidosis[3]) While prolonged muscle activity does produce lactic acid, human studies of ECD exposures up to 15 seconds (or 3 cycles) have shown that there is no evidence of metabolic acidosis. Strong physical exertion (e.g., resisting law enforcement restraint) can lead to profound metabolic acidosis and measures to limit the period of resistance might be beneficial in already acidotic persons.

- (Rhabdomyolysis[4]) With ECD use, it is reasonable to expect some elevation in markers of skeletal muscle injury consistent with participation in an athletic event; however, this elevation is not believed to be important in the sudden in-custody death phenomenon. Rhabdomyolysis does not cause injury for days after the inciting event and in the case of severe rises in creatine kinase, the clinical course is deteriorating renal function that can be treated with dialysis if needed.

- (Ventricular Fibrillation [VF][5]) The preponderance of the data, including all of the human studies, suggests that VF is not caused by ECDs in real-world usage. There is no evidence of important electrocardiogram changes, or capture (pacing response of the heart to electrical stimulation), and finite element modeling does not suggest a current density in real-world use able to induce fibrillation in humans. Also, epidemiological studies do not find that real-world human ECD use causes VF.

These new warnings remove the prior warnings regarding breathing impairment and continuous exposure risks. These warnings continue to emphasize the importance of minimizing any application of force or restraint, cuffing under power, and minimizing objectively reasonable force and restraint to accomplish lawful objectives.

---

[1] See, March 1, 2006 Memorandum, Re: Reason for June 28, 2005, TASER Training Bulletin, regarding multiple TASER electronic control device exposures alleged effects on respiration and pH levels warnings.
[2] For brief summary, see TASER Reference Sheet (TRS) - Detail (D) Breathing Effect (April 24, 2008).
[3] For brief summary, see TRS-D Metabolic Acidosis (April 24, 2008).
[4] For brief summary, see TRS-D Rhabdomyolysis (April 25, 2008).
[5] For brief summary, see TRS-D VF (April 24, 2008).
(These reference materials are available at www.TASER.com.)





## TASER® X3™, X26™, and M26™ ECD Warnings, Instructions, and Information: Law Enforcement

### Important ECD Product Safety and Health Information

These safety warnings are for your protection as well as the safety of others. Disregarding this information could result in death or serious injury.[1]

| ⚠ WARNING | |
|---|---|
| 🎓 | **Complete Training First**<br>Significant differences exist between each of the TASER International, Inc. ("TASER") Electronic Control Device ("ECD") models. Do not Use[2] or attempt to Use any ECD model unless you have been trained and certified by a Certified TASER Instructor[3] on that particular model. |
| 📖 | **Read and Obey**<br>Read, study, understand, and follow all instructions, warnings, information, training bulletins and TASER training materials[4] before Using the ADVANCED TASER® M26™ ECD, TASER X3™ ECD, or TASER X26™ ECD. Failure to comply with these instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the User, force recipient, and others. |
| ⚖ | **Obey Applicable Laws**<br>Use the ECD only in accordance with applicable federal, state, and local laws and other regulations or legal requirements. Your law enforcement agency's Guidance[5] must also be followed[6]. Any Use of an ECD must be legally justifiable. Resistance to law enforcement interaction incurs substantial risk of death or serious injury and subjects who resist law enforcement assume all such risks of death or serious injury. |
| | **These warnings are effective May 1, 2010, and supersede all prior revisions and relevant Training Bulletins.** The most current warnings are online at www.TASER.com. | ⚠**WARNING**<br>**Electronic Control Device**<br>• Can temporarily incapacitate target.<br>• Can cause injury.<br>• Obey warnings, instructions and all laws<br>• Comply with current warnings, materials and requirements.<br>• See www.TASER.com.<br>*This warning label appears on newer ECD models.* |

[1] These warnings are state of the art but cannot address all possible ECD application circumstances or permutations. They are intended to inform Users about reasonably foreseeable potential risks of harm. The decision to Use the ECD in a particular manner or circumstance must follow applicable legal standards. These warnings do not create a standard of care. Herein, the singular is also the plural, the plural includes the singular, and the masculine is also the feminine.

[2] The terms "Use," "Used," "Using," or "User" include, but are not limited to: acquiring; accessing; encrusting; providing; possessing; storing; handling; manipulating; carrying; holstering; drawing; brandishing; displaying; deploying; utilizing; drive-stunning; using alligator or other types of clips or attachments; or discharging an ECD.

[3] A Certified TASER Instructor possesses and maintains a current TASER Instructor certification for the specific product model they are teaching, demonstrating, or Using and is required to be fully compliant with TASER's most current training requirements and materials.

[4] Current TASER Instructor Training materials may be obtained by contacting TASER's Training Department.

[5] Law enforcement agencies are force and force tools experts and are solely responsible for their own Guidance. "Guidance" includes, but is not limited to: policy, procedure, rule, order, directive, training, continuum, and standard. TASER has no power or authority to mandate or require Guidance, set policy, require training, or establish standards of care or conduct.

[6] Law enforcement agencies, government entities, and Users are sophisticated purchasers, sophisticated users, and learned intermediaries with respect to law enforcement weapons (including ECDs), force, force use, legality of force use, and reporting.

## Scope and Purpose

This document presents important safety warnings, instructions, and information intended to reasonably minimize hazards associated with ECD deployment, intended Use, side effects, and environment of Use.

CDPM, DPM, EPM, EVIDENCE.COM, M26, TASER CAM, TFM, X3, X26, XDPM and ⚡ are trademarks of TASER International, Inc., and TASER® is a registered trademark of TASER International, Inc., registered in the U.S. All rights reserved. © 2010 TASER International, Inc.

# EXHIBIT  M



On 11-16-16 around 1430 hours, Ofc. Anderson came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of her Miranda Rights, Ofc. Anderson agreed to give a statement. She said when she first encountered the suspect, he was in the roadway, had blood on him and had a handgun tucked under one arm pit. When she challenged him, he kept walking into oncoming traffic. He eventually stopped and then eventually put the gun on the ground. As she continued to give him commands to get on the ground he started to go to the ground then got up instead and started running away. She gave chase and eventually caught up with him as he was trying to break down a door to a home with his shoulder. He then tried to flee again and she used her Taser. One probe went into each arm. He then fell to the ground in the grass on his side. Once other officers arrived, they began trying to pry his arms from under him. While doing so one officer got bit by the suspect.

Ofc. Anderson said she thinks another officer did drive stuns on the suspect but she wasn't sure which one.

The only injuries she saw were scrape marks on one of his arms and the injury to his wrist. She said the suspect was awake but seemed unable to comprehend what was going on or what was being said to him. She noted he had dilated pupils and that EMS administered something to him prior to him being transported via the ambulance. When Ofc. Anderson last saw him he was conscious and the ambulance crew was talking to him.

Ofc. Anderson said her car does not have a camera system and she was not wearing a body camera.

Ofc. Anderson also provided a written statement.

Detective Signature – Badge # – Date

DKPD000394

# EXHIBIT N

 GRADY HOSPITAL
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN,COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/6/2016

Consult Notes

Version 2 of 2

Consults by Frerich, Jason, MD at 9/13/2016 2:43 AM

| Author: Frerich, Jason, MD | Service: Neurosurgery | Author Type: Resident |
|---|---|---|
| Filed: 9/13/2016 8:33 AM | Note Time: 9/13/2016 2:43 AM | Status: Attested |

Editor: Frerich, Jason, MD (Resident)
Related Notes: Original Note by Frerich, Jason, MD (Resident) filed at 9/13/2016 8:31 AM
Cosigner: Keen, Joseph, DO at 9/13/2016 5:33 PM
Attestation signed by Keen, Joseph, DO at 9/13/2016 5:33 PM

I saw and evaluated the patient and agree with the resident's note, examination findings, and plan of care.

**Addendum:** Patient re-examined this AM @ approx 5:30 AM. Patient now w/ eyes spont open and weakly following commands RUE/RLE, no movement on L. EVD opening pressure 18, cont EVD open @ 20. CTA neg for vascular etiology, presumably tSAH.

## NEUROLOGICAL SURGERY CONSULTATION REPORT

Date of Consult: 9/13/2016

Time of Consult: 2:43 AM

Requesting Service: Trauma

Reason for Consult: tSAH

**Subjective:**

Emergency U Alpharetta4 is a 109 y.o. unknown Hx s/p GSW R hand, found agitated and delirious by police, subdued w/ taser, decompensated during transport, GCS3 in ED on arrival, intubated and paralyzed, called re: CT w/ diffuse SAH layering R cortex/slyvian/pre-pontine cistern, hematoma along R parietal scalp, patient unresponsive on my exam w/ no exam other than reactive pupils BL 3-2, no family available for further Hx, of note patient febrile w/ initial venous pH < 7.00, UDS (+).

There are no active problems to display for this patient.

No past medical history on file.

No past surgical history on file.

(Not in a hospital admission)

**Allergies**

# EXHIBIT O



GRADY HOSPITAL
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN,COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/8/2016

Discharge Summaries (continued)

Discharge Summaries by Ludl, Erica, MD at 10/7/2016 9:11 PM (continued)

1. Respiratory failure                                                                                      Version 1 of 1
2. Need for long-term enteral access
3. Open fasciotomy wounds of right upper extremity

**Postoperative Diagnosis:**
1. Respiratory failure
2. Need for long-term enteral access
3. Open fasciotomy wounds of right upper extremity

**Procedure:**
1. Open tracheostomy
2. Percutaneous endoscopic gastrostomy tube placement
3. Debridement, partial closure, and reapplication of wound vac, >50cm2


Hospital course

Patient presented with SAH and myoglobinemia causing AKI. Positive UDS for cocaine. Nsgy placed
EVD. Admitted to ICU for q1 neurovascular checks. Exam improved significantly from 3T on
admission to GCS 11T Day 1, following commands and good strength through all extremities.
Extubated hospital day 2. GCS 14 s/p extubation. Cr continuing to rise, up to 4.8. Back to OR 9/15 for
procedures above . reDay three: ICP's increased, repeat head CT showing evolving SAH. Responded
well to 23.4% boluses. EVD draining, ICP's <25. Patient put onto CRRT by nephrology for acute renal
failure. Exam remain consistent over next few days: sedated, weakly following commands, no ICP
spikes. Went back to OR 9/20 for emergent fasciotomies + trach and PEG. No improvement in exam
over next couple days. 9/23: ICP's rising, emergent CT head showed enlarging ventricles. EVD
started draining purulent fluid. Final cultures grew meropenem and patient was treated with
meropenem per ID recs. EVD replaced x2 9/27-9.28 2/2 ventriculitis and new tract hemorrhage with
IVH and clotting off. Also during this time period had been tolerating intermittent HD but transitioned
back to CRRT to minimize fluid shifts. Remained stable over next few days. Neuro exam around 9T
with intermittent eye opening and weakly following commands. Repeat head CT obtained 9/30 with
unchanged IPH and vasogenic edema, stable ventricle size. Over the next few days, neuro exam
began to decline. Responded to voice but wouldn't follow commands. Repeat head CT ordered 10/4:
iInterval bilateral anterior cerebral artery infarction is compared to 9/30/2016. Infarction is probably
been within the last couple of days. Diffuse increase in cerebral edema with effacement of sulci and
gyri as compared to prior. Still some open cisterns as described. Ventricles have significantly
decompression prior there is some persistent hemorrhage within the ventricles. Patient came back to
room, ICP's <25. 1 hour later on neuro check ICP's 30-40, pupils fixed and dilated. Another emergent
head CT done: Interval marked central herniation with complete effacement of the basal cisterns and
severe mass effect of the structures of the brainstem. More conspicuous diffuse loss of gray-white
differentiation concerning for diffuse hypoxic ischemic injury. Unchanged severe cerebral edema.
Neurosurgery was aware of exam change and CT scans. Unfortunately injury was too severe and
neurosurgical intervention was deemed futile. Patient was released from custody the next day to
family. Brain death exam completed and brain death confirmed on 10/7/16 at 1353. Patient left on
support apparatuses until all family members could say goodbye. Care completely withdrawn 10.8.16.

Exam:
Patient without brainstem reflexes. Tolerated apnea test. No hemodynamic instability. Initial PCO2

# EXHIBIT P

3. It is important that each street be spelled out completely. Streets with directional abbreviations will begin with the first letter of the directional prefix, (i.e. "E" for East Ponce de Leon Avenue) followed by the remainder.

B. The STAR Team commander will furnish each precinct with totals at the end of each month.

## SUPERVISOR RESPONSIBILITIES

All supervisors will ensure that their personnel are familiar with the policy and support its provisions. Additionally, supervisors will receive all citizen complaints or allegations of profiling on the part of individual officers, units or the division and forward such information for further inquiry or review to the Internal Affairs Unit.

## TRAINING RESPONSIBILITIES

The DeKalb County Police Department Training Division shall ensure that this enforcement profiling policy is appropriately addressed in all relevant departmental training programs including but not limited to: Recruit Training, In-Service Training, Roll Call Training and Legal Updates. This training will be conducted annually. Topics will include a review of departmental policy and legal aspects including statutory provisions including Title 42 U.S.C. 1983, Title 42, U.S.C. Section 14141 and current case law.

## VIOLATIONS

Violation of this policy, by act or omission, may subject the employee to disciplinary action up to and including termination.

## ADMINISTRATIVE REVIEW

An administrative review of the Department's practices relative to biased base profiling shall be completed annually by Internal Affairs and shall include all documented citizen concerns related to issues of race, ethnicity, gender, sexual orientation, religion, socio-economic status, age, cultural group, or any other identifiable group. The review will encompass all aspects of communications with citizens including, but not limited to complaints, incident reports and citizen contact forms.

## 4-5.21 DEALING WITH THE MENTALLY ILL

**PURPOSE:**

This policy is intended to address the varying role officers play in their encounters with people with mental illnesses.

**POLICY:**

It is the policy of the DeKalb County Police Department to ensure a consistently high level of service is provided to all community members. Agency personnel shall afford people who have mental illnesses the same rights, dignity and access to police and other government and community services as are provided to all citizens.

**DISCUSSION:**

As first responders and law enforcers, police officers may encounter victims, witnesses or suspects who have mental illnesses; they may be called upon to help people obtain psychiatric attention or other needed services. Helping people with mental illnesses and their families obtain the services of mental health organizations, hospitals, clinics, and shelter care facilities has increasingly become a prominent role for police officers.

No single policy or procedure can address all of the situations in which officers, communications personnel and other Agency personnel may be required to provide assistance to persons who have mental illnesses. This policy is intended to address the most common types of interactions with people who have mental illnesses.

While many people with mental illness control symptoms successfully with the use of medications, others who do not have access to mental health services, fail to take their medications, or do not recognize that they are ill can experience psychiatric difficulties.

Officers and other personnel must be prepared to deal with situations involving persons who have mental illnesses and know how to respond to these situations in an appropriate and sensitive manner.

**DEFINITIONS:**

**Mental Illness** – Any of various conditions characterized by impairment of an individual's normal cognitive, emotional, or behavioral functioning, and caused by social, psychological, biochemical, genetic, or other factors, such as infection or head trauma

**PROCEDURES:**

1. **Mental Health Indicators**

As a peace officer, it is not necessary to learn how to diagnose a person who appears to be abnormal. It would be helpful to be aware of some of the characteristics of the major mental disorders in order to become more skilled in dealing with mentally ill people.

Mental illness can develop at an early age or at any age. It is sometimes treatable and even curable. It can also reoccur without warning. Mental illness crosses all socioeconomic lines and no group is immune. It is sometimes misdiagnosed and misunderstood.

Some signs to look for are:
1. Big changes in behavior.
2. Strange loss in memory.
3. Belief that people are plotting against him.
4. Grand ideas about himself, especially in the presence of others.
5. Talks to himself, especially in the presence of others.
6. Hears voices.
7. Sees visions, smells strange odors, has peculiar tastes.
8. Thinks people are watching or talking about him; is very sensitive to the remarks of others.
9. Has bodily ailments that are impossible, even when nothing is physically wrong.
10. Extremely frightened, jumpy.

Affective disorders or extreme disturbances of mood, either elation or deep depression, are usually labeled manic-depressive psychosis. Once diagnosed, those who suffer from such extreme mood swings can be treated with medication.

During a manic state, the person is humorous, optimistic, and carefree. He lives in the present and says what comes to mind. He may become involved in activities that are dangerous or foolish. The manic attacks are usually shorter in duration that the depression state.

Depression can be characterized by:
1. Weight loss or weight gain (while not on a diet)
2. Sleep difficulty or sleeping too much
3. Loss of energy, fatigability, or tiredness
4. Psychomotor agitation or retardation (not restlessness)
5. Loss of interest or pleasure in usual activities or decrease in sexual desire
6. Feelings of self-reproach or excessive or inappropriate guilt
7. Complaints or evidence of diminished ability to think or concentrate such as slow thinking or indecisiveness
8. Recurrent thoughts of death, suicide or any suicidal behavior

This form of depression differs from normal depression because of the severity and duration of the behavior, the appropriateness of the depression in relation to its cause, and the level at which it interferes with ones life.

In its most severe state, depression can lead to suicide. For every successful suicide, it is estimated that there may be from 10-20 attempts. People commit suicide for many reasons including letting others know they need help and hoping to embarrass someone or punish someone.

A person may be suffering from schizophrenia if he has disordered thinking, delusions, hallucinations, social withdrawal and/or bizarre behavior. Other symptoms to look for are:
1. Identity confusion
2. Difficulty in distinguishing fantasies from real life
3. Social withdrawal
4. Inappropriate moods
5. Thinking and behavior dominated by wishes, fears, and fantasies
6. Inability to realize or denial that one's behavior is abnormal

Symptoms related to neurosis include acute anxiety, irrational fears, obsessive thoughts, feelings of unreality and over concern with the state of one's health. The neurotic has been described as his own worst enemy. The neurotic is aware of his sick behavior but is helpless to do anything about it. A good example of a person exhibiting neurotic behavior would be a person suffering from some form of phobia, such as claustrophobia. The person might even be aware of his problem but unable to help himself.

2. **Situation Assessment**
    A.    When making observations, personnel should note as many cues as possible, put the cues into the context of the situation, and be mindful of environmental and cultural factors. The degree to which these symptoms exist varies from person to person according to the type and severity of the mental illness. Many of these symptoms represent internal, emotional states that are not readily observable from a distance, but are noticeable in conversation with the individual. The officer responding to the scene is not expected to diagnose a mental illness, but to decide on the appropriate response to the individual and situation. Recognizing that symptoms may indicate mental illness will help officers decide on an appropriate response and disposition.

    B.    Obtaining relevant information from family members, friends or others at the scene who know the individual and his or her history, or seeking advice from mental health professionals, can also assist officers in taking the appropriate action. Officers on the

# EXHIBIT Q



GRADY HOSPITAL
80 Jesse Hill Jr. Drive
Atlanta GA 30303
Inpatient Record

DONEGAN,COREY BRANDON
MRN: 10488233
DOB: 7/25/1986, Sex: M
Adm: 9/13/2016, D/C: 10/8/2016

Consult Notes (continued)

Consults by Summers, Nathan, MD at 9/26/2016 9:20 AM (continued)

Version 1 of 1

## ID RECOMMENDATIONS:
1. Enterobacter cloacae ventriculitis
- Please send CSF today from EVD for cell count + diff, glucose, total protein, and bacterial culture
- Increase meropenem to 2gm IV q8hr
- Please screen for HIV

Seen and discussed with attending physician, Dr. Henry Blumberg.

Thank you for this consult. We will continue to follow.

Nate Summers, MD
Infectious Disease Fellow year 1, PGY-4
PIC: 54940

========================================================
**Referring Service:** SICU
**Referring Attending:** Hodge, Juvonda S., MD
**Primary ID Physician:** Blumberg, Henry MD

**Patient Name:** EMERGENCY U ALPHARETTA4
**Patient MRN:** 100339988
**Admit Date:** 9/13/2016

## Reason for Referral:
Enterobacter cloacae ventriculitis

## HPI:
EMERGENCY U ALPHARETTA4 is a 30 yoAAM male with unknown PMH who was brought in on 9/13 after being found to be agitated by police. Pt had a GSW to the R hand and was agitated when found by police, so the Pt was tasered to the RUE due to his agitation. Pt then started to decompensate with GCS=3 upon arrival to the ED, so he was promptly intubated for airway protection. CT chest/abd/pelvis on 9/13 was unremarkable, but CTH showed extensive subarachnoid hemorrhage throughout the R cerebral convexity without herniation/shift, with R > L cerebral edema. Neurosurgery was consulted and placed an EVD on 9/13, with rapid improvement in mental status per documentation, being able to follow commands. Pt was admitted to the SICU for further care. He underwent a bedside I&D on 9/13 by ortho to his R hand.

Pt was found to have rhabdomyolysis with CPK>50,000 and AKI, so nephrology consulted and felt the ATN to be due to rhabdo & cocaine (UDS + on admit). Pt was started on CRRT on 9/16. Pt was extubated briefly on 9/15 and was documented to be AAOx2, but then went to the OR and was reintubated on 9/15 for concern for RUE compartment syndrome. Pt underwent decompressive fasciotomy of the R forearm & R upper arm, w/ debridement of nonviable ischemic muscle; no purulence seen per op note. RIJ vascath was placed in the OR. Pt then had an ICP spike on 9/16,

# EXHIBIT R



# DeKalb County Police Department – Criminal Investigation Division

## Case Note  Supplemental Form

| Detective | Date | Case Number |
|---|---|---|
| Sgt. B. L. Danner, #1917 | 9-13-16 | 16-089186 |

On 9-13-16 I responded to 7850 Stonecrest Square, the Fairfield Inn, to supervise the execution of a search warrant. Upon arrival I spoke to Caridad Rojas, the General Manager (Phnone: 770-484-9993 ext. 500) who said that there was video of the shooting that occurred in the hallway of the second floor. Viewing the video does not show who was shooting but does show people ducking and plaster falling from the ceiling. Ms. Rojas said she would have to have someone from her corporate office transfer the video to a disk and that we would need to call back in the morning to make those arrangements.

I also spoke to Kim Boyce, the night shift front desk manager, and she was able to tell me that Charisma Johnson had checked into room 218 about 1300 hours on Monday and paid cash for the room. Ms. Johnson had provided the hotel with the address of 1616 Flat Rock Dr, Conyers, GA 30094 and a phone number of 678-608-6774.

I directed Det. Kershaw to take the witness, Shoronda Stewart, to police headquarters to be interviewed while I waited at the scene for the search warrant. Once the search warrant was signed, Det. Paden, CSI Richardson and I conducted the search warrant. We located the purses and personal effects for Shoronda Stewart and Charisma Johnson and small amounts of suspected marijuana and cocaine. The room was then released back to the hotel.

# TABLE OF CONTENTS REVISED FOR REPLY BREIFS SUBMITTED

1. DEKALB COUNTY INCIDENT DETAIL REPORT.................

1(a) DEKALB COUNTY POLICE/FIRE COMMUNICATION CAD REPORT...

2.DEKALB COUNTY TASER REPORT.............................................

3. OFFICER TIFFINY ANDERSON USE OF FORCE REPORT.....................

4. DEKALB CRIMINAL DIV. SUPPLEMENT REPORT...*Pg. 6*.................

5. AMERICAN MEDICAL RESPONSE REPORT.....................................

6. ORDER ADMITTING WILL TO PROBATE IN SOLEMN FORM..............

7. LT. LAVINE USE OF FORCE GUIDELINES IN REGARDS TO TASER
USAGE OF OFFICER LATTIMORE AND ANDERSON ..........................

8. USE OF FORCE POLICT 4-6.1..................................................

9. POLICE GROUND PHOTOS.....................................................

10. PARKS INCONSISTENT STATEMENTS 10(a)(b)(c)...........................

11. OFFICER LATTIMORE STATEMENT OF TASING.............................

12. SGT. A. BROWN USE OF FORCE REPORT....................................

13. TASER INDUCED RHABDOMYOLYSIS REPORT........*Refer To*.........

14. AUTOPSY PHOTOS.............................................................

15. TASER EVIDENCE SYNC REPORT............................................

16. MEDICAL EXAMINER REPORT................................................

17. MCQUILKEN AND OFFICER ANDERSON" BUMPING HEAD"
STATEMENT ....................................................................

