IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHARON BOOKER *as executrix of* : 
*the estate of Corey Donegan and* : 
*next of friend of J.D., C.D., and C.T.,* : 
*minor children and surviving heirs* : 
*of Corey Donegan,* : 
  : 
     Plaintiff, : 
  :     CIVIL ACTION NO.
  :     1:18-CV-4297-LMM
v. : 
  : 
  : 
TIFFINY D. ANDERSON, TIMOTHY : 
J. LATTIMORE, CHARLES J. : 
LISTER, JUNIOR L. STEPHENS, : 
SAMUEL G. WOOLWINE, and : 
EDWARD PARKS, *individually*, : 
  : 
     Defendants. : 

## ORDER

This case comes before the Court on Defendant Edward Parks's Motion for Summary Judgment [105]; Defendants Tiffiny D. Anderson, Timothy J. Lattimore, Charles J. Lister, and Samuel G. Woolwine's Motion for Summary Judgment [106] and Motion to Strike Affidavit [120]; and Plaintiff Sharon Booker's Motion to Strike Deposition Testimony and Opposing Summary Judgment [116] and Motion to Strike Response [118]. After due consideration, the Court enters the following Order:

# I.  BACKGROUND

Plaintiff Sharon Booker alleges that Defendants, police officers in the DeKalb County and Lithonia Police Departments, killed her son, Corey Donegan, through their use of excessive force during his arrest. Dkt. No. [1]. Defendants have moved for summary judgment on all of Plaintiff's claims. Dkt. Nos. [105, 106]. They contend that Plaintiff lacks evidence from which a reasonable factfinder could conclude that the officers used excessive force during Mr. Donegan's arrest.

The events underlying Plaintiff's claims took place on September 12, 2016. Mr. Donegan, the decedent, first encountered Defendants at approximately 10:30 p.m. when Defendant Officer Tiffiny Anderson of the DeKalb County Police Department responded to a 9-1-1 call. However, Defendants have marshalled facts indicating that the encounter between Mr. Donegan and Defendants was shaped by Mr. Donegan's prior activity on the evening of September 12.

Defendants cite the DeKalb County Police Department Criminal Investigation Division Supplemental Report ("CID Report") to show that Mr. Donegan checked into a Lithonia hotel room with two women on September 12, 2016. Dkt. No. [106-15] (citing Dkt. No. [106-7] at 7). According to the CID Report, Mr. Donegan and the two women drank beer and consumed cocaine in the hotel room. Dkt. No. [106-7] at 8, 10. Evidence that Mr. Donegan consumed cocaine was supported by several facts, including that (1) detectives and crime-scene investigators discovered suspected cocaine when they searched the hotel

room, id. at 12, (2) both women told DeKalb County detectives that Mr. Donegan was using cocaine, id. at 12, 15, and (3) Mr. Donegan's urinary drug screen returned positive for cocaine when he later arrived at the hospital. Dkt. No. [108-2] at 13. Surveillance footage from the hotel showed Mr. Donegan and the two women leaving around 9:41 p.m., at which point Mr. Donegan twice fired a handgun into the ceiling. Dkt. No. [106-7] at 9.

The CID Report describes that Mr. Donegan and the two women got into a car and drove away from the hotel. Id. at 10.[1] Mr. Donegan sat in the back seat behind the driver with one woman driving and the other sitting in the passenger seat. Id. at 10, 12. Mr. Donegan attempted to jump out of the car several times and forced the driver to keep driving while he leaned out of the open door. Id. The driver stopped and insisted that she would not continue unless Mr. Donegan sat down in the car. Id. At some point after that, the women reported that Mr. Donegan shot the passenger, Ms. Johnson, and ran off. Id.

At 10:19 p.m., a caller in the area dialed 9-1-1 and reported that they heard a gunshot near Phillips Road and Phillips Lake Way. Dkt. No. [106-7] at 13. The caller reported that an African-American man wearing a white tank top and blue jeans was standing in the road and taking off his shoes. Id. A second caller reported seeing a man in the same area walking in circles in the road. Id.

---

[1] The DeKalb County detectives pieced together the events of the car ride from interviews with the two women, Sharonda Stewart and Charisma Johnson.

At around 10:30 p.m., Defendant Officer Tiffiny Anderson of the DeKalb County Police Department responded to the 9-1-1 calls. Dkt. No. [106-1] ¶ 4.[2] When she arrived, she saw Mr. Donegan wearing a blood-smeared tank top and blue jeans. Id. ¶ 5. He seemed disoriented and began to walk into oncoming traffic. Id. Officer Anderson told Mr. Donegan to stop, and he did so, raising his hands slightly but holding his elbows against his body. Id. Officer Anderson saw that Mr. Donegan was holding a gun in his armpit. Id. She drew her own gun on Mr. Donegan and commanded him several times to drop his gun, which he eventually did, slowly placing the weapon on the ground. Id. Officer Anderson then holstered her gun and drew her taser. Id.

Mr. Donegan fled into incoming traffic. Id. ¶ 6; Dkt. No. [1] ¶¶ 33–34. He ran down Laurel Post Drive into a nearby neighborhood. Once there, he approached a house and banged on the door. Dkt. No. [1] ¶¶ 35–39. The resident of the house, Sylverine Burrows a/k/a Sylverine Peacock, called 9-1-1 to report that Mr. Donegan was banging on her door. Id. ¶ 35. Officer Anderson submits that Mr. Donegan was banging against the door with his shoulder in an attempt to break into the house. Dkt. No. [106-1] ¶ 6.