# EXHIBIT 1

# Incident Detail Report

Data Source: Data Warehouse
Incident Status: Closed
Incident number: 2016-0479282
Case Number: 2016-89200
Incident Date: 9/12/2016 22:19:51
Report Generated: 9/10/2016 16:25:45

**Incident Information**

| | | | |
|---|---|---|---|
| Incident Type: | 1 CAR | Alarm Level: | |
| Priority: | 7 | Problem: | PERSON DOWN |
| Determinant: | | Agency: | PD |
| Base Response#: | | Jurisdiction: | East Precinct |
| Confirmation#: | | Division: | East Precinct |
| Taken By: | CHARRELL | Battalion: | East Precinct |
| Response Area: | | Response Plan: | |
| Disposition: | | Command Ch: | |
| Cancel Reason: | | Primary TAC: | |
| Incident Status: | Closed | Secondary TAC: | |
| Certification: | | Delay Reason (if any): | |
| Longitude: | | Latitude: | |

**Incident Location**

| | | | |
|---|---|---|---|
| Location Name: | | County: | DEKALB |
| Address: | PHILLIPS RD / PHILLIPS LAKE WAY | Location Type: | |
| Apartment: | | Cross Street: | PHILLIPS CT / PHILLIPS LAKE WAY |
| Building: | | Map Reference: | |
| City, State, Zip: | LITHONIA GA | | |

**Call Receipt**

| | | | |
|---|---|---|---|
| Caller Name: | MALE CALLER | | |
| Method Received: | | Call Back Phone: | 404-454-6354 |
| Caller Type: | NON 9-1-1 CALL | Caller Location: | PHILLIPS RD&PHILLIPS LAKE WAY |

**Time Stamps**

| Description | Date | Time | User | Elapsed Times Description | Time |
|---|---|---|---|---|---|
| Phone Pickup | 9/12/2016 | 22:19:51 | | | |
| 1st Key Stroke | | | | Received to In Queue | |
| In Waiting Queue | 9/12/2016 | 22:22:02 | | Call Taking | |
| Call Taking Complete | 9/12/2016 | 22:22:02 | CHARRELL | In Queue to 1st Assign | |
| 1st Unit Assigned | 9/12/2016 | 22:26:12 | | Call Received to 1st Assign | 00:06:20.9 |
| 1st Unit Enroute | 9/12/2016 | 22:30:57 | | Assigned to 1st Enroute | 00:04:45.4 |
| 1st Unit Arrived | 9/12/2016 | 22:36:31 | | Enroute to 1st Arrived | 00:05:33.7 |
| Closed | 9/16/2016 | 12:51:52 | | Incident Duration | 86:32:01.4 |

**Resources Assigned**

| Unit | Primary Flag | Assigned | Disposition | Enroute | Staged | Arrived | At Patient | Delay Avail | Complete | Odm. Enroute | Odm. Arrived | Cancel Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 432M | N | 22:26:12 | | 03:38:36 | | 04:32:17 | | | 05:31:14 | | | |
| 462M | N | 22:38:30 | | 22:38:30 | | 22:43:28 | | | 02:33:59 | | | |
| 422M | N | 22:38:36 | | 22:38:36 | | 22:43:35 | | | 23:56:04 | | | |
| 421M | N | 22:38:50 | | 23:30:56 | | 00:00:21 | | | 06:33:09 | | | |
| 1529 | N | 22:41:52 | | 22:41:52 | | 22:41:52 | | | 22:48:58 | | | |
| 1549 | N | 22:42:01 | | 22:42:01 | | 22:42:01 | | | 22:42:07 | | | |
| 431M | N | 22:46:07 | | 22:46:07 | | 22:50:06 | | | 23:52:00 | | | |
| 415M | N | 22:49:29 | | 22:49:06 | | 23:02:02 | | | 02:37:26 | | | |
| 433M | N | 00:46:19 | | 00:46:19 | | 00:46:19 | | | 03:41:05 | | | |
| 442D | N | 05:13:48 | | 06:13:48 | | | | | 17:32:59 | | | |
| 452E | N | 13:09:00 | | 13:09:00 | | 19:59:32 | | | 00:54:22 | | | |
| 441M | N | 21:09:06 | | 21:09:19 | | 22:09:25 | | | 08:32:43 | | | |
| 441D | N | 05:06:21 | | | | 05:39:36 | | | 15:11:30 | | | |
| 432E | N | 13:37:55 | | 13:37:55 | | 15:32:16 | | | | | | |
| 432E | N | 15:32:39 | | 15:32:39 | | 15:32:41 | | | 01:27:05 | | | |
| 441M | N | 23:49:39 | | 23:49:39 | | 00:25:35 | | | 06:32:56 | | | |
| 442D | N | 05:10:46 | | | | 05:45:42 | | | 16:21:49 | | | |
| 431E | N | 14:31:22 | | 14:31:26 | | 16:21:57 | | | 01:38:30 | | | |
| 422M | N | 23:18:10 | | 23:29:58 | | 00:31:54 | | | 12:22:08 | | | |
| 461D | N | 05:04:02 | | 05:04:02 | | | | | 12:51:52 | | | |

**Personnel Assigned**

| Unit | Name |
|---|---|
| 1529 | Systems Integration (Systemintegrat) |
| 415M | Systems Integration (Systemintegrat) |
| 421M | Systems Integration (Systemintegrat) |
| 422M | LISTER, CHARLES J (052079); VERELIEN, NAOMIE (050517) |
| 431E | Systems Integration (Systemintegrat) |
| 431M | Systems Integration (Systemintegrat) |
| 432E | LATTIMORE, TIMOTHY J (050579); LATTIMORE, TIMOTHY J (050579) |
| 432M | Systems Integration (Systemintegrat) |
| 433M | LATTIMORE, TIMOTHY J (050579) |
| 441D | Systems Integration (Systemintegrat) |
| 441M | Systems Integration (Systemintegrat); LISTER, CHARLES J (052079) |
| 442D | Systems Integration (Systemintegrat); JONES, CURTIS J (050297) |
| 452E | Systems Integration (Systemintegrat) |

CD 4167

462M       STEPHENS, JUNIOR (029988)
481D       Systems Integration (SystemIntegrat)

**Pre-Scheduled Information**
No Pro-Scheduled Information

**Transports**
No Transports Information

**Transport Logs**
No Transports Information

**Comments**

| Date | Time | User | Type | Conf. | Comments |
|---|---|---|---|---|---|
| 9/12/2016 | 22:19:51 | CHARRELL | Response | | [1] COMPL HEARD A GUNSHOT ...COMPL ADV SEEING A MALE TAKE OFF HIS SHOES AND WALK UP THE STREET...NO 38 |
| 9/12/2016 | 22:24:25 | MLOWE | Response | | [2] 419 clr on pend call |
| 9/12/2016 | 22:26:34 | MLOWE | Response | | [3] unit clr |
| 9/12/2016 | 22:29:05 | SLEGG | Response | | [4] ADDITIONAL CALLER..615 430 1348 .SHOTS FIRED...ADV SEES 78//BM,WHT TANK |
| | | | | | TOP  STANDING NEAR INTERSECTION IN MIDDLE OF STREET WALKING IN CIRCLES..CHECK |
| | | | | | FOR -4..NO 38 |
| 9/12/2016 | 22:32:30 | MLOWE | Response | | [5] CLR ON UPDATE |
| 9/12/2016 | 22:38:01 | MLOWE | Response | | [6] OUT ON SUBJ |
| 9/12/2016 | 22:39:01 | MLOWE | Response | | [7] SUBJ AT GUNPOINT...10-3 |
| 9/12/2016 | 22:39:01 | MLOWE | Response | | [8] SUBJ ON THE GROUND |
| 9/12/2016 | 22:39:52 | MLOWE | Response | | [9] SUBJ RUNNING TWDS MARBUT |
| 9/12/2016 | 22:40:23 | MLOWE | Response | | [10] subj running twds laurel post dr |
| 9/12/2016 | 22:41:02 | MLOWE | Response | | [11] 6310 laurel post dr subj stip to break into loc |
| 9/12/2016 | 22:42:04 | SLEGG | Response | | [12] COMPL ADV SOMEONE IS BANGING ON THE DOOR.... |
| 9/12/2016 | 22:42:17 | MLOWE | Response | | [13] related to 432m call |
| 9/12/2016 | 22:42:26 | SLEGG | Response | | [14] RELATED TO CAD #9282., |
| 9/12/2016 | 22:42:41 | SLEGG | Response | | [15] COMPL ADV PD HAS SUBJ...59 W/COMPL |
| 9/12/2016 | 22:42:56 | MLOWE | Response | | [16] need someone to secure her unit 69 in grass |
| 9/12/2016 | 22:43:17 | SLEGG | Response | | [17] DUP #9307 #9282 |
| 9/12/2016 | 22:44:09 | SLEGG | Response | | [18] 6316 LAUREL POST DR...PX 770 484 0493..REQ PD 59 IN REF TO SUBJ IN CUSTODY ATTE |
| | | | | | MPTING TO BREAK IN |
| 9/12/2016 | 22:45:12 | MLOWE | Response | | [19] SUBJ DETAINED CHECK SUBJ WRIST 6302 LAUREL POST DR |
| 9/12/2016 | 22:47:24 | MLOWE | Response | | [20] 431M OUT AT PHILLIPS LAKE AT UNIT |
| 9/12/2016 | 22:47:59 | CPEPPER | Response | | [21] B66 CLR VERB |
| 9/12/2016 | 22:52:35 | MLOWE | Response | | [22] SUBJ BITE UNIT OFFICER -4 |
| 9/12/2016 | 22:54:03 | MLOWE | Response | | [23] CHECKING 6256 PHILLIPS LAKE WAY IN REF TO SIG 23 |
| 9/12/2016 | 23:09:11 | DRIVERA | Response | | [24] B66 REQ ALS FOR COMBATIVE PAT |
| 9/12/2016 | 23:12:53 | CPEPPER | Response | | [25] AM79 CLR |
| 9/12/2016 | 23:14:49 | CPEPPER | Response | | [26] AM54 CLR |
| 9/12/2016 | 23:15:11 | DRIVERA | Response | | [27] B66 IS 10-4.. PD IS 10-7 WUNIT |
| 9/12/2016 | 23:19:41 | MLOWE | Response | | [28] HEAR SIG 23 IN THE AREA OF LAUREL POST DR&EASTBRIAR DR PER 421 |
| 9/12/2016 | 23:23:13 | MLOWE | Response | | [29] 10-25 ADDTL SIG 23 |
| 4/5/2016 | 15:02:54 | Import | Response | | [30] Imported from legacy system, 2016-479282; Agencies: FIRE - LAW - ; Zone: EP; Location: PHILLIPS RD&PHILLIPS LAKE WAY, LITHONIA - DEKALB COUNTY; Type: 02 - PERSON DOWN; Priority: 7; Dispo: COMPLETED |

**Address Changes**
No Address Changes

**Priority Changes**
No Priority Changes

**Alarm Level Changes**
No Alarm Level Changes

**Activity Log**

| Date | Time | Radio | Activity | Location | Log Entry | User |
|---|---|---|---|---|---|---|
| 9/12/2016 | 22:22:02 | | legacy system | | Initial Law Response Routed | CHARRELL |
| 9/12/2016 | 22:22:13 | | legacy system | | WI #9282 | CHARRELL |
| 9/12/2016 | 22:25:02 | | legacy system | | HU #9282 419E | MLOWE |
| 9/12/2016 | 22:25:03 | | legacy system | | L01 Hold Incident | MLOWE |
| 9/12/2016 | 22:26:12 | | DSP | | [Legacy System] Status: DSP : DISPATCH | MLOWE |
| 9/12/2016 | 22:26:12 | | legacy system | | MDT Dispatch Message To: 432M | MLOWE |
| 9/12/2016 | 22:26:12 | | legacy system | | MDT Status Update To: 432M | MLOWE |
| 9/12/2016 | 22:27:19 | | legacy system | | WI 432M | SLEGG |
| 9/12/2016 | 22:29:21 | | legacy system | | NAR 432M | SLEGG |
| 9/12/2016 | 22:30:57 | | ENR | | [Legacy System] Status: ENR : ENROUTE | TANDERSON |
| 9/12/2016 | 22:31:02 | | legacy system | | WI 432M | MLOWE |
| 9/12/2016 | 22:32:30 | | legacy system | | M 432M,CLR ON UPDATE | MLOWE |
| 9/12/2016 | 22:36:31 | | OS | | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | TANDERSON |
| 9/12/2016 | 22:38:01 | | legacy system | | M 432M,OUT ON SUBJ | MLOWE |
| 9/12/2016 | 22:38:30 | | ENR | | [Legacy System] Status: ENR : ENROUTE | MLOWE |
| 9/12/2016 | 22:38:30 | | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfill | MLOWE |
| 9/12/2016 | 22:38:30 | | legacy system | | MDT Dispatch Message To: 462M | MLOWE |
| 9/12/2016 | 22:38:30 | | legacy system | | MDT Status Update To: 462M | MLOWE |
| 9/12/2016 | 22:38:32 | | legacy system | | AE 432M 462M | MLOWE |
| 9/12/2016 | 22:38:36 | | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto | MLOWE |

CD 4168

| | | | | |
|---|---|---|---|---|
| | | | Backfill | |
| 9/12/2016 | 22:38:36 | ENR | [Legacy System] Status: ENR : ENROUTE | MLOWE |
| 9/12/2016 | 22:38:36 | legacy system | MDT Dispatch Message To: 422M | MLOWE |
| 9/12/2016 | 22:38:37 | legacy system | MDT Status Update To: 422M | MLOWE |
| 9/12/2016 | 22:38:38 | legacy system | AE 462M 422M | MLOWE |
| 9/12/2016 | 22:38:50 | DSP | [Legacy System] Status: DSP : DISPATCH; Auto | MLOWE |
| | | | Backfill | |
| 9/12/2016 | 22:38:50 | ENR | [Legacy System] Status: ENR : ENROUTE | MLOWE |
| 9/12/2016 | 22:38:50 | legacy system | MDT Dispatch Message To: 421M | MLOWE |
| 9/12/2016 | 22:38:50 | legacy system | MDT Status Update To: 421M | MLOWE |
| 9/12/2016 | 22:38:51 | legacy system | AE 432M 421M | MLOWE |
| 9/12/2016 | 22:39:01 | legacy system | M 432M,SUBJ AT GUNPOINT...10-3 | MLOWE |
| 9/12/2016 | 22:39:08 | legacy system | WI 432M | MLOWE |
| 9/12/2016 | 22:39:31 | legacy system | M 432M,SUBJ ON THE GROUND | MLOWE |
| 9/12/2016 | 22:39:52 | legacy system | M 432M,SUBJ RUNNING TWDS MARBUT | MLOWE |
| 9/12/2016 | 22:41:40 | legacy system | NAR 432M | MLOWE |
| 9/12/2016 | 22:41:52 | OS | [Legacy System] Status: OS : ON SCENE UNIT | MLOWE |
| | | | (CLI) | |
| 9/12/2016 | 22:41:52 | ENR | [Legacy System] Status: ENR : ENROUTE; Auto | MLOWE |
| | | | Backfill | |
| 9/12/2016 | 22:41:52 | DSP | [Legacy System] Status: DSP : DISPATCH; Auto | MLOWE |
| | | | Backfill | |
| 9/12/2016 | 22:41:52 | legacy system | MDT Dispatch Message To: 1529 | MLOWE |
| 9/12/2016 | 22:41:52 | legacy system | MDT Status Update To: 1529 | MLOWE |
| 9/12/2016 | 22:41:54 | legacy system | AO 432M 1529 | MLOWE |
| 9/12/2016 | 22:42:01 | OS | [Legacy System] Status: OS : ON SCENE UNIT | MLOWE |
| | | | (CLI) | |
| 9/12/2016 | 22:42:01 | ENR | [Legacy System] Status: ENR : ENROUTE; Auto | MLOWE |
| | | | Backfill | |
| 9/12/2016 | 22:42:01 | DSP | [Legacy System] Status: DSP : DISPATCH; Auto | MLOWE |
| | | | Backfill | |
| 9/12/2016 | 22:42:01 | legacy system | MDT Dispatch Message To: 1549 | MLOWE |
| 9/12/2016 | 22:42:01 | legacy system | MDT Status Update To: 1549 | MLOWE |
| 9/12/2016 | 22:42:02 | legacy system | AO 462M 1549 | MLOWE |
| 9/12/2016 | 22:42:07 | AV | [Legacy System] Status: P : PREEMPT | MLOWE |
| 9/12/2016 | 22:42:07 | legacy system | MDT Status Update To: 1549 | MLOWE |
| 9/12/2016 | 22:42:09 | legacy system | WI 432M | SLEGG |
| 9/12/2016 | 22:43:24 | legacy system | NAR 432M | MLOWE |
| 9/12/2016 | 22:43:27 | legacy system | Duplicate Closed: 2016-0000476307 | SLEGG |
| 9/12/2016 | 22:43:27 | legacy system | ### Address 6316 LAUREL POST DR | SLEGG |
| 9/12/2016 | 22:43:27 | legacy system | ### Name PEACOCK, SYLVERINE A | SLEGG |
| 9/12/2016 | 22:43:27 | legacy system | ### Remarks BELIEVES SOMEONE IS TRYING | SLEGG |
| | | | TO BREAK INTO HER HOME.... | |
| 9/12/2016 | 22:43:27 | legacy system | ### Event 42RP | SLEGG |
| 9/12/2016 | 22:43:27 | legacy system | ### Caller 6316 LAUREL POST DR | SLEGG |
| 9/12/2016 | 22:43:27 | legacy system | ### Phone 7704840493 | SLEGG |
| 9/12/2016 | 22:43:27 | legacy system | DUP #9307 #9282 | SLEGG |
| 9/12/2016 | 22:43:29 | OS | [Legacy System] Status: OS : ON SCENE UNIT | MLOWE |
| | | | (CLI) | |
| 9/12/2016 | 22:43:29 | legacy system | MDT Status Update To: 462M | MLOWE |
| 9/12/2016 | 22:43:29 | legacy system | OS 462M | MLOWE |
| 9/12/2016 | 22:43:35 | OS | [Legacy System] Status: OS : ON SCENE UNIT | CJLISTER |
| | | | (CLI) | |
| 9/12/2016 | 22:43:56 | legacy system | WI 432M | CSWIFT |
| 9/12/2016 | 22:44:09 | legacy system | M 462M, 6316 LAUREL POST DR.,,PX 770 484 | SLEGG |
| | | | 0493, REQ PD 59 IN REF TO SUBJ IN CUSTODY | |
| | | | ATTEMPTING TO BRE | |
| 9/12/2016 | 22:45:12 | legacy system | M 432M,SUBJ DETAINED CHECK SUBJ WRIST | MLOWE |
| | | | 6302 LAUREL POST DR | |
| 9/12/2016 | 22:46:07 | ENR | [Legacy System] Status: ENR : ENROUTE | MLOWE |
| 9/12/2016 | 22:46:07 | DSP | [Legacy System] Status: DSP : DISPATCH; Auto | MLOWE |
| | | | Backfill | |
| 9/12/2016 | 22:46:07 | legacy system | MDT Dispatch Message To: 431M | MLOWE |
| 9/12/2016 | 22:46:07 | legacy system | MDT Status Update To: 431M | MLOWE |
| 9/12/2016 | 22:46:08 | legacy system | AE 432M 431M | MLOWE |
| 9/12/2016 | 22:46:19 | legacy system | Previous Priority: 02 | MLOWE |
| 9/12/2016 | 22:46:19 | legacy system | Previous Law Event: 23 | MLOWE |
| 9/12/2016 | 22:46:19 | legacy system | Previous Event: 23 | MLOWE |
| 9/12/2016 | 22:46:19 | legacy system | Previous Fire Event: 23 | MLOWE |
| 9/12/2016 | 22:46:19 | legacy system | Previous RESCUE Event: 23 | MLOWE |
| 9/12/2016 | 22:46:19 | legacy system | Previous EMS Event: 23 | MLOWE |
| 9/12/2016 | 22:46:19 | legacy system | Updating Agency Events | MLOWE |
| 9/12/2016 | 22:46:20 | Legacy System Status Entry | [Legacy System] Status: ; Event Change--Old: 23 New:02 | MLOWE |
| 9/12/2016 | 22:46:20 | Legacy System Status Entry | [Legacy System] Status: ; Event Change--Old: 23 New:02 | MLOWE |
| 9/12/2016 | 22:46:20 | Legacy System Status Entry | [Legacy System] Status: ; Event Change--Old: 23 New:02 | MLOWE |
| 9/12/2016 | 22:46:20 | Legacy System Status Entry | [Legacy System] Status: ; Event Change--Old: 23 New:02 | MLOWE |
| 9/12/2016 | 22:46:20 | Legacy System Status Entry | [Legacy System] Status: ; Event Change--Old: 23 New:02 | MLOWE |
| 9/12/2016 | 22:46:30 | OS | [Legacy System] Status: OS : ON SCENE UNIT | BPEHASZ |
| | | | (CLI) | |
| 9/12/2016 | 22:46:47 | legacy system | FF01 View - No Action | CPEPPER |