Officer Anderson approached Mr. Donegan and ordered him to get down. Id. ¶ 7. Mr. Donegan stepped off the front porch but then turned to run across the

---

[2] The evidence from this point forward comes from the affidavits of the officers involved in Mr. Donegan's arrest. Plaintiff adamantly disputes their account, and the Court will review Plaintiff's arguments below.

front yard. Id. Officer Anderson reports that she saw a woman nearby walking toward her car and was afraid for that woman's safety. Id. She warned Mr. Donegan to stop or she would deploy her taser. Id. Mr. Donegan kept running. Id. Officer Anderson yelled, "Taser! Taser!" and deployed her taser. Id. The taser probes connected with Mr. Donegan's triceps, and he fell. Id. Officer Anderson states that Mr. Donegan fell sideways onto the lawn, id., but Plaintiff alleges that Mr. Donegan fell forward and that the right side of his head struck the pavement. Dkt. No. [1] ¶ 59.

Once Mr. Donegan fell, Officer Anderson ordered him to stay down and put his hands behind his back, but Mr. Donegan tried to stand up. Dkt. No. [106-1] ¶ 8. To force him to comply, Officer Anderson triggered a second taser charge. Id.

At this point, Defendant Officers Junior L. Stephens of the DeKalb County Police Department and Edward Parks of the Lithonia Police Department arrived on the scene. Dkt. No. [106-15] at 7. Officer Parks states by affidavit that Officer Anderson asked him to secure her patrol vehicle, which she had left unsecured near Laurel Post Drive and Giles Road when she pursued Mr. Donegan. Dkt. No. [106-14] ¶ 5. He searched for Officer Anderson's vehicle for a few minutes, failed to find it, and returned to help the other officers. Id. He heard another taser deployment as he was returning by foot along Laurel Post Drive. Id. ¶ 6.

While Officer Parks searched for Officer Anderson's vehicle, Officers Anderson and Stephens stayed with Mr. Donegan. They attempted but failed to handcuff Mr. Donegan due to his combativeness. Dkt. No. [106-1] ¶ 9. Officer

Lister of the DeKalb County Police Department states that when he arrived, he saw Officers Anderson and Stephens struggling to handcuff Mr. Donegan. Dkt. No. [106-3] ¶ 5. Officer Lattimore of the DeKalb County Police Department arrived at approximately 10:45 p.m. and observed Officers Anderson, Lister, and Stephens struggling to put Mr. Donegan into custody. Dkt. No. [106-2] ¶ 5. Because Mr. Donegan continued to struggle against the officers, holding his hands under his body to avoid being handcuffed, Officer Lattimore "drive stunned" Mr. Donegan with his taser. Id. Mr. Donegan continued to struggle, and after approximately 50 seconds, Officer Lattimore drive stunned Mr. Donegan again. Id. The officers recall that, at some point during the struggle, Mr. Donegan bit Officer Lister's hand and broke the skin. Dkt. No. [106-1] ¶ 11; [106-2] ¶ 6; [106-3] ¶ 7.

After the officers put Mr. Donegan in handcuffs, Officer Anderson called EMS. Dkt. No. [106-1] ¶ 12. American Medical Response of Georgia sent an ambulance, which arrived at 10:54 p.m., carrying EMTs Angela Washington and Chanelle Robinson. Dkt. No. [107-1].[3] EMT Robinson testified that Mr. Donegan was in handcuffs when she arrived, id. at 10, and that she saw no taser deployments after she arrived on the scene. Id. at 12. She observed what appeared to be "an old entrance wound from a bullet" on the palm of Mr. Donegan's hand. Id. at 18. Plaintiff does not argue that the officers were

---

[3] Plaintiff has moved to strike the testimony of EMT Robinson, and the Court discusses that motion below.

responsible for this wound, and the officers report that Mr. Donegan had the wound when they first encountered him.

She further testified that Mr. Donegan was "very erratic, very agitated," id. at 11, and that "[h]e was fighting us. He was yelling at us. He was trying to get away. He was kicking." Id. at 13. She also observed that he was sweating and breathing very rapidly. Id. at 14. Mr. Donegan's condition was such that EMT Robinson called an Advanced Life Support unit to the scene:

> And due to his mental status I felt that it was unsafe for him to go off on his own, to be let go. So I felt that he really needed to go to the ER to be evaluated. So I called the ALS unit because DeKalb County protocol tells us that in order to restrain a patient or if a patient is extremely combative, that we can chemically sedate them to calm them down.

Id. at 17. EMT Robinson, her partner, and three of the officers worked together to get Mr. Donegan onto a stretcher, and then EMT Robinson and her partner lifted the stretcher onto the ambulance. Id. at 21. After ALS arrived and checked Mr. Donegan, the EMTs rode with Mr. Donegan to Grady Hospital, arriving at 12:06 a.m.

When he arrived at Grady Hospital, Mr. Donegan went to the Emergency Room. Dkt. No. [108-2] at 3. His situation had rapidly deteriorated such that he was largely unresponsive. At his initial exam, the Grady doctors noted "no signs of trauma to the head," Dkt. No. [108-2], but a CT scan revealed that Mr. Donegan had suffered a "small" subarachnoid hemorrhage, which did not readily

explain his level of unresponsiveness, id. at 13. A urinary drug screen returned positive for cocaine. Id.

Doctors used an EVD drain to attempt to relieve the pressure of the hemorrhage, which involved drilling into Mr. Donegan's skull. Id. at 16. Doctors later performed a fasciotomy on Mr. Donegan's right arm to relieve swelling. Despite the efforts of the Grady staff, Mr. Donegan died in the hospital on October 8, 2016. Dkt. No. [108-1] at 10. The autopsy lists his cause of death as "Delayed Complications of Cocaine Associated Delirium" and "Gunshot of the Right Hand." Id.