| Date | Time | Type | | Description | User |
|---|---|---|---|---|---|
| 9/12/2016 | 22:46:59 | legacy system | | Prev Loc: PHILLIPS RD&PHILLIPS LAKE WAY | CPEPPER |
| 9/12/2016 | 22:47:02 | legacy system | | WI #8262 | F489 |
| 9/12/2016 | 22:47:05 | legacy system | | FF01 View - No Action | CPEPPER |
| 9/12/2016 | 22:47:24 | legacy system | | M 431M,431M OUT AT PHILLIPS LAKE AT UNIT | MLOWE |
| 9/12/2016 | 22:47:28 | DSP | | [Legacy System] Status: DSP : DISPATCH | CPEPPER |
| 9/12/2016 | 22:47:28 | legacy system | | MDT Dispatch Message To: B66 | CPEPPER |
| 9/12/2016 | 22:47:28 | legacy system | | MDT Status Update To: B66 | CPEPPER |
| 9/12/2016 | 22:48:08 | ENR | | [Legacy System] Status: ENR : ENROUTE | BASIC66 |
| 9/12/2016 | 22:48:29 | ENR | | [Legacy System] Status: ENR : ENROUTE | MLOWE |
| 9/12/2016 | 22:48:29 | DSP | | [Legacy System] Status: DGP : DISPATCH; Auto | MLOWE |
| | | | | Backfill | |
| 9/12/2016 | 22:48:29 | legacy system | | MDT Dispatch Message To: 415M | MLOWE |
| 9/12/2016 | 22:48:29 | legacy system | | MDT Status Update To: 415M | MLOWE |
| 9/12/2016 | 22:48:31 | legacy system | | AE 432M 415M | MLOWE |
| 9/12/2016 | 22:48:58 | AV | | [Legacy System] Status: AV : AVAILABLE; 1539 ISLGOODWIN | MLOWE |
| | | | | OUT ON THIS CALL | |
| 9/12/2016 | 22:48:58 | legacy system | | L18 Agency Cleared | LGGODWIN |
| 9/12/2016 | 22:49:06 | ENR | | [Legacy System] Status: ENR : ENROUTE | ABROWN1852 |
| 9/12/2016 | 22:49:14 | legacy system | | WI 432M | MLOWE |
| 9/12/2016 | 22:50:06 | OS | | [Legacy System] Status: OS : ON SCENE UNIT | MLOWE |
| | | | | (CLI) | |
| 9/12/2016 | 22:50:06 | legacy system | | MDT Status Update To: 431M | MLOWE |
| 9/12/2016 | 22:50:06 | legacy system | | OS 431M | MLOWE |
| 9/12/2016 | 22:50:32 | legacy system | | WI 431M | MLOWE |
| 9/12/2016 | 22:52:35 | legacy system | | M 432M,SUEJ BITE UNIT OFFICER -4 | MLOWE |
| 9/12/2016 | 22:54:03 | legacy system | | M 421M,CHECKING 6286 PHILLIPS LAKE WAY | MLOWE |
| | | | | IN REF TO SIG 23 | |
| 9/12/2016 | 22:54:53 | legacy system | | WI B66 | DRIVERA |
| 9/12/2013 | 22:55:02 | OS | | [Legacy System] Status: OS : ON SCENE UNIT | BASIC66 |
| | | | | (CLI) | |
| 9/12/2016 | 22:58:21 | legacy system | | Prev Loc: 6302 LAUREL POST DR | CPEPPER |
| 9/12/2016 | 23:02:02 | OS | | [Legacy System] Status: OS : ON SCENE UNIT | MLOWE |
| | | | | (CLI) | |
| 9/12/2016 | 23:02:02 | legacy system | | MDT Status Update To: 415M | MLOWE |
| 9/12/2016 | 23:02:02 | legacy system | | OS 415M | MLOWE |
| 9/12/2016 | 23:06:04 | legacy system | | WI 415M | FPOWELL |
| 9/12/2015 | 23:08:05 | legacy system | | WI B66 | NARBROWN |
| 9/12/2016 | 23:09:36 | legacy system | | NAR B66 | DRIVERA |
| 9/12/2016 | 23:11:17 | DSP | | [Legacy System] Status: DSP : DISPATCH | CPEPPER |
| 9/12/2016 | 23:11:17 | legacy system | | MDT Dispatch Message To: AM79 | CPEPPER |
| 9/12/2016 | 23:11:18 | legacy system | | MDT Status Update To: AM79 | CPEPPER |
| 9/12/2016 | 23:11:21 | legacy system | | WI AM79 | CPEPPER |
| 9/12/2016 | 23:11:22 | legacy system | | AUTO DSP Pages Attempted/Sent | CPEPPER |
| 9/12/2016 | 23:11:22 | legacy system | | A B66 AM79 | CPEPPER |
| 9/12/2016 | 23:11:39 | ENR | | [Legacy System] Status: ENR : ENROUTE | MEDIC79 |
| 9/12/2016 | 23:11:57 | legacy system | | WI B66 | F489 |
| 9/12/2016 | 23:12:53 | legacy system | | M AM79, AM79 CLR | CPEPPER |
| 9/12/2016 | 23:13:56 | DSP | | [Legacy System] Status: DSP : DISPATCH | CPEPPER |
| 9/12/2016 | 23:13:56 | legacy system | | MDT Dispatch Message To: AM54 | CPEPPER |
| 9/12/2016 | 23:13:57 | legacy system | | MDT Status Update To: AM54 | CPEPPER |
| 9/12/2016 | 23:14:00 | legacy system | | PD AM79 AM54 | CPEPPER |
| 9/12/2016 | 23:14:01 | AV | | [Legacy System] Status: AV : AVAILABLE; | CPEPPER |
| | | | | Disposition: P-PREEMPTED | |
| 9/12/2016 | 23:14:01 | legacy system | | MDT Status Update To: AM79 | CPEPPER |
| 9/12/2016 | 23:14:02 | legacy system | | AM79 > Call Times Paged Out | CPEPPER |
| 9/12/2016 | 23:14:05 | legacy system | | WI AM54 | CPEPPER |
| 9/12/2016 | 23:14:16 | ENR | | [Legacy System] Status: ENR : ENROUTE | MEDIC54 |
| 9/12/2016 | 23:14:24 | legacy system | | WI 422M | MTOLER |
| 9/12/2016 | 23:14:49 | legacy system | | M AM54, AM54 CLR | CPEPPER |
| 9/12/2016 | 23:15:14 | legacy system | | NAR B66 | DRIVERA |
| 9/12/2016 | 23:19:41 | legacy system | | M 432M,HEAR SIG 23 IN THE AREA OF LAUREL | MLOWE |
| | | | | POST DR&EASTBRIAR DR PER 421 | |
| 9/12/2016 | 23:23:13 | legacy system | | M 432M,10-25 ADDTL SIG 23 | MLOWE |
| 9/12/2016 | 23:24:36 | legacy system | | WI 462M | MLOWE |
| 9/12/2016 | 23:28:36 | CASE (CLI) | | [Legacy System] Status: CASE : CASE (CLI); Run | MLOWE |
| | | | | Number: 2016-99200 | |
| 9/12/2016 | 23:28:39 | legacy system | | MDT Status Update To: 432M | MLOWE |
| 9/12/2016 | 23:30:49 | TR | | [Legacy System] Status: TR : TRANSPORT (CLI) | BASIC66 |
| 9/12/2016 | 23:30:56 | ENR | GRADY | [Legacy System] Status: ENR : ENROUTE | MLOWE |
| 9/12/2016 | 23:30:56 | legacy system | | MDT Status Update To: 421M | MLOWE |
| 9/12/2016 | 23:30:56 | legacy system | | ENR 421M[GRADY | MLOWE |
| 9/12/2016 | 23:32:28 | TR | GRADY | [Legacy System] Status: TR : TRANSPORT (CLI) | DRIVERA |
| 9/12/2016 | 23:32:28 | legacy system | | MDT Status Update To: B66 | DRIVERA |
| 9/12/2016 | 23:32:28 | legacy system | | TR B66 [GRADY | DRIVERA |
| 9/12/2016 | 23:32:41 | ENR | GRADY-PERSONNEL | [Legacy System] Status: ENR : ENROUTE | DRIVERA |
| 9/12/2016 | 23:32:41 | legacy system | | MDT Status Update To: AM54 | DRIVERA |
| 9/12/2016 | 23:32:41 | legacy system | | ER AM54 [GRADY-PERSONNEL | DRIVERA |
| 9/12/2016 | 23:33:34 | TR | GRADY-PERSONNEL | [Legacy System] Status: TR : TRANSPORT (CLI) | MEDIC54 |
| 9/12/2016 | 23:52:00 | AV | | [Legacy System] Status: AV : AVAILABLE; | MLOWE |
| | | | | Disposition; 63-No Report Made | |
| 9/12/2016 | 23:52:01 | legacy system | | MDT Status Update To: 431M | MLOWE |
| 9/12/2016 | 23:52:02 | legacy system | | AV 431M | MLOWE |
| 9/12/2016 | 23:58:04 | AV | | [Legacy System] Status: AV : AVAILABLE; | CJLISTER |
| | | | | Disposition: Incident report | |
| 9/12/2016 | 23:59:50 | MOBILE DATA OFF | | [Legacy System] Status: MDTOFF : MOBILE | ABROWN1852 |
| | | | | DATA OFF | |
| 9/12/2016 | 23:59:52 | MOBILE DATA ON | | [Legacy System] Status: MDTON : MOBILE DATA | ABROWN1852 |

CD 4170

| Date | Time | Action | Location | Description | Unit |
|---|---|---|---|---|---|
| 9/13/2016 | 00:00:11 | MOBILE DATA OFF | | ON; BEGINNING MILEAGE; 30986 [Legacy System] Status: MDTOFF ; MOBILE DATA OFF | ABROWN1852 |
| 9/13/2016 | 00:00:28 | MOBILE DATA ON | | [Legacy System] Status: MDTON : MOBILE DATA ON; BEGINNING MILEAGE; 30986 | ABROWN1852 |
| 9/13/2016 | 00:07:00 | TRC | GRADY | [Legacy System] Status: TRC : TRANSPORT COMPLETE | BASIC66 |
| 9/13/2016 | 00:07:05 | TRC | GRADY-PERSONNEL | [Legacy System] Status: TRC : TRANSPORT COMPLETE | MEDIC54 |
| 9/13/2016 | 00:09:21 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | FPOWELL |
| 9/13/2016 | 00:09:21 | legacy system | | MDT Status Update To: 421M | FPOWELL |
| 9/13/2016 | 00:19:27 | legacy system | | WI #9282 | DPOWELL |
| 9/13/2016 | 00:40:50 | AV | GRADY-PERSONNEL | [Legacy System] Status: AV : AVAILABLE; Available | MEDIC54 |
| 9/13/2016 | 00:44:15 | LOG (CLI) | GRADY | [Legacy System] Status: LOG : LOG (CLI); DELAYED DOCUMENTATION | DRIVERA |
| 9/13/2016 | 00:46:19 | OS | | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | FPOWELL |
| 9/13/2016 | 00:46:19 | ENR | | [Legacy System] Status: ENR : ENROUTE; Auto Backfil | FPOWELL |
| 9/13/2016 | 00:46:19 | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfil | FPOWELL |
| 9/13/2016 | 00:46:19 | legacy system | | MDT Dispatch Message To: 433M | FPOWELL |
| 9/13/2016 | 00:46:19 | legacy system | | MDT Status Update To: 433M | FPOWELL |
| 9/13/2016 | 00:46:31 | CHANGE LOCATION (CLI) | EAST PCT | [Legacy System] Status: CL : CHANGE LOCATION (CLI) | FPOWELL |
| 9/13/2016 | 00:46:31 | legacy system | | MDT Status Update To: 433M | FPOWELL |
| 9/13/2016 | 00:46:31 | legacy system | | CL 433M[EAST PCT | FPOWELL |
| 9/13/2016 | 01:10:16 | legacy system | | WI #9282 | MTOLER |
| 9/13/2016 | 01:38:33 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Available | BASIC66 |
| 9/13/2016 | 01:38:34 | legacy system | | F01 Agency Cleared P | BASIC66 |
| 9/13/2016 | 02:23:59 | AV | | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | STEPHENSJ |
| 9/13/2016 | 02:37:25 | AV | | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | FPOWELL |
| 9/13/2016 | 02:37:25 | legacy system | | MDT Status Update To: 415M | FPOWELL |
| 9/13/2016 | 03:38:38 | ENR | PROP ROOM | [Legacy System] Status: ENR : ENROUTE | FPOWELL |
| 9/13/2016 | 03:38:38 | legacy system | | MDT Status Update To: 432M | FPOWELL |
| 9/13/2016 | 03:38:38 | legacy system | | ER 432M[PROP ROOM | FPOWELL |
| 9/13/2016 | 03:41:05 | AV | EAST PCT | [Legacy System] Status: AV : AVAILABLE; Disposition; Incident report | TJLATTIMOR |
| 9/13/2016 | 04:32:17 | OS | PROP ROOM | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | FPOWELL |
| 9/13/2016 | 04:32:17 | legacy system | | MDT Status Update To: 432M | FPOWELL |
| 9/13/2016 | 05:13:48 | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfil | FPOWELL |
| 9/13/2016 | 05:13:48 | ENR | | [Legacy System] Status: ENR : ENROUTE | FPOWELL |
| 9/13/2016 | 05:13:48 | legacy system | | MDT Dispatch Message To: 442D | FPOWELL |
| 9/13/2016 | 05:13:48 | legacy system | | MDT Status Update To: 442D | FPOWELL |
| 9/13/2016 | 05:14:02 | CHANGE LOCATION (CLI) | GRADY | [Legacy System] Status: CL : CHANGE LOCATION (CLI) | FPOWELL |
| 9/13/2016 | 05:14:02 | legacy system | | MDT Status Update To: 442D | FPOWELL |
| 9/13/2016 | 05:14:02 | legacy system | | CL 442D[GRADY | FPOWELL |
| 9/13/2016 | 05:31:14 | AV | PROP ROOM | [Legacy System] Status: AV : AVAILABLE; Disposition; Incident report | TANDERSON |
| 9/13/2016 | 06:33:09 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | BPEHASZ |
| 9/13/2016 | 09:37:57 | legacy system | | WI 442D | CGRAHAM |
| 9/13/2016 | 11:08:15 | MOBILE DATA OFF | GRADY | [Legacy System] Status: MDTOFF : MOBILE DATA OFF | RDEASON |
| 9/13/2016 | 13:09:00 | ENR | | [Legacy System] Status: ENR : ENROUTE | TJACKSON |
| 9/13/2016 | 13:09:00 | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfil | TJACKSON |
| 9/13/2016 | 13:09:00 | legacy system | | MDT Dispatch Message To: 452E | TJACKSON |
| 9/13/2016 | 13:09:00 | legacy system | | MDT Status Update To: 452E | TJACKSON |
| 9/13/2016 | 13:09:02 | legacy system | | AE 442D 452E | TJACKSON |
| 9/13/2016 | 14:05:03 | OS | | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | BROWNDJ |
| 9/13/2016 | 17:32:59 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: Incident report | TJACKSON |
| 9/13/2016 | 19:59:32 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | DEDMONSON |
| 9/13/2016 | 19:59:33 | legacy system | | MDT Status Update To: 452E | DEDMONSON |
| 9/13/2016 | 19:59:33 | legacy system | | OS 452E[GRADY | DEDMONSON |
| 9/13/2016 | 21:09:08 | ENR | | [Legacy System] Status: ENR : ENROUTE | DEDMONSON |
| 9/13/2016 | 21:09:08 | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfil | DEDMONSON |
| 9/13/2016 | 21:09:08 | legacy system | | MDT Dispatch Message To: 441M | DEDMONSON |
| 9/13/2016 | 21:09:09 | legacy system | | MDT Status Update To: 441M | DEDMONSON |
| 9/13/2016 | 21:09:19 | ENR | GRADY | [Legacy System] Status: ENR : ENROUTE | DEDMONSON |
| 9/13/2016 | 21:09:19 | legacy system | | MDT Status Update To: 441M | DEDMONSON |
| 9/13/2016 | 21:09:19 | legacy system | | ER 441M[GRADY | DEDMONSON |
| 9/13/2016 | 22:09:25 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | BANAHENEEA |
| 9/13/2016 | 23:20:25 | MOBILE DATA ON | GRADY | [Legacy System] Status: MDTON : MOBILE DATA | BROWNDJ |

| Date | Time | Action | Unit | Description | Officer |
|---|---|---|---|---|---|
| | | | | ON [Legacy System] Status: MDTOFF : MOBILE DATA OFF | BROWNDJ |
| 9/13/2016 | 23:26:49 | MOBILE DATA OFF | GRADY | | |
| 9/14/2016 | 00:53:34 | legacy system | | WI 452E | DEDMONSON |
| 9/14/2016 | 00:54:22 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | DEDMONSON |
| 9/14/2016 | 00:54:24 | legacy system | | AV 452E | DEDMONSON |
| 9/14/2016 | 02:37:04 | legacy system | | WI 441M | FPOWELL |
| 9/14/2016 | 05:06:21 | DSP | GRADY | [Legacy System] Status: DSP : DISPATCH | FPOWELL |
| 9/14/2016 | 05:06:21 | legacy system | | MDT Dispatch Message To: 441D | FPOWELL |
| 9/14/2016 | 05:06:22 | legacy system | | MDT Status Update To: 441D | FPOWELL |
| 9/14/2016 | 05:06:23 | legacy system | | A 441M 441D[GRADY | FPOWELL |
| 9/14/2016 | 05:14:02 | legacy system | | WI #9282 | MTGLER |
| 9/14/2016 | 05:39:33 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | FPOWELL |
| 9/14/2016 | 05:39:34 | legacy system | | MDT Status Update To: 441D | FPOWELL |
| 9/14/2016 | 05:39:34 | legacy system | | OS 441D | FPOWELL |
| 9/14/2016 | 05:39:36 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | ACROWE |
| 9/14/2016 | 06:15:49 | legacy system | | WI 441D | CFREELON |
| 9/14/2016 | 06:32:43 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | BANAHENEEA |
| 9/14/2016 | 11:53:02 | MOBILE DATA OFF | GRADY | [Legacy System] Status: MDTOFF : MOBILE DATA OFF | ACROWE |
| 9/14/2016 | 13:37:55 | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfill | CCTHOMAS |
| 9/14/2016 | 13:37:55 | ENR | | [Legacy System] Status: ENR : ENROUTE | CCTHOMAS |
| 9/14/2016 | 13:37:55 | legacy system | | MDT Dispatch Message To: 432E | CCTHOMAS |
| 9/14/2016 | 13:37:55 | legacy system | | MDT Status Update To: 432E | CCTHOMAS |
| 9/14/2016 | 13:38:01 | legacy system | | AE 441D 432E | CCTHOMAS |
| 9/14/2016 | 14:43:48 | OS | | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | TJLATTIMOR |
| 9/14/2016 | 15:09:34 | MOBILE DATA ON | GRADY | [Legacy System] Status: MDTON : MOBILE DATA ON; BEGINNING MILEAGE: 165752 | ACROWE |
| 9/14/2016 | 16:11:30 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | ACROWE |
| 9/14/2016 | 15:32:16 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | CCTHOMAS |
| 9/14/2016 | 15:32:18 | legacy system | | MDT Status Update To: 432E | CCTHOMAS |
| 9/14/2016 | 15:32:18 | legacy system | | OS 432E [GRADY | CCTHOMAS |
| 9/14/2016 | 15:32:28 | HOLD UNIT | GRADY | [Legacy System] Status: HU : HOLD UNIT | CCTHOMAS |
| 9/14/2016 | 15:32:28 | legacy system | | MDT Status Update To: 432E | CCTHOMAS |
| 9/14/2016 | 15:32:28 | legacy system | | L01 Hold Incident | CCTHOMAS |
| 9/14/2016 | 15:32:39 | OS | | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | CCTHOMAS |
| 9/14/2016 | 15:32:39 | ENR | | [Legacy System] Status: ENR : ENROUTE; Auto Backfill | CCTHOMAS |
| 9/14/2016 | 15:32:39 | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfill | CCTHOMAS |
| 9/14/2016 | 15:32:39 | legacy system | | MDT Dispatch Message To: 432E | CCTHOMAS |
| 9/14/2016 | 15:32:40 | legacy system | | MDT Status Update To: 432E | CCTHOMAS |
| 9/14/2016 | 15:32:41 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | CCTHOMAS |
| 9/14/2016 | 15:32:41 | legacy system | | MDT Status Update To: 432E | CCTHOMAS |
| 9/14/2016 | 15:32:42 | legacy system | | OS 432E [GRADY | CCTHOMAS |
| 9/14/2016 | 15:32:42 | legacy system | | DO #9282 432E | CCTHOMAS |
| 9/14/2016 | 16:40:15 | legacy system | | 419E Stack Deleted | CCTHOMAS |
| 9/14/2016 | 16:40:18 | legacy system | | 432E Stack Deleted | CCTHOMAS |
| 9/14/2016 | 20:21:10 | MOBILE DATA OFF | GRADY | [Legacy System] Status: MDTOFF : MOBILE DATA OFF | TJLATTIMOR |
| 9/14/2016 | 23:49:38 | DSP | GRADY | [Legacy System] Status: DSP : DISPATCH; Auto Backfill | FPOWELL |
| 9/14/2016 | 23:49:38 | ENR | GRADY | [Legacy System] Status: ENR : ENROUTE | FPOWELL |
| 9/14/2016 | 23:49:39 | legacy system | | MDT Dispatch Message To: 441M | FPOWELL |
| 9/14/2016 | 23:49:39 | legacy system | | MDT Status Update To: 441M | FPOWELL |
| 9/14/2016 | 23:49:41 | legacy system | | AE 432E 441M[GRADY | FPOWELL |
| 9/15/2016 | 00:04:57 | legacy system | | WI 441M | FPOWELL |
| 9/15/2016 | 00:25:35 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | CJLISTER |
| 9/15/2016 | 01:26:35 | legacy system | | WI 432E | FPOWELL |
| 9/15/2016 | 01:27:05 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | FPOWELL |
| 9/15/2016 | 05:10:46 | DSP | GRADY | [Legacy System] Status: DSP : DISPATCH | FPOWELL |
| 9/15/2016 | 05:10:46 | legacy system | | MDT Dispatch Message To: 442D | FPOWELL |
| 9/15/2016 | 05:10:46 | legacy system | | MDT Status Update To: 442D | FPOWELL |
| 9/15/2016 | 05:10:48 | legacy system | | A 441M 442D[GRADY | FPOWELL |
| 9/15/2016 | 05:45:42 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | FPOWELL |
| 9/15/2016 | 05:45:42 | legacy system | | MDT Status Update To: 442D | FPOWELL |
| 9/15/2016 | 06:02:31 | MOBILE DATA OFF | GRADY | [Legacy System] Status: MDTOFF : MOBILE DATA OFF | CJLISTER |
| 9/15/2016 | 06:03:57 | legacy system | | WI #9282 | SMITCHELL |
| 9/15/2016 | 06:26:17 | MOBILE DATA ON | GRADY | [Legacy System] Status: MDTON : MOBILE DATA ON; BEGINNING MILEAGE: 125389 | CJLISTER |
| 9/15/2016 | 06:32:56 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | CJLISTER |
| 9/15/2016 | 12:50:10 | MOBILE DATA OFF | GRADY | [Legacy System] Status: MDTOFF : MOBILE | CJJONES |

| Date | Time | Event | Location | Detail | Unit |
|---|---|---|---|---|---|
| | | | | DATA OFF | |
| 9/15/2016 | 14:31:22 | ENR | | [Legacy System] Status: ENR : ENROUTE | BWAY |
| 9/15/2016 | 14:31:22 | DSP | | [Legacy System] Status: DSP : DISPATCH; Auto Backfill | BWAY |
| 9/15/2016 | 14:31:22 | legacy system | | MDT Dispatch Message To: 431E | BWAY |
| 9/15/2016 | 14:31:23 | legacy system | | MDT Status Update To: 431E | BWAY |
| 9/15/2016 | 14:31:26 | ENR | GRADY | [Legacy System] Status: ENR : ENROUTE | BWAY |
| 9/15/2016 | 14:31:26 | legacy system | | MDT Status Update To: 431E | BWAY |
| 9/15/2016 | 14:31:26 | legacy system | | ER 431E [ GRADY | BWAY |
| 9/15/2016 | 14:31:27 | legacy system | | AE 442D 431E | BWAY |
| 9/15/2016 | 16:21:49 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE | BWAY |
| 9/15/2016 | 16:21:49 | legacy system | | AV 442D | BWAY |
| 9/15/2016 | 16:21:57 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | BWAY |
| 9/15/2016 | 16:21:57 | legacy system | | MDT Status Update To: 431E | BWAY |
| 9/15/2016 | 16:21:57 | legacy system | | OS 431E | BWAY |
| 9/15/2016 | 21:11:40 | MOBILE DATA OFF | GRADY | [Legacy System] Status: MDTOFF : MOBILE DATA OFF | QRAINEYJR |
| 9/15/2016 | 23:18:10 | DSP | GRADY | [Legacy System] Status: DSP : DISPATCH; Auto Backfill | FPOWELL |
| 9/15/2016 | 23:18:10 | ENR | GRADY | [Legacy System] Status: ENR : ENROUTE | FPOWELL |
| 9/15/2016 | 23:18:10 | legacy system | | MDT Dispatch Message To: 422M | FPOWELL |
| 9/15/2016 | 23:18:10 | legacy system | | MDT Status Update To: 422M | FPOWELL |
| 9/15/2016 | 23:18:13 | legacy system | | AE 431E 422M[GRADY | FPOWELL |
| 9/16/2016 | 23:29:58 | ENR | GRADY | [Legacy System] Status: ENR : ENROUTE | NVERELIEN |
| 9/16/2016 | 00:31:54 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | FPOWELL |
| 9/16/2016 | 00:31:54 | legacy system | | MDT Status Update To: 422M | FPOWELL |
| 9/16/2016 | 01:35:38 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | FPOWELL |
| 9/16/2016 | 05:04:02 | DSP | GRADY | [Legacy System] Status: DSP : DISPATCH; Auto Backfill | FPOWELL |
| 9/16/2016 | 05:04:02 | ENR | GRADY | [Legacy System] Status: ENR : ENROUTE | FPOWELL |
| 9/16/2016 | 05:04:02 | legacy system | | MDT Dispatch Message To: 461D | FPOWELL |
| 9/16/2016 | 05:04:02 | legacy system | | MDT Status Update To: 461D | FPOWELL |
| 9/16/2016 | 05:04:04 | legacy system | | AE 422M 461D[GRADY | FPOWELL |
| 9/16/2016 | 05:43:42 | OS | GRADY | [Legacy System] Status: OS : ON SCENE UNIT (CLI) | ONEILMK |
| 9/16/2016 | 06:42:01 | MOBILE DATA OFF | GRADY | [Legacy System] Status: MDTOFF : MOBILE DATA OFF | NVERELIEN |
| 9/16/2016 | 07:35:38 | LOG (CLI) | GRADY | [Legacy System] Status: LOG : LOG (CLI) (CLAY CO | TJACKSON |
| 9/16/2016 | 07:35:38 | legacy system | | MDT Status Update To: 461D | TJACKSON |
| 9/16/2016 | 10:39:57 | legacy system | | WI 461D | TJACKSON |
| 9/16/2016 | 10:49:12 | legacy system | | WI 461D | TJACKSON |
| 9/16/2016 | 12 22 06 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | TJACKSON |
| 9/16/2016 | 12:22:19 | legacy system | | AV 422M | TJACKSON |
| 9/16/2016 | 12:51:52 | AV | GRADY | [Legacy System] Status: AV : AVAILABLE; Disposition: 63-No Report Made | ONEILMK |
| 9/16/2016 | 12:51:52 | legacy system | | L01 Agency Cleared 65 | ONEILMK |