Plaintiff's Complaint includes the following counts: Count I – Excessive Force under 42 U.S.C. § 1983 (Officer Anderson); Count II – Excessive Force under 42 U.S.C. § 1983 (Officer Lattimore); Count III – Excessive Force - Failure to Intervene under 42 U.S.C. § 1983 (Officers Lister, Stephens, Woolwine, and Parks); Count IV – Wrongful Death (All Defendants); Count V – Assault & Battery under Georgia law (Officers Anderson and Lattimore).

Defendants have moved for summary judgment on all claims through two motions—one filed by Officer Parks and the other filed by the remaining Defendants. Dkt. Nos. [105, 106]. The parties have also filed three motions to strike. Dkt. Nos. [116, 118, 120]. The Court will address the motions to strike and then will turn to the summary judgment motions.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

The Court recognizes that Plaintiff is proceeding *pro se*.[4] The court reads "the briefs of *pro se* parties liberally." Ebanks v. Samsung Telecomm. Am, LLP, 667 F. App'x 740, 741 (11th Cir. 2016) (per curiam) (unpublished) (citing Lorisome v. I.N.S., 129 F.3d 1441, 1444 n.3 (11th Cir. 1997)). Even so, Plaintiff must still "demonstrate that there is a genuine issue of material fact in order to escape summary judgment." Id. (citing Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990).

## III. MOTIONS TO STRIKE

### A. Plaintiff's Motion to Strike Chanelle Robinson's Deposition

Plaintiff has moved to strike from the record the deposition testimony of Chanelle Robinson, one of the EMTs who treated Mr. Donegan on the night of the arrest. Dkt. No. [116] at 16. Defendants have collectively responded opposing this Motion to Strike. Dkt. No. [122].

Plaintiff disagrees with many statements in Ms. Robinson's testimony, and she points out what she believes to be inconsistencies. For example, Plaintiff

---

4 Plaintiff's counsel filed a motion to withdraw from the case on June 18, 2019. Dkt. No. [45].

points out that Ms. Robinson testified that she saw no tasering or excessive force but that she was familiar with the picture of the taser prong embedded in Mr. Donegan's arm. Dkt. No. [116] at 7. Plaintiff likewise argues that Ms. Robinson was not telling the truth when she said that only she and her partner were inside the ambulance with Mr. Donegan because there is a picture of a black gloved hand holding Mr. Donegan's hand inside the ambulance. Id. at 8. Plaintiff excerpts similar facts to contest the general reliability of Ms. Robinson's testimony:

> Chanelle Robinson appears to be bias and evasive in her deposition testimony, she has distorted pertain facts of this case by not being truthful, in her mental and physical assessments of the plaintiff's conditions, including the real causes of injuries, that she observed, while treating the plaintiff on scene, that night. She appears to specific about the plaintiff's actions, on that night, but, vague and can't recall, when it comes to the Officers action and behavior on that night.

Id. at 9 (quoted verbatim).

Plaintiff's disagreements with Ms. Robinson's testimony do not provide a legal basis to strike it from the record. Plaintiff was present at the deposition of Ms. Robinson and cross-examined her. Dkt. No. [107-1]. Plaintiff had an opportunity to expose any inconsistencies and biases in Ms. Robinson's testimony. Further, the Court does not find that Ms. Robinson's testimony is so manifestly biased or evasive that it should be stricken from the record. Rather, Ms. Robinson testified based on her personal knowledge of the events on the night of the arrest. Accordingly, Plaintiff's Motion to Strike [116] is **DENIED**.

### B. Plaintiff's Motion to Strike her Response

Plaintiff has also filed a motion in which she asks that the Court strike several of her own filings. Dkt. No. [118]. The relief Plaintiff requests in this Motion is **GRANTED in part** and **DENIED in part**:

As Plaintiff requests, the Court will disregard the following docket entries: [117], [117-1], and [117-3].[5] The Court **CONSTRUES** docket entry [116] as Plaintiff's Brief in Opposition to Summary Judgment and Reply Brief, and docket entry [117-2] as her Response Brief. Plaintiff additionally requests that the Court construe docket entry [81] as her "brief opposing summary judgment," but the Court refuses to do so because the Court is already allowing Plaintiff two opposition briefs—a Brief in Opposition to Summary Judgment [116] and a Response Brief [117-2]. Together, the three briefs would amount to over 130 pages of briefing, which is excessive even for a pro se Plaintiff. See LR 7.1(D), N.D. Ga ("Absent prior permission of the Court, briefs in support of a motion are limited in length to twenty-five (25) pages."). In any event, the Court has reviewed docket entry [81] and finds that it does not affect the outcome of the motions addressed in this Order. The substantive arguments and case law in docket entry [81] have been incorporated into the most recent round of briefing.

---

[5] Plaintiff says that she moves "to strike plaintiff's [Doc. 17], and [Doc. 17-1], and [Doc. 17-3]." The Court reads these as referring to docket entries [117], [117-1], and [117-3]. Likewise, when Plaintiff says she wants [Doc. 17-2] and [Doc. 16] to be considered, the Court understands her as referring to docket entries [117-2] and [116]. The earlier docket entries are not relevant to the motions for summary judgment.