**Edit Log**
No Edits

**Custom Time Stamps**
No Custom Time Stamps

**Custom Data Fields**
No Custom Data Fields

**Attachments**
No Attachment

CD 4173

# Incident Detail Report

Data Source: Data Warehouse
Incident Status: Closed
Incident number: 2016-0479307
Case Numbers:
Incident Date: 9/12/2016 22:41:13
Report Generated: 9/10/2018 15:28:08

## Incident Information

| | | | |
|---|---|---|---|
| Incident Type: | 1 CAR | Alarm Level: | |
| Priority: | 1 | Problem: | BURG-RES-IN PROG |
| Determinant: | | Agency: | PD |
| Base Response#: | | Jurisdiction: | East Precinct |
| Confirmation#: | | Division: | East Precinct |
| Taken By: | SLEGG | Battalion: | East Precinct |
| Response Area: | | Response Plan: | |
| Disposition: | | Command TAC: | |
| Cancel Reason: | | Primary TAC: | |
| Incident Status: | Closed | Secondary TAC: | |
| Certification: | | Delay Reason (if any): | |
| Longitude: | | Latitude: | |

## Incident Location

| | | | |
|---|---|---|---|
| Location Name: | | County: | DEKALB |
| Address: | 6316 LAUREL POST DR | Location Type: | |
| Apartment: | | Cross Street: | PHILLIPS RD / LAUREL POST CT |
| Building: | | Map Reference: | |
| City, State, Zip: | LITHONIA GA | | |

## Call Receipt

| | | | |
|---|---|---|---|
| Caller Name: | PEACOCK, SYLVERINE A | | |
| Method Received: | | Call Back Phone: | 770-484-0493 |
| Caller Type: | 9-1-1 CALL | Caller Location: | 6316 LAUREL POST DR |

## Time Stamps

| Description | Date | Time | User | Elapsed Times Description | Time |
|---|---|---|---|---|---|
| Phone Pickup | 9/12/2016 | 22:41:04 | | | |
| 1st Key Stroke | | | | Received to In Queue | |
| In Waiting Queue | 9/12/2016 | 22:41:16 | | Call Taking | |
| Call Taking Complete | 9/12/2016 | 22:41:46 | SLEGG | In Queue to 1st Assign | |
| 1st Unit Assigned | | | | Call Received to 1st Assign | |
| 1st Unit Enroute | | | | Assigned to 1st Enroute | |
| 1st Unit Arrived | | | | Enroute to 1st Arrived | |
| Closed | 9/12/2016 | 22:43:28 | | Incident Duration | 00:02:13.4 |

## Resources Assigned
No Resources Assigned

## Personnel Assigned
No Personnel Assigned

## Pre-Scheduled Information
No Pre-Scheduled Information

## Transports
No Transports Information

## Transport Legs
No Transports Information

## Comments

| Date | Time | User | Type | Conf. | Comments |
|---|---|---|---|---|---|
| 9/12/2016 | 22:41:13 | SLEGG | Response | | [1] BELIEVES SOMEONE IS TRYING TO BREAK INTO HER HOME.... |
| 9/12/2016 | 22:42:04 | SLEGG | Response | | [2] COMPL ADV SOMEONE IS BANGING ON THE DOOR.... |
| 9/12/2016 | 22:42:17 | MLOWE | Response | | [3] related to 432m call |
| 9/12/2016 | 22:42:26 | SLEGG | Response | | [4] RELATED TO CAD #9282 ... |
| 9/12/2016 | 22:42:41 | SLEGG | Response | | [5] COMPL ADV PD HAS SUBJ...59 W/COMPL |
| 9/12/2016 | 22:43:17 | SLEGG | Response | | [6] DUP #9307 #9282 |
| 4/5/2018 | 16:02:54 | Import | Response | | [7] Imported from legacy system: 2016-479307; Agencies: LAW - ; Zone: EP; Location: 6316 LAUREL POST DR, LITHONIA - DEKALB COUNTY; Type: 42RP - BURG-RES-IN PROG; Priority: 1; Dispo: COMPLETED |

## Address Changes
No Address Changes

## Priority Changes
No Priority Changes

## Alarm Level Changes
No Alarm Level Changes

## Activity Log

| Date | Time | Radio | Activity | Location | Log Entry | User |
|---|---|---|---|---|---|---|
| 9/12/2016 | 22:41:46 | | legacy system | | Initial Law Response Routed | SLEGG |

| | | | | |
|---|---|---|---|---|
| 9/12/2016 | 22:43:17 | legacy system | M #9307, DUP #9307 #9282 | SLEGG |
| 9/12/2016 | 22:43:26 | legacy system | L01 Closing: Agency Duplicate Of: 2016-0000479282 | SLEGG |
| 9/12/2016 | 22:43:26 | legacy system | CAD Incident Closed | SLEGG |
| 9/12/2016 | 22:43:26 | legacy system | Duplicate: 2016-0000479282 | SLEGG |
| 9/12/2016 | 22:43:26 | legacy system | DUP #9307 #9282 | SLEGG |

**Edit Log**
No Edits

**Custom Time Stamps**
No Custom Time Stamps

**Custom Data Fields**
No Custom Data Fields

**Attachments**
No Attachment

# EXHIBIT 1(a)

AD Incident: 2016-00479307        ESN  : 0402            EP  F      AU
 ı e   : 770 484-0493             Law  : DEKALB POLI      430 420 440 460
ame     : PEACOCK, SYLVERINE A    Fire : DEKALB FIRE      F14 F13 F25 F11
ddress  : 6316 LAUREL POST DR     EMS  :
ommunity: LITHONIA                Rescue: ANIMAL CONT     CE NE SE SC
urisdctn: DEKALB COUNTY

                                  Disp : C
ubDivisn: EAST                    Source: 911
ow Intersection : PHILLIPS RD
igh Intersection: LAUREL POST CT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
AD Call Times: BURG-RES-IN PROG
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
ncoming Call: 09/12/2016 22:41:04
all Created : 09/12/2016 22:41:13    Created By: SLEGG     Pos:040
all Send Time   :        22:41:46    Sent By  : SLEGG      Action:
all Dispatch Time:       00:00:00    Event : 42RP    1     Language:
all Enroute Time :       00:00:00    Law   :         1  1CAR
all Arrival Time :       00:00:00    Fire  :
all Clear Time   :       00:00:00    EMS   :
all Closed  :09/12/2016 22:43:26     Rescue:

)riginal Dispatch Remarks:
  BELIEVES SOMEONE IS TRYING TO BREAK INTO HER HOME....
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                          Narratives
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Jarrative By: 040\SLEGG      09/12/2016 22:42
COMPL ADV SOMEONE IS BANGING ON THE DOOR....

Jarrative By: 017\MLOWE      09/12/2016 22:42
related to 432m call

Jarrative By: 040\SLEGG      09/12/2016 22:42
RELATED TO CAD #9282...

Jarrative By: 040\SLEGG      09/12/2016 22:42
COMPL ADV PD HAS SUBJ...59 W/COMPL

Narrative By: 040\SLEGG      09/12/2016 22:43
 DUP #9307 #9282
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                       Vehicle Information
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

UNIT  DEPT STATUS/DSP/CASE  LOCATION/REMARK         USER  DATE   TIME
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| 431E | L01 AV   | 63 |   | GRADY           |   | FPOWE 09/16 01:38:36 |
|      | D L01 DSP |   |   | Auto Backfill   |   | FPOWE 09/16 05:04:02 |
|      |          |   |   | GRADY           |   |                      |
| 481D | L01 ENR  |   |   | GRADY           |   | FPOWE 09/16 05:04:02 |
| 481D | L01 OS   |   |   | GRADY           |   | ONEIL 09/16 05:43:42 |
| 422M | L01 MDTOF |  |   | GRADY           |   | NVERE 09/16 06:42:01 |
| 481D | L01 LOG  |   |   | CLAY CO         |   | TJACK 09/16 07:35:38 |
|      |          |   |   | GRADY           |   |                      |
| 422M | L01 AV   | 63 |  | GRADY           |   | TJACK 09/16 12:22:06 |
| 481D | L01 AV   | 63 |  | GRADY           |   | ONEIL 09/16 12:51:52 |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

UNIT / VEHICLE ASSIGNMENT

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| 462M | 2877 | STEPHENS, JUNIOR     | 12333 | 09/12 22:25:57 |
| 422M | 3251 | VERELIEN, NAOMIE     | 13403 | 09/15 22:42:12 |
| 421M | 3337 | ANDERSON, B.         | 12252 | 09/15 22:40:14 |
| 1529 | 65   | GOODWIN, LARRY D      |       | 09/12 22:12:35 |
| 431M | 3348 | VANCE, J             | 12101 | 09/15 22:41:19 |
| 433M | 3160 | JONES, DARWIN        | 12455 | 09/16 07:02:56 |
| 442D | 3263 | JOHNSON, MARQUIS T.  | 13408 | 09/16 06:24:05 |
| 452E | 3275 | WILLIAMS, CHASE A.   |       | 09/15 18:04:45 |
| 441M | 3160 | JONES, DARWIN        | 12455 | 09/15 23:22:01 |
| 441D | 3354 | GUYTON, A'JAMI J.    | 12105 | 09/16 09:21:57 |
| 441D | 3354 | GUYTON, A'JAMI J.    | 12105 | 09/16 09:21:19 |
| 432E | 3268 | POWELL, JASON C.     |       | 09/15 14:20:58 |
| D    | 2990 | ONEIL, M K           | 12486 | 09/16 04:59:45 |

CAD  cident: 2016-00479282          ESN  : 0402              EP  F      AU
Pho..  :    ██████████            Law  : DEKALB POLI       430 420 440 460
Name    : MALE CALLER               Fire : DEKALB FIRE       F14 F13 F25 F11
Address : PHILLIPS RD&PHILLIPS LAKE WA  EMS  :
Community: LITHONIA                  Rescue: ANIMAL CONT       CE NE SE SC
Jurisdctn: DEKALB COUNTY
                                     Disp :
SubDivisn: EAST                      Source: N9C
Low Intersection : PHILLIPS CT
High Intersection: PHILLIPS LAKE WAY
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
CAD Call Times: PERSON DOWN
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Incoming Call: 09/12/2016 22:19:51
Call Created : 09/12/2016 22:19:51   Created By: CHARRELL    Pos:029
Call Send Time :         22:22:02    Sent By  : CHARRELL     Action:
Call Dispatch Time:      22:26:12    Event : 02      7       Language:
Call Enroute Time :      22:30:57    Law  :          3  1CAR
Call Arrival Time :      22:36:31    Fire :          7  1CR
Call Clear Time  :       00:00:00    EMS  :
Call Closed  :00/00/0000 00:00:00    Rescue:

Original Dispatch Remarks:
  COMPL HEARD A GUNSHOT ...COMPL ADV SEEING A MALE TAKE OFF HIS SHOES
  I   WALK UP THE STREET...NO 38
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                              Narratives
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Narrative By: 017\MLOWE      09/12/2016 22:24
419 clr on pend call

Narrative By: 017\MLOWE      09/12/2016 22:26
unit clr

Narrative By: 040\SLEGG      09/12/2016 22:29
ADDITIONAL CALLER..615 430 1348..SHOTS FIRED...ADV SEES 78//BM,WHT TANK
TOP...STANDING NEAR INTERSECTION IN MIDDLE OF STREET WALKING IN CIRCLES..CHECK
FOR -4..NO 38

Narrative By: 017\MLOWE      09/12/2016 22:32
CLR ON UPDATE

Narrative By: 017\MLOWE      09/12/2016 22:38
OUT ON SUBJ

Narrative By: 017\MLOWE      09/12/2016 22:39
SUBJ AT GUNPOINT...10-3

Narrative By: 017\MLOWE      09/12/2016 22:39
SUBJ ON THE GROUND

Nar   ive By: 017\MLOWE        09/12/2016 22:39
SUB. RUNNING TWDS MARBUT

Narrative By: 017\MLOWE        09/12/2016 22:40
subj running twds laurel post dr

Narrative By: 017\MLOWE        09/12/2016 22:41
6310 laurel post dr subj attp to break into loc

Narrative By: 017\MLOWE        09/12/2016 22:42
need someone to secure her unit 69 in grass

Narrative By: 040\SLEGG        09/12/2016 22:42
   Narratives copied over from duplicate call
COMPL ADV SOMEONE IS BANGING ON THE DOOR....

Narrative By: 017\MLOWE        09/12/2016 22:42
   Narratives copied over from duplicate call
related to 432m call

Narrative By: 040\SLEGG        09/12/2016 22:42
   Narratives copied over from duplicate call
RELATED TO CAD #9282...

Nar   ive By: 040\SLEGG        09/12/2016 22:42
   .arratives copied over from duplicate call
COMPL ADV PD HAS SUBJ...59 W/COMPL

Narrative By: 040\SLEGG        09/12/2016 22:43
   Narratives copied over from duplicate call
 DUP #9307 #9282

Narrative By: 040\SLEGG        09/12/2016 22:44
 6316 LAUREL POST DR...PX 770 484 0493..REQ PD 59 IN REF TO SUBJ IN CUSTODY ATTE
MPTING TO BREAK IN

Narrative By: 017\MLOWE        09/12/2016 22:45
SUBJ DETAINED CHECK SUBJ WRIST 6302 LAUREL POST DR

Narrative By: 017\MLOWE        09/12/2016 22:47
431M OUT AT PHILLIPS LAKE AT UNIT

Narrative By: 007\CPEPPER      09/12/2016 22:47
B66 CLR VERB

Narrative By: 017\MLOWE        09/12/2016 22:52
SUBJ BITE UNIT OFFICER -4

Nar   ive By: 017\MLOWE        09/12/2016 22:54
CHE  ING 6266 PHILLIPS LAKE WAY IN REF TO SIG 23

DKPD000349

Narrative By: 009\DRIVERA     09/12/2016 23:09
B6 ..EQ ALS FOR COMBATIVE PAT

Narrative By: 007\CPEPPER     09/12/2016 23:12
  AM79 CLR

Narrative By: 007\CPEPPER     09/12/2016 23:14
  AM54 CLR

Narrative By: 009\DRIVERA     09/12/2016 23:15
B66 IS 10-4.. PD IS 10-7 W/UNIT

Narrative By: 017\MLOWE       09/12/2016 23:19
HEAR SIG 23 IN THE AREA OF LAUREL POST DR&EASTBRIAR DR PER 421

Narrative By: 017\MLOWE       09/12/2016 23:23
10-25 ADDTL SIG 23

........................................................................................

| UNIT  | DEPT STATUS/DSP/CASE | LOCATION/REMARK         | USER  | DATE  | TIME     |
|-------|----------------------|-------------------------|-------|-------|----------|
| 432M  | L01 DSP              |                         | MLOWE | 09/12 | 22:26:12 |
| 432M  | L01 ENR              |                         | TANDE | 09/12 | 22:30:57 |
| 432M  | L01 OS               |                         | TANDE | 09/12 | 22:36:31 |
| 462M  | L01 DSP              | Auto Backfill           | MLOWE | 09/12 | 22:38:30 |
| 462   | L01 ENR              |                         | MLOWE | 09/12 | 22:38:30 |
| 422M  | L01 DSP              | Auto Backfill           | MLOWE | 09/12 | 22:38:36 |
| 422M  | L01 ENR              |                         | MLOWE | 09/12 | 22:38:36 |
| 421M  | L01 DSP              | Auto Backfill           | MLOWE | 09/12 | 22:38:50 |
| 421M  | L01 ENR              |                         | MLOWE | 09/12 | 22:38:50 |
| 1529  | L18 DSP              | Auto Backfill           | MLOWE | 09/12 | 22:41:52 |
| 1529  | L18 ENR              | Auto Backfill           | MLOWE | 09/12 | 22:41:52 |
| 1529  | L18 OS               |                         | MLOWE | 09/12 | 22:41:52 |
| 1549  | L18 DSP              | Auto Backfill           | MLOWE | 09/12 | 22:42:01 |
| 1549  | L18 ENR              | Auto Backfill           | MLOWE | 09/12 | 22:42:01 |
| 1549  | L18 OS               |                         | MLOWE | 09/12 | 22:42:01 |
| 1549  | L18 P                |                         | MLOWE | 09/12 | 22:42:07 |
| 462M  | L01 OS               |                         | MLOWE | 09/12 | 22:43:29 |
| 422M  | L01 OS               |                         | CJLIS | 09/12 | 22:43:35 |
| 431M  | L01 DSP              | Auto Backfill           | MLOWE | 09/12 | 22:46:07 |
| 431M  | L01 ENR              |                         | MLOWE | 09/12 | 22:46:07 |
| 421M  | L01                  | Event Change---Old: 23  | MLOWE | 09/12 | 22:46:20 |
| 422M  | L01                  | Event Change---Old: 23  | MLOWE | 09/12 | 22:46:20 |
| 431M  | L01                  | Event Change---Old: 23  | MLOWE | 09/12 | 22:46:20 |
| 432M  | L01                  | Event Change---Old: 23  | MLOWE | 09/12 | 22:46:20 |
| 462M  | L01                  | Event Change---Old: 23  | MLOWE | 09/12 | 22:46:20 |
| 1529  | L18                  | Event Change---Old: 23  | MLOWE | 09/12 | 22:46:20 |
| 421M  | L01 OS               |                         | BPEHA | 09/12 | 22:46:30 |
| B66   | F01 DSP              |                         | CPEPP | 09/12 | 22:47:26 |
| B66   | F01 ENR              |                         | BASIC | 09/12 | 22:48:08 |
| 415M  | L01 DSP              | Auto Backfill           | MLOWE | 09/12 | 22:48:29 |
| 415M  | L01 ENR              |                         | MLOWE | 09/12 | 22:48:29 |

DKPD000350

```
152      L18 AV              1539 IS OUT ON THIS CALL     LGOOD 09/12 22:48:58
415.     L01 ENR                                          ABROW 09/12 22:49:06
431M     L01 OS                                           MLOWE 09/12 22:50:06
B66      F01 OS                                           BASIC 09/12 22:55:02
415M     L01 OS                                           MLOWE 09/12 23:02:02
AM79     F01 DSP                                          CPEPP 09/12 23:11:17
AM79     F01 ENR                                          MEDIC 09/12 23:11:39
AM54     F01 DSP                                          CPEPP 09/12 23:13:56
AM79     F01 AV    P                                      CPEPP 09/12 23:14:01
AM54     F01 ENR                                          MEDIC 09/12 23:14:16
432M     L01 CASE            0000089200/                  MLOWE 09/12 23:28:38
B66      F01 TR                                           BASIC 09/12 23:30:49
421M     L01 ENR             GRADY                         MLOWE 09/12 23:30:56
B66      F01 TR              GRADY                         DRIVE 09/12 23:32:28
AM54     F01 ENR             GRADY-PERSONNEL               DRIVE 09/12 23:32:41
AM54     F01 TR              GRADY-PERSONNEL               MEDIC 09/12 23:33:34
431M     L01 AV    63                                     MLOWE 09/12 23:52:00
422M     L01 AV    65                                     CJLIS 09/12 23:56:04
415M     L01 MDTOF                                        ABROW 09/12 23:59:50
415M     L01 MDTON           BEGINNING MILEAGE: 30988     ABROW 09/12 23:59:52
415M     L01 MDTOF                                        ABROW 09/13 00:00:11
415M     L01 MDTON           BEGINNING MILEAGE: 30988     ABROW 09/13 00:00:28
B66      F01 TRC             GRADY                         BASIC 09/13 00:07:00
AM54     F01 TRC             GRADY-PERSONNEL               MEDIC 09/13 00:07:05
421      L01 OS              GRADY                         FPOWE 09/13 00:09:21
AM54     F01 AV              Available                     MEDIC 09/13 00:40:50
                             GRADY-PERSONNEL
B66      F01 LOG             DELAYED DOCUMENTATION         DRIVE 09/13 00:44:15
                             GRADY
433M     L01 DSP             Auto Backfill                 FPOWE 09/13 00:46:19
433M     L01 ENR             Auto Backfill                 FPOWE 09/13 00:46:19
433M     L01 OS                                           FPOWE 09/13 00:46:19
433M     L01 CL              EAST PCT                      FPOWE 09/13 00:46:31
```

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
UNIT / VEHICLE ASSIGNMENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

```
432M     3293        ANDERSON, TIFFINY D.              09/12 22:26:10
462M     2877        STEPHENS, JUNIOR      12333       09/12 22:25:57
422M     3328        LISTER, CHARLES J     12427       09/12 22:30:39
421M     3280        EHASZ, BRADLEY P      13325       09/12 22:35:27
1529     65          GOODWIN, LARRY D                  09/12 22:12:35
431M     3360        WOOLWINE, SAMUEL G.   12111       09/12 21:04:31
433M     3266        LATTIMORE, TIMOTHY J 13323        09/13 00:46:10
```

DKPD000351

CAD cident: 2016-00479336          ESN  : 0414          EP  F      AU
Phone   : 404 501-8660             Law  : DEKALB POLI    440 430 450 480
Name    : NURSE TAMIKO             Fire : DEKALB FIRE    F14 F13 F16 F11
Address : 2801 DEKALB MEDICAL PKY   EMS  :
Community: LITHONIA                Rescue: ANIMAL CONT   SE SW SC LN HN
Jurisdctn: DEKALB COUNTY
                                   Disp :
SubDivisn: EAST                    Source: N9C
Low Intersection : CAMELLIA LN
High Intersection: HILLANDALE DR
Location Info: DEKALB MEDICAL HILLANDALE
..................................................................
CAD Call Times: PERSON SHOT-HOS
..................................................................
Incoming Call: 09/12/2016 23:10:07
Call Created : 09/12/2016 23:10:07   Created By: SBUSH    Pos:031 TERM 31
Call Send Time   :        23:11:32   Sent By  : SBUSH     Action:
Call Dispatch Time:       23:11:56   Event : 50H    3     Language:
Call Enroute Time :       23:12:57   Law   :        3  1CAR
Call Arrival Time :       23:41:55   Fire  :
Call Clear Time   :       00:00:00   EMS   :
Call Closed   :00/00/0000 00:00:00   Rescue:

Original Dispatch Remarks:
  [ ' ....GSW TO STOMACH AREA....PAT NAME: CHARISMA JOHNSON ..BEING
  TRANSPORTED TO GRADY ....
..................................................................
                          Narratives
..................................................................

Narrative By: 017\MLOWE      09/12/2016 23:12
unitcl;r

Narrative By: 031\SBUSH      09/12/2016 23:12
OCCURED AT GAS STATION NEAR PHILLIPS RD ...NOT PROVIDING MUCH INFO

Narrative By: 031\SBUSH      09/12/2016 23:13
WILL BE GAS STATION BTWN PHILLIPS COV HWY AND MARBUT RD ...UNK PERP BY STRAY
BULLET ...COMPL ADV PATIENT IS BEING TRANSPORTED AT THIS TIME TO GRADY

Narrative By: 017\MLOWE      09/12/2016 23:15
UNIT 76 TO GRADY
..................................................................
UNIT   DEPT STATUS/DSP/CASE   LOCATION/REMARK        USER  DATE    TIME
..................................................................
442M   L01 DSP                                       MLOWE 09/12 23:11:56
442M   L01 ENR                                       BROWN 09/12 23:12:58
442M   L01 OK                                        MLOWE 09/12 23:40:34
442    L01 OS                                        MLOWE 09/12 23:41:55
442M   L01 OCA#             0000089202/              BROWN 09/12 23:48:00
442M   L01 CL               GRADY                    FPOWE 09/13 00:06:45
..................................................................