### C.  Defendants' Motion to Strike Plaintiff's Affidavit

Defendants move to strike Plaintiff's Revised Renewed Affidavit and Findings of Fact in Regards to Discovery and Objections Thereto. Dkt. No. [120] (moving to strike Dkt. No. [115]). Defendants argue that Plaintiff's affidavit does not comply with the personal knowledge requirement and that it contains mostly argument concerning the weight and validity of Defendants' evidence. Dkt. No. [120-1]. Defendants also argue that, if the Court views docket entry [115] as Plaintiff's statement of material facts, the Court should not consider any facts unsupported by a citation to record evidence. Id. at 7 (citing LR 56.1(B)(2), N.D. Ga.).

The Court **DENIES** Defendants' Motion to Strike [120]. It is clear to the Court that Plaintiff intends to use docket entry [115] as her statement of material facts in opposition to Defendants' motions for summary judgment. Accordingly, the Court will not view the filing as an affidavit that requires Plaintiff's personal knowledge. On the other hand, the Court will not accept as a material fact any statement of Plaintiff's in the "affidavit" that does not cite to record evidence. The Court will treat the filing as a statement of material facts and rely on it only to the extent it cites "evidence to contradict [Defendants'] material facts." Penley v. Eslinger, 605 F.3d 843, 853 (11th Cir. 2010)

### IV.  MOTIONS FOR SUMMARY JUDGMENT

Two motions for summary judgment are before the court: that of Officer Parks, Dkt. No. [105], and that of Officers Anderson, Lattimore, Lister, and

Woolwine, Dkt. No. [106]. The officers argue that Plaintiff's § 1983 and Georgia law claims fail because, among other reasons, there was no constitutional violation during Mr. Donegan's arrest. The officers argue that they used a constitutionally reasonable level of force to subdue Mr. Donegan.

Whether the officers are correct depends in part on whether their rendition of the facts is properly disputed. See Penley, 605 F.3d at 848 ("When a district court considers the record in [the light most favorable to the party asserting the injury], it eliminates all issues of fact. By approaching the record in this way, the court has the plaintiff's best case before it." (quoting Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005)). Plaintiff disagrees with the officers' story for four key reasons: First, Plaintiff argues that the taser logs show that the arresting officers tasered Mr. Donegan *after* he was already in handcuffs. Second, Plaintiff argues that the arresting officers tasered Mr. Donegan five times, instead of four. Third, Plaintiff argues that Mr. Donegan sustained a head injury and lacerations to his arms because the officers allegedly beat and dragged him. And fourth, Plaintiff contends that Mr. Donegan sustained these injuries while behaving in a manner that was passive and compliant.

The Court begins by examining whether Plaintiff can point to record evidence supporting each of these contentions. See Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[T]he non-moving party must produce substantial evidence in order to defeat a motion for summary judgment."). If she can, the Court must grant Plaintiff the reasonable inferences to be drawn from

that evidence. See Penley, 605 F.3d at 848 ("In determining the relevant set of facts at the summary judgment stage, we must view all evidence and make any 'reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party.'" (quoting Rine v. Imagitas, Inc., 590 F.3d 1215, 1222 (11th Cir. 2009)). But if Plaintiff cites no record evidence, the Court cannot rely on Plaintiff's speculations and arguments. See Kernel Records Oy v. Mosley, 694 F.3d 1294, 1301 (11th Cir. 2012) ("[I]nferences based upon speculation are not reasonable."). After the Court has isolated the genuine disputes of material fact, the Court then turns to the merits of the officers' summary judgment motions. See Penley, 605 F.3d at 848–49 ("At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [the officer's] actions . . . is a pure question of law.") (citation and alteration omitted).

## A. Disputed Facts

### 1. Timing of Taser Deployments

The parties disagree about when the officers deployed their tasers. As discussed, the officers contend that they only used their tasers to subdue Mr. Donegan before placing handcuffs on him. Plaintiff argues that the officers deployed their tasers after Mr. Donegan was already in handcuffs. See, e.g., Dkt. No. [116] at 18, 23, 43. Plaintiff reaches this conclusion by cross-referencing the tasers' internal time-logs with the AMR report generated by EMT Robinson and

her partner. The AMR Patient Care Report and EMT Robinson's testimony indicate that the ambulance arrived on scene at 10:54:49 p.m. Dkt. No. [117-7] at 45. When the EMTs arrived, they saw that Mr. Donegan was sitting on the grass in handcuffs. Id. The taser time-logs suggest that there were at least two taser deployments after that. See Dkt. No. [117-5] at 15. If the times recorded in the taser log are correct, the events transpired in the following order:

10:34:24 – Officer Anderson triggered her taser for five seconds.

10:51:12 – Officer Lattimore triggered his taser for five seconds.

10:52:03 – Officer Lattimore triggered his taser for five seconds.

10:54 p.m. – The ambulance with the two EMTs arrived at the scene of the arrest. Mr. Donegan was in handcuffs.

11:02:44 p.m. – Officer Anderson deployed her taser for five seconds.

11:03:02 p.m. – Officer Anderson deployed her taser for five seconds.

Id. Plaintiff also points to a report by Lieutenant Lavigne of the DeKalb County Police Department Criminal Investigation Division ("CID") listing the logged times according to the taser time-logs. Dkt. No. [117-7]. This report summarizes the relevant events from the time-logs and so corroborates them. Id.

If the taser time-log is correct without any modifications, Officer Anderson deployed her taser twice between eight and ten minutes after the ambulance

arrived. Plaintiff infers from this that Officer Anderson must have triggered her taser while Mr. Donegan was in handcuffs. Dkt. No. [116] at 18, 23, 43.[6]

Defendants argue that this sequence of events is incorrect. They argue that the taser logs Plaintiff cites are inaccurate because of "clock drift." See Dkt. Nos. [106-5, 106-6]. This is a process by which the internal clocks of the tasers fall out of synch with other clocks over time.