UNI   VEHICLE ASSIGNMENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
442M   3296           BROWN, DYTAVIS J.    13526              09/12 23:10:21

DKPD000362

# EXHIBIT 2




## DeKalb County Police Department – Criminal Investigation Division

### Case Note – Supplemental Form

| Detective | Date | Case Number |
|---|---|---|
| LT M. F. Lavigne #1836 | 10.13.2016 | 16-089200 |

I was tasked with documenting the Taser downloads for 9.12.2016 from after 22:00 hours for the 2 listed Tasers.

Per the OUF Taser information,, Officer Tiffany Anderson, #3293, discharged her Taser utilizing one Taser cartridge: C4103M76N. It lists that a total of 3 cycles applied from her Taser with an unknown number of those three cycles being Drive Stuns.

It also lists that Officer Timothy Lattimore #3266 discharged his Taser also. Per the Taser download, he discharged it twice in succession and he writes in his supplemental narrative they were drive stuns.

The report does not list which Taser Serial Number belongs to which officer but the first Taser discharged would have been Officer Anderson's which would be Taser X130011F2. Officer Lattimore thus used Taser # X130029H2.

The UOF report shows no one else used a Taser. Officers Lister #3328 and Officer Stephens #2877 utilized <u>control holds</u> and <u>take down/balance displacements</u>.

The following is the time line for the Taser activations on September 12, 2016:

| | | | |
|---|---|---|---|
| 22:34:00 | Taser Armed | | Anderson |
| 22:34:24 | Taser Triggered | (5) seconds | **Anderson** |
| | *(unknown if drive stun or cartridge deployment)* | | |
| 22:34:29 | Taser Safe | (29) seconds | Anderson |
| | | | |
| 22:51:04 | Taser Armed | | Lattimore |
| 22:51:04 | Taser Safe | (0) seconds | Lattimore |
| 22:51:06 | Taser Armed | | Lattimore |
| 22:51:12 | Taser Triggered | (5) seconds | **Lattimore** |
| | *(drive stun per Lattimore supplemental narrative)* | | |
| 22:52:03 | Taser Triggered | (5) seconds | **Lattimore** |
| | *(drive stun per Lattimore supplemental narrative)* | | |
| 22:52:11 | Taser Safe | (65) seconds | Lattimore |
| | | | |
| 23:00:57 | Taser Armed | | Anderson |
| 23:01:02 | Taser Safe | (5) seconds | Anderson |
| 23:02:35 | Taser Armed | | Anderson |
| 23:02:44 | Taser Triggered | (5) seconds | **Anderson** |
| | *(unknown if drive stun or cartridge deployment)* | | |
| | | | |
| 23:03:02 | Taser Triggered | (5) seconds | **Anderson** |
| | *(unknown if drive stun or cartridge deployment)* | | |
| 23:03:53 | Taser Safe | (78) seconds | Anderson |

Officer Anderson stated she discharged her Taser the first time with the cartridge when the suspect attempted to run after attempting to break into a stranger's home. This would have been the first

Detective Signature – Badge # · Date

Page 1 of 2

DKPD000380

# EXHIBIT 3

# DeKalb County Police

| REPORT TYPE: | [X] USE OF FORCE | [ ] ACCIDENTAL DISCHARGE | [ ] ATTACHMENTS | INTERNAL AFFAIRS |
|---|---|---|---|---|

*USE AS A SUPPLEMENTAL REPORT ONLY - NOT ACCEPTED AS A STAND ALONE REPORT*

| Case Number | Division | Precinct | Watch | Date of Incident | Time of Incident |
|---|---|---|---|---|---|
| 16-089200 | Uniform | East | Morning | 09/12/2016 | 10 19.00 |

Location of Incident 6316 Laurel Post Drive Lithonia, GA 30038

| Location Type: | Residence | Weather | Clear | Lighting | Artificial |
|---|---|---|---|---|---|

| Officer #1 First Name: | MI: | Last Name: | Badge: | Race: | Sex: | Age: | Total Officers | Other Officers Involved |
|---|---|---|---|---|---|---|---|---|
| Tiffany | D | Anderson | 3293 | BLACK | FEMALE | 25 | 4 | |

| Supervisor Notified | Name of Supervisor Notified | Name of Supervisor on Scene |
|---|---|---|
| YES | Sgt. A. Brown, Sr. 1852 | Sgt. A. Brown, Sr. 1852 |

## Subject's Information    Subject's Number:    1

| Subject Name | D. D. B | Race | Sex | Subject Arrested | Arresting Officer |
|---|---|---|---|---|---|
| Donegan, Corey | 07/25/1986 | BLACK | MALE | YES | T.D. Anderson 3293 |

| Did Subject Allege Injuries Occurred Because of Officer's Response | NO | Did Injuries Occur to Subject Because of Officer's Response | NO |
|---|---|---|---|

Subject Injury: [ ] No Injury  [ ] Claimed Injury (If checked explain)  [X] Visible Injury (If checked explain)  [ ] Fatality (If checked explain)

Description/Explanation of Subject Injury: Subject had existing injuries (wrist, arms, hands, forearms, when officers made initial contact with the subject)

| Photographs Taken of Subject: | Medical Treatment | First Aid Administered | Decontamination Provided |
|---|---|---|---|
| YES | YES | YES | NO |

## Subject's Actions   (Check all actions that apply)

| | | |
|---|---|---|
| [X] Safety Risk to Self / Others | [X] Aggressively Resisted | [X] Possessed Weapon |
| [X] Ignored Verbal Direction / Passively Resisted | [X] Attempted Harm to Self  Others  or Property | [ ] Life Threatening Attack |
| [X] Displayed Physical Danger Cues | [X] Caused Harm to Self  Others  or Property | [ ] Vicious/ Injured Animal |

## Officer #1 Response    (Check your actions only)

| | | | |
|---|---|---|---|
| [X] Issued Verbal Command | [ ] Applied Strike(s) With Hand | [X] Deployed Taser | [ ] Deployed Less-Lethal Round | [ ] K-9 Bite |
| [ ] Applied Control Hold | [ ] Applied Strike(s) With ASP | [ ] Displayed Taser | [ ] Fired Firearm | [X] Handcuff |
| [ ] Applied Pressure Points / Joint Manipulation | [X] Performed Take Down / Balance Displacement | [ ] Deployed Chemical Agent | [ ] Other |  |

Witnesses Listed on Incident Report  [X] Yes [ ] No
Witnesses Statements Obtained  [X] Yes [ ] No

## APPLICATION AREAS

(Place "X" where probes hit Subject AND "O's" for Drive Stun & Other Strikes

### **Electronic Control Device**
--Complete this Section Only if TASER was Deployed--

TASER Serial Number  X130011F2 and X130029H2
Number of Cartridges Used:  1
CARTRIDGE SERIAL NUMBER(s):  C4103M76N  |

Subject: [X] Human  [ ] Animal
Drive Stun Used: [X] Yes [ ] No
TASER Use: [X] Success [ ] Failure
Number of Cycles Applied:  3
Approximate Target Distance at Time of Deployment  5 ft.
Did Darts Penetrate Subject's Skin: [X] Yes [ ] No
Distance Between the Two Probes  24  Inches
Probes Removed on Scene: [X] Yes [ ] No
Did TASER Application Cause Injury [ ] Yes [X] No
Medical Exam: [X] Yes [ ] No

Front          Back

# EXHIBIT 4

(L) List of personnel guarding Donegan at Grady Hospital

(M) Officer's Written Statements

(N) Crime Scene Reports

(O) Search Warrants

(P) Property Sheets

(Q) Taser Report

(R) Medical Examiner Report

(S) Fairfield Inn Video

(T) Cell Phone Extraction Report

(U) Photo Lineup

(V) 911 Audio CD

(W) Ofc. Stephens Dash-cam video CD

(X) **GBI Report (Pending)**

## SUMMARY:

Between 21:50 hours and 23:10 hours on 9-12-16, Corey Donegan, was involved in multiple incidents at multiple locations in Unincorporated DeKalb County. It was not known that he was involved in all the incidents until the investigation was completed.

Donnegan was eventually arrested by DeKalb Police after fighting five police officers. He was then transported from the scene of the arrest to Grady Hospital to be treated for a self-inflicted gunshot wound he received prior to contact with the police. He was admitted to Grady Hospital on or about the late evening of 9-12 or early morning hours of 9-13 of 2016. He later died on 10-8-2016.

The Medical Examiner concluded that the cause of death was the result of delayed complications of cocaine associated with excited delirium and that the deceased additionally suffered from a gunshot wound to the hand.

**The manner of death has been ruled accidental.**

**Sgt. B. L. Danner, #1917          Approved by: _____**
******************** Closed Pending Further Court Action ********************

DKPD000330

# EXHIBIT 5

 **ATLANTA - AMERICAN MEDICAL RESPONSE OF GEORGIA**
**PATIENT CARE REPORT**

DOE, JOHN
DOB: (35 (EST.))
SEX: MALE
CASE #: 2816186
DOS: 09/12/2016

| SERVICE MODEL AGENCY AMR | DISPATCH INFORMATION | TIMES |
|---|---|---|
| FROM:<br>  6302 LAUREL POST DR<br>  LITHONIA, GA 30058<br>  (ROADWAY)<br>TO:<br>  GRADY MEMORIAL HOSPITAL ATLANT<br>  80 JESSE HILL JUNIOR DRIVE SOUTHEAST<br>  ATLANTA, GA 30303<br>  (HOSPITAL - ED)<br>  ROOM/DEPT: ROOM 6<br>DESTINATION DECISION:<br>PATIENT/FAMILY REQUEST | CALLER: DEKALB COUNTY 911<br>UNIT: M66<br>RESPONSE MODE: LIGHTS AND SIREN<br>TRANSPORT MODE: NO LIGHTS AND SIREN<br>ALS ASSESSMENT: AMR EMT INTERMEDIATE<br>DISPOSITION:<br>TRANSPORTED - TO HOSPITAL ER/ED | CALL RECEIVED: 22:46:54<br>DISPATCHED: 22:46:54<br>ENROUTE: 22:47.53<br>AT SCENE: 22:54:49<br>AT PT SIDE: 22:55:00<br>TRANSPORT: 23.30:09<br>ARRIVAL: 00:06:50<br>CARE TRANS'D: 01:02:00<br>AVAILABLE: 01:02:11<br><br>SCENE MILES: 0.0<br>DESTINATION MILES: 10.0<br>TOTAL MILES: 10.0 |

## PATIENT DEMOGRAPHICS

NAME: DOE, JOHN
ADDRESS: UNKNOWN
CITY, STATE ZIP: LITHONIA, GA 30058
PHONE:
CELL PHONE:
SSN:

DOB:
AGE: 35 (EST.)
GENDER: MALE
ETHNICITY: BLACK/AFRICAN AMERICAN

INSURANCE: NO INSURANCE AVAILABLE    POLICY:    GROUP:

RESPONSIBLE PARTY: DOE, JOHN
PHONE:

## NARRATIVE

NARRATIVE
BASIC 66 DISPATCHED TO A ROADWAY FOR A MALE WITH A WRIST INJURY, PD STATED THE MAN WAS FOUND WITH NO SHOES RUNNING DOWN THE ROAD AND WHEN THEY TRIED TO DETAIN HIM HE BECAME COMBATIVE, PD ADVISED THAT HE WAS TASED IN THE RIGHT ARM AND THAT ALL THE BLOOD AND ROAD RASH ON HIS BODY WAS THERE PRIOR TO THEIR ARRIVAL. THE LITTLE BIT OF INFO WE WERE ABLE TO GET FROM OUR PT WAS AS FOLLOWS "I WAS ROBBED"

AOS TO FIND A 35 YOM SITTING IN THE GRASS HANDCUFFED BEHIND HIS BACK. PT SEEMED TO BE AGITATED AND HAD A WORK OF BREATHING AND WAS VERY COMBATIVE. PT WAS UNABLE TO ANSWER QUESTIONS WAS NOT AWARE OF PERSON, PLACE, OR EVENT, PT OPENED EYES TO VOICE. PT WAS BREATHING 24 X A MIN UPON OR ARRIVAL. PT WAS PLACED ON STRETCHER VIA MY PARTNER AND 3 PD OFFICERS. PT BECAME MORE COMBATIVE BITING AND SPITTING ON PD ALSO. I ADVISED DISPATCHED THAT WE NEEDED AN ALS UNIT TO RESPOND DUE TO THE PT BEING VERY COMBATIVE. PT WAS A/O X 1, AIR WAY PATENT AND SELF MAINTAINED. A FULL HEAD TO TOE ASSESSMENT REVILED SEVERAL ABRASIONS TO HIS RIGHT FOREARM AND RIGHT LEG, AND WHAT LOOKED TO BE AN ENTRANCE WOUND TO HIS RIGHT PALM OF HIS HAND WITH EDEMA AND SWELLING TO THE DISTAL PART OF HIS WRIST. -JVD, =BBS, PERRL, HEENT UNREMARKABLE, ABD SOFT AND NON TENDER, PELVIS STABLE, PMSX4. MEDIC 54 ARRIVED ON SCENE AND HELPED EVALUATE THE PT. PT VITALS TAKEN AND WITH NORMAL LIMITS BUT HR WAS ELEVATED AND LISTED IN LOW CHART. PT WAS GIVEN A 18G IV AND 200 L OF NS. PT TAKEN TO GRADY IN UNIT 66 WITH MEDIC FROM 54 RIDING IN. PT CARE TURNED OF TO PD AND NURSING STAFF. PT WAS UNABLE TO SIGN BECAUSE IS WAS NOT ALERT.

## IMPRESSION

DOE, JOHN
DOB: (35 (EST.))
SEX: MALE
CASE #: 2816188
DOS: 09/12/2016

PRIMARY IMPRESSION: TRAUMA - PENETRATING
SECONDARY IMPRESSION: TRAUMA - SOFT TISSUE

## HISTORY OF PRESENT ILLNESS

CHIEF COMPLAINT(S):

PT. STATED COMPLAINT: JAW AND RIGHT KNEE PAIN; CHIEF COMPLAINT CATEGORY: GUNSHOT WOUND; ONSET: ACUTE

CAUSE(S) OF INJURY: O - ASSAULT - POSSIBLE ASSAULT AND BATTERY (INTENTIONAL, OTHER (ASSAULTED)); COMMENTS: NOT ADDED

## MEDICAL HISTORY

HISTORY OBTAINED FROM: NOT OBTAINED
MEDICAL HISTORY: NONE STATED
ALLERGIES: NOT KNOWN
MEDICATIONS: UNKNOWN
DOES THE PATIENT DISPLAY/COMPLAIN OF ANY OF THE FOLLOWING SYMPTOMS?          NO
 - FEVER/CHILLS
 - HEADACHE, JOINT OR MUSCLE ACHES
 - WEAKNESS OR FATIGUE
 - STOMACH PAIN, DIARRHEA, OR VOMITING
 - ABNORMAL BLEEDING

## VITAL SIGNS

| TIME | BLOOD PRESSURE | PULSE | RESP | GLASGOW COMA SCALE | | | | EKG | SPO2 | BLOOD GLUCOSE | PAIN SCALE |
|------|----------------|-------|------|---|---|---|-------|-----|------|---------------|------------|
|      |                |       |      | E | V | M | TOTAL |     |      |               |            |
| 22:55 | 120 / 80 (93) | 144 | 22 | 4 | 5 | 6 | 15 |  | 98% | 79 |  |
| 23:05 | 150 / 51 (84) | 159 | 22 | 4 | 5 | 6 | 15 |  | 89% |  |  |
| 23:15 | 189 / 119 (142) | 140 | 20 | 4 | 5 | 6 | 15 |  |  |  |  |

## PHYSICAL FINDINGS

WEIGHT: 99.8 KG; 220 LBS

PHYSICAL ASSESSMENT

HEAD: ATRAUMATIC, SYMMETRICAL
NECK: ATRAUMATIC, NO JVD
CHEST: SYMMETRIC WITH BILATERAL CHEST RISE/FALL, NO CREPITUS
ABDOMEN: SOFT, NON-TENDER, NON-DISTENDED
PELVIS: STABLE, NO CREPITUS OR DEFORMITY
BACK: NO CREPITUS, DEFORMITY, PAIN
EXTREMITIES:
  RIGHT HAND -
  NEGATIVE: BLEEDING - CONTROLLED AND PENETRATING

RIGHT FINGERS -
NEGATIVE: ABRASION
RIGHT LEG -
NEGATIVE: ABRASION

## TREATMENTS

| PTA | TIME | CAREGIVER | PROCEDURE |
|---|---|---|---|
| | 22:55:00 | ROBINSON, CHANELLE,AMR | VITAL SIGNS - |
| | | | GLASGOW COMA SCALE - GCS EYES: 4; GCS VERBAL: 5; GCS MOTOR: 6; GCS SCORE: 15; GCS SCORE QUALIFIER: PATIENT'S BASELINE |
| | | | VITALS - BP: 120/80; PULSE: 144; PULSE REGULARITY: REGULAR; PULSE STRENGTH: NORMAL; PULSE TAKEN AT: RADIAL; RESPIRATORY RATE: 22; RESPIRATORY DEPTH: NORMAL; RESPIRATORY EFFORT: NORMAL; PATIENT POSITION: SEMI-FOWLERS; MEAN ARTERIAL PRESSURE: 93 |
| | 22:55:00 | ROBINSON, CHANELLE,AMR | PULSE OXIMETRY - 98% ON ROOM AIR |
| | 22:55:00 | ROBINSON, CHANELLE,AMR | BLOOD GLUCOSE - BLOOD GLUCOSE READING/LEVEL: 79 |
| | 22:55:00 | ROBINSON, CHANELLE,AMR | LUNG SOUNDS - UPPER RIGHT LUNG: CLEAR; UPPER LEFT LUNG: CLEAR; LOWER RIGHT LUNG: CLEAR, LOWER LEFT LUNG: CLEAR |
| | 22:55:00 | ROBINSON, CHANELLE,AMR | LEVEL OF CONSCIOUSNESS - RESPONDS TO (AVPU): VOICE; ORIENTED TO PERSON: NO; ORIENTED TO PLACE: NO; ORIENTED TO TIME: NO; ORIENTED TO EVENT: NO |
| | 22:55:00 | ROBINSON, CHANELLE,AMR | PUPILS - LEFT PUPIL: NORMAL (PERL); RIGHT PUPIL: NORMAL (PERL); LEFT PUPIL SIZE (MM): 4 MM; RIGHT PUPIL SIZE (MM): 4 MM |
| | 22:55:00 | ROBINSON, CHANELLE,AMR | SKIN ASSESSMENT - CAPILLARY REFILL: <2 SECONDS; NORMAL COLOR; DIAPHORETIC MOISTURE; WARM TEMPERATURE |
| | 23:05:00 | ROBINSON, CHANELLE,AMR | VITAL SIGNS - |
| | | | GLASGOW COMA SCALE - GCS EYES: 4; GCS VERBAL: 5; GCS MOTOR: 6; GCS SCORE: 15; GCS SCORE QUALIFIER: PATIENT'S BASELINE |
| | | | VITALS - BP: 150/51; PULSE: 159; PULSE REGULARITY: REGULAR; PULSE STRENGTH: NORMAL; PULSE TAKEN AT: RADIAL; RESPIRATORY RATE: 22; RESPIRATORY DEPTH: NORMAL; RESPIRATORY EFFORT: NORMAL; MEAN ARTERIAL PRESSURE: 84 |
| | 23:05:00 | ROBINSON, CHANELLE,AMR | PULSE OXIMETRY - 89% ON ROOM AIR |
| | 23:15:00 | ROBINSON, CHANELLE,AMR | VITAL SIGNS - |
| | | | GLASGOW COMA SCALE - GCS EYES: 4; GCS VERBAL: 5; GCS MOTOR: 6, GCS SCORE: 15; GCS SCORE QUALIFIER: PATIENT'S BASELINE |

DOE, JOHN
DOB: (35 (EST.))
SEX: MALE
CASE #: 2816188
DOS: 09/12/2016

| PTA | TIME | CAREGIVER | PROCEDURE |
|-----|------|-----------|-----------|
| | | | VITALS - BP: 189/119; PULSE: 140; PULSE REGULARITY: REGULAR; PULSE STRENGTH: NORMAL; PULSE TAKEN AT: RADIAL; RESPIRATORY RATE: 20; RESPIRATORY DEPTH: NORMAL; RESPIRATORY EFFORT: NORMAL; MEAN ARTERIAL PRESSURE: 142 |
| | 23:35:00 | ROBINSON, CHANELLE,AMR | FACILITY ACTIVATION - ACTIVATION TYPE: TRAUMA ALERT - ADULT; ACTIVATION METHOD: LANDLINE |

**RUN COMPLETION**

CONDITION OF PATIENT AT DESTINATION: UNCHANGED

PRIVACY PRACTICES: THE NOTICE OF PRIVACY PRACTICES WAS UNABLE TO BE PROVIDED

PCR ID: 20160913000045579765                 DEVICE:                 PRINTED: 4/6/2017 06:11:21

 **AMR**
AMERICAN MEDICAL RESPONSE®

## ATLANTA - AMERICAN MEDICAL RESPONSE OF GEORGIA
## PRE-HOSPITAL CARE REPORT SIGNATURES

CASE #: 2816188          UNIT ID: M66          DATE: 09/12/2016

---

**ATLANTA - AMERICAN MEDICAL RESPONSE OF GEORGIA CREW MEMBERS**

CREW 1
NAME: ROBINSON, CHANELLE,AMR
NUMBER: 43239
CERTIFICATION: EMT INTERMEDIATE

CREW 2
NAME: WASHINGTON, ANGELA,AMR
NUMBER: 2134
CERTIFICATION: ADVANCED EMT

**DESTINATION**

DESTINATION: GRADY MEMORIAL HOSPITAL ATLANT
DESTINATION FLOOR/DEPT/ROOM: ROOM 6
TURNED OVER TO: EBONI EVANS
DATE/TIME SIGNED: 00:46:47 09/13/2016

---

PCR ID: 2016091300045579765          DEVICE:          PRINTED: 4/6/2017 08:11:21

# American Medical Response

Run Number: 2816188
Patient Name: john doe
Destination: GRADY MEMORIAL HOSPITAL ATLANT, 80 Jesse Hill Junior Drive Southeast, ATLANTA, GA 30303

Date and Time of Transport: 9/12/2016 23:30:09

I acknowledge that I am legally responsible for the ambulance services provided to me. I request and assign payment of authorized Medicare benefits and/or other insurance benefits be made on my behalf to AMR directly for any ambulance services and supplies furnished to me by AMR whether in the past, now, or in the future. I authorize any holder of medical information about me or other relevant documentation about me to release to the Centers for Medicare and Medicaid Services and its agents and contractors, any and all appropriate third party payers and their respective agents and contractors, as well as AMR, any information or documentation in their possession needed to determine these benefits and /or the benefits payable for related services whether in the past, now or in the future. I agree to cooperate with AMR or its agent in collecting any such benefits. I acknowledge that I have been provided with a copy of AMR's Notice of Privacy Practices. I expressly authorize AMR or it agents or associates to contact me or any responsible party at any phone number provided, including any cellular phone number provided, for the purpose of resolving any unpaid balances or other pertinent issues. Patient or Guarantor agrees that such contact may be made to any mailing address, telephone number, cellular phone number, e-mail address, or any other electronic address that Patient or Guarantor has provided, or may in the future provide, to AMR. Patient or Guarantor agrees and acknowledges that any e-mail address or any other electronic address that Patient or Guarantor provides to AMR is Patient's or Guarantor's private address and cannot be accessed by unauthorized third parties. Patient or Guarantor agrees that in addition to individual persons' attempting to communicate directly with Patient or Guarantor, any type of contact described above may be made using, among other methods, pre-recorded or artificial voice messages delivered by an automatic telephone dialing system, pre-set e-mail messages delivered by an automatic e-mailing system, or any other pre-set electronic messages delivered by any other automatic electronic messaging system. Patient or Guarantor also authorizes AMR or its agents or associates to obtain a credit report to assist in the collection of any unpaid balances. Nothing herein shall relieve me from the direct financial responsibility for any charges not paid by an insurer. I further agree to send promptly to AMR any payments that an insurer forwards to me.