Defendants' witnesses point to time-log entries on both Officer Anderson and Officer Lattimore's tasers to show that the internal clocks on the devices were corrected after the night of Mr. Donegan's arrest.[7] Officer Anderson's taser log reflects that her taser was synchronized on September 14, 2016, two days after the arrest, at which time it was adjusted from 3:11:08 p.m. EDT to 14:49:19 EDT. Dkt. No. [106-5] at 15. This adjustment indicates that the clock in Officer Anderson's taser was running 21 minutes and 49 seconds fast. Likewise, Officer Lattimore's taser was synchronized to correct its clock drift on September 19,

---

[6] At some points in her briefing, Plaintiff argues that Mr. Donegan was tasered three or four times while handcuffed. See Dkt. No. [116] at 25 ("[P]laintiff was [] tased while handcuffed for the 3rd, 4th and 5th time according to taser records . . . ."); 39 ("[T]hey blatantly disregarded the plaintiff rights, by subjecting him to 5 tasing, 4 while handcuffed . . . ."). However, Plaintiff's only evidence for this contention is that the CAD detail report lists Plaintiff as being in custody at 10:45 p.m. Dkt. No. [117-7] at 11. However, dispatch was not the scene and could not directly witness whether Mr. Donegan was in handcuffs, as EMT Robinson could. This detail does not create a genuine issue of material fact, and the Court will consider only two post-handcuff taserings.

[7] Plaintiff objects to these witnesses' testimony. Dkt. No. [117-2]. The Court declines to address Plaintiff's objections because the Court relies on the timeline Plaintiff has advocated. This renders any objection to the testimony moot.

2016, at which time it was adjusted from 2:02:33 p.m. EDT to 1:57:37 p.m. EDT. Dkt. No. [105-6] at 19. This adjustment indicates that the clock in Officer Lattimore's taser was running 4 minutes and 56 seconds fast.

With the adjusted times on the officers' tasers, Defendants contend that the events transpired as follows:

10:12:35 p.m. – Officer Anderson conducted a spark test.

10:30 p.m. – Officer Anderson responded to the 9-1-1 call.

10:40:55 p.m. – Officer Anderson triggered her taser for the first time.

10:41:13 p.m. – Officer Anderson triggered her taser for the second time.

10:46 p.m. – The EMTs received Officer Anderson's call.

10:46:16 p.m. – Officer Lattimore triggered his taser for the first time.

10:47:07 p.m. – Officer Lattimore triggered his taser for the second time.

10:54 p.m. – The EMTs arrived on scene in an ambulance.

This sequence of events would be consistent with the testimony of the officers and EMT Robinson who each testified that no taser was used after Mr. Donegan was placed into handcuffs.

However, Plaintiff is entitled to all reasonable inferences that may be drawn from the record evidence. A reasonable factfinder could infer based on the taser time-logs that the tasers were deployed in the sequence that Plaintiff contends. The Court finds that this is a disputed issue and will therefore view the taser timing as favorably to Plaintiff as the facts allow. In that light, Plaintiff has

supported her assertion the officers deployed their tasers twice before Mr.

Donegan was in handcuffs and twice after.[8]

### 2. *Mr. Donegan's Injuries*

Plaintiff argues that Mr. Donegan sustained more extensive injuries than

the officers admit, which she argues would support her argument of excessive

force used in his arrest. She claims that he sustained a head injury as well as

lacerations on his arms:

> Plaintiff Corey Donegan received several severe injuries by officers
> that ultimately led to his death, on scene injuries was so severe that
> on scene supervisor sgt. A. Brown was unable to identify plaintiff due
> to unconsciousness, received a 7 inch as well a 10 inch lacerations, to
> the same right arm that rendered him paralyzed, as well as blunt force
> trauma to the head, according to grady hospital reports.

Dkt. No. [116] at 18 (quoted verbatim). These injuries, Plaintiff claims, Mr.

Donegan suffered when the officers "beat and dragged him."

While the evidence indicates that Plaintiff suffered these injuries at some

point, Plaintiff has presented no evidence that the officers caused them through

the use of excessive force. Mr. Donegan was diagnosed with subarachnoid

---

[8] That said, the Court will not rely on Plaintiff's argument that Mr. Donegan was
tasered five times instead of four. Defendants acknowledge that the taser time-log
shows a fifth deployment—at 10:12:35 p.m. according to their timeline—but they
argue that this was Officer Anderson's "spark test" conducted while she was still
in the police station. Dkt. No. [123] at 5; see also Dkt. No. [106-1] ¶ 3 (Officer
Anderson). But even if the time-log is accurate and taser was triggered later,
Plaintiff presents no evidence whatsoever showing that the taser struck Mr.
Donegan. Brier v. De Cay, 719 F. App'x 1001, 1002 (11th Cir. 2018) ("A mere
scintilla of evidence in the form of conclusory allegations, legal conclusions,
evidence that is merely colorable or not significantly probative of a disputed fact
cannot satisfy a party's burden.").

hemorrhage (brain bleeding) when he arrived at Grady Hospital. See Dkt. No. [117-5] at 59 (surgeon's notes from night after arrest noting "positive head trauma" and "[s]ubarachnoid hemorrhage"); Dkt. No. [117-6] at 34 (medical notes of unclear origin noting "CT head with small SAH which does not readily explain patient's GCS of 3"); id. at 36 (detective's notes observing "[i]njury to the top of his head in the form of a small lump that caused brain swelling").