_____          _____
Signature of Patient                                                          Date

## REPRESENTATIVE SIGNATURE

Reason Patient could not Sign :

_____          _____          _____
Signature of Representative              Printed Name of Representative             Date

## FACILITY SIGNATURE

Complete this section only if you are unable to obtain the signature of the patient or authorized representative listed above.
Reason Patient could not Sign: Appears to be under the influence of an intoxicant

By signing below, I certify that the above named patient was physically or mentally incapable of signing at the time of transport and that none of the individuals listed in 42 C.F.R. §424.36(b)(1)-(3) was available or willing to sign the claim on behalf of the beneficiary.

_____          09/13/2016
Crew Signature                                                     Crew Date

This section is to be complete by a representative of the receiving facility, whenever you are unable to obtain the signature of the patient or an authorized representative. Note: The crew must also complete the "Crew Signature" Section above.

Name and Location of Facility  GRADY MEMORIAL HOSPITAL ATLANT, 80 Jesse Hill Junior Drive Southeast

The above named patient, as described by AMR, was received by our facility, which provided care or assistance to the patient, on the date and time set forth above.

_____          09/13/2016
Signature of Receiving Representative                       Date

eboni evans                                                         Registered Nurse
Printed Name of Receiving Facility Representative          Title

AMR is required to obtain this form in order to submit a claim for payment to Medicare or other third party payer. This Signature is not an acceptance of financial responsibility for the patient.

CASE #:2816188
PCR ID:201609130004557976S
DATE:09/12/2016

PAGE 1 OF 1
PT:JOHN DOE

PRINTED:4/6/2017 06:11:21
DEVICE NAME:
PT # 1 OF 1:4/6/2017 06:11:21

https://medsviewer.amr.net/

4/6/2017

# EXHIBIT 6

In re:  Estate of Brandon Donegan       *       Estate No. 2016-453
                                         *
                                         *
                                         *

FILED IN OFFICE
PROBATE COURT
NEWTON COUNTY, GEORGIA
2017 APR -7 PM 2:23

## ORDER ADMITTING WILL TO PROBATE IN SOLEMN FORM

Sharon Booker, the mother of the Decedent, filed a Petition to Probate Will in Solemn Form. On February 1, 2017, Victoria Donegan, the estranged wife of the Decedent, filed a Caveat. The matter came before the Court on March 27, 2017, for a hearing on the Petition and Caveat. Petitioner was represented by Christopher J. Palazzola and Victoria Donegan was *pro se*. Attorney William F. Elliott was appointed Guardian ad Litem for the minor children and was present for the hearing. The will submitted for probate was a self-proving will.

Brandon Donegan died on October 28, 2016. At the time of his death he was domiciled in Newton County, Georgia. Both sides agreed that he and Victoria Donegan had been separated since December 2012 and had filed for divorce. All heirs of law were served or acknowledged service of the Petition. The Caveator also raised a claim that the Will was a forgery, and relied on her own testimony and the introduction of several documents which she claimed demonstrated the Will to be a forgery. The Petitioner testified that the signature on the Will was her son's, and that he had come to her home the day he made the Will and told her he wanted her to be the Executrix of his estate should anything happen to him. He explained, as is contained in the Will, that he wanted to be sure that all of his natural children shared equally in his estate.

The Guardian ad Litem argued that there was sufficient evidence to demonstrate the Will was properly executed by the Decedent. The Guardian ad Litem also stated to the Court that he believed it was appropriate for the Petitioner, as maternal grandmother, to ensure a fair division of

the estate between the three natural children who have three different mothers. The Court agrees and finds that based upon the totality of the circumstances, the Court finds by preponderance of the evidence that the Will executed on August 20, 2016, was signed by Brandon Donegan.

Accordingly, IT IS ORDERED that the Will dated August 20, 2016, is established as the Last Will and Testament of the Decedent, and the Will shall be admitted to record as proven in Solemn Form. The named Executor Sharon Booker will have leave to qualify as Personal Representative by taking the required oath, after which Letters Testamentary shall issue. The Clerk shall serve the Personal Representative with copies of this Order and the Letters upon qualification.

IT IS FURTHER ORDERED that the Personal Representative shall disburse all property according to the terms of the Decedent's Will and shall maintain all records of income and disbursements until discharged by Order of this Court. No inventory or return shall be required to be filed with the Court, as the Personal Representative was absolved of this obligation in the Will.

SO ORDERED, this 7th day of April, 2017.

*Melanie M. Bell*

Melanie M. Bell
Judge, Probate Court

State of Georgia
County of Newton

I hereby certify that the foregoing is a true and correct copy of a record on file in the Probate Court of said County, same being of full force and effect as of this date.

This the 10th day of April, 20 17.

_____                     _____
                                                           Clerk

CD 48

# EXHIBIT 7

Miquel Hightower who reported hearing a gunshot, seeing the suspect and then calling the police.

A letter (Tab E) dated 9-16-16 from Christopher J. Palazzola, an attorney, advised the Homicide unit that his firm was representing Corey Donegan. On 9-30-2016, Kenneth Booker filed a complaint (Tab J) with DeKalb County Police Internal Affairs alleging excessive use of force against his son Corey Donegan. On 10-8-16, Corey Donegan died. On 10-11-16, Sgt. Dean wrote a statement (Tab D) about a phone conversation he had with Mrs. Donegan who wanted to retrieve his personal belongings.  During the conversation, Sgt. Dean said he thought Donegan may have been injured when he jumped out of a car.  Sgt. Dean went on to write that he was not very familiar with the case.

Tab L is the list of the DeKalb police officers that guarded Corey Donegan until the Sheriff's office took over. Also at Tab L is a written statement from Ofc. O'Neil, #2290 detailing when and how he was relieved of guard duty by a deputy from the Sheriff's office. Tab L also contains the list of Sheriff's Office personnel that guarded Donegan.

At Tab C is an analysis prepared by Lt. Lavigne of the Use of Force in regards to the Taser usage of Ofc. Anderson and Ofc. Lattimore.  It's extracted from the Taser download (Tab J). Tab K is a time line created by Lt Lavigne by merging the times on the CAD calls as well as the Taser download reports.

On 10-17-16, Lt Bryant assigned me this case as an in-custody death investigation.  I contacted Inv. Anglin of the Medical Examiner's office and asked if Grady Hospital had provided the medical records. Per Inv. Anglin they had not yet done so.  Inv. Anglin also asked for a copy of the video footage from the hotel and a copy of written statements. Only Sharonda Stewart provided written statements, Charisma Johnson's statements were audio taped due to her injuries. I had Det. McQuilkin make two copies of the video, one for myself and one for the ME's office.  I also scanned Sharonda Stewart's statements and e-mailed them to Inv. Anglin.

Inv. Anglin also asked about a discrepancy in the case notes of Det. R.S. Harris and Det. K.C. Payton as Det. Payton's listed a head injury.  I knew that Det. Harris responded to the hospital the night of the incident, sometime after midnight, and Det. Payton was not working at the time of the incident and didn't start working until day shift on Monday and didn't come in to work until about 0630 hours.

I directed Det. McQuilkin to take the shell casings recovered from the Fairfield Inn to the GBI and request they be compared with the gun recovered from Corey Donegan during his arrest. The results are pending.

I also directed Det. McQuilkin to obtain a search warrant (Tab O) on the phone recovered from the search of the vehicle. Det. McQuilkin did so and found the phone contained the phone numbers of Shronda Stewart, Charisma Johnson, and Sharon Booker, who is believed to be related to Donegan. (Tab D)

Sgt. B. L. Danner, #1917            Approved by: _____
****************** Closed Pending Further Court Action ******************

# EXHIBIT 8

# USE OF FORCE

## 4-6    PURPOSE and SCOPE

It is the mission of the DeKalb County Police Department to promote order, protect the public, and deliver the optimum police services through an effective, efficient and professional response in partnership with the entire community.

In fulfilling the Department's mission, its officers have been delegated the ultimate responsibility to protect life and property and apprehend criminal offenders. The apprehension of criminal offenders and protection must at all times be subservient to the protection of life. The officer's responsibility for protecting life must include the officer's own life.

It is the responsibility of every member of the department to keep our standards at an adequate level to provide protection and service to the community while at the same time keeping ourselves as safe as possible.

The value of human life is immeasurable. One of the department's core value statements is the preservation of life. Officers must exhaust every means available of non-lethal force, prior to utilizing deadly force. When non-lethal force is utilized, officers should only use that force which is minimal and reasonable to effect control of a non-compliant subject.

Litigation resulting from a shooting by a police officer will usually require the Department to prove the individual officer was properly trained in all aspects of the use of force, up to and including the use of firearms. This type of requirement demands that the Department take a pro-active approach to defending itself long before litigation is filed.

The purpose of this policy is to structure the use of force, including deadly force, by members of the DeKalb County Police Department and to provide a framework whereby the law enforcement duties can be properly and lawfully discharged by police officers. Since police officers have 24-hour/7 day-a-week law enforcement powers, this policy will be adhered to concerning off-duty conduct as well as on-duty conduct. This policy also applies to all other employees who may encounter situations with the public where a degree of force is required in order to carry out and complete their job responsibilities.

This policy is for departmental use only and does not apply in any criminal or civil proceeding. The departmental policy shall not be construed as a creation of a higher-level standard of safety or care in an evidentiary sense with respect to third party claims. Violations of this policy will form the basis for departmental administrative sanctions only. Violations of law will form the basis for civil and criminal sanctions in a recognized judicial setting.

## 4-6.1   USE of FORCE

Georgia Statutory Law, under Criminal Code Section 16-3-21 (Use of Force), justifies the threat or use of force. Ga. O.C.G.A. 16-3-21 reads:

*"A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat of force is necessary to defend himself or a third person against such others' imminent use of unlawful force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or a third person, or the commission of a forcible felony".*

Officers are often confronted with situations where control must be exercised to affect arrests and to protect the public safety. Control may be achieved through advice, warnings, and persuasion or by the use of necessary force.

Necessary Force is the use of a reasonable amount of force to achieve a legitimate police objective. Reasonable refers to belief that is supported by facts or circumstances. Force may be used by a police officer in the performance of police duties:

A. When necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self inflicted injury

B. When preventing or interrupting a crime or attempted crime against property

C. When making lawful arrests and searches, overcoming resistance to such arrests and searches, and preventing escapes from custody

D. When in self-defense, or defense of another against unlawful violence to that person.

The amount and degree of force which may be employed are based upon, but not limited to, the following factors:

A. The nature of the offense

B. The behavior of the subject against whom the force is to be used

C. Action by third parties who may be present

D. Physical conditions and tactical considerations

E. The possibility of creating an unreasonable risk of injury or death to innocent persons

F. The feasibility or availability of alternative actions

At times necessary force will include the use of certain tactics or equipment by the officer or specialty team, such as:

A. Verbal Skills and Empty Hands

B. Physical Strength and Compliance Techniques

C. Soft or Hard Hand Techniques

D. Handcuffs

E. Oleoresin Capsicum (OC)

F. ASP Baton

G. Electronic Control Devices (ECDs)

H. Patrol-rifles

I. Chemical Munitions
J. Specialty Impact Munitions

K. Distraction Devices

L. Approved Weapon and Ammunition

The use of any unauthorized weapon is prohibited unless very unusual, severe, and justifiable circumstances prevail.

In every community, the proper utilization of force is crucial to the definition, design, and delivery of effective police services. We must recognize that the fate of our function directly impacts the lives of those we have sworn to serve and protect. Officers with the DeKalb County Police Department will be trained in the use of the Federal Integrated Force Management model. This Use of Force Continuum model is a concept used in incident handling that simultaneously recognizes the level of subject resistance encountered and the level of control and force required for the situation. This concept does not direct an officer on how much control and/or force to use in a particular incident, but gives the officer direction in dealing with changing situations that might dictate the escalation or de-escalation of the amount and degree of force to be used.

The Integrated Force Management program shifts force focus and function from a pattern of confusion, towards a process of consolidation and coordination, consistent with contemporary management procedures and principles.

It is important to note that this Use of Force Continuum is to be used as a general guide and officers must always factor in objective reasonableness in determining the appropriate level of control and force to be utilized.

Any use of force by an officer must be examined from two perspectives: Resistance (Subject) and Control or Force (Officer). Both control and resistance can be in the form of verbal directives or physical action.

**Resistance** is a subject's non-compliance to the officer. The amount and type of resistance varies based on a number of factors.

**Control** is the force an officer uses to influence or neutralize a non-compliant subject. Officers are justified in using physical control methods in the following situations:

> To protect the officer or another from injury or death.
> To effect the lawful detention or arrest of a non-compliant subject.
> To stop potentially dangerous and unlawful behavior.
> To protect a subject from self-injury.

The DeKalb County Police Department uses broad standards to measure the justification of an officer's use of force.

> The control methods used were initiated by a subject's resistance, and
> The level of control used was necessary and reasonable considering the subject's resistance.

A *Show of Control* (displaying tactical advantage to persuade the subject to comply with verbal commands) can be implemented to influence a subject to make positive decisions.
A *Show of Control*:

> Reduces reaction time;
> Serves as a visual warning of potential use and imparts to a subject that resistance is futile;
> Adds intermediate steps to the Use of Force Continuum; and
> Can be recalled or de-escalated to lower forms of control.

A *Use of Control* is an action that can result in tissue damage to a subject and when employed cannot be recalled.

Officers must always be alert and attentive to changing situation which may dictate the escalation or de-escalation of control and/or force to be utilized. Officers should never abandon verbal communications when seeking compliance.

**Use of Deadly Force:**

If a situation does occur which dictates the use of deadly force, the decision to take another person's life is the most serious decision a police officer can ever be called upon to make. Officers should take great strides in attempting to de-escalate an incident and avoid using deadly force whenever possible.

The protection and preservation of human life is a primary goal of this department; therefore, officers have a responsibility to use only the amount and degree of force necessary and reasonable to protect and preserve life.

**Deadly force is defined as that force which is intended to cause death or great bodily harm or which creates some specified degree of risk that a reasonable and prudent person would consider likely to cause death or great bodily harm.**

According to Georgia State Law, O.C.G.A. 16-3-21, deadly force may be used if:

A.    There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure the officer

B.    There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure another person

C.    There is clear and sufficient reason to believe that the force must be used to prevent the commission of a forcible felony

Great bodily harm has been generally defined to mean harm that is likely to maim or permanently disable.

O.C.G.A. 17-4-20 (b) addresses the use of deadly force for arrest by peace officers by stating *"...peace officers...may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm..."*

To reasonably believe is the determination of whether or not the officer's decisions and actions are in fact reasonable and is most commonly decided on the basis of the "reasonable officer doctrine," which is a basic standard of our legal system. In common terms it means that if an officer of common judgment and ordinary prudence, experiencing the same facts and circumstances experienced by the officer, would come to the same general conclusion that the officer reached, and then it is a reasonable belief.

Forcible Felony, as defined in Ga. O.C.G.A. 16-1-3, means, *"any felony which involves the use or threat of physical force or violence against any person".*    From this definition, it is obvious that many crimes that could be technically classified as "forcible felonies" would not be life threatening enough to justify the use of deadly force to prevent them.   It should be noted that Section 16-3-21 does not give the police officer any more authority in using deadly force than any other citizen in the State of Georgia.  The law says, *"a person is...justified in threatening or using force,"* which means that any person may use deadly force under the given circumstances. Although the courts commonly recognize that officers are frequently involved in the justifiable use of deadly force, technically the law provides no additional authority or latitude to the circumstances under which deadly force may be used by a police officer.

**It will be the policy of this Department NOT to use deadly force in order to prevent the escape of a fleeing felon, unless that suspect continues to pose an immediate danger or serious threat to innocent persons.**

If someone is fleeing or attempting to flee (felon or not; convicted or not), the officer will be allowed to use reasonable force to prevent the escape. The fact that someone is escaping or attempting to escape is not justification in itself to use deadly force. It is important to note again that reasonable grounds must exist to justify the use of deadly force, and again the reasonable officer doctrine is the standard of justification.

Once the officer has determined that the use of deadly force is reasonable, the Department's policy is shoot to stop. An officer shall not discharge a weapon to kill, but rather to stop and incapacitate an assailant from completing a potentially deadly act as described in this policy. For maximum stopping effectiveness and minimal danger to innocent bystanders, the officer should shoot at "center mass," unless extreme circumstances cause for an elevated shot to immediately stop the suspect. Appropriate first aid is to be rendered whenever possible after any use of force (either rendered by the officer, or summoning EMS, etc.).

*Self-defense and imminent threat shall be the only policy guideline for employing deadly force.* The discharge of a firearm is an irreversible action and officers should ensure that their actions do not unreasonably precipitate the use of deadly force by placing themselves or others unnecessarily in jeopardy by engaging in actions that are inconsistent with the officer's training and/or Departmental policies and guidelines.

In all situations, justification for the use of deadly force must be limited to the facts reasonably apparent to the officer at the time the officer decides to use the force.

These considerations are provided to aid officers who decide to utilize deadly force:
1. other methods available to effect an arrest or apprehension
2. whether the suspect is in plain view
3. the need for extreme caution at night as darkness may inhibit vision
4. danger posed to bystanders by the discharge of the firearm, regardless of whether they are in plain view or concealed, such as in a building
5. the direction of fire
6. moving to cover, repositioning and/or waiting for additional responding units to gain and maintain a superior tactical advantage
7. the possibility of collateral injury or death.

Officers should not take undue risks that could result in death or serious bodily injury. Whenever possible, officers should attempt to defuse and stabilize the situation by using communication skills and/or waiting for additional responding officers. Officers are never required to take unreasonable risks and may opt to disengage or withdraw if such action can be safely accomplished without further endangering themselves, other officers or the public. Officers should always be prepared to constantly re-evaluate any situation and de-escalate or escalate as needed or required.

Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force.

Deadly force will be used with great restraint, as a last resort, and only when the level of resistance warrants the use of deadly force. The DeKalb County Police Department places a greater value on human life than on the protection of property; therefore, the use of deadly force is not allowed to protect property interests.

No distinction shall be made relative to the age of the intended subject of deadly force.

Officers must make every attempt to identify and isolate a specific subject and then "shoot to stop."

Officers **will not** discharge a firearm as a warning shot.

Officers who are authorized can deploy with patrol rifles when they have reason to believe the suspect(s) is (are):
1. Wearing body armor
2. Armed with firepower that is superior to their sidearm
3. Armed and situated at a distance or fortified position with a tactically superior position requiring accuracy at a greater range
4. When an armed confrontation is imminent or when the officer is engaged in activities that have a high probability that the suspect(s) may be armed and dangerous, such as armed robberies in progress or active shooter situations, or
5. With prior authorization from a supervisor in situations where the tactical environment is such that a rifle would be the most effective way to prevent the death or serious physical injury to officers or the public.

Officers are prohibited from discharging firearms when it appears likely that an innocent person may be injured. Officers **will not** discharge a firearm at or from a moving vehicle except as the ultimate measure of self-defense or defense of another when the suspect is using deadly force. Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force. This policy is intended to be concordant with OCGA Title 17, Chapter 4, Article 2, Section 17-4-20 (b) and (d).

Every time a firearm is discharged (accidentally or not) it is that officer's duty to report the incident to a superior officer(s), who will then report it to Internal Affairs. In addition, officers must also report to the firing range for re-qualification and weapons inspection by a member of the range staff. Officers will not have to re-qualify for shooting an injured animal unless otherwise directed to do so by Internal Affairs. Only Range staff or Internal Affairs are authorized to provide replacement ammunition following a weapon discharge event. Exceptions to this policy are when the weapon is fired during qualification or other training exercises.

Excessive force and brutality on individuals by any member of this Department will not be permitted. When an officer is affecting an arrest, reasonable force may be used as previously mentioned. The use of any piece of equipment, whether county issue or not, (i.e., flashlight, handcuffs, ASP baton, etc) will be used for their intended purposes only and not as a method for inflicting injury except in cases where the officer must defend himself against deadly force or great bodily harm. The use of any type of neck restraint or choke hold is prohibited.

When a person is arrested or placed into custody and resistance by that person has ceased, the officer shall immediately reduce their level of force to control techniques. It shall be the responsibility of the officer to take appropriate behavior or physical contact with the individual. It shall be the responsibility of the officer to take appropriate action without any unnecessary use of force.

Pursuant to Section 519 of Public Law 101-104, the 1990 HUD Appropriations Act, officers are, in addition to the prohibitions previously mentioned, specifically prohibited from using excessive force against any individual engaged in a nonviolent civil rights demonstration.

Officers who are working off-duty jobs and are involved in situations, which require a degree of force, shall report the incident immediately to the area supervisor who shall complete a Use of Force report as if the incident occurred while the officer was on duty

The killing of an animal is justified: (1) for self-defense; (2) to prevent substantial harm to the officer or another; or (3) when the animal is so badly injured that humanity requires its relief from further suffering. A seriously wounded or injured animal may be destroyed only after all attempts have been made to request assistance from an agency (humane society, animal control, game warden, etc.) responsible for the disposal of animals. The destruction of vicious animals shall be guided by the same rules set forth for self-defense and the defense and safety of others.

**Domesticated Animals injured in a use of force incident**
If a domesticated animal is injured during a use of force incident, the animal will be provided medical treatment to the best ability of the officer. This treatment may include;
A) Allowing the owner, or designee, to transport the animal to a veterinarian unless the animal must remain at the scene related to a crime or investigation.
B) If the owner cannot be located in a timely manner, DeKalb County Animal Enforcement will be called to transport the animal to a veterinarian.
This policy applies to domesticated animals injured by Department personnel. Officers must always use caution and their best judgment when handling an injured animal.

Except for general maintenance, storage or authorized training, officers shall not draw or exhibit a firearm unless circumstances create strong reasonable cause to believe that it may be necessary to lawfully use the weapon in conformance with other sections of this policy.

## 4-6.2 OLEORESIN CAPSICUM

**PURPOSE**
The purpose of this policy is to establish guidelines for the use of oleoresin capsicum (OC) aerosol restraint spray.

**POLICY**
The department has issued OC aerosol restraint spray to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance of resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that personnel use OC when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

**PROCEDURES**

A. **AUTHORIZATION**
1. All sworn personnel will be required to complete the prescribed course of instruction in the use of OC spray. Only sworn and non-sworn personnel who have completed the prescribed course of instruction on the use of OC are authorized to carry the device. Only Departmental issued 10% oleoresin capsicum cone spray will be carried.

2. All on-duty uniformed officers shall be equipped with the Department issued OC spray.

3. Sworn and non-sworn personnel whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry departmentally authorized OC while on duty.

4. Uniformed officers shall carry only departmentally authorized OC canisters in the prescribed manner on the duty belt. Non–uniformed personnel may carry OC in alternative devices as authorized by the agency.

**B.  USAGE CRITERIA**

1. OC spray is considered a use of force and shall be employed in a manner consistent with this agency's use-of-force policy. OC is a force option following verbal compliance tactics and the use of physical strengths and skills (the "soft or hard hands" approach) when appropriate on the use-of force continuum.

2. OC may be used when a verbal dialogue has failed to bring about the subject's compliance and the subject has signaled his intention to actively resist the officer's efforts to make the arrest.

3. Whenever practical and reasonable, personnel should issue a verbal warning prior to using OC against a suspect.

4. An officer may use deadly force to protect himself from the use or threatened use of OC when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.

5. Once a suspect is incapacitated or restrained, use of OC is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.

**C.  USAGE PROCEDURES**

1. Whenever possible, officers should be upwind from the suspect before using OC and should avoid entering the spray area.

2. Personnel should maintain a safe distance from the suspect of between two and 10 feet.

3. A single spray burst of between one half and one second should be directed at the suspect's eyes, nose and mouth. Additional burst(s) may be used if the initial or subsequent burst proves ineffective.

4. Use of OC should be avoided, if possible, under conditions where it may affect innocent bystanders. Caution should be taken during the use of OC in enclosed areas, business, homes, etc.

**D.  EFFECTS of OC, OFFICER RESPONSE and MEDICAL AID**

1. Within several seconds of being sprayed by OC, a suspect will normally display symptoms of temporary blindness, have difficulty breathing, burning sensation in the throat, nausea, lung pain and/or impaired thought processes.