But it is far from clear what caused this injury. EMT Robinson found no apparent injuries to Mr. Donegan's head when she conducted a head-to-toe exam at the scene of the arrest. Dkt. No. [107-1] at 25. Likewise, when Mr. Donegan was admitted to the hospital, he had no external signs of head trauma. Dkt. No. [108-2]. Mr. Donegan's CT scan showed small subarachnoid hemorrhage without herniation, but his treating physician noted that the injury did not explain his Glasgow Coma Scale (GCS) score of 3.

Plaintiff argues that the officers beat Mr. Donegan, which could theoretically have created the hemorrhage, but there is no evidence that they did so. Each of the officers has stated that they did not strike Mr. Donegan or see anyone strike him, Dkt. Nos. [106-1] ¶ 17; [106-2] ¶ 14; [106-3] ¶ 13; [106-4] ¶ 12, and EMT Robinson testified in her deposition that she saw no one strike him. Dkt. No. [107-1] at 25. Plaintiff cites no direct evidence to the contrary.

Nor does the head injury by itself prove that the officers beat Mr. Donegan. The undisputed evidence reflects that he had suffered at least some physical trauma—including a gunshot wound, obvious bleeding, and a self-reported

robbery—before the officers encountered him. Plaintiff can only speculate that Mr. Donegan sustained his injury during his altercation with the police, and speculation cannot sustain Plaintiff's burden at summary judgment. Without *some* evidence tying Mr. Donegan's head injury to a police beating, the Court cannot assume that fact in Plaintiff's favor.[9]

The same is true of the lacerations on Mr. Donegan's arms. It is undisputed that Mr. Donegan sustained scrapes to his arms at some point before or during his arrest. See, e.g., Dkt. No. [107-1] at 85 (photo depicting scrape on Mr. Donegan's right arm). The officers told EMT Robinson upon her arrival that "all the blood and road rash on his body was there prior to their arrival." Id. at 12. However, no evidence ties the officers to these injuries.

Because she references the autopsy photos, Plaintiff may be referring to separate injuries, which are far more extensive than those indicated by the on-scene pictures. While Plaintiff seeks to attribute these to the arresting officers, Mr. Donegan's records from Grady Hospital indicate that he "underwent decompressive fasciotomy of the R forearm & R upper arm [with] debridement of nonviable ischemic muscle . . . ," Dkt. No. [108-2] at 16. See also id. at 40 ("14 Days Post-OpProcedure(s) (LRB): DEBRIDEMENT; SKIN, SUBCUTANEOUS

---

[9] Plaintiff originally alleged that Mr. Donegan sustained this head injury when Officer Anderson tasered him and he "lost control of his muscle function and fell face first onto the pavement. He could not break his fall and the right side of his head struck the pavement." Dkt. No. [1] ¶ 59. She has not raised this theory at the summary judgment stage.

TISSUE, AND MUSCLE OR BONE (Right)"); Dkt. No. [108-1] at 11 (autopsy describing "fasciotomies on the right lateral upper arm, inner right arm extending from the medial bicep region to near the wrist and the dorsal forearm over the ulnar, with suture material opposing the skin edges"). Plaintiff has not presented evidence that these extensive lesions were caused by the arresting officers, rather than the fasciotomy designed to relieve swelling in Mr. Donegan's arm.

Accordingly, the Court finds no evidence that the officers beat and dragged Mr. Donegan as Plaintiff contends. Rather, the record indicates that the officers were responsible for four taser shocks against Mr. Donegan.

### 3. Mr. Donegan's Level of Compliance

The parties also disagree about how Mr. Donegan was behaving during his arrest. Each of the officers, as well as EMT Robinson, reported that Mr. Donegan was violently resisting arrest, even after he was placed in handcuffs. Dkt. No. [106-1] (Officer Anderson) ¶¶ 13–14 ("He continued to struggle and he kept jumping up off the stretcher. . . . Once the subject was strapped to the stretcher and inside the ambulance, he continued trying to get out . . . ."); Dkt. No. [106-2] (Officer Lattimore) ¶¶ 9–10 (same); Dkt. No. [106-3] (Officer Lister) ¶ 8 ("About 30 seconds to a minute after the subject bit me, we were able to get the subject hand-cuffed. He continued acting belligerent and irate, and he was cursing."). EMT Robinson testified that, even in handcuffs, Mr. Donegan was difficult to control. See Dkt. No. [107-1] at 13 ("He was fighting us. He was yelling at us. He

22

was trying to get away. He was kicking."); 14 ("When we were attempting to put him on the stretcher to get him to the hospital to be assessed, he was refusing to go. He was kind of agitated, trying to get off the stretcher. Just kind of wiggling around a lot, trying to fight us off of him."); 15 ("He was yelling. He was agitated. He kept repeating 'I was robbed.' He was trying to get off of the stretcher.").

EMT Robinson called an Advanced Life Support unit "because DeKalb County protocol tells us that in order to restrain a patient or if a patient is extremely combative, that we can chemically sedate them to calm them down." Id. at 17. In fact, documentary and photographic evidence indicate that Mr. Donegan bit Officer Lister. Dkt. No. [107-1] at 90. He also attempted to bite Officer Lattimore once he was in handcuffs. Dkt. No. [106-2] ¶ 9.