2. The effects of OC vary among individuals. Therefore, all suspects will be handcuffed as soon as possible after being sprayed. Personnel should also be prepared to employ other means to control the suspect - to include, if necessary, other force options consistent with the agency policy - if the suspect does not respond sufficiently to the spray and cannot otherwise be subdued.

3. Immediately after spraying a suspect, personnel will be alert to any indications that the individual needs medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.

4. Air will normally begin reducing the effects of OC spray within 15 minutes of exposure. How-

ever, once the suspect has been restrained, officers may flush the exposed area with water if the suspect request.

5. Suspects that have been sprayed will be monitored for indications of medical problems and will not be left alone while in police custody. Personnel should provide assurance to suspects who have been sprayed that the effects are temporary and encourage them to relax.

6. Assistance will be offered to any individuals accidentally exposed to OC spray who feel the effects of the agent. All such incidents will be reported as soon as possible to the officer's immediate supervisor and shall be detailed in an incident report. Non-sworn personnel will report any such incident to the nearest police supervisor.

E.  **REPORTING PROCEDURES**
1. An incident report will be submitted. Accidental discharges as well as intentional uses of OC spray against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible. All uses of OC spray by non-sworn personnel will immediately be reported to the nearest police supervisor.

2. A use-of-force report will be completed following all discharges of OC spray except during testing, training, malfunction or accidental discharge.

F.  **REPLACEMENT**
1. All OC spray devices will be maintained in an operational and charged state by assigned personnel. Replacements for damaged, inoperable or empty devices are the responsibility of officers to whom they are issued.

2. Unexplained depletion of OC canisters will require an investigation and written report by the officer's supervisor to the Division Commander.

G.  **TRAINING**
1. The Department's OC spray training program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) effects and first aid procedures, and (4) a practical exercise including exposure.

2. All personnel will receive annual In-Service training on the use of OC. This training will include instruction of the Departmental policy on use of force.

H.  **OFF-DUTY/PART TIME EMPLOYMENT**
1. All authorized part-time employment will be approved as per existing Departmental policy.

2. Officers working part-time in uniform must wear the Department issued OC Spray canisters in the prescribed manner on the duty belt.

3. Officers working part-time employment in plain clothes must carry the Department issued OC spray the alternative device as authorized by the agency.

## 4-6.3  ASP BATON

**PURPOSE**
The purpose of this policy is to establish guidelines for the use of the ASP Tactical Baton expandable defensive impact weapon.

## POLICY

The department has issued the ASP Baton to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance and control of resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that personnel use the ASP Baton when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

## PROCEDURES

**A. AUTHORIZATION**

1. All on-duty uniform officers shall be equipped with the Department issued ASP Baton or authorized self-purchased ASP Baton unless specifically exempted by the Chief of Police. All sworn personnel will be required to complete the prescribed course of instruction in the use of the ASP Baton.

2. Only sworn and non-sworn personnel who have completed the prescribed course of instruction are authorized to carry the device. The 21" and 26" ASP Batons will be the standard authorized impact weapon issued to employees of the DeKalb County Police Department. In addition, the Airweight 21" or 26" ASP Baton may be carried (*after completing the prescribed training course*) at the employee's expense. The Airweight Baton is lighter in weight and more practical for carry by non-uniform personnel and those officers who desire to carry less weight on their duty belt.

    Personnel who are authorized to wear plain clothes and Command/Administrative Staff not wearing the duty belt may carry the ASP P12 12" baton or the ASP P16 16" baton. These batons are designed for carry without the Sidebreak Scabbard and are purchased at the expense of the employee. Any employee in full uniform must carry the 21" or 26" baton.

3. Any officer whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry a departmentally authorized ASP Baton while on duty.

4. Uniformed personnel shall carry only departmentally authorized ASP Batons in the issued Sidebreak Scabbard in the prescribed manner on the duty belt. Non-uniformed personnel may carry the ASP Baton in an alternative manner as authorized by the agency.

5. "Hindi" (mushroom) or other non-ASP end caps shall not be installed on any ASP Baton, as it voids the manufacturer's warranty.

**B. USAGE CRITERIA**

1. The ASP Baton is considered a use of force and shall be employed in a manner consistent with this agency's Use-of-Force policy. The ASP Baton is an intermediate level of force on the same level with the OC spray and the use of a firearm to control an assailant.

2. The ASP Baton may be used to establish lawful objectives when:
   a) verbal dialogue has failed to bring about the subject's compliance

   b) the use of OC spray has failed to bring about the subject's compliance or the use of OC spray is impractical in the given situation

   c) the subject has signaled his intention to actively resist the officer's efforts to make the arrest or

   d) in self-defense, or defense of another against unlawful violence to that person

3. Whenever practical and reasonable, employees should issue a verbal warning prior to using the ASP Baton against a suspect.

4. An officer may use deadly force to protect himself from the use or threatened use of an ASP Baton when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.

5. Once a suspect is incapacitated, controlled, or restrained, use of the ASP Baton is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.

C. **USAGE PROCEDURES**

1. All action, relational factors between parties and conditions surrounding the enforcement situation comprise the totality of the situation. These include officer/subject factors and special circumstances. Each relevant condition relates to the confrontation in determining the officer's course of action.

Officer/Subject Factors may include:
   a. age
   b. gender
   c. size
   d. fitness
   e. skill level
   f. multiple officers
   g. multiple subjects

It is reasonable that a discrepancy in the age, gender, physical size, fitness, or skill level of individuals involved in the confrontation may mandate that an officer use more or less force to control the situation. In a similar manner, it would be reasonable for a single officer to use more force controlling a situation when confronted by multiple subjects.

Special Circumstances may include:
   a. close proximity to a firearm/weapon
   b. special knowledge
   c. injury or exhaustion
   d. ground position
   e. disability
   f. imminent danger

A subject in close proximity to a firearm or other weapon creates an increased danger to the officer, which must be dealt with immediately. An officer may have special knowledge of a subject's skills that would require the use of increased force. An officer who is injured, exhausted, on the ground, disabled, or is in imminent danger would be justified in escalating through the use-of-force options.

2. The ASP Tactical Baton is drawn with the weapon hand or drawn with the reaction hand (off-hand) and transferred to the weapon hand.

3. All basic strikes are delivered with the baton in the weapon hand, unless the weapon hand is incapacitated.

4. There are two modes of the ASP Baton, Open Mode and Closed Mode. The Baton Mode is determined by the distance to the threat encountered by the employee.

5. When striking a subject, the employee should target those areas of the subject, which are likely to inflict injury to the subject (i.e., center mass of arm, center mass of leg, center mass of body). These targets are the vehicles, which transport force against the employee.

6. Open Mode strikes are ideally delivered to target areas with the last three inches of the shaft or tip of the ASP Baton. Closed Mode strikes are delivered to target areas with the end cap or fist.

7. Do not target strikes to the head, neck, spine, sternum, or groin. Strikes to these areas may produce injuries that could be fatal, while not effectively terminating assailant resistance.

**D.** **EFFECTS of the ASP BATON, OFFICER RESPONSE, APPROPRIATE MEDICAL AID**

1. Strikes to the center mass of the extremities effectively disable an assailant's "delivery system." Strikes to the center mass of the body generate fluid shock waves. Strikes to the primary "center mass" target areas have a high potential for control and a low potential for fatal injury.

2. If the assailant moves or a strike misses its target, surrounding targets also have a high potential for control and a lesser potential for damage.

3. All suspects will be handcuffed as soon as possible after being controlled. However, personnel should also be prepared to employ other means to control the suspect – to include, if necessary, other force options consistent with agency policy – if the subject does not respond sufficiently to the strikes and cannot otherwise be subdued.

4. Immediately after employing the ASP Baton, employees should be alert to any indications that the individual needs medical care and if needed, will ensure appropriate medical aid. This includes, but is not limited to, loss of consciousness, breathing difficulties, and excessive swelling to extremities. Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.

5. Suspects on which the ASP Baton has been used will be monitored for indication of medical problems and will not be left alone while in police custody.

6. In order to minimize the stress involved in the use of force, any officer or non-sworn personnel involved in a use of force incident, which results in death or serious injury, will be placed on "administrative leave" directly upon completion of their preliminary report of the incident. This leave will be without loss of pay or benefits, pending the results of the investigation. The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly.

   While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time. The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family.

   Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

E.  **REPORTING PROCEDURES**
1.  Use of the ASP Baton against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible. If non-sworn personnel employ the baton, the incident will immediately be reported to the nearest police supervisor.

2.  A use-of-force report and an incident report will be completed following all tactical uses of the ASP Baton.

3.  To properly complete the Use of Force Report, it will be necessary to document and photograph the strike area on the suspect's body.

4.  The Department will conduct an annual analysis of reported usage of the ASP Baton, via documented reports conducted by the Internal Affairs Department.

F.  **REPLACEMENT**
1.  Assigned personnel will maintain ASP Batons in an operational state. Repair or replacements for damaged or inoperable batons are the responsibility of employees to whom they are issued.

2.  Qualified personnel in the Training Division will make all repairs of ASP Batons. No employee should attempt to repair his or her own baton. If repair of the baton is not possible, Training Division personnel will recommend the Supply Unit replace the ASP Baton.

G.  **TRAINING**
1.  The Department's ASP Baton 8-hour certification program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) ASP baton skills, and (4) a practical exercise for proficiency.

2.  Once an officer or non-sworn personnel completes the certification class, he/she must annually be re-certified to retain carry authorization.

3.  Those employees failing to re-certify by December 31st of each year, will no longer be authorized to carry the ASP Baton until completion of the 2-hour certification class for ASP re-familiarization.

4.  Should the officer fail to meet certification standards, the authority to carry the weapon shall be IMMEDIATELY REVOKED by the certifying authority and written notification of such revocation shall be forwarded to the officer's Commander, the Training Division, and the Chief of Police. Officers, whose authority to carry the ASP Baton has been revoked, shall be reassigned to non-uniformed administrative duty for a period of 5 days. Within the 5 day period, the officer must report to the Training Division for remedial ASP Baton training and certification. Officers who fail to achieve certification after attending remedial ASP Baton training will be recommended for termination for failing to maintain standards. A non-sworn employee who, after receiving remedial training fails to meet certification standards, will have the authority to carry the ASP Baton immediately revoked by the certifying authority and written notification of such revocation will be forwarded to the employee's Commander, the Training Division, and the Chief of Police.

5.  Any employee who is absent from duty for any extended period of time and fails because of that absence to re-certify as scheduled will have 10 days to re-certify upon their return to full duty status. Responsibility for notifying the Training Division will rest with the individual employee.

6.  All sworn personnel will receive annual In-Service training on the use of the ASP baton. This training will include re-certification and instruction of Departmental policy on use of force.

# EXHIBIT 10

# DEKALB COUNTY POLICE DEPARTMENT
## STATEMENT FORM



CASE NUMBER: 16-087200

STATEMENT OF: Officer Edward Parks _____ SOC. SEC. # _____

DOB: ████████ SEX: M HEIGHT: 508 WEIGHT: 150 RACE: B

ADDRESS: 6920 Main Street APT: ___ CITY/STATE/ZIP: Lithonia, GA 30058

ALTERNATE ADDRESS: _____

EMPLOYER: Lithonia Police Department

PHONE #S: HOME: _____ WORK: 770-482-8947 CELL: _____

STATEMENT TAKEN BY: Sgt B.C. Danna 1917 DATE: 11-10-16

TIME: BEGAN: 1635 ENDED: 1700 LOCATION: Homicide/Assault

On 09/12/2016 I responded as a backup officer to Officer T. Anderson (Dekalb County Police) in reference to a suspect who was armed with a gun. Around 2245 hours I arrived at Laurel Post Drive, along with Officer Stephens (Dekalb County Police) where a suspect was laying on the ground and Officer T. Anderson was covering him after a Taser ECW was deployed (prior to my arrival). The suspect was wearing a white tank top, blue jeans, and had gold teeth. His shirt was torn and contained blood stains. The suspect was alert and conscious and was yelling incredible words and vulgar language. Officer Stephens told the subject to relax and remain calm. Officer T. Anderson stated that she needed her patrol vehicle secured so I left the incident location and went to Giles Road and Laurel Post Drive. After a few minutes of searching, I was unable to locate her patrol vehicle so I headed back to the incident location. As I was walking down Laurel Post Drive, I could hear the sound of a ✱ Taser ECW being deployed. When I arrived back to the scene Officer Lister and Officer Lattimore were with Officer Stephens and they were attempting to place him into custody. He continued to resist arrest by holding his hands together and yell at the officers. Officer Lister was able to secure a handcuff on the suspect before yelling "Ouch!" and was bitten by the suspect. Officer Stephens secured the other arm of the suspect and I assisted him with placing the other handcuff onto him. The officers were about to stand the suspect up but I told them to wait, at which point I double-locked the handcuffs so they would not tighten down.

Signed: _____ Page 1/2 Witnessed: _____



# DEKALB COUNTY POLICE DEPARTMENT
## STATEMENT FORM

STATEMENT OF: Officer Edward Parks     CASE NUMBER: 16-087200

While on scene, I observed a taser ECW with the cartridge head off, laying in the grass near the suspect. I am unable to recall what officer the taser belonged to. The suspect had two taser probes into his back area, but I did not observe any other injuries. AMR arrived on scene who provided medical treatment to the suspect. I recalled the suspect being alert, and breathing and responding to Dekalb County Police and EMS statements and questions. I observed to suspect being placed into the ambulance for transport to the hospital. After he was placed into handcuffs I did not make any other contact with the suspect.

Signed: _____    Page 2 / 2    Witnessed: _____

DKPD000502

# EXHIBIT 10(a)



**DeKalb County Police Department – Criminal Investigation Division**

Case Note – Supplemental Form

| Detective | Date | Case Number |
|---|---|---|
| Sgt. B. L. Danner, #1917 | 11-10-16 | 16-089200 |

On 11-10-16 around 1600 hours, Ofc. Parks of the Lithonia Police Department came to headquarters to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. This interview has been loaded into RMS.

After being advised of his Miranda Rights, Ofc. Parks agreed to give a statement. He said that when he first got to the scene, Ofc. Anderson had already deployed her Taser and the suspect was on the ground. He then heard Ofc. Anderson say her patrol car wasn't secured so he left to try and find it to secure it. When he couldn't he came back and saw the suspect was still fighting the other officers. He then grabbed one of the suspects arms to help him be handcuffed.

I asked if his patrol car had a video system and he said it did not and that he did not have a body camera. I asked him if he saw any injuries to the suspect and he said he saw blood on his shirt but did not see any injuries. I asked him specifically if he saw any injuries to the suspect's head and he said no. I also asked him if he or any officer used any impact weapons or any hand, knee or elbow strikes. He said he did not and he is not aware of any other officer using any strikes.

Ofc. Parks said he provided a written statement on the night of the incident but I could not locate that in the file. Ofc. Parks said he might have a copy and I asked him to send me one. I asked him to provide a written statement and he did. The statement is included in the file.

About 1700 hours Ofc. Lister responded to be interviewed. I recorded the interview starting with the advisement of Miranda Rights. The interview has been loaded into RMS.

After being advised of his Miranda Rights, Ofc. Lister agreed to provide me with a statement. He said that when he got to the scene, the suspect had already been Tasered and that he joined the other officers already present in trying to handcuff the suspect. He said that as he was struggling with the suspect the suspect bit him but that he was wearing a glove and the bite didn't go through the glove. He said that they were eventually able to handcuff the suspect.

When asked if he or any other officers used hand, knee or foot strikes, he said no. When I asked if any impact weapons were used, he again said no. When I asked if he saw any injuries to the suspect he said no. He did say the suspect complained of being shot in the wrist but that he did not see the injury.

Ofc. Lister also said his car does not have cameras and he was not wearing a body camera.

I did not ask for a written statement as he wrote a supplemental report at the time of the original incident.

Detective Signature – Badge # - Date

Page 1 of 1

DKPD000392

RPTID:     9612
AGENCY: GA0440700

# INCIDENT REPORT - NARRATIVE

*LITHONIA POLICE DEPARTMENT*

*Print Date: 02/07/2019 07:12:29 PM*

CASENO: 16-09-0560

Referenced Dekalb County Police - East Precinct Case #16-089200

On 09/12/2016, at approximately 2240 hours, I began responding as back up to Officer T. Anderson (Dekalb County Police - East), in reference to having a subject at gun point, who was also armed with a handgun, before fleeing from Officer T. Anderson on foot.

Around 2243 hours, I, Officer E. Parks (#96, Lithonia Police Department), arrived at 6316 Laurel Post Drive to assist Officer T. Anderson with an extremely combative suspect who I observed to be a Black Male, approximately 6'00-6'03', about 230-260 lbs wearing a white tank top with blood stains, torn blue jeans and had gold teeth. I quickly approached the suspect along with Officer J. Stephens (DeKalb County Police - East) who was still trying to resist Officer T. Anderson.

Officer T. Anderson was covering the suspect due to deploying her Taser. While Officer T. Anderson and Officer J. Stephens kept watch on the suspect, I walked back on Laurel Post Drive towards Giles Road to secure Officer Anderson's patrol vehicle, but was unable to locate it. As I walked back down the hill towards where the suspect and officers were, I could hear the sound of what I perceived to be a Taser ECW being deployed. I expedited my run down the hill back to where Officer T. Anderson was and I observed the suspect continuing to be combative, yelling out loud and resisting arrest.

At this time Officer Lister (DeKa____ ___ ___                                    DeKalb County Police - East) had now arrived and were assisting Officer J.
Stephens in placing the suspec____                                          over his wrists to avoid being placed in handcuffs. At some point I heard Officer
Lister scream "Ouch" and he quickly pulled his hands away from the suspect after being bitten on his right hand.

Officer Lister was able to place one handcuff on the suspect, myself and Officer Stephens was able to place the other handcuff on the suspect's wrist. Officer J. Stephens secured the subject's arm while I clasped the handcuff onto his wrist. After being placed in handcuffs, I double-locked the handcuffs for safety. I was not injured during apprehension and placing the suspect into custody. Once the suspect was in custody, I no longer made contact with him.

AMR arrived on scene after being dispatched by Dekalb County Police where they made contact with the suspect who was still alert, breathing and responding to statement from the Officers and questions from EMS. I witnessed the subject get placed into the AMR unit by EMS where he was transported to Grady Hospital for treatment.

https://www____ ____box.com/home/Corey Donegan/Discovery/RRD to Non-Parties/Lithonia Police De_____nent?preflae&npreview=DONEGAN.Lithonia+PD%27s+Documents+Provided.pdf

# EXHIBIT 11




# DEKALB COUNTY POLICE DEPARTMENT
## STATEMENT FORM

CASE NUMBER: _16-087200_

STATEMENT OF: _Timothy Lattimore_    SOC. SEC. # _____

DOB: ██████    SEX: ____ HEIGHT: ____ WEIGHT: ____ RACE: ____

ADDRESS: _____ APT: ____ CITY/STATE/ZIP: _____

ALTERNATE ADDRESS: _____ EMPLOYER: _____

PHONE #s: HOME: _____ WORK: _____ CELL: ██████

STATEMENT TAKEN BY: _Sgt Dunne 1917_    DATE: _11-14-16_

TIME: BEGAN: _1625_ ENDED: _1645_ LOCATION: _Headquarters_

When I arrived on scene I observed the subject and my fellow officers on the ground. I then got out of my patrol unit to help place the subject in custody. He was face down and refusing to be placed under arrest. After a few moments of attempting to place him in custody, I took out my taser, removed the cartridge, and dry stun the subject twice. After seeing that it had no affect on the subject, I put it away and continued to attempt to place the subject in custody. We attempted to place him in custody by using our hands only. But I did not strike the subject during the incident. After the subject bit a fellow officer, he was placed in custody. After he was placed in custody, EMS arrived to evaluate him. With the help of the other officers and myself, he was placed and handcuffed to the stretcher. The subject was then transported to the hospital by EMS. I observed an injury to the subjects head, and he was alert and talking at the time he left the scene. I recall see the injury to his at the time.

Signed: _[signature]_    Page _1_    Witnessed: _NL 1917_

# EXIHIBIT 12

## INVESTIGATING SUPERVISOR SECTION:

Officer Injury:  ☐ No Injury  ○ Claimed Injury  ☑ Visible Injury  ○ Medical Treatment  ☑ Refused Medical Treatment

Attach Supervisor Incident Report     ● Yes     ○ No

| Description/Explanation of Injury | Officer Lister received a bite to his right hand, but there was no direct contact because Officer Lister was wearing gloves. He received an abrasion as he pulled his hand from the suspects mouth. |
|---|---|

| Photographs Taken of Officer | Photographed By | Supervisor Responded to Scene | Supervisor Arrival Time |
|---|---|---|---|
| YES | MPO J. Stephens 3301 | YES | 11:02:00 |

### Investigating Supervisor
☑ Meets Policy  ☐ Does Not Meet Policy  ☐ Further Review by IA

Comments: Officer Anderson received and responded to a call of a discharging of a firearm with a suspect of a black male wearing a white tank top, and blue jeans. Once on scene contact was made immediately with the subject described by the dispatcher. The subject was armed with .45 caliber semi-automatic pistol. Officer Anderson gave the subject commands to drop the weapon. After hesitating and not initially dropping the weapon. The subject suddenly dropped the weapon and fled. Officer Anderson gave chase. She chased the subject south on Phillips Road, then down Laurel Post Drive. The subject then attempted to force his way into a house at 6136 Laurel Post Drive. Officer Anderson yelled verbal commands for the subject to stop. The subject ran down the steps of the residence. Officer Anderson yelled commands for the subject to stop and get on the ground. The subject did not comply. Officer Anderson deployed her taser. The subject was taken into custody, but was unable to be identified due to unconsciousness, and the need for immediate surgery.

| Angela Brown, Sr. 1852 | 09/13/2016 | ☐ See Memo |
|---|---|---|
| Signature | Date | |

### Next Level Supervisor
☑ Meets Policy  ☐ Does Not Meet Policy  ☐ Further Review by IA

Comments:

| Lt. CS Clere #1569  Digitally signed by Lt. CS Clere #1569  Date: 2016.09.19 21.52.17 -04'00' | 09/19/2016 | ☐ See Memo |
|---|---|---|
| Signature | Date | |

### Next Level Supervisor
☑ Meets Policy  ☐ Does Not Meet Policy  ☐ Further Review by IA

Comments:

| Lt. AW Ford #2281  Digitally signed by Lt.AW Ford #2281  Date: 2016.09.30 17.18.50 -04'00' | 09/30/2016 | ☐ See Memo |
|---|---|---|
| Signature | Date | |

### Next Level Supervisor
☐ Meets Policy  ☐ Does Not Meet Policy  ☐ Further Review by IA

Comments:

| | | ☐ See Memo |
|---|---|---|
| Signature | Date | |

### Assistant Chief
☑ Meets Policy  ☐ Does Not Meet Policy  ☐ Further Review by IA

Comments:

| Asst. Chief E.L. Jones #1468  Digitally signed by Asst. Chief E.L. Jones #1468  Date: 2016.10.04 14.31.28 -04'00' | 10/04/2016 | ☐ See Memo |
|---|---|---|
| Signature | Date | |

### Chief
☐ Meets Policy  ☐ Does Not Meet Policy  ☐ Further Review by IA

Comments:

| | | ☐ See Memo |
|---|---|---|
| Signature | Date | |

### Internal Affairs Review:
☑ Meets Policy  ☐ Does Not Meet Policy

Comments: _J.L. Reward_ #2363   10/11/16

# EXHIBIT 15

 **TASER** **EVIDENCE⊘SYNC**

PROTECT LIFE

**TASER Information**

| | |
|---|---|
| Dept. | DeKalb County Police Dept. |
| Serial | X130029H2 |
| Model | TASER X26P |
| Firmware Version | Rev. 04.024 |
| Device Name | X130029H2 |
| Health | Good |

**Report Generated by**

| | |
|---|---|
| Name | Berman, SH |
| Badge ID | 2741 |
| Local Timezone | Eastern Standard Time (UTC -0400) |
| Generated On | 19 Sep 2016 13:58:50 |