Plaintiff argues that Mr. Donegan was physically subdued and compliant. For support, she points to the on-scene photos of Mr. Donegan. She argues that these photographs show Mr. Donegan "under control, face down, handcuffed at all time behind his back as well sitting up on the lawn handcuffed behind his back, and in the ambulance handcuffed to the stretcher unconscious." Dkt. No. [116] at 22. However, the Court does not find that these photos contradict the testimony of the officers and EMT Robinson or create a genuine issue of fact on Mr. Donegan's combativeness. The photographs show Mr. Donegan in handcuffs—and, once he was on the stretcher, in restraints—but they do not show the arrest in real time. There is no dispute that, at some point, the officers

physically controlled Mr. Donegan. The question is whether they used a reasonable level of force to do so, and the photographs do not suggest otherwise.

### B. Motions for Summary Judgment

Officers Anderson, Lattimore, Lister, Woolwine, and Parks have moved for summary judgment on all of Plaintiff's claims. Dkt. Nos. [105, 106]. They contest Plaintiff's version of events. However, they argue that even if the time-logs are accurate without synchronization, and Mr. Donegan was tasered in handcuffs, that level of force was justified. They invoke qualified immunity on that basis.

"'Qualified immunity protects government officials performing discretionary functions . . . from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Jacoby v. Baldwin County, 835 F.3d 1338, 1343–44 (11th Cir. 2016) (quoting Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996)). "[T]he official must have been engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Once an official has shown that they were exercising a discretionary function, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." Holloman, 370 F.3d at 1264. To carry this burden, a plaintiff must show that the defendant violated a constitutional right that was clearly established at the time of the alleged violation. Id. (citing Wilson v. Layne, 526 U.S. 603, 609 (1999)).

The parties do not dispute that the Defendant Officers were performing discretionary functions when they took the relevant actions. Dkt. No. [116] at 19. The Court therefore addresses Plaintiff's § 1983 claim to determine whether the evidence supports a constitutional rights violation. Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) ("One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." (citing Hope v. Pelzer, 536 U.S. 730, 736 (2002))).

### 1. *Officer Anderson and Lattimore*

Plaintiff alleges that Officers Anderson and Lattimore used excessive force against Mr. Donegan during his arrest. As previously discussed, the Court finds no record evidence from which to conclude that Officers Anderson and Lattimore beat and dragged Mr. Donegan as Plaintiff alleges. However, the Court finds that a reasonable jury could find that Officer Anderson, at least, tasered Mr. Donegan twice while he was handcuffed. Dkt. No. [116] at 18, 23. Officer Anderson contests this account on the facts and argues that she only tasered Mr. Donegan before he was handcuffed. However, Officers Anderson and Lattimore argue that, even if they had tasered Mr. Donegan while he was in handcuffs, that use of force would have been reasonable because Mr. Donegan was being violent and combative against the officers. Dkt. No. [123] at 9.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Draper v. Reynolds, 369 F.3d 1270, 1277 (11th Cir. 2004)

(citations omitted). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest [] necessarily carries with it the right to use some degree of physical coercion [] to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). However, the only permissible force is that which "a reasonable officer would believe . . . is necessary in the situation at hand." Penley, 605 F.3d at 849 (citations omitted). This "objective reasonableness" standard requires courts to "carefully balance . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 850 (quoting Graham, 490 U.S. at 396).

In conducting this balance, the Court must view officers' conduct "on a case-by case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Id. (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993)). The Supreme Court has held that courts must consider "the facts and circumstances . . . including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

The Court holds that Officers Anderson and Lattimore's use of force was reasonable. The factors of "crime at issue," "threat to safety," and resisting/evading arrest each support the use of force. Officer Anderson responded to a call of shots fired in a public intersection. Dkt. No. [106-1] ¶ 4. When she got there, she saw Mr. Donegan in a "blood smeared tank top and blue

jeans." Id. ¶ 5. From the outset, a reasonable officer in Officer Anderson's shoes would have been on notice of a potential violent crime. Mr. Donegan then fled into oncoming traffic, ran into a neighborhood, and apparently tried to break through the door of the house at 6316 Laurel Post Drive. See id. ¶ 6 ("He stopped at 6316 Laurel Post Drive and attempted to break into the residence by banging against the door with his right shoulder with his right hand on the doorknob[.]"); Dkt. No. [106-10] at 3 ("Somebody's banging front door [sic]. They're trying to break in. Trust me."). Officer Anderson ordered Mr. Donegan down, but he turned and fled across the lawn—one of several acts of obstruction. See Long v. State, 261 Ga. App. 478, 583 (2003) ("A person commits the offense of obstruction of a law enforcement officer when he knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties.").

As previously discussed, the testimony of all officers present, as well as EMT Robinson, indicates that Mr. Donegan was violently resisting arrest by kicking, spitting, biting, and cursing. He bit officer Lister's hand. He laid on top of his hands to prevent the officers from handcuffing him and continued to struggle once the officers had handcuffed him. Even when the officers and EMTs loaded him onto the stretcher, Mr. Donegan continued to struggle against them. He attempted to jump off the stretcher and to bite Officer Lattimore. His state

was such that EMT Robinson called an Advanced Life Support unit in case he needed to be sedated.[10]

Where, as here, an arrestee is violently resisting arrest, Eleventh Circuit law supports the use of repeated tasering to force the arrestee's compliance. See Barfield v. Rambosk, 641 F. App'x 845, 848 (11th Cir. 2015) (per curiam) (unpublished) ("The force [officers] used against a non-compliant suspect who was resisting arrest and disobeying commands—several uses of the taser and five blows to the upper body—were not excessive under the circumstances."); Hoyt v. Cooks, 672 F.3d 972, 979 (11th Cir. 2012) (finding force reasonable when a defendant "resisted during the entire time that [the officers] tried to handcuff him" and "[e]ven after repeatedly using their Tasers, [the officers] had considerable difficulty in effecting the arrest"); Floyd v. Corder, 426 F. App'x 790, 792 (11th Cir. 2011) (per curiam) (unpublished) (approving three taserings when the plaintiff was behaving erratically and resisting arrest); Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009) (holding use of force reasonable where officers tasered suspect three times when suspect "actively resisted the deputies' efforts at effectuating a lawful arrest . . . [and her] behavior was violent, aggressive and prolonged").