## Device (X26P)

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1 | 18 Nov 2014 13:02:15 | Power Magazine Change | Manufacturing S/N: XXXXX6  Battery capacity: 100% | | |
| 2 | 18 Nov 2014 13:02:15 | Firmware Update | FW Bundle, Rev. 04.010, 7/23/2014 | | |
| 3 | 18 Nov 2014 13:02:15 | Firmware Update | MC, Rev. 04.010, 7/23/2014 | | |
| 4 | 18 Nov 2014 13:02:15 | Firmware Update | LDR, Rev. 04.009, 7/22/2014 | | |
| 5 | 18 Nov 2014 13:02:15 | Firmware Update | CAM, Rev. 01.022, 6/6/2014 | | |
| 6 | 18 Nov 2014 13:02:15 | Armed | | 28 | 100 |
| 7 | 18 Nov 2014 13:02:26 | Reset | Low Battery Reset | | |
| 8 | 18 Nov 2014 13:02:47 | Power Magazine Change | 0xFF    S/N:    Battery capacity: 255% | | |
| 9 | 18 Nov 2014 13:02:47 | Armed | | 29 | |
| 10 | 18 Nov 2014 13:02:47 | Reset | Low Battery Reset | | |
| 11 | 18 Nov 2014 13:05:14 | Power Magazine Change | Manufacturing S/N: DPH000  Battery capacity: 100% | | |
| 12 | 18 Nov 2014 13:05:14 | Armed | | 28 | 100 |
| 13 | 18 Nov 2014 13:05:16 | Trigger | 5 | | 100 |
| 14 | 18 Nov 2014 13:05:22 | Trigger | 5 | | 99 |
| 15 | 18 Nov 2014 13:05:27 | Trigger | 5 | | 99 |
| 16 | 18 Nov 2014 13:05:33 | Trigger | 5 | | 99 |
| 17 | 18 Nov 2014 13:05:38 | Trigger | 5 | | 99 |
| 18 | 18 Nov 2014 13:05:43 | Trigger | 5 | | 99 |
| 19 | 18 Nov 2014 13:05:49 | Trigger | 5 | | 99 |

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 830 | 23 Aug 2016 14:30:10 | Trigger | 5 | | 25 |
| 831 | 23 Aug 2016 14:30:15 | Safe | 17 | 32 | 24 |
| 832 | 24 Aug 2016 14:20:23 | Armed | | 29 | 24 |
| 833 | 24 Aug 2016 14:20:33 | Trigger | 5 | | 24 |
| 834 | 24 Aug 2016 14:20:39 | Safe | 16 | 29 | 24 |
| 835 | 28 Aug 2016 14:26:11 | Armed | | 30 | 24 |
| 836 | 28 Aug 2016 14:26:18 | Trigger | 5 | | 24 |
| 837 | 28 Aug 2016 14:26:24 | Safe | 13 | 30 | 24 |
| 838 | 29 Aug 2016 14:35:36 | Armed | | 28 | 24 |
| 839 | 29 Aug 2016 14:35:39 | Reset | Low Battery Reset | | |
| 840 | 29 Aug 2016 14:35:47 | Armed | | 28 | 24 |
| 841 | 29 Aug 2016 14:35:48 | Reset | Low Battery Reset | | |
| 842 | 29 Aug 2016 14:36:16 | Armed | | 28 | 24 |
| 843 | 29 Aug 2016 14:36:18 | Reset | Low Battery Reset | | |
| 844 | 29 Aug 2016 14:36:21 | Armed | | 28 | 24 |
| 845 | 29 Aug 2016 14:36:22 | Reset | Low Battery Reset | | |
| 846 | 29 Aug 2016 14:42:49 | Armed | | 27 | 24 |
| 847 | 29 Aug 2016 14:42:50 | Safe | 1 | 28 | 24 |
| 848 | 29 Aug 2016 14:44:08 | Power Magazine Change | Standard    S/N: 218444    Battery capacity: 97% | | |
| 849 | 29 Aug 2016 14:44:08 | Armed | | 27 | 97 |
| 850 | 29 Aug 2016 14:44:09 | Trigger | 5 | | 97 |
| 851 | 29 Aug 2016 14:44:15 | Safe | 7 | 27 | 97 |
| 852 | 29 Aug 2016 14:44:20 | Armed | | 28 | 97 |
| 853 | 29 Aug 2016 14:44:21 | Safe | 1 | 28 | 97 |
| 854 | 29 Aug 2016 14:44:41 | Armed | | 28 | 97 |
| 855 | 29 Aug 2016 14:44:43 | Safe | 2 | 28 | 97 |
| 856 | 30 Aug 2016 14:16:40 | Armed | | 30 | 97 |
| 857 | 30 Aug 2016 14:16:56 | Trigger | 5 | | 97 |
| 858 | 30 Aug 2016 14:17:02 | Safe | 22 | 31 | 97 |
| 859 | 31 Aug 2016 14:17:33 | Armed | | 28 | 97 |

| Seq # | Local Time [DD-MM-YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 860 | 31 Aug 2016 14:17:42 | Trigger | 5 | | 97 |
| 861 | 31 Aug 2016 14:17:47 | Safe | 14 | 29 | 97 |
| 862 | 07 Sep 2016 14:19:59 | Armed | | 29 | 97 |
| 863 | 07 Sep 2016 14:20:00 | Safe | 1 | 29 | 97 |
| 864 | 07 Sep 2016 14:20:02 | Armed | | 29 | 97 |
| 865 | 07 Sep 2016 14:20:12 | Trigger | 5 | | 97 |
| 866 | 07 Sep 2016 14:20:18 | Safe | 16 | 29 | 96 |
| 867 | 11 Sep 2016 14:29:30 | Armed | | 30 | 96 |
| 868 | 11 Sep 2016 14:29:38 | Trigger | 5 | | 96 |
| 869 | 11 Sep 2016 14:29:43 | Safe | 13 | 30 | 96 |
| 870 | 12 Sep 2016 14:19:26 | Armed | | 31 | 96 |
| 871 | 12 Sep 2016 14:19:40 | Trigger | 5 | | 96 |
| 872 | 12 Sep 2016 14:19:45 | Safe | 19 | 31 | 96 |
| 873 | 12 Sep 2016 22:51:04 | Armed | | 31 | 96 |
| 874 | 12 Sep 2016 22:51:04 | Safe | 0 | 30 | 96 |
| 875 | 12 Sep 2016 22:51:06 | Armed | | 30 | 96 |
| 876 | 12 Sep 2016 22:51:12 | Trigger | 5 | | 96 |
| 877 | 12 Sep 2016 22:52:03 | Trigger | 5 | | 96 |
| 878 | 12 Sep 2016 22:52:11 | Safe | 65 | 35 | 95 |
| 879 | 13 Sep 2016 14:23:58 | Armed | | 29 | 95 |
| 880 | 13 Sep 2016 14:24:03 | Trigger | 5 | | 95 |
| 881 | 13 Sep 2016 14:24:08 | Safe | 10 | 30 | 95 |
| 882 | 18 Sep 2016 14:24:36 | Armed | | 27 | 95 |
| 883 | 18 Sep 2016 14:24:47 | Trigger | 5 | | 95 |
| 884 | 18 Sep 2016 14:24:53 | Safe | 17 | 27 | 95 |
| 885 | 19 Sep 2016 14:01:59 | Armed | | 27 | 95 |
| 886 | 19 Sep 2016 14:02:00 | Safe | 1 | 27 | 95 |
| 887 | 19 Sep 2016 14:02:32 | USB Connected | | | |
| 888 | 19 Sep 2016 13:57:37 | Time Sync | 19 Sep 2016 14:02:33 to 19 Sep 2016 13:57:37 | | |
| 889 | 19 Sep 2016 13:58:13 | Firmware Update | CAM, Rev. 01.025, 8/4/2015 | | |

 **TASER**   **EVIDENCE⑥SYNC**

**TASER Information**

| | | **Report Generated by** | |
|---|---|---|---|
| **Dept.** | Dekalb County Police Dept. | **Name** | Berman, SM |
| **Serial** | X130011F2 | **Badge ID** | 2741 |
| **Model** | TASER X26P | **Local Timezone** | Eastern Standard Time (UTC -04··· |
| **Firmware Version** | Rev. 01.024 | **Generated On** | 14 Sep 2016 14:51:10 |
| **Device Name** | X130011F2 | | |
| **Health** | Good | | |

## Device (X26P)

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1 | 07 Apr 2014 14:00:40 | Power Magazine Change | Manufacturing S/N XXXXX6 Battery capacity 62% | | |
| 2 | 07 Apr 2014 14:00:40 | Firmware Update | FW Bundle, Rev. 03.041, 4 15 2013 | | |
| 3 | 07 Apr 2014 14:00:40 | Firmware Update | MC Rev. 03 041, 4/15/2013 | | |
| 4 | 0 Apr 2014 14 00:40 | Firmware Update | LDR Rev. 03.041, 4/15/2013 | | |
| 5 | 07 Apr 2014 14:00.40 | Firmware Update | CAN, Rev 01.021, 11/19/2013 | | |
| 6 | 07 Apr 2014 14:00.40 | Armed | | 29 | 62 |
| 7 | 07 Apr 2014 14:00:58 | Power Magazine Change | Standard S/N: 010402 Battery capacity: 99% | | |
| 8 | 07 Apr 2014 14:00:58 | Armed | | 29 | 99 |
| 9 | 07 Apr 2014 14:16:25 | Power Magazine Change | 0x87 S/N: DPM001 Battery capacity: 79% | | |
| 10 | 07 Apr 2014 14:16:25 | Armed | | 28 | 79 |
| 11 | 07 Apr 2014 14 16 33 | Trigger | 5 | | 79 |
| 12 | 07 Apr 2014 14.16:42 | Trigger | 5 | | 79 |
| 13 | 07 Apr 2014 14:16.53 | Trigger | 5 | | 79 |
| 14 | 07 Apr 2014 14:16:59 | Trigger | 5 | | 79 |
| 15 | 07 Apr 2014 14:17:06 | Trigger | 5 | | 79 |
| 16 | 07 Apr 2014 14:17:14 | Trigger | 5 | | 79 |
| 17 | 07 Apr 2014 14:17:21 | Trigger | 5 | | 79 |
| 18 | 07 Apr 2014 14.17.27 | Trigger | 5 | | 79 |
| 19 | 07 Apr 2014 14:17:34 | Trigger | 5 | | 79 |

| Seq # | Local Time [DD:HH:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1220 | 20 Aug 2016 22:51:08 | Trigger | 5 | | 29 |
| 1221 | 20 Aug 2016 22:51:14 | Safe | 13 | 27 | 29 |
| 1222 | 21 Aug 2016 22 47:58 | Armed | | 27 | 29 |
| 1223 | 21 Aug 2016 22:48:09 | Trigger | 5 | | 29 |
| 1224 | 21 Aug 2016 22.48:16 | Safe | 18 | 28 | 29 |
| 1225 | 22 Aug 2016 22:33:51 | Armed | | 27 | 29 |
| 1226 | 22 Aug 2016 22:34:16 | Trigger | 5 | | 29 |
| 1227 | 22 Aug 2016 22:34:21 | Safe | 30 | 29 | 29 |
| 1228 | 26 Aug 2016 22:35:58 | Armed | | 28 | 29 |
| 1229 | 26 Aug 2016 22:36:04 | Trigger | 5 | | 29 |
| 1230 | 26 Aug 2016 22 36:10 | Safe | 12 | 28 | 28 |
| 1231 | 27 Aug 2016 22:50:48 | Armed | | 28 | 28 |
| 1232 | 27 Aug 2016 22.50:56 | Trigger | 5 | | 28 |
| 1233 | 27 Aug 2016 22.51:02 | Safe | 14 | 29 | 28 |
| 1234 | 28 Aug 2016 22 41:21 | Armed | | 27 | 28 |
| 1235 | 28 Aug 2016 22.41:50 | Trigger | 5 | | 28 |
| 1236 | 28 Aug 2016 22 41:55 | Safe | 34 | 30 | 28 |
| 1237 | 29 Aug 2016 22 43:07 | Armed | | 27 | 28 |
| 1238 | 29 Aug 2016 22 43:22 | Trigger | 5 | | 28 |
| 1239 | 29 Aug 2016 22 43:27 | Safe | 20 | 28 | 28 |
| 1240 | 30 Aug 2016 03 41:56 | Armed | | 28 | 28 |
| 1241 | 30 Aug 2016 03 42:12 | Safe | 16 | 29 | 28 |
| 1242 | 09 Sep 2016 22:46.40 | Armed | | 27 | 28 |
| 1243 | 09 Sep 2016 22:46:44 | Trigger | 5 | | 28 |
| 1244 | 09 Sep 2016 22:46:49 | Safe | 9 | 27 | 27 |
| 1245 | 10 Sep 2016 22:56:34 | Armed | | 28 | 27 |
| 1246 | 10 Sep 2016 22:56:49 | Trigger | 5 | | 27 |
| 1247 | 10 Sep 2016 22:56:54 | Safe | 20 | 29 | 27 |
| 1248 | 11 Sep 2016 22:42:05 | Armed | | 29 | 27 |
| 1249 | 11 Sep 2016 22:42:16 | Trigger | 5 | | 27 |

DKPD000444

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celcius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 1250 | 11 Sep 2016 22:42:22 | Safe | 17 | 30 | 27 |
| 1251 | 12 Sep 2016 22:34:00 | Armed | | 27 | 27 |
| 1252 | 12 Sep 2016 22:34:24 | Trigger | 5 | | 27 |
| 1253 | 12 Sep 2016 22:34:29 | Safe | 29 | 28 | 27 |
| 1254 | 12 Sep 2016 23:00:57 | Armed | | 27 | 27 |
| 1255 | 12 Sep 2016 23:01:02 | Safe | 5 | 27 | 27 |
| 1256 | 12 Sep 2016 23:02:35 | Armed | | 27 | 27 |
| 1257 | 12 Sep 2016 23:02:44 | Trigger | 5 | | 27 |
| 1258 | 12 Sep 2016 23:03:02 | Trigger | 5 | | 26 |
| 1259 | 12 Sep 2016 23:03:53 | Safe | 78 | 31 | 26 |
| 1260 | 14 Sep 2016 15:10:51 | USB Connected | | | |
| 1261 | 14 Sep 2016 14:49:19 | Time Sync | 14 Sep 2016 15:11:08 to 14 Sep 2016 14:49:19 | | |
| 1262 | 14 Sep 2016 14:50:20 | Firmware Update | CAM, Rev. 01.025, 8/4/2015 | | |
| 1263 | 14 Sep 2016 14:50:26 | Firmware Update | FW Bundle, Rev. 04.024, 6/28/2016 | | |
| 1264 | 14 Sep 2016 14:50:26 | Firmware Update | MC, Rev. 04.024, 6/28/2016 | | |
| 1265 | 14 Sep 2016 14:50:26 | Firmware Update | LDR, Rev. 04.013, 12/16/2014 | | |
| 1266 | 14 Sep 2016 14:50:31 | Time Sync | 14 Sep 2016 14:50:31 to 14 Sep 2016 14:50:31 | | |

DKPD000443

# EXHIBIT 16

# MEDICAL EXAMINER



# DEKALB COUNTY

## Medical Examiner's Inquiry

Case Number: _____ 16-1323 _____

Name of Deceased: _____ Corey Donegan _____

Race: __ Black _____ Sex: __ Male ____ Age: ____ 30 ____

Manner of Death: __ Accident ____ Date of Death: _ October 8, 2016 _

Cause of Death: _ Delayed Complications of Cocaine Associated Excited _

_ Delirium _____

Other Significant Condition: Gunshot of the Right Hand _____

Medical Examiner's Investigator: _____ Mark Anglin _____

## Procedure:

Autopsy: Yes  Limited Dissection: _____  External Examination: _____

Procedure Date: _ October 10, 2016 __ Day of Week: ____ Monday ____

## Certification by Medical Examiner:

Medical Examiner: _ Geoffrey Smith, M.D. ____  Date: _January 15 2017_

Signature: _____ _____

Medical Examiner: _____  Date: _____

Signature: _____

# MEDICAL EXAMINER

# DEKALB COUNTY

Geoffrey Smith, M.D.,
Associate Medical Examiner
AP, FP Board Certified

## Autopsy Report

### General Information:

Under the provisions of the Georgia Death Investigation Act, an autopsy of the body is performed. This examination takes place in the DeKalb County Forensic Science Center on Monday, October 10, 2016 commencing at 1115 hours.

### Presentation of the Body:

The body is received within a black plastic body bag and identified with material from the Medical Examiner Investigator. The decedent is covered with a hospital gown unclad and there are no personal effects.

### Evidence of Therapeutic Intervention:

The appearance of the decedent is consistent with an extended period of time of hospitalization, with medical intervention consisting of incisions on the upper right forehead that have been sutured in association with neurosurgical intervention; the larger of these measures 3.5 cm in length, with the incisions accompanied by shaving of the scalp hair. There is a double lumen catheter in the right side of the neck, tracheostomy site, and gastric feeding tube, Foley catheter and fasciotomies on the right lateral upper arm, inner right arm extending from the medial bicep region to near the wrist and the dorsal forearm over the ulnar, with suture material opposing the skin edges. The body exhibits generalized edema and the sclerae are jaundiced.

### External Examination:

This is the unembalmed body of an adult black male, weighing 212 pounds, having a length of 71", and an appearance that is consistent with the given age of 30 years. The body is cold to the touch and rigor mortis is barely discernible. Livor mortis is not visible. The soft tissues of the scalp, face and neck are moderately congested, with minor degrees of soft tissue edema. The curled black scalp hair is up to 3.0 cm in length, portions shaved away on the upper right side to accommodate the neurosurgical intervention.


## External Examination, continued:

The irides are brown and the pupils are fixed and dilated. The scleral surfaces exhibit a minor degree of jaundice and edema; whilst there is congestion, no petechiae are noted. The nose is in the midline and the nasal bone is intact. The ears are normally formed and set, with multiple earlobe piercings. A mustache and bears are worn. The majority of the teeth in the upper and lower gums have gold colored embellishments with clear stones. There is no visible trauma.

The neck is free of external trauma and other than the tracheostomy site which appears healthy, there are four discrete healing defects at the upper and lower margins, separated from the defect itself, and likely represent fixation points of the tracheostomy tubes.

The chest is unremarkable with a normal distribution of body hair, and a tattoo with an emblem that resembles the star of David.

A feeding tube is secured in the left upper quadrant of the abdomen. A tattooed depiction of a female's head and shoulders is on the left side of the abdomen and the letters "MOB" span the upper abdomen. There is no palpable organomegaly. The external genitalia are those of an adult male with descended testes. The back is unremarkable.

Fasciotomies performed on the right arm are described above. Edema is generalized, and injuries that are healing on the lower extremities are centered around the knee, and consist of irregularly shaped hyperpigmented, crusted and granulating skin abrasions separated by varying amounts of intervening uninvolved skin, and measuring 0.5-1.8 cm in greatest dimensions. Examination of the palmar surface of the right hand discloses a near circular granulating defect with hypopigmented margins, at the base of the 4th and 5th metacarpals, just distal to the crease of the wrist, and this is an elliptical defect, with a pink center and rim of skin devitalization and hypopigmentation, over an area measuring ¾" in greatest dimensions.

An x-ray discloses no radiopaque foreign body and no visible bony injury. Examination of the dorsal right hand opposite the defect on the palm, is a healed and crusted linear defect that likely represents a healed exit gunshot wound. Medical record review is undertaken.



## Internal Examination:

The body is opened with a Y-shaped incision and the organs of the thoracic and abdominal cavities are in their normal anatomic positions. There are no fluid collections, adhesions or injuries identified.

### Head:

The scalp is incised and reflected and directly beneath the defect on the upper scalp is a scalp hematoma and a circular burr hole in the upper right frontal bone, corresponding to neurosurgical intervention. The calvarium is otherwise intact as is the base of the skull. The brain weighs 1,460 grams and there are no epidural, subdural or subarachnoid hemorrhages. The leptomeninges do not demonstrate purulent exudate and no yellow/brown discoloration is noted. Sections through the brain demonstrate diffuse softening of the organ, involving the cerebral hemispheres as well as the cerebellum. Within the right ventricular system is a hematoma, comprising between 5-10 grams of blood as well as a small amount of liquid blood. Microscopic sections are procured. The basal ganglia bilaterally appear intact. As best can be ascertained, the cortical gray and subcortical white matter are unremarkable. Sections through the cerebellum exhibit marked softening of this structure. The brainstem exhibits softening.

### Neck:

The soft tissues of the anterior neck are congested but free of trauma. The laryngeal cartilages and the hyoid bone are intact and the thyroid gland is in its usual location. The airway is unobstructed. The thoracotomy site appears patent and healthy.

### Cardiovascular System:

The heart weighs 380 grams and is morphologically unremarkable. Its epicardial surface is intact with a physiologic amount of pericardial fluid accumulated. The coronary arteries, cardiac valves and myocardium are all within normal limits and show no preexisting antemortem pathology. The coronary arteries show no visible atherosclerotic disease. The aorta and its major branches are intact.


**Respiratory System:**

The right and left lungs weigh 870 grams each. The visceral pleural surfaces are smooth and glistening overlying congested pink and purple parenchyma. The airways and the pulmonary arteries are unobstructed. The cut surfaces of both lungs exhibit congestion and edema but no consolidations, neoplasms or cavitations.

**Hepatobiliary System:**

The liver weighs 1,920 grams and has an intact capsule overlying softened homogenous brown parenchyma. Steatosis, cirrhosis and neoplasms are not seen. The gallbladder is distended with bile.

**Gastrointestinal System:**

The esophagus is unobstructed and gastric content amounts to less than 10 mL of brown fluid, along with a few small tan colored solid food particles. The feeding tube is appropriately situated. The small and large intestines are unremarkable and the pancreatic parenchyma has the usual lobular architecture.

**Genitourinary System:**

The right and left kidneys weigh 310 and 290 grams, respectively. The capsules strip with ease from dark red-brown cortical surfaces. The renal vessels, collecting systems and ureters are normally formed with the ureters following their usual retroperitoneal courses to enter the bladder appropriately. The bladder is devoid of urine. The prostate gland and testes are unremarkable.

**Reticuloendothelial System:**

The spleen weighs 370 grams and has an intact capsule overlying dark red parenchyma. There are no enlarged lymph nodes.

**Endocrine System:**

The adrenal glands and thyroid gland appear unremarkable.



# MEDICAL EXAMINER

# DEKALB COUNTY

**Musculoskeletal System:**

No deformities are seen.

**Microscopic:**

Sections of hematoma from the cerebral ventricle show organization of the hematoma and focal of cerebral necrosis.

Kidney sections show amorphous brown pigment within the renal tubules.

Lung sections demonstrate acute and organizing bronchopneumonia.

Remaining sections examined show varying degrees of autolysis but are essentially within normal limits.

**Summary:**

I.  Excited delirium associated with cocaine use:

  A.  Reports of combative, disorganized behavior.

  B.  Apprehension by law enforcement, including use of "Taser" device multiple times.

  C.  Assault on law enforcement officer (bitten by decedent) in the course of apprehension.

  D.  Continued belligerent behavior after apprehension by law enforcement 9/13/2016.

  E.  Became unresponsive while being transported by EMS to Grady Hospital.

  F.  Earliest recorded body temperature upon arrival at the hospital of 103.1 °F (9/132016 @00:33 hrs.).

  G.  Urine drug screen indicative of cocaine use.

# MEDICAL EXAMINER



# DEKALB COUNTY

**Cause of Death:**

Delayed complications of cocaine associated excited delirium

**Other Significant Condition:**

Gunshot of the right hand

**Manner of Death:**

Accident

_____

Geoffrey Smith, M.D., M.E.

# EXHIBIT 17

| DeKalb County Police Department – Criminal Investigation Division | | |
|---|---|---|
| Case Note – Supplemental Form | | |
| Detective | Date | Case Number |
| Det. K. McQuilkin 2424 | 10/11/16 | 16-089200 |



I was notified of this incident by telephone while investigating another shooting victim at DNC Hillandale. The female officer advised that she and other officers encountered a male in this incident that was armed and acting erratically. She told me that the male dropped his weapon but a taser had to be used to get him into custody. When he got tased, he fell and bumped his head. She advised that he was being transported to the hospital and that they were going to have charges on the male.

| Di. K McQ11 2424 | NL 19/7 |
|---|---|
| Detective Signature – Badge # – Date | Reviewing Supervisor Signature – Badge # – Date |