---

[10] Mr. Donegan's consultation notes from October 6, 2016 show that he was 6'2" tall and 180 lbs after 24 days of hospitalization. Dkt. No. [108-2] at 23. This suggests that he was fairly large and would not have been easy to physically subdue.

The only evidence of tasering after Mr. Donegan was placed in handcuffs comes from the taser time-log of Officer Anderson's taser. There is no evidence countering the evidence of Mr. Donegan's resistance. The Court therefore finds that the record evidence shows that Officer Lattimore only used his taser to force Mr. Donegan to comply before Mr. Donegan was handcuffed. Accordingly, Officer Lattimore's use of force was reasonable under the Eleventh Circuit cases cited here. Officer Lattimore used his taser to subdue a combative arrestee who had already assaulted an officer.

The Eleventh Circuit has also held the use of a taser against a handcuffed arrestee to be a reasonable use of force when the arrestee remains physically aggressive after being placed in handcuffs. Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008) (finding that officers' use of a taser against a handcuffed arrestee was reasonable when the arrestee spat blood at the officers). The officers' interest here was even stronger than that of the Zivojinovich officers, given Mr. Donegan's physically aggressive resistance. See also Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1356 (11th Cir. 2015) ("[F]orce applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive.").

These cases support Officer Anderson's use of force, even if she tasered Mr. Donegan twice while was in handcuffs. From the perspective of a reasonable officer, Mr. Donegan had fled from police after discharging a firearm in the middle of an intersection, attempting to break into a house in a residential

neighborhood, and biting a police officer who was attempting to handcuff him. His continued combativeness after being placed in handcuffs and his resistance to restraint made it reasonable for Officer Anderson to use her taser to subdue him.

Accordingly, the Court finds that Plaintiff has failed to show that Officer Anderson or Officer Lattimore used excessive force during Mr. Donegan's arrest. Defendants' motions for summary judgment are **GRANTED** as to Plaintiff's § 1983 excessive force claims (Counts I and II).[11]

### 2. *Failure to Intervene Defendants*

Plaintiff has sued Officers Lister, Woolwine, and Parks for failure to intervene. Since the Court finds that Officers Anderson and Lattimore's use of force was reasonable, Plaintiff's failure-to-intervene claims against Officers Lister Woolwine, and Parks must also fail. See Mobley, 783 F.3d at 1357 ("[A] police officer has no duty to intervene in another officer's use of force when that use of force is not excessive."); Crenshaw, 556 F.3d at 1294 (same). Accordingly, Defendants' motions for summary judgment are **GRANTED** as to Plaintiff's § 1983 failure-to-intervene claim (Count III).

---

[11] Because the Court finds no § 1983 violation, the Court need not address whether clearly established precedent put the officers on notice of a violation. Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009).

### 3. State Law Claims for Wrongful Death and Assault/Battery

Defendants invoke their official immunity against Plaintiff's claims for wrongful death and assault and battery under Georgia law. See Dkt. No. [105-1] at 16; Dkt. No. [106-15] at 15. In Georgia, the "doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity." Cameron v. Lang, 274 Ga. 122, 123 (2001). "Qualified immunity 'protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without willfulness, malice, or corruption.'" Id. (citing Teston v. Collins, 217 Ga. App. 829, 830 (1995)). "Actual malice, in the context of official immunity, means a deliberate intention to commit a wrongful or illegal act." Tittle v. Corso, 256 Ga. App. 859, 862 (2002). Defendants argue that Plaintiff's Georgia law claims fail because she has not produced evidence showing that they acted with actual malice.

The Court agrees with Defendants. As discussed, Defendants were acting in a discretionary role when they arrested Mr. Donegan. The undisputed evidence reflects that the officers used force that was objectively reasonable to subdue Mr. Donegan, prevent injury to themselves, and effect the arrest. Evidence of malice and intent to injure are absent from the record. On these facts, Defendants are entitled to official immunity under Georgia law. See Wells v. Talton, 695 F. App'x 439, 447 (11th Cir. 2017) (per curiam) (unpublished) (applying Georgia law official immunity to wrongful death claim when plaintiff failed to present

evidence creating genuine issue as to whether officer "acted with actual malice or with actual intent to cause injury"). Accordingly, Defendants' motions for summary judgment are **GRANTED** as to Plaintiff's wrongful death and assault and battery claims (Counts IV and V).

## V. CONCLUSION

Based upon the foregoing, Defendants Tiffiny Anderson, Timothy Lattimore, Charles Lister, Samuel Woolwine, and Edward Parks's Motions for Summary Judgment [105, 106] are **GRANTED**.

Plaintiff Sharon Booker's Motion to Strike Chanelle Robinson's Testimony [116] is **DENIED**. Plaintiff's Motion to Strike Response [118] is **GRANTED in part** and **DENIED in part**. The Court will not strike the briefs from the record, but the Court will construe the briefs as Plaintiff requests. Defendants' Motion to Strike [120] is **DENIED**. The Clerk is directed to **CLOSE** this case.

**IT IS SO ORDERED** this 26th day of October, 2020.

_____
**Leigh Martin May**
**United States District Judge